UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHEA DEVELOPMENT CORP., BRAVERA,
INC., and IP HOLDING OF NEVADA CORP.

         Plaintiffs,      Case Number: 07 CV 11201  (DLC)

    -against-

                 **AFFIDAVIT OF**
                 **ELIZABETH ANNE CONLEY**

CHRISTOPHER WATSON and
ELIZABETH ANNE CONLEY

         Defendants

---

STATE OF SOUTH CAROLINA   )
               )ss.:
COUNTY OF CHARLESTON    )

    Elizabeth Anne Conley, being duly sworn, deposes and says:

1.   I am a Defendant in the within-captioned action.

2.   I make the within representations bases on my personal knowledge, except as to those matters alleged upon information and belief, and as to them, I believe them to be true.

3.   I am a resident of South Carolina.

4.   Upon information and belief, none of the Plaintiffs reside in New York, maintain offices in New York, nor are registered to do business in New York.

### Employment with Plaintiff

5.   I was hired by Bravera Inc. (hereinafter "Bravera-Watson" or the "Company") on or about December 11, 2006, as a sales representative.

6.   At all relevant times, I worked at the Company offices in Charleston, South Carolina.

7.   Bravera-Watson sells proprietary computer software.

8.   In March, 2007, I was promoted to Vice-President of Sales of Bravera-Watson, although my duties and responsibilities did not change.

9.   In my capacity as Vice President of Sales, I had no managerial responsibility and supervised no employees.

10.   In my capacity as Sales Representative, and later as Vice President of Sales, I solicited sales of software product to the private sector market, and sold Company product nationwide.

11.   Bravera-Watson had six salespeople. Each salesperson was responsible for his or her own sales. Each salesperson (including President Christopher Watson; hereinafter, "Watson") had a license to use the Company SalesForce.com software, and prospected their own clients.

12.   Sometime in the spring of 2007, I renewed the lapsed general Company license for the SalesForce.com software, which resulted in my name being listed as "systems administrator". Upon information and belief, this resulted in all information entered prior to the renewal to be listed under my name, even though most of the entries had been entered by other sales representatives, and were not mine.

13.   Upon information and belief, several current or former employees of Bravera-Watson and/or Bravera-Shea, who have key information concerning the input of information into the Salesforce.com software, reside in South Carolina, and will likely be called as witnesses in this action.

## The Relevant Contracts

14.   On or about June 26, 2007, I executed an Employment Agreement with Bravera for the position of Vice-President of Strategic Accounts, which I signed and submitted to Watson's assistant in Charleston, South Carolina (hereinafter, the "Employment Agreement"). A true and complete copy of the Employment Agreement is attached as Exhibit A. This agreement was drafted and presented to me for execution by the Plaintiffs.

15.   The Employment Agreement has an arbitration clause requiring all disputes to be submitted to arbitration in "Orlando, Florida or such other location as the parties may mutually agree". (*See* Exh. A, unnumbered page preceding signature page.)

16.   Upon information and belief, on or about July 16, 2007, Bravera-Watson was acquired by Shea Development Corp. (hereinafter, "Shea" or "Bravera-Shea"), pursuant to an Agreement or Plan of Merger (hereinafter, the "Acquisition Agreement") and a "Software License and Asset Purchase Agreement (hereinafter, the "Asset Purchase Agreement"). Relevant pages from the Acquisition Agreement and Asset Purchase Agreement (sometimes referred to

2

collectively hereinafter as the "Merger Documents") are attached as Exhibits B and C, respectively.

17.    I did not participate in any of the merger or due diligence discussions in this merger, nor did I prepare any of the final documents submitted as part of the due diligence or merger, nor did I have any input into the preparation of these documents.

18.    I did not participate in negotiating the Merger Documents.

19.    I was neither a party, nor a signatory, to the Merger Documents.

20.    Indeed, I did not even see the Merger Documents, including the Acquisition Agreement, until after Bravera-Shea terminated my employment in October 2007. Thus, prior to my termination, I had no knowledge of any forum selection clause in the Merger Documents, I was not informed of a New York forum selection clause, and never agreed to the forum selection clause in the Acquisition Agreement.

21.    I never had, nor do I have now, any ownership interest in either Bravera-Watson or Bravera-Shea, and as the Merger Documents indicate, I am not a beneficiary of, or a party to, the merger.

22.    On or about April 23, 2007, Defendant Watson asked me to travel with him to Orlando, Florida from April 30 to May 2, 2007, to attend a meeting with representatives of Shea.

23.    At the Orlando meeting, Watson made a PowerPoint presentation (referred to as the "Orlando Plan" in the Complaint, ¶40). I did not help prepare that PowerPoint presentation, and did not know its contents prior to arriving in Orlando for the May 2 meeting. I did not prepare the Orlando Plan, nor to my knowledge create any of the exhibits to the Orlando Plan. I made no representations at that meeting.

24.    Any documents that I forwarded to Shea prior to the merger were documents that Watson had already presented to Shea.

25.    At Defendant Watson's instructions and in the normal course of business, I extracted and provided to him information from SaleForce.com that represented information put into SalesForce.com by all Bravera-Watson sales representatives, including Watson.

26.    I had no knowledge of the accuracy of the information entered into SalesForce.com by the other license holders at Bravera-Watson, nor was it my job to confirm the accuracy of such information.

27.  I worked for Bravera-Watson for approximately six months and Bravera-Shea for approximately three months.

28.  All actions that I took as concerns Bravera-Watson and Bravera-Shea were in furtherance of my employment.

### Termination of Employment and Commencement of Lawsuit

29.  On October 15, 2007, Bravera-Shea terminated my employment without cause. Exhibit D is a true and complete copy of the termination letter and proposed severance agreement that I received via E-Mail from Bravera-Shea HR director Wendell Stewart who, to my knowledge, resides and works in Texas. Upon information and belief, the severance offered is less than the amount required pursuant to my employment contract.

30.  Plaintiffs improperly conditioned payment of the severance amount specified in the Employment Agreement upon my signing an affidavit which was not truthful. After I declined to sign the proffered affidavit, Plaintiffs commenced this action against me. Exhibits E-J are true and complete copies of the severance negotiations, proposed affidavit and proposed settlement agreement.

31.  On December 18, 2007, Plaintiffs delivered the Summons and Complaint at bar to my home in Charleston, South Carolina.

32.  I believe I was named in this action to retaliate for not signing Plaintiffs' false affidavit, and to neutralize me as a witness by making me an adverse party.

Elizabeth Anne Conley

SWORN TO BEFORE ME THIS 25th DAY OF January, 2008.

_____ (Seal)
Notary Public for South Carolina
My Commission Expires:

4

SENIOR MANAGEMENT EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of June 26, 2007 by and between Bravera, Inc., a Florida corporation (the "Company"), and Anne Conley, an employee of the Company ("Employee").

RECITALS:

WHEREAS, the Company and Employee desire to enter into a written agreement for the Company's employment of Employee as an employee, on the terms specified herein.

NOW, THISEFORE, in consideration of the mutual promises, agreements and mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

Employment. The Company hereby employs Employee, and Employee hereby accepts employment with the Company, upon the terms and subject to the conditions set forth in this Agreement.

Position and Duties. Employee shall be employed as the Vice President of Strategic Accounts of the Company and shall report directly to the Chief Sales and Marketing Officer of the Company. Employee shall also serve in such additional capacities as may be assigned to her from time to time by the Board of Directors of Company (the "Board"). Employee shall devote substantially all of her business time, attention, skill and best efforts to the diligent performance of her duties hereunder.

Term. The term of employment hereunder shall commence as of the date hereof (the "Commencement Date") and shall continue for Three (3) years unless sooner terminated earlier in accordance with the provisions of this Agreement (the "Term").

Compensation. As compensation for all services rendered by Employee under this Agreement, the Company shall pay Employee compensation as follows:

Annual Salary. For all services rendered by Employee during her employment under this Agreement, beginning on the Commencement Date, the Company shall pay Employee an annual salary of 95,000.00, payable semi-monthly (24 payments) in accordance with the Company's standard payroll policies, subject to annual increases of 5% throughout the Term. The increase shall become effective on annual anniversary date of the Commencement Date, for each year throughout the Term.

Taxes and Withholdings. All taxes and governmentally required withholdings shall be deducted from any amount paid by the Company to Employee hereunder in conformity with applicable laws.

Commissions. Employee shall be entitled to receive commission payments based upon mutually agreed to quota assignments. For the year ending December 31, 2007, employee has been granted guarantee commissions for Q3 and Q4. The amount of

guarantee for Q3 is $28,700.00 and $28,750.00 for Q4 of 2007 ending December 31, 2007. In the event Employee achieves her target sales or exceeds them then the guarantee will be subtracted from the earned amount. The commission plan states that if employee is 50% or below of attainment goal (quota) then employee shall receive 5% of product and license sales and 2% of service sales. If employee achieves greater than 50% of sales quota, then employee will be entitled to 6% of product and license sales and 3% of service sales. Quotas and attainment values are set forth and defined as Bravera products and services only until otherwise amended.

Performance Bonuses.    Employee shall be entitled to receive performance bonuses based on performance criteria mutually agreed to by Employee and the Company from time to time. Such bonus program shall provide for a minimum of $20,000.00 in bonus compensation annually beginning with the calendar year 2008, which includes a quarterly bonus amounts of at $5,000.00 per quarter for the calendar year 2008 throughout the remainder of the Term, 50% of which is earned based on the Company achievement of planned quarterly group objectives and 50% of which is earned based on the individual achievement of planned individual objectives for the quarter.

Equity Based Compensation.    The Company plans to establish one or more Incentive Stock Option plans (the "ISO Plans") for Company Directors, Company Officers and other key employees of the Company and will use its best efforts to establish the effectiveness of such ISO Plans within 60 days of the Commencement Date (the "ISO Plan Date"). The ISO Plans will provide for the grant to Company Directors, Company Officers and other key employees of the Company, including Employee, incentive stock options (the "ISO") to acquire shares of the capital stock of the Company in accordance with the terms of the ISO Plans.

As part of the Board approved ISO plan, the Company agrees to provide Employee the sum of 100,500 options based upon the outline of the ISO Plan.

The date on which the Company grants the ISO to Employee will be the grant date (the "ISO Grant Date"). The strike price for the ISO shall be the fair market value for the particular class of capital stock of the Company granted to Employee under the ISO Plans on the ISO Grant Date. The vesting rights and benefits for each ISO granted shall vest in the Employee, 25% of the total, immediately and no slower than 1/36th of the remaining total ISO granted each month for the 36 months immediately following the ISO Grant Date; and in addition such vesting shall be accelerated and immediately vested for all unvested ISO shares in the event of a Change of Control, or for early termination without Cause as defined in Sections 7 and 8, or for early termination for Good Reason as defined in Section 10. Vesting will otherwise cease upon termination of employment from the Company by Employee upon such Termination Date.

Benefits and Fringes.

Benefits.   During the Term, Employee shall be eligible to participate in the Company's standard benefits for key executives of the Company in accordance with the Company's policies.

Vacation.  Employee shall be entitled to four (4) weeks of paid vacation in each calendar year during the Term in accordance with the Company's practice.  Employee shall take vacations at such time or times as shall be reasonable as mutually determined by Employee and Company based upon the current duties.

Other. Employee shall be entitled to the following according to policy and practices established by Company from time to time:

Corporate Credit Card

Cell Phone

High Speed Internet

Laptop Computer

Expenses Reimbursement.  The Company shall reimburse Employee for all reasonable expenses incurred by Employee during the Term in the course of performing Employee's duties under this Agreement that are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other approved business expenses, including cellular phone charges and mileage related to business expenses, subject to the Company's requirements applicable generally with respect to reporting and documentation of such expenses.  Expenses shall be reimbursed in accordance with the Company's policies in effect from time to time.

Termination by Company for Cause.  The Company shall have the right at any time to terminate the employment of Employee for Cause effective immediately by delivering to Employee a written notice specifying such Cause.  If the Company exercises such right, in full settlement and discharge of the Company's obligation to Employee, the Company shall make a payment to Employee in a lump sum amount equal to all compensation accrued and unpaid as of the Termination Date and the Company's obligation under this Agreement to make any further payments to Employee shall thereupon cease and terminate.  This Section 7 of this Agreement in no way limits the Company's right to terminate Employee's employment without cause pursuant to Section 8 of this Agreement.  As used herein, the term "Cause" shall be deemed to exist upon (i) willful misconduct or gross negligence of Employee in the performance of her duties and services to the Company or any of its subsidiaries; (ii) the commission of a felony, whether or not committed in the course of performing services for the Company or any of its subsidiaries; (iii) Employee's deliberate dishonesty or breach of fiduciary duty; (iv) the commission by Employee in the course of performing any services for the Company or any of its subsidiaries of embezzlement, theft or any other fraudulent act; (v) the unauthorized disclosure by Employee of any material trade secret or material confidential information of the Company or any of its

subsidiaries; (vi) the commission by Employee of an act which constitutes unfair competition with the Company or any of its subsidiaries, including, without limitation, inducing any employee or customer of the Company to breach a contract with the Company or any of its subsidiaries; (vii) the repeated refusal or failure by Employee to comply with any policies of the Company or any lawful directives of the Board of the Company; or (viii) the material breach by Employee of any agreement to which the Company and Employee are parties, which material breach remains uncured by Employee for a period of 10 days after the Company has given Employee written notice thereof.

Termination by Company Without Cause. The Company shall have the right at any time and for any reason or for no reason to terminate the employment of Employee and this Agreement without cause effective immediately upon written notice to Employee. Upon termination of this Agreement pursuant to this Section 8, Employee shall be entitled to receive, (i) an amount equal to Employee's annual salary accrued and unpaid as of the Termination Date, (ii) a pro-rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) for the year as well as the quarter in which such termination occurs, (iii) salary, plus all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) and all benefits for a period of six (6) months after the Termination Date, and (iv) continue to provide Employee, at Company expense, with the same medical coverage Employee carried while an active employee for a period of six (6) months after the Termination Date, after which Employee will be eligible under Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended ("COBRA"). All of the foregoing shall be payable in accordance with the Company's then effective payroll schedule applicable to Employee. All payments under this Section 8 shall be in full settlement and discharge of the Company's obligation to Employee, and the obligation of the Company to make such payments shall be conditioned upon the execution by Employee of a separation and release agreement in a form satisfactory to the Company.

Termination Upon Death or Disability. The Company may terminate the employment of Employee and this Agreement effective upon notice to Employee (or her heirs or legal representatives, as the case may be) if Employee either dies or is disabled. As used herein, the term "disabled" shall mean the inability or failure of Employee to perform the essential functions of the position with or without reasonable accommodation as a result of a mental or physical disability for a period of ninety (90) or more days (whether or not consecutive) during any twelve months, all as determined in good faith by the Board. Upon termination of this Agreement pursuant to this Section 9, Employee (or her heirs or legal representatives, as the case may be) shall be entitled to receive, in full settlement and discharge of the Company's obligation to Employee, a lump sum amount equal to all compensation accrued and unpaid as of the Termination Date.

Termination by Employee.

Employee may terminate her employment under this Agreement at any time upon thirty (30) days notice to the Company. Employee, at the request of the Company and for a period not to exceed such thirty (30) days as requested by the Company, shall continue to render

her services in accordance with this Agreement and shall be paid her regular salary plus performance bonuses and receive her normal benefits up to the Termination Date.

Employee may terminate her employment with the Company under this Agreement at any time for Good Reason (as defined below). Upon termination of this Agreement pursuant to this Section 10(b), Employee shall be entitled to receive, (i) an amount equal to Employee's annual salary accrued and unpaid as of the Termination Date, (ii) a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) for the year as well as the quarter in which such termination occurs, (iii) salary, plus all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) and all benefits for a period of six (6) months after the Termination Date, and (iv) continue to provide Employee, at Company expense, with the same medical coverage Employee carried while an active employee for a period of six (6) months after the Termination Date, after which Employee will be eligible under the provisions of COBRA. All of the foregoing shall be payable in accordance with the Company's then effective payroll schedule applicable to Employee. The term "Good Reason" means Employee's resignation as an Employee of the Company as a result of (i) the Company materially violating any of its material obligations to Employee under this Agreement or any other agreement with Employee, (ii) a substantial change in Employee's duties to which Employee does not consent, (iii) a decrease in Employee's salary or performance bonuses to which Employee does not consent, or (iv) the Company failing to enter into a new employment agreement with the Employee thirty (30) days prior to the expiration of this Agreement, on terms equal to or greater than the existing agreement. Such termination for Good Reason shall only be effective if Employee gives the Company a minimum of 30 days' written notice, provided that the occurrence of such violation shall have occurred within the 60 days preceding such notice and that the Company shall have failed to cure such violation within 30 days after receipt of such notice.

Covenants of Confidentiality and Non-Competition.

Definitions. For this Agreement, the following terms shall have the meanings specified below:

"Person" - any individual, corporation, partnership, association, unincorporated organization or other entity.

"Termination Date" - the last day Employee is employed by Company, whether separation is voluntary or involuntary and with or without Cause.

"Confidential Information" - information relating to Company's customers, suppliers, distributors, operations, finances, and business that derives value from not being generally known to other Persons, including, but not limited to, technical or non technical data, formulas, patterns, compilations (including compilations of customer information), programs (including computer programs and software), devices, methods, techniques, drawings, processes, financial data (including sales and sales forecasts), and lists of actual or potential customers or

suppliers (including identifying information about those customers), without regard to form and whether or not reduced to writing. Confidential Information includes information owned or disclosed to Company by third parties that Company treats as or is obligated to maintain as confidential. Confidential Information subject to this Agreement may include information that is not a trade secret under applicable law, but information not constituting a trade secret shall only be treated as Confidential Information under this Agreement for a one-year period after the Termination Date.

"Competing Business" shall mean any one or more of the following: (i) the Company's Business, or (ii) any other business in which the Company or its subsidiaries develops an intention, with full knowledge of Employee, to engage on or before the Termination Date and (a) for which the Company or its subsidiaries prepared an existing business plan or study on or before the Termination Date, or (b) for which the Board commissioned a business plan or study on or before the Termination Date.

"Company's Business" Company's Business means the business of offering comprehensive software solutions and strategies internationally through custom programming, consulting, and off-site software development throughout the Territory.

"Company's Products" means the products of the Company related to the Company's Business.

"Territory" The term "Territory" shall mean the United States.

Confidential Information. Employee shall use her or her best efforts to protect Confidential Information. At all times, both during and after Employee's employment, Employee will not use, reproduce or disclose any Confidential Information, except as may be necessary in connection with work for Company.

Return of Materials. On the Termination Date or for any reason or at any time at Company's request, Employee will deliver promptly to Company all materials, documents, plans, records, notes, or other papers or electronically-stored materials and any copies in Employee's possession or control relating in any way to Company's Business, which at all times shall be the property of Company.

Disparagement. Employee shall not at any time make false, misleading or disparaging statements about the Company, including its products, services, management, employees, and customers. The Company shall not make false, misleading or disparaging statements about Employee.

Non-Solicitation of Customers. Employee agrees that, for a period of twelve (12) months following the Termination Date, Employee shall not, directly or indirectly, solicit, or assist in the solicitation of, any Person who is, or was during the period of Employee's employment with Company, a customer of Company, including actively sought prospective customers, with whom Employee had personal business contact with during her or her employment with the Company.

Non-Solicitation of Employees, Consultants and Contractors. Employee agrees that, for a period of twelve (12) months following the Termination Date, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, Persons who were employees, consultants or independent contractors of the Company at the time of Employee's termination of employment and who continue to be employed or engaged by Company, and with whom Employee had personal business contact with during her or her employment with the Company, to leave their employment or engagement with the Company.

Covenant against Competition. Employee covenants and agrees with the Company that, except on behalf of Company, at any time during the period of her or her employment with Company and continuing for a period of twelve (12) months after the Termination Date, Employee will not in any manner (other than as an employee of or as a consultant to Company), directly or by assisting in, engage in or perform any of the specific duties or activities which Employee performed for Company during her or her employment for any Competing Business in the Territory. Employee further agrees that during the period of her or her employment with Company and continuing for a period of twelve (12) months after the Termination Date, Employee will not own or invest in any Competing Business; except that Employee may own securities of the Company or acquire either directly or indirectly and solely as an investment, up to five percent (5%) of the securities of any Competing Business issuer that is publicly traded on any United States national securities exchange or quoted on the NASDAQ system.

Prior Agreements. Employee warrants that Employee is not under any obligation, contractual or otherwise, limiting or affecting Employee's ability or right to render to Company the services for which Employee has been or is being hired. Upon execution of this Agreement, Employee will give Company a copy of any agreement, or notify Company in writing of any agreement if a written agreement is not available, with a prior employer or other Person purporting to limit or affect Employee's ability or right to render to Company the services for which Employee has been or is being hired, to solicit customers or potential customers, or to use any type of information.

Future Employment Opportunities. At any time before, and for six (6) months after, the Termination Date, Employee shall provide any prospective company with a copy of this Agreement, and upon accepting any employment with another Person, shall provide Company with the employer's name and a description of the services Employee will provide.

Tolling. In the event the enforceability of any terms of this Section 11 are challenged in a lawsuit instituted during the Term or for a period of twelve (12) months following the Termination Date and Employee is not enjoined from breaching any of the protective covenants, then if a court of competent jurisdiction finds that the challenged protective covenant is enforceable, the time period shall be tolled during the pendency of the lawsuit until the dispute is finally resolved and all periods of appeal have expired.

Work For Hire Acknowledgment; Assignment. Employee acknowledges that Employee's work on and contributions to documents, programs, and other expressions in any tangible medium that relate to the Company's Business or the Company's Products (collectively, "Works") since the date of employment and thereafter through the Termination Date are within the scope of Employee's employment and part of Employee's duties and responsibilities.

Employee's work on and contributions to the Works will be rendered and made by Employee for, at the instigation of, and under the overall direction of, Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States Copyright Laws. Without limiting this acknowledgment, Employee assigns, grants, and delivers exclusively to Company all rights, titles, and interests in and to any Works, and all copies and versions, including all copyrights and renewals. Employee will execute and deliver to Company, its successors and assigns, any assignments and documents Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual, and worldwide ownership of all rights, titles, and interests of every kind and nature, including all copyrights, in and to the Works, and Employee constitutes and appoints Company as her or her agent to execute and deliver any such assignments or documents Employee fails or refuses to execute and deliver, this power and agency being coupled with an interest and being irrevocable.

Inventions, Ideas and Patents. Employee shall disclose promptly to Company (which shall receive it in confidence), and only to Company, any invention or idea of Employee (developed alone or with others) that relates in any way to Company's Business or Company's Products or was conceived or made before or during Employee's employment by Company or within six months of the Termination Date. Employee assigns to Company any such invention or idea in any way connected with Employee's employment or related to Company's Business, research or development, or demonstrably anticipated research or development, and will cooperate with Company and sign all papers deemed necessary by Company to enable it to obtain, maintain, protect and defend patents covering such inventions and ideas and to confirm Company's exclusive ownership of all rights in such inventions, ideas and patents, and irrevocably appoints Company as its agent to execute and deliver any assignments or documents Employee fails or refuses to execute and deliver promptly, this power and agency being coupled with an interest and being irrevocable. This constitutes Company's written notification that this assignment does not apply to an invention for which no equipment, supplies, facility or trade secret information of Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to Company's Business, or (ii) to Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for Company.

Representations and Disclosures. Employee represents and warrants that he has the legal capacity to execute and deliver this Agreement, and that the execution, delivery and performance of this Agreement by such party will not violate any agreement made by such party or to which such party is subject. Employee represents and warrants that there are no inventions or ideas of which Employee claims ownership as of the date of this Agreement other than the inventions or ideas described on Appendix A. If no inventions or ideas are listed on Appendix A, Employee represents that there are no such inventions or ideas at the time of signing this Agreement. Employee represents and warrants that performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Employee in confidence or in trust prior to the execution of this Agreement. Employee has not entered into, and Employee agrees not to enter into, any agreement either written or oral that conflicts or might conflict with Employee's employment or Employee's performance under this Agreement. Except as described on Appendix A, Employee is not bound by any agreement regarding confidentiality or ownership of intellectual property with any person or entity other than the

Company. Employee agrees not to disclose to the Company or use on its behalf any confidential information belonging to others that is known to have been improperly acquired or acquired from a person known to be subject to a duty not to disclose it.

Continuing Employment Upon a Change of Control. Upon the occurrence of a Change of Control (as defined below), the Company covenants that it shall cause the acquiring company to offer Employee an employment agreement containing (i) an employment period of not less than one (1) year, (ii) duties and responsibilities consistent with Employee's then current position in the Company and (iii) such other terms consistent with and comparable to the terms set forth in this Agreement, as and if amended, in all material respects, including without limitation, compensation and benefits. Such employment agreement will not require relocation unless mutually agreed upon by the Company and Employee. If the acquiring company fails to offer Employee an employment agreement containing such terms, then Employee shall be entitled to a lump sum severance in an amount not less than Employee's aggregate compensation (including salary, bonuses, and commission, whether or not paid) for the prior twelve month period, plus the continuation of all benefits for a period of twelve (12) months after the Termination Date. If the acquiring company terminates Employee's employment or if Employee terminates employment for Good Reason within one (1) year after the Change of Control, then Employee shall be entitled to a lump sum severance in an amount equal to the lump sum severance Employee would have received in the prior sentence, plus the continuation of all benefits for a period of twelve (12) months after the Termination Date. The provisions of this Section 15 shall be binding upon and enforceable against all successors and assigns of the Company. A "Change of Control" shall be deemed to have occurred after (a) the sale of all or substantially all of the assets of the Company, whether in a single transaction or in a series of transactions occurring within any single 12 month period, (b) the sale by one or more shareholders of the Company, in a single transaction or in a series of transactions occurring within any single 12 month period, of more than 50% of the issued and outstanding capital stock of the Company to any individual, corporation, trust or other entity; or (c) a merger, reorganization, exchange of stock or other securities, or other business combination between the Company and another individual, corporation, trust or other entity comprised of a single transaction or a series of transactions occurring within any single 12 month period, resulting in any individual, corporation, trust or other entity owning more than 50% of the issued and outstanding capital stock of the Company.

Interpretation; Severability. Rights and restrictions in this Agreement may be exercised and are applicable only to the extent they do not violate any applicable laws, and are intended to be limited to the extent necessary so they will not render this Agreement illegal, invalid or unenforceable. If any term shall be held illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. This Agreement does not in any way limit Company's rights under the laws of agency, fiduciary obligation, unfair competition, trade secret, copyright, patent, trademark or any other applicable law(s), or under any other agreement or instrument, all of which are in addition to rights under this Agreement. The existence of a claim by Employee, whether predicated on this Agreement or otherwise, shall not constitute a defense to Company's enforcement of this Agreement.

Remedies for Breach. Employee understands and agrees that any breach of this Agreement may cause the Company great and irreparable harm and that it would be difficult or impossible to establish the full monetary value of such damage. Consequently:

Employee covenants and agrees that any breach by Employee of the Agreement during Employee's employment with the Company shall be grounds for disciplinary actions up to and including dismissal of Employee for Cause.

Employee further covenants and agrees that in the event of any Employee breach of this Agreement, Employee consents to the entry of appropriate preliminary and permanent injunctions in a court of appropriate jurisdiction, without the posting of a bond or other security, in addition to whatever other remedies the Company may have. Injunctive relief is in addition to any other available remedy, including damages.

Employee agrees that Employee will indemnify and hold the Company harmless from any loss, cost, damage or expense (including attorneys' fees) incurred by the Company arising out of Employee's breach of any portion of this Agreement, whether or not such breach results in litigation or other formal proceedings.

Miscellaneous.

Counterparts. This Agreement may be executed in several counterparts each of which is an original. This Agreement and any counterpart so executed shall be deemed to be one and the same instrument. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

Contents of Agreement; Parties In Interest, Etc. This Agreement sets forth the entire understanding of the parties. Any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and superseded by this Agreement. If there are any inconsistencies between the terms of this Agreement and the Company's Employee Handbook, this Agreement shall control. All representations, warranties, covenants, terms, conditions and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, legal representatives, successors and permitted assigns of the Company and Employee. Neither this Agreement nor any rights, interests or obligations hereunder may be assigned by any party without the prior written consent of the other party hereto.

FLORIDA LAW TO GOVERN. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS. Each party irrevocably (a) consents to the exclusive jurisdiction and venue of the federal and state courts located in, State of Florida, in any action arising under or relating to this Agreement, and (b) waives any jurisdictional defenses (including personal jurisdiction and venue) to any such action.

Section Headings. The section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

Notices. All notices, requests, demands and other communications which are required or permitted hereunder shall be sufficient if given in writing and delivered personally or by registered or certified mail, postage prepaid, by a nationally recognized overnight courier service, or by facsimile transmission (with a copy simultaneously sent by registered or certified

mail, postage prepaid), as follows (or to such other address as shall be set forth in a notice given in the same manner):

        (1)      If to the Company, to:

> Dunnington, Bartholow and Miller
> Attention: Robert Lincoln
> 477 Madison Avenue
> 12th Floor, Suite 1200
> New York, NY 10022

        (2)      If to Employee, to:

> _____
> _____
> _____
> _____

All such notices shall be deemed to have been received on the date of delivery.

**Location of Employment.** The location of employment of Employee shall be the State of South Carolina. This Agreement will not require relocation unless mutually agreed upon by the Company and Employee.

**Modification and Waiver.** Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof, and this Agreement may be modified or amended at any time by the Company and Employee. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by each of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof nor shall such waiver constitute a continuing waiver.

**Mediation.** The Company and Employee shall mediate any claim or controversy arising out of or relating to this Agreement or any breach thereof if either of them requests mediation and gives written notice to the other (the "Mediation Notice"). Any notice given pursuant to the preceding sentence shall include a brief statement of the claim or controversy. If the Company and Employee do not resolve the claim or controversy within five (5) days after the date of the Mediation Notice, the Company and Employee shall then use reasonable efforts to agree upon an independent mediator. If the Company and Employee do not agree upon an independent mediator within ten (10) days after the date of the Mediation Notice, either party may request that JAMS/Endispute ("JAMS"), or a similar mediation service of a similar national scope if JAMS no longer then exists, appoint an independent mediator. The Company and Employee shall share the costs of mediation equally and shall pay such costs in advance upon the request of the mediator or any party. Within ten (10) days after selection of the mediator, the mediator shall set the mediation. If the Company and Employee do not resolve the dispute

within thirty (30) days after the date of the Mediation Notice, the dispute shall be decided by arbitration as set forth in Section 18(i) hereof.

Arbitration. Any claim or controversy arising out of or relating to this Agreement or any breach thereof shall be settled by arbitration if such claim or controversy is not settled pursuant to Section 18(h) hereof. The venue for any such arbitration shall be Orlando, Florida, or such other location as the parties may mutually agree. Except as expressly set forth herein, all arbitration proceedings under this Section 18(i) shall be undertaken in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in force. Only individuals who are (i) lawyers engaged full-time in the practice of law and (ii) on the AAA register of arbitrators shall be selected as an arbitrator. There shall be one arbitrator who shall be chosen in accordance with the rules of the AAA. Within twenty (20) days of the conclusion of the arbitration hearing, the arbitrator shall prepare written findings of fact and conclusions of law. Judgment on the written award may be entered and enforced in any court of competent jurisdiction. It is mutually agreed that the written decision of the arbitrator shall be valid, binding, final and non-appealable; provided however, that the parties hereto agree that the arbitrator shall not be empowered to award punitive damages against any party to such arbitration. The arbitrator shall require the non-prevailing party to pay the arbitrator's full fees and expenses or, if in the arbitrator's opinion there is no prevailing party, the arbitrator's fees and expenses will be borne equally by the parties thereto. In the event action is brought to enforce the provisions of this Agreement pursuant to this Section 18(i), the non-prevailing parties shall be required to pay the reasonable attorneys' fees and expenses of the prevailing parties, except that if in the opinion of the court or arbitrator deciding such action there is no prevailing party, each party shall pay its own attorneys' fees and expenses.

**The remaining part of this page is intentionally left BLANK**

**I HAVE READ THIS AGREEMENT CAREFULLY. I ACKNOWLEDGE THAT THIS AGREEMENT DESCRIBES THE BASIC LEGAL AND ETHICAL RESPONSIBILITI ES THAT I AM REQIJRED TO OBSERVE AS AN EMPLOYEE EXPOSED TO HIGHLY SENSITIVE TECHTOLOGY AND STRATEGIC INFORMATION.**

**IN WITNESS WHEREOF,** the parties hereto have executed or have caused this Agreement to be duly executed as of the date first above written.

EMPLOYEE

Name:

COMPANY

Bravera, Inc.
By: _____
Name: _____
Title: _____

<u>**Execution Copy**</u>

**AGREEMENT AND PLAN OF MERGER**

This AGREEMENT AND PLAN OF MERGER (this "**Agreement**") is made and entered into as of April 26, 2007, by and among Shea Development Corp., a Nevada corporation ("**Parent**"), Shea Development Acquisition No. 3 Corp., a Nevada corporation and a wholly-owned subsidiary of Parent ("**Merger Sub**"), Bravera, Inc. a Florida corporation (the "**Company**"), and Christopher Watson, the holder of all of the outstanding capital stock of the Company (the "**Shareholder**"). Capitalized terms used and not otherwise defined herein have the meanings set forth in Article 10.

**RECITALS**

A.    The respective Boards of Directors of Parent, Merger Sub and the Company each have approved and declared advisable this Agreement and the merger of Merger Sub with and into the Company (the "**Merger**"), upon the terms and subject to the conditions set forth in this Agreement, whereby each issued and outstanding share of common stock, par value $0.01 per share, of the Company ("**Company Common Stock**") will be converted into the right to receive common stock, par value $0.001 per share, of Parent ("**Parent Common Stock**") and cash as provided herein.

B.    The respective shareholders of Parent, Merger Sub and the Company have, or will have, prior to the Closing Date, by the legally required vote, approved and adopted the Merger.

C.    In connection with the Merger, the parties desire to make certain representations, warranties, covenants and agreements and also to prescribe various conditions to the Merger, upon the terms and subject to the conditions contained herein.

NOW, THEREFORE, in consideration of the covenants, promises, representations and warranties set forth herein, and for other good and valuable consideration, intending to be legally bound hereby the parties agree as follows:

**ARTICLE 1**<br>**THE MERGER**

1.1    <u>Merger</u>. At the Effective Time as defined below, in accordance with this Agreement and applicable law Section 607.1105 of the Florida Statutes and Nevada Revised Statutes Section 92A.200, Merger Sub will be merged with and into the Company, the separate corporate existence of Merger Sub will cease and the Company will continue as the surviving corporation in the Merger and shall become a wholly-owned Subsidiary of Parent. The Company, as the surviving corporation after the Merger, is sometimes referred to herein as the "**Surviving Corporation**."

1.2    <u>Closing</u>. Subject to the terms and conditions of this Agreement, the closing of the Merger (the "**Closing**") will take place at the offices of Dunnington, Bartholow & Miller, LLP located at 477 Madison Avenue, New York, NY 10022 or at such other place as Parent and the Company mutually agree, at 10:00 a.m. local time on the later to occur of June 15, 2007 or the

twelve (12) month period following the Effective Date (the "**Year 1 Earn-Out Period**"), Parent shall pay the following amounts:

(i)    to the Shareholder a Warrant in the form attached hereto as Exhibit B.

(ii)    to the Shareholder $750,000 payable in cash by wire transfer to an account designated by the Shareholder.

(iii)    to the Shareholder twenty percent (20%) of the Surviving Corporation's Year 1 EBITDA payable in cash by wire transfer to the account designated by the Shareholder.

(b)    *Year 2 Earn-Out Payments*.    Subject to the Surviving Corporation's gross revenue(s) exceeding eighty percent (80%) of $8,900,000 and the Surviving Corporation's EBITDA (the "**Year 2 EBITDA**"), exceeding eighty percent (80%) of $4,500,000 for the twelve (12) month period following the first anniversary of the Effective Date (the "**Year 2 Earn-Out Period**"), Parent shall pay the following amounts:

(i)    to the Shareholder a  Warrant in the form attached hereto as Exhibit C.

(ii)    to the Shareholder $500,000 payable in cash by wire transfer to an account designated by the Shareholder.

(iii)    to the Shareholder, a pro rata share of twenty percent (20%) of the Surviving Corporation's Year 2 EBITDA payable in cash by wire transfer to the account designated by the Shareholder.

(c)    *Equity Earn-Out*.    Parent shall provide a warrant to the Shareholder in the form attached hereto as Exhibit D.

(d)    *EBITDA Calculations*.    The parties agree that, for the purpose of computing the Earn-Out Payments, the Surviving Corporation shall be credited with the entire revenue(s) of the Surviving Corporation and its Affiliates, including revenues derived from any joint ventures, license agreements or products developed or co-developed by the Surviving Corporation with Parent or its Subsidiaries or Affiliates, and EBITDA recognized by the Parent (and/or its Subsidiaries and other Affiliates) associated with each such joint venture, license agreement, product, service and/or solution developed or co-developed by the Surviving Corporation with the Parent and/or its Subsidiaries and Affiliates.

1.14    Employment Agreements. At the Effective Time, the Surviving Corporation will offer employment to and will employ the senior management team listed in Schedule 1.14 Part I (the "**Senior Management Team**") for a period of three (3) years under the terms and conditions of Senior Management Employment Agreements, in the form set forth at Schedule 1.14 Part II, such employment agreements to be executed concurrently with the Closing.

1.15    Stock Options.    Parent will establish an incentive stock option program with respect to shares of the Parent Common Stock in which employees of the Surviving Corporation are eligible to participate (the "**ISO Plan**") and will use its best efforts to establish such ISO Plan

9.6    Waiver.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, will be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.  All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

9.7    Third Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights, and this Agreement does not confer any such rights, upon any other Person other than any Person entitled to indemnity as described in Article 7.

9.8    No Assignment; Binding Effect.  Neither this Agreement nor any right, interest or obligation hereunder may be assigned (by operation of law or otherwise) by any party without the prior written consent of the other parties and any attempt to do so will be void.  Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

9.9    Headings.  The headings and table of contents used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

9.10    Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

9.11    Governing Law.  This Agreement will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision.  The parties hereto expressly and irrevocably consent and submit to the exclusive jurisdiction of the applicable local, federal, or appellate courts located in New York, New York, in connection with any proceeding arising from or out of this Agreement.  Each party agrees that such courts shall be deemed to be a convenient forum in any such legal proceeding, and agrees not to assert (by way of motion, as a defense or otherwise) any claim that such party is not subject personally to the jurisdiction of any such courts, that such legal proceeding has been brought in an inconvenient forum, that the venue of such legal proceeding is improper or, that this Agreement or the subject matter hereof may not be enforced in, or by, any such courts.

9.12    Construction.  The parties hereto agree that this Agreement is the product of negotiation between sophisticated parties and individuals, all of whom were represented by

counsel, and each of whom had an opportunity to participate in and did participate in, the drafting of each provision hereof. Accordingly, ambiguities in this Agreement, if any, will not be construed strictly or in favor of or against any party hereto but rather will be given a fair and reasonable construction without regard to the rule of contra proferentum.

9.13    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

9.14    <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur in the event that Section 5.2 of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is agreed that the parties will be entitled to an injunction or injunctions to prevent breaches of Section 5.2 of this Agreement and to enforce specifically the terms and provisions thereof in any court having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

## ARTICLE 10
## DEFINITIONS

**10.1    <u>Definitions</u>.**

(a)    As used in this Agreement, the following defined terms will have the meanings indicated below:

"**$**" means United States Dollars unless otherwise indicated.

"**Actions or Proceedings**" means any action, suit, petition, investigation, proceeding, arbitration, litigation or Governmental or Regulatory Authority investigation, audit or other proceeding, whether civil or criminal, in law or in equity, or before any arbitrator or Governmental or Regulatory Authority.

"**Affiliate**" means, as applied to any Person, (a) any other Person directly or indirectly controlling, controlled by or under common control with, that Person, (b) any other Person that owns or controls 10% or more of any class of equity securities of that Person or any of its Affiliates (including any equity securities issuable upon the exercise of any option or convertible security) of that Person or any of its Affiliates, or (c) any director, partner or officer of such Person. For the purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by", and "under common control with") as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Agreement and Plan of Merger, the Schedules the Exhibits, and the certificates and instruments delivered in connection herewith, or incorporated by reference, as the same may be amended or supplemented from time to time in accordance with the terms hereof.

IN WITNESS WHEREOF, Parent, Merger Sub, the Shareholder and the Company have caused this Agreement to be signed by their duly authorized representatives, all as of the date first written above.

**BRAVERA, INC.**

By: _____
Christopher Watson
President and CEO

**SHEA DEVELOPMENT CORP.**

By: _____
Francis E. Wilde
Chairman and CEO

**SHAREHOLDER**

By: _____
Christopher Watson

**SHEA DEVELOPMENT ACQUISITION NO. 3 CORP.**

By: _____
E. Joseph Vitetta, Jr.
Secretary

50

Execution copy

## SOFTWARE LICENSE AND ASSET PURCHASE AGREEMENT

THIS SOFTWARE LICENSE AND ASSET PURCHASE AGREEMENT ("Agreement") is entered into as of the 16th day of July, 2007 by and between Intellectus, LLC, a Florida limited liability company with its principal offices located at 300 Bucksley Lane, #305, Daniel Island, South Carolina 29492 ("Owner") and IP Holding of Nevada Corp., a Nevada corporation with its principal offices located at 1351 Dividend Drive, Suite G, Marietta, Georgia 30067 ("Licensee"), a subsidiary of Shea Development Corp. ("Shea").

## WITNESSETH:

**WHEREAS,** Owner is in the business of designing, developing, manufacturing and licensing computer software ("Software"); and

**WHEREAS,** Owner has rights in certain Software identified as "Bravera Process Director", "Bravera Content Director" and "Bravera RAPID Workplace" (collectively, the "Software");

**WHEREAS,** the Owner has taken what Owner believes are reasonable steps to register and protect the Software and certain other intellectual property identified more fully in **Exhibit A** attached hereto and incorporated herein by this reference (collectively, the "Intellectual Property Assets"); and

**WHEREAS,** Licensee desires to obtain, effective as of the date of this Agreement, an exclusive, royalty free, worldwide license from the Owner with respect to the Intellectual Property Assets and subsequently to acquire all of Owner's right, title and interest to the Intellectual Property Assets in accordance with the terms and conditions identified more fully in **Exhibit B** and **Exhibit C**.

**NOW, THEREFORE** in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

### Article I.        Definitions

For purposes of this Agreement, the following definitions apply:

"Agreement" shall mean this Software License and Asset Purchase Agreement.

"Confidential Information" shall mean the Source Code and the source code to the Derivative Works.

"Customer" shall mean the end users of the Software.

"Derivative Works" shall include any work, revision, elaboration, enhancement, modification, translation, abridgement, condensation or other expansion that is based upon the Software or a portion thereof. For purposes of this Agreement, Derivative Works shall not include works that remain separable from, or merely link to the interfaces of the work and Derivative Works thereof.

"Domain" shall mean the Owner's domain names listed on **Exhibit A**.

"Effective Date" shall mean July 16, 2007.

"Intellectual Property Assets" shall have the meaning set forth in the recitals.

IN WITNESS WHEREOF, the Company has caused this Warrant to be duly executed by the authorized officer as of July _16_, 2007.


Shea Development Corp.


By: _____

        Name:   Francis E. Wilde
        Title:    Chairman and CEO

October 15, 2007


Elizabeth Conley
1147 Blakeway St.
Daniel Island, SC 29492

Dear Anne:

Subject:  Separation from Bravera

This is your notification that your employment with Bravera will end on October 15, 2007.
Please read the attached separation agreement very carefully before signing and returning to me.
If you have any questions, contact me directly at 972-816-0504.

I wish you success in your future endeavors.

Regards,



Wendell Stewart
Human Resources

Acknowledgement:


_____          _____
Elizabeth Conley                 Date

**CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE**
Between
**Elizabeth Conley and Bravera Inc.**

This Agreement shall serve as a fully binding separation agreement between Elizabeth Conley ("Employee") and Bravera Inc. (the "Company"). Employee's employment with the Company is hereby terminated effective October 15, 2007. In exchange for Employee signing and not revoking this Agreement and complying with all its terms and conditions, the Company will pay to Employee a gross severance amount equal to four months' salary at Employee's last regular rate of pay to be paid out in bi-weekly installment payments over the four month period coinciding with the Company's regular payment schedule, commencing on the Company's next regular payday after the Employee's termination. Second, the Company agrees to pay the Q3 bonus as outlined in your employment agreement. This amount will be paid over the four months in your regular payroll. In addition, the Company agrees to pay the Employee's premiums for continued health insurance coverage under the applicable state law during the same four month period at the same level Employee participated at during Employee's employment with the Company as well as the Employee's accrued but unpaid vacation time through the Effective Date. This payment will be subject to applicable payroll withholdings as well as any other appropriate and permissible withholding.

In consideration for the Company's voluntary agreement to provide Employee with the payments described above, Employee agrees to be available for up to 8 hours per week through December 31, 2007 to respond to any Bravera business needs and hereby voluntarily and knowingly releases the Company and their predecessors, subsidiaries, parent corporations, affiliates, sister corporations, along with their officers, directors, shareholders, employees and affiliates ("the Released Parties") from any and all claims, actions, demands and causes of action of any kind, arising under state or federal law, common or statutory, whether now known or unknown, which Employee has or may claim to have against the Released Parties on or before the Effective Date of this Agreement, including but not limited to claims in any manner connected with Employee's employment with the Company, with Employee's separation of employment from the Company, or otherwise, including, without limitation, any contract claims (express or implied claims of tortious conduct, any claims under any applicable federal, state or local law, including but not limited to the United States Constitution or any state Constitution; South Carolina's Wage Payment Act, S.C. Code Ann. §§ 41-10-10 *et seq.;* the South Carolina Human Affairs Law, S.C. Code Ann. §§ 1-13-10 *et seq.*; Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 1981; the Americans with Disabilities Act ("ADA"); the Age Discrimination in Employment Act ("ADEA"); the Family and Medical Leave Act ("FMLA"); the Fair Labor Standards Act ("FLSA"); and the Employee Retirement Security Act of 1974, as amended ("ERISA"); COBRA; the Worker Adjustment and Retraining Notification Act ("WARN"); and/or any other federal, state, or local civil rights, employee rights, or human rights law.

In addition, Employee agrees to keep the terms, conditions, and circumstances of this Agreement and of the Employee's separation from the Company confidential. Employee further agrees to not aid or render assistance in any form to any person or entity pursuing, or that may in the future pursue, any claim against Released Parties of any nature unless required to do so by law. Nevertheless, this Agreement does not purport to prevent Employee from providing truthful

information in response to any inquiry by any administrative or investigative agency or from otherwise participating in an investigation or proceeding conducted by such an agency.

**Following the termination of Employee's employment relationship with the Company, the Employee agrees not to disparage the Company and will not say, write, do, authorize, or otherwise create or publish anything (or otherwise assist anyone else to do any of the foregoing) that will in any way disparage the Company or any past or present employee, agent, officer, or director of the Company, or interfere with the management of the Company's business through any contact with the Company's shareholders, directors, employees, vendors, and others, and not make any public or private statements or comments using any source including message boards, that have the effect of disparaging or disrupting operations of the Company's business in any way. If a violation of these terms occurs, no further severance payments will be made. However, this policy is not intended to, and will not, prohibit or prevent Employee from communicating with any local, state, or federal investigative, enforcement, or civil rights agencies or commissions, or from reporting any alleged illegal or wrongful conduct, including conduct covered by the 2002 Sarbanes-Oxley Act, Title VII, or any other local, state, or federal ordinance or statute that may be applicable.**

**NOTICE TO EMPLOYEE:** Employee hereby acknowledges that Employee knowingly and voluntarily enters into this Agreement with the purpose of waiving and releasing any age discrimination claims she may have under the Age Discrimination in Employment Act of 1967 ("ADEA"), and acknowledges and agrees that:

(1)   this Agreement is written in a manner in which Employee fully understands;

(2)   Employee specifically waives any rights or claims arising under the ADEA;

(3)   this Agreement does not waive rights or claims under the ADEA that may arise after the date this Agreement is executed;

(4)   the rights and claims waived in this Agreement are in exchange for consideration over and above anything to which Employee is already entitled;

(5)   Employee has been advised in writing to consult with an attorney prior to executing this Agreement, and has, in fact had an opportunity to do so;

(6)   Employee has been given a period of up to at least (21) days, if desired, within which to consider this agreement;

(7)   Employee has a period of seven (7) days within which she can revoke this agreement, and the agreement shall not be effective until the seven-day revocation period has been exhausted.  Thus, the Effective Date of this Agreement is the eighth day after this Agreement has been executed, providing it was not revoked ("Effective Date").  Notice of revocation must be delivered in writing and received by the Company, Bravera Corporate Services, PO Box 111100 Carrollton, TX 75011, Attention: Wendell Stewart, by the end of the seven-day revocation period; and

(8)   Any changes made to this Agreement, whether material or immaterial, will not restart the running of this 21-day period.

Employee understands that nothing in this agreement is intended to interfere with or deter Employee's right to challenge the enforceability of the waiver of an ADEA claim or to

participate in any investigation or proceeding conducted by any investigative agency. However, a challenge to the waiver of an ADEA claim will not affect the validity of the release of all other claims covered by this Agreement.

This Agreement is intended by Employee and the Company to be a legally valid and binding agreement, to be construed in accordance with the laws of the State of South Carolina. If any provision of this Agreement is held to be unenforceable, illegal or invalid, such provision shall be fully severable from this Agreement and this Agreement shall be construed and enforced as if such unenforceable, illegal or invalid provision was never a part of this Agreement. All parties hereto hereby irrevocably submit to the nonexclusive jurisdiction of the state and federal courts of the State of South Carolina and agree and consent that service of process may be made upon them in any proceeding arising out of this Agreement by service of process as provided by South Carolina law. All parties hereto hereby irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any state court in Berkeley County, State of South Carolina, or in the United States District Court, and hereby further irrevocably waive any claims that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

This Agreement sets forth the entire agreement between Employee and the Company regarding the subject matter herein. No other promises have been made. The parties agree that the offer or execution of this Agreement is not an admission of liability of any nature by the Company or Employee and that it cannot be used in any proceeding other than one to enforce its terms.

**Bravera Inc.**

By: _____

      Wendell Stewart
      Human Resources

**EMPLOYEE'S AGREEMENT:** I have read the foregoing Agreement, agree to its terms, and acknowledge receipt of a copy of same and the sufficiency of the payments and other consideration recited herein, and I agree the payments offered are beyond those I am otherwise entitled to receive. I acknowledge that I have had a sufficient opportunity to seek counsel from any attorney with regard to all aspects of such Agreement (including, but not limited to, the releases contained herein), and I hereby voluntarily agree to the terms hereof.

Employee: _____    Date: _____

# TERRY ANN RICKSON, ESQ., INC.

102 WAPPOO CREEK DRIVE, NO. 8

CHARLESTON, SOUTH CAROLINA 29412

———

(843) 722-1500

FAX (843) 722-7080

terry@ricksonlaw.com

CERTIFIED SPECIALIST IN

EMPLOYMENT AND LABOR LAW

*Anne E. Mjaatvedt, Esq.*
*amjaatvedt@ricksonlaw.com*

October 29, 2007

FOR SETTLEMENT PURPOSES ONLY - SUBJECT TO RULE 408 AND INADMISSIBLE

<u>Sent via E-mail and U.S Mail</u>
Francis E. Wilde, President and CEO
Bravera, Inc.
P.O. Box 111100
Carrollton, TX 75011-1100

RE: Termination of Elizabeth Anne Conley

Dear Mr. Wilde:

This office represents Ms. Elizabeth Anne Conley with regard to the termination of her employment on October 15, 2007.

<u>Summary of Facts</u>

Ms. Conley has been employed by Bravera, Inc., since December of 2006 as Vice President of Strategic Accounts. Based on her excellent performance, Bravera and Ms. Conley executed a Senior Management Employment Agreement for a three-year term effective June 26, 2007, prior to Bravera's merger with Shea Development in July 2007.

On October 12, 2007, Ms. Conley was notified by Joe Vitetta, Senior Vice-President, that she would be terminated from her employment, and on October 15, 2007 received a termination letter and a document entitled, "Confidential Settlement Agreement and Release". The terms of the October 15 proposed agreement do not even begin to comport with the contractual severance provided by her Employment Agreement, thus breaching that contract.

Under the section entitled "Continuing Employment Upon a Change of Control", the June 26, 2007 Employment Agreement states:

> If the acquiring company fails to offer Employee an employment agreement containing such terms, then Employee shall be entitled to a lump sum severance in an amount not less than Employee's aggregate compensation (including salary, bonuses, and commission, whether or not paid) for the prior twelve month period, plus the continuation of all benefits for a period of twelve (12) months after the Termination Date. If the acquiring company terminates Employee's employment

Mr. Frank Wilde
10/29/2007
Page 2

or if Employee terminates employment for Good Reason within one (1) year after the Change of Control, then Employee shall be entitled to a lump sum severance in an amount equal to the lump sum severance Employee would have received in the prior sentence, plus the continuation of all benefits for a period of twelve (12) months after the Termination Date.  The provisions of the Section 15 shall be binding upon and enforceable against all successors and assigns of the Company.

In addition, as you are well aware, Ms. Conley was subjected to sexual harassment by Mr. Vitetta, who continued to harass her by email even after she insisted that he stop.  Despite complaints to upper management, Mr. Vitetta remained employed by the company, and Ms. Conley was required to interact with him in the performance of her job duties, all in violation of Title VII of the Civil Rights Act.  A fact-finder would be particularly outraged to discover that Shea Development executives knew that Mr. Vitetta had been terminated from prior employment for this same pattern of illegal behavior, yet he was hired into a senior executive position at the current company.

<u>Legal Analysis</u>

Under South Carolina law, for Bravera's breach of the June 26 Employment Agreement, Ms. Conley would be entitled to three years of salary and bonuses valued at least $472,000, plus benefits, including her contracted 4 weeks per year vacation pay.  In addition, the Company could be found in violation of the South Carolina Wage Claim Act, entitling Ms. Conley to treble damages, attorney's fees and costs.

For Bravera's violations of Title VII, Ms. Conley would be awarded compensatory and punitive damages, attorney's fees and costs.

At this early stage, prior to investing time and money in litigation, my client has authorized me to settle and compromise her federal and state court claims for $250,000.

Please forward this settlement proposal to your attorney or insurance adjuster and I would be happy to discuss it with him or her.  I look forward to your response.

Very truly yours,

Anne E. Mjaatvedt

AEM/kar

Cc:    Wendell Stewart
       Anne Conley

## DUNNINGTON, BARTHOLOW & MILLER LLP

MARVIN M. BROWN
RAYMOND J. DOWD
JOHN T. DUNLAP
GEORGE W. GOWEN
MICHAEL J. KOPCSAK
STEVEN E. LEWIS
ROBERT T. LINCOLN
ALBERT L. LINGELBACH
THOMAS V. MARINO
JOSEPH MICHAELS IV
C. FREDERICK ROGGE, III
JOHN W. SHROYER
CAROL A. SIGMOND
LOUIS E. TEITEL

ATTORNEYS AT LAW
477 MADISON AVENUE
NEW YORK, N. Y. 10022
——
TELEPHONE: (212) 682-8811
FACSIMILE: (212) 661-7769
DBM@DUNNINGTON.COM
WWW.DUNNINGTON.COM

FREDERICK W. LONDON
FRANCIS J. MOONEY, JR.
JOHN I. FORRY
OF COUNSEL

November 1, 2007

<u>Confidential; For Settlement Purposes Only</u>

Anne E. Mjaatvedt, Esq.
Terry Ann Rickson, Esq., Inc.        *By Electronic and First Class Mail*
102 Wappoo Creek Drive, No. 8
Charleston, South Carolina 29412

RE:  <u>Termination of Elizabeth Anne Conley</u>

Dear Ms. Mjaatvedt:

We are attorneys for Shea Development Corp. ("Shea"), and its wholly owned subsidiary Bravera, Inc. ("Bravera"). In response to your correspondence of October 29, 2007 addressed to Francis E. Wilde ("Mr. Wilde"), I submit this response to bring your attention to relevant facts concerning the October 15, 2007 termination of Ms. Conley's employment.

Ms. Conley was employed by Bravera as Vice President of Strategic Accounts before Shea acquired Bravera on July 17, 2007. In conjunction with Shea's acquisition of Bravera on July 17, 2007, she was hired as Vice President of Sales. Although the employment agreement between Ms. Conley and Bravera indicates a date of June 26, 2007 on page 1 thereof ("Employment Agreement"), it did not take effect until the date of the acquisition of Bravera by Shea on July 17, 2007. Ms. Conley was aware of this anticipated acquisition, not only from the Agreement and Plan of Merger that was executed by each company on April 26, 2007 ("Merger Agreement"), but also through her personal contributions in the course of due diligence that was conducted in connection therewith.

The Merger Agreement provides that:

> "At the Effective Time [July 17, 2007], the Surviving Corporation [Bravera as a wholly-owned subsidiary of Shea] will offer employment to and will employ the senior management team listed in <u>Schedule 1.14 Part I</u> (the "Senior Management Team") [which includes "Anne Conley, VP Sales"] for a period of three (3) years under the terms and conditions of Senior Management Employment Agreements, in the form set forth at <u>Schedule 1.14 Part II</u>, such employment agreements to be executed concurrently with the Closing [July 17, 2007]."

DUNNINGTON, BARTHOLOW & MILLER LLP

Anne E. Mjaatvedt, Esq.
November 1, 2007
Page 2

Although Ms. Conley did not execute her Employment Agreement concurrently with the closing, Shea accepted this Employment Agreement as conforming with that which was provided for in the Merger Agreement, as stated above. Accordingly, there has been no "change of control" at Bravera since the July 17, 2007 commencement date of the Employment Agreement, to render the "Continuing Employment Upon a Change of Control" provision applicable. Absent being regarded as such, any agreement that Ms. Conley made with Bravera prior to its acquisition by Shea was not an obligation assumed by Shea under the terms of the acquisition, and therefore any such claim should be made directly to Chris Watson, as President of Bravera prior to July 17, 2007 ("Mr. Watson").

Shea may have the right to have terminated Ms. Conley <u>for cause</u> on the basis of her "deliberate dishonesty," "breach of fiduciary duty," and "fraudulent act[s]" among other causes, but elected not to do so. Such cause stems in part from Ms. Conley's involvement in pre- and post-acquisition meetings, in which she and Mr. Watson made representations and commitments that Bravera would generate $2,300,000 in its third fiscal quarter, when in fact it generated just one-quarter of that amount. Since Bravera has a 6 to 9 month sales process, Ms. Conley, as the most senior executive of Bravera's sales division, had a responsibility to confirm and verify forecasts. It is apparent that she had knowledge of the fact that the revenues to be generated in 60 days' time were, in fact, not expected to be $2,300,000. Ms. Conley misrepresented and purposefully made representations to Shea that were not true, which were also the basis on which the compensation in her Employment Agreement was structured. After the July 17, 2007 acquisition, Ms. Conley disclosed to the management team at Shea and Bravera that the revenue pipeline that had been previously represented to be millions of dollars of value was capable of producing only $275,000 over the next 6 months.

In the beginning of September 2007, Bravera held an emergency meeting to develop programs designed to deal with Ms. Conley's and Mr. Watson's fraudulent misrepresentation that Bravera would reach the $2,300,000 quota for its third fiscal quarter and a $2,500,000 quota for its fourth fiscal quarter. After a week of meetings and work it was decided that Bravera would not be able to make up the vast discrepancy and that it would be necessary to drastically modify the operating structure of Bravera. In conjunction with this restructuring, Mr. Wilde offered to have further conversations with all of the members of Bravera's senior management team, in which each employee individually elected to participate, with the exception of Ms. Conley, who failed to make herself available by phone.

Prior to his abrupt departure from Bravera on October 1, 2007, Mr. Watson acknowledged and apologized to Mr. Wilde for his misrepresentations, stating that both he and Ms. Conley had full knowledge of the depth of the revenue problems at Bravera. Therefore, to assert that Ms. Conley's performance was "excellent" is an entirely subjective claim, since her performance as Vice President of Sales fell significantly below her own projected representations, in addition to consisting of "deliberate dishonesty," a "breach of fiduciary duty," and "fraudulent act[s]" on her part.

Despite Bravera's knowledge of Ms. Conley's misrepresentations, Bravera believed that she could be a reasonable performer through individual contributions if she was properly supervised and not under the management of Mr. Watson. Therefore, as part of the restructuring, Ms. Conley was

DUNNINGTON, BARTHOLOW & MILLER LLP

Anne E. Mjaatvedt, Esq.
November 1, 2007
Page 3

made an offer to remain in her current position at her current base salary and sell a different product. Ms. Conley rejected this offer, claiming that she would rather leave Bravera. In a subsequent discussion, Ms. Conley was later made an offer to remain in her current position at her current base salary and continue selling her existing products, at which time she stated that she did not wish to remain with Bravera. Although no written resignation was tendered, Bravera determined that it would be in Ms. Conley's and Bravera's mutual best interests for Bravera to provide her with a separation package in exchange for a release, in connection with the decision that she would leave Bravera. It is for this reason that the terms of the October 15, 2007 confidential separation agreement and general release ("Separation Agreement") do not conform to the contractual severance provided by her Employment Agreement. On October 15, 2007 the Separation Agreement was presented to her, offering: (a) four (4) months' salary; (b) an unearned Q3 commission payment; and (c) reimbursement for four (4) months' health insurance coverage at her employee contribution rate, which exceeded any amounts to which she would be entitled under the terms of her Employment Agreement, or otherwise, given the nature of her stated preference to leave Bravera.

Without prejudice to the foregoing, under the terms of the Employment Agreement, the amount to which Ms. Conley would be entitled if termination were made by Bravera, without cause, would be equal to: (a) salary accrued as of October 15, 2007; (b) salary for a period of six (6) months after October 15, 2007; (c) pro-rated performance bonus from January 1, 2008 through April 14, 2008; and (d) six (6) months' reimbursement for medical coverage at her employee contribution rate, subject to withholdings and payable in conformance with Bravera's regular payroll practices. This illustrates that the $60,366.66 (four (4) months' salary plus unearned Q3 commission payment) and four (4) months' medical coverage offered <u>exceeds</u> the $53,333.33 (six (6) months' salary and pro-rated performance bonus) and six (6) months' medical coverage, which she would otherwise be due. In exchange for a duly executed Separation Agreement, Bravera agrees to provide Ms. Conley with her choice of either: $60,366.66 and four (4) months' medical coverage, as set forth in the Separation Agreement; or $53,333.33 and six (6) months' medical coverage, as provided in the Employment Agreement. This offer shall remain in effect for a period of twenty-one (21) days from her separation date, until November 5, 2007.

In response to the allegation that Ms. Conley was subjected to sexual harassment by Mr. Vitetta, neither Bravera nor Shea received any reports or had any knowledge of any such allegations until her conversation with Bravera's Human Resources Director on or about October 12, 2007. As an employee of Bravera, Ms. Conley was provided with the company's policies concerning "open communication" and "sexual and other unlawful harassment" which sets forth in part:

> "If you experience or witness sexual or other unlawful harassment in the workplace, report it immediately to your supervisor. If the supervisor is unavailable or you believe it would be inappropriate to contact that person, you should immediately contact the Human Resources Office or any other member of management."

No such report was ever made by Ms. Conley to either a supervisor or Human Resources. If there was a claim that she had to make or wished to insure that Shea had knowledge of, numerous opportunities were provided for her to make such claim through confidential telephone conversations with Mr. Wilde, or otherwise. At the beginning of October when Mr. Wilde availed

DUNNINGTON, BARTHOLOW & MILLER LLP

Anne E. Mjaatvedt, Esq.
November 1, 2007
Page 4

himself to discuss any and all open issues with all senior management on an individual basis, Ms. Conley openly stated to him on a conference call with other participants that she had nothing to discuss with him. On or about October 12, 2007, Ms. Conley made reference to "sexual harassment" for the first time to the Human Resources Director. When he asked if she had filed a report, she told him that she had not. He asked Ms. Conley for details concerning her alleged claim, in order to investigate the matter further, but Ms. Conley failed to provide him with any details or specifics regarding any incident, time, or event whereby she felt sexually harassed. In addition to not having reported any claim during the term of her employment, at no time did Ms. Conley inform Mr. Vitetta that his conduct was unwelcome and should stop, either through words or through conduct demonstrating that the alleged harassment was unwelcome. At all times that Ms. Conley was in the presence of Mr. Vitetta, at least six (6) other company employees were also present, none of whom reported to have witnessed any sexual or other unlawful harassment.

Mr. Wilde is a proponent of safety and equal opportunity in the workplace and has a long track record of operating companies that promote these values. He personally reinforced this, emphasizing the behavior that is expected of Bravera's employees and its zero tolerance policy for transgressions at a senior management meeting soon after Shea's acquisition of Bravera, on July 19, 2007. Bravera and Shea take reasonable and appropriate measures to prevent any sexual harassment behavior within the workplace. Any sexual harassment claims that Ms. Conley may have had during her term of employment would have been addressed quickly and confidentially, pursuant to the company's policies; however, she failed to make any claims. If at any time during her employment with Bravera from July 17, 2007 through October 15, 2007, Ms. Conley felt that she was subjected to sexual harassment, she unreasonably failed to utilize the preventive and corrective opportunities provided to her by Bravera's grievance system.

The legal analysis applying South Carolina law is inapplicable to Ms. Conley's employment with Bravera, which pursuant to the terms of her Employment Agreement, is to be "enforced in accordance with the laws of the State of Florida without regard to the principles of conflict of laws."

An additional copy of the Separation Agreement is enclosed herewith for Ms. Conley's review and execution. Bravera maintains its position in offering the consideration set forth therein (or the alternative as set forth above), which exceeds the amount to which she would otherwise be entitled. All indemnifications provided therein will extend to Ms. Conley for her cooperation in the preparation for and any conduct of any future actions or claims that the company may commence against Mr. Watson with respect to the fraud and misrepresentations described herein. All rights reserved.

Very truly yours,

Gayle A. Taylor

Gayle A. Taylor

Encl.

cc:    Francis E. Wilde
       Wendell Stewart

**E-mail**

| | |
|---|---|
| From: | Gayle Taylor |
| Date: | Mon Nov 19, 07 - 6:08 PM - E-mail |
| To: | amjaatvedt@ricksonlaw.com |
| CC: | |
| Subject: | Form of Affidavit |
| | |
| Contact: | Taylor, Esq., Gayle |
| File: | Conley, Anne - Conley, Anne |

Attached please find a form of Affidavit for Anne's review, revision, and execution.  We anticipate her sworn Affidavit to be substantially similar to this, with additional information filled in, and she may expand on any points or related points therein.  I will forward you a Settlement Agreement tomorrow, whereby the company will release and indemnify her in connection with the contents of the Affidavit that she provides.


Regards,

Gayle A. Taylor, Esq.
Dunnington, Bartholow & Miller LLP
477 Madison Avenue, 12th floor
New York, New York 10022
Phone: 212-682-8811
Fax:    212-661-7769
Email:   gtaylor@dunnington.com

CONFIDENTIALITY NOTE: The information contained in this e-mail message and any attachment is confidential information intended for the use of the individual or entity named in this message. This information may be protected by attorney/client privilege, work product  privilege  or other  laws, rules, and regulations providing for the protection of confidential communications. If you are not the intended recipient, you are hereby notified that any retention, use, copying or forwarding of this message is prohibited. If you have received this e-mail message in error, please contact the sender of this message by return e-mail and delete this message and any attachments.

——

IRS CIRCULAR 230 DISCLOSURE:

To ensure our compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this document cannot be used for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter that is contained in this document.  Despite the Confidentiality Note above, there is no limitation on disclosure by the intended recipient of the tax treatment or tax structure of the transaction that is the subject of the written advice.

——

Attachments: A Conley Affidavit (11-19-07).doc

# A F F I D A V I T

STATE OF SOUTH CAROLINA    )
                             ) ss:
COUNTY OF _____    )

      ELIZABETH ANN CONLEY, residing at _____,having been being duly sworn, deposes and says:

      1.  I was employed by Bravera, Inc. (under the control and management of Christopher Watson ("Mr. Watson")), as Vice President of Strategic Accounts from December 2006 until Bravera, Inc. was acquired by Shea Development Corp. ("Shea") on July 17, 2007 (the "Acquisition").  During this period, I reported directly to Mr. Watson who was the President, CEO, and sole owner of the company.

      2.  From July 17, 2007 until October 15, 2007, I was employed by Bravera, Inc. (a wholly owned subsidiary of Shea) ("Bravera") as Vice President of Sales, pursuant to an employment agreement ("Employment Agreement") which took effect upon the Acquisition.

      3.  As the Vice President of Strategic Accounts from December 2006 until July 17, 2007, it was my responsibility to determine Bravera's pipeline of anticipated sales, and as part of my regular duties I prepared written reports of projected sales on a **[monthly / weekly / daily]** basis.  In addition to written reports, I regularly provided Mr. Watson with oral updates as information about potential sales became available.

      4.  As the Vice President of Sales from July 17, 2007 through October 15, 2007, it was my responsibility to continue to determine Bravera's pipeline of anticipated sales, and as part of my regular duties I prepared written reports of projected sales on a **[monthly / weekly / daily]** basis.  In addition to written reports, I regularly provided _____ with oral updates as information about potential sales became available.

5.  On or about _____, I became aware that Mr. Watson had provided Shea with projected sales figures of $8,000,000 to $10,000,000 for the calendar year 2007.  A copy of that projection is annexed as Exhibit A hereto.

6.  Prior to May 31, 2007, I had presented to Mr. Watson with a report dated _____, which projected sales for the calendar year 2007 to be $_____.  A copy of my projection is annexed as Exhibit B hereto.

7.  During my employment with Bravera, Inc., prior to and subsequent to the Acquisition, I primarily used SalesForce.com to track and report actual and potential sales.

8.  My sales projections, as inputted into SalesForce.com, or otherwise [describe other reports], were based on specific customer sales opportunities available at the time that I entered the sales data into such report.

9.  Attached as Exhibit C hereto are copies of my projected sales reports for April, May, June and July 2007 all of which were given to Mr. Watson.

10. On or around July 15, 2007, I had projected sales for the remainder of calendar year 2007 to be $_____.

11.  Mr. Watson never challenged the accuracy of the overall numbers reported in the projections attached as Exhibits B & C hereto.

12.  By the time of the closing of the Acquisition, I was aware that the customers **[list names]** (listed on Exhibit A) had elected to purchase their related software and services from competitors of Bravera, Inc. by _____[how she was informed].

13.  Mr. Watson and I first communicated with each other about the potential customers having contracted with Bravera's competitors on _____, 2007.

14.  I had updated the information and "Probability" column in SalesForce.com _____ days after learning that such potential customers engaged the services of a Bravera competitor.

2

15.  On October 17, 2007, at or around 7:12 a.m., I logged onto Bravera's SalesForce.com system for the purpose of _____.

16.  From July 17, 2007, through the date hereof, I did not breach any duties as an employee and officer of Bravera, including but not limited to any breach of fiduciary duty, confidentiality, misfeasance, or fraud.

17.  I agree, at Shea's or Bravera's request, and upon receipt of reasonable notice, to voluntarily participate and provide testimony or bear witness in connection with any action or matter arising out of the Acquisition, for which Shea and / or Bravera will provide legal representation for me, at their expense, if it is done so upon Shea and / or Bravera's request.


_____
Elizabeth Anne Conley

Subscribed and sworn to before me,
this _____ day of November, 2007


_____
        NOTARY PUBLIC


My commission expires: _____, 20____.

3

**E-mail**

From:           Gayle Taylor
Date:           Tue Nov 20, 07 - 9:04 AM - E-mail
To:             amjaatvedt@ricksonlaw.com
CC:
Subject:        Settlement Agreement

Contact:        Taylor, Esq., Gayle
File:           Conley, Anne - Conley, Anne

Anne,
In exchange for Anne Conley providing a duly sworn Affidavit, the company will furnish her with a Settlement Agreement indemnifying her in connection with the statements made therein, substantially in the form of the attached.  I am available to discuss at your convenience.  If possible, we would like to finalize these before Thanksgiving.


Regards,

Gayle A. Taylor, Esq.
Dunnington, Bartholow & Miller LLP
477 Madison Avenue, 12th floor
New York, New York 10022
Phone: 212-682-8811
Fax:    212-661-7769
Email:   gtaylor@dunnington.com

CONFIDENTIALITY NOTE: The information contained in this e-mail message and any attachment is confidential information intended for the use of the individual or entity named in this message. This information may be protected by attorney/client privilege, work product  privilege or other  laws, rules, and regulations providing for the protection of confidential communications. If you are not the intended recipient, you are hereby notified that any retention, use, copying or forwarding of this message is prohibited. If you have received this e-mail message in error, please contact the sender of this message by return e-mail and delete this message and any attachments.

———

IRS CIRCULAR 230 DISCLOSURE:

To ensure our compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this document cannot be used for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter that is contained in this document.  Despite the Confidentiality Note above, there is no limitation on disclosure by the intended recipient of the tax treatment or tax structure of the transaction that is the subject of the written advice.

———


Attachments: A Conley Settlement Agr (11-20-07).doc

11/20/07 Draft – **CONFIDENTIAL**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement") entered into as of this ___ day of November, 2007 ("Effective Date") is made by and on behalf of the following person and entities: Elizabeth Anne Conley ("Ms. Conley"), Shea Development Corp., a Nevada corporation ("Shea"), and Shea's wholly owned subsidiary, Bravera, Inc., a Florida corporation ("Bravera") (together the "Parties").

WHEREAS, Ms. Conley was employed by Bravera, Inc. as Vice President of Strategic Accounts, under the control and management of Christopher Watson ("Mr. Watson"), from December 2006 until Bravera was acquired by Shea on July 17, 2007 (the "Acquisition"), whereupon Ms. Conley became Vice President of Sales of Bravera (a wholly owned subsidiary of Shea) from such date through October 15, 2007;

WHEREAS, various disputes have arisen between Shea and Bravera on the one hand, and Mr. Watson on the other hand, in connection Mr. Watson's misrepresentations in the course of the Acquisition of Bravera, as set forth in the Agreement and Plan of Merger executed on or around April 27, 2007, and thereafter;

WHEREAS, as an executive employee of Bravera both before and after the Acquisition, Ms. Conley had knowledge and responsibility for Bravera's projected sales forecasts and sales;

WHEREAS, as an executive employee of Bravera both before and after the Acquisition, Ms. Conley exchanged reports and had conversations with Mr. Watson regarding Bravera's projected sales forecasts and sales;

WHEREAS, during the Acquisition of Bravera by Shea, Mr. Watson provided Shea with

1

anticipated sales projections of $8,000,000 to $10,000,000 for the calendar year 2007;

WHEREAS, at a company meeting in September 2007, Ms. Conley advised Shea's management team that the actual projected sales for the same period that had previously been estimated to be $8,000,000 to $10,000.000 was only $275,000.

WHEREAS, Ms. Conley has provided a sworn Affidavit stating that she had no knowledge of the erroneous sales projections that Mr. Watson had provided to Shea in connection with the Acquisition until _____, 2007.

WHEREAS, Ms. Conley has identified in her sworn Affidavit that a number of customers who were listed as potential sales for Bravera by Mr. Watson were already known by Bravera and Mr. Watson to have contracted with competitors of Bravera and therefore, should not have been included in the sales projections that Mr. Watson presented to Shea;

WHEREAS, Ms. Conley has stated in her sworn Affidavit that Mr. Watson knew or should have known that those customers should not have been included in the projected sales reports that were provided to Shea;

WHEREAS, the Parties now intend to amicably settle, compromise and resolve the claims, disagreements, disputes and demands that may exist between them arising out of the Acquisition, through the date hereof;

NOW, THEREFORE, in consideration of the above premises and the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agree as follows:

1.    <u>Delivery of Affidavit</u>.  At the same time as Ms. Conley executes this Settlement Agreement, she shall deliver to Shea her duly sworn affidavit, substantially in the form attached

2

hereto as Exhibit A (the "Affidavit").

2.    <u>Testimony / Affidavit</u>.  In return for any testimony offered by Ms. Conley at Shea's request, in connection with any dispute, litigation, claim, expense, demand, liability and/or damage incurred by and/or made in connection with Mr. Watson or the Acquisition and Shea or Bravera, Bravera shall select and provide Ms. Conley with her legal representation, at its expense, and shall reimburse Ms. Conley for all reasonable travel related expenses in accordance with Shea's normal travel policies for its executives.  Shea represents that the Affidavit provided by Ms. Conley on the date hereof shall be used in the course of any dispute, litigation, claim, expense, demand, liability and/or damage incurred by and/or made in connection with Mr. Watson or the Acquisition, <u>only</u> in the event that any further testimony by Ms. Conley is contrary to the contents of the Affidavit.

3.    <u>Indemnification.</u>

(a)  In exchange for the Affidavit, Shea and Bravera agree to indemnify and hold Ms. Conley harmless from any litigation, claim, expense, demand, liability and/or damage incurred by and/or made in connection with the Acquisition asserted by any officer, director, entity, or company which they control directly or indirectly.

(b)  In the event that the Affidavit is found to be contrary to the contents of any further testimony or valid evidence in connection with the contents thereof, Ms. Conley shall be in breach of this Settlement Agreement, and no release or indemnification shall be provided to her; and whereupon Shea and Bravera shall have the right to seek any legal or equitable relief that may be available to enforce their rights with respect to the same including all attorneys' fees incurred, as a result of the breach.

(c)  Any attorneys' fees that Ms. Conley herself may incur in connection with any dispute, litigation, claim, expense, demand, liability and/or damage incurred by and/or made in connection with Mr. Watson or the Acquisition, for which Shea or Bravera request such testimony, shall be reimbursed by Shea or Bravera <u>only</u> in the event that Ms. Conley is represented in such matter by legal counsel of Shea or Bravera's choosing.

4.    <u>Non-Disparagement</u>.  Ms. Conley agrees that neither she nor her representatives will make any oral or written statement or communication directly or indirectly to any person or entity which disparages, or has the effect of damaging the personal or professional standing and/or reputation of Shea, Bravera, and/or its affiliates, officers, directors, or employees, whether truthful or not.

5.    <u>Enforcement of Settlement Terms</u>:  It is understood and agreed that all terms of this Settlement Agreement are material.  The failure of Ms. Conley to perform any obligations of this Settlement Agreement shall be deemed a material breach.  Upon any breach by Ms. Conley of any of the terms and or obligations of this Settlement Agreement, Shea and Bravera shall have the right to seek any legal or equitable relief that may be available to enforce their rights with respect to same including all attorneys' fees incurred, as a result of the breach.

6.    <u>No Waiver</u>:    Failure to declare a breach or the actual waiver of any particular breach of this Settlement Agreement or any of its terms by Ms. Conley shall not operate as a waiver of any of her rights or remedies as to any other breach.

7.    <u>Miscellaneous</u>.  The following terms, conditions and principles shall apply to this Settlement Agreement:

(a)  <u>Governing Law and Severability</u>.  This Settlement Agreement shall be

governed by and construed in accordance with the laws of the State of New York. If any provision of this Settlement Agreement is determined to be invalid or illegal, such provision shall not affect the validity or legality of the remaining provisions hereof.

(b) <u>No Admission of Liability</u>. This Settlement Agreement represents a compromise and a resolution of a good faith dispute. This Settlement Agreement, and any negotiations, discussions or proceedings connected with it, shall not, in any event, constitute or be construed as, or be deemed to be evidence of, an admission of, or concessions of, any liability or wrongdoing by any party hereto.

(c) <u>Entire Understanding</u>. This Settlement Agreement embodies the entire understanding between and among the Parties hereto concerning this Settlement Agreement as well as the matter arising in any such dispute, litigation, claim, expense, demand, liability and/or damage. Any and all prior correspondence, pleading, conversation or memoranda are merged herein and replaced and superseded hereby.

(d) <u>Assignment</u>. This Settlement Agreement is a personal contract, and, except as specifically set forth herein, the rights and interests of Ms. Conley herein may not be sold, transferred, assigned, pledged or hypothecated. The rights and obligations of Shea and Bravera hereunder shall be binding upon and shall run in favor of Shea and Bravera, and each of their successors and assigns.

(e) <u>Modification</u>. No change, waiver, modification or termination of this Settlement Agreement may be effected without the written consent of an authorized representative of each party hereto.

(f) <u>Execution</u>. This Settlement Agreement may be executed using one or more

counterparts.  If multiple copies are executed, the several executed copies together shall be considered an original and shall be binding on the Parties.  If enforcement of this Settlement Agreement is necessary, use of a fully-executed copy shall be just as effective as the original.

(g) <u>Headings</u>.  The headings and sub-headings hereto are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Settlement Agreement.

(h) <u>Disputes</u>.  Should a dispute arise between the Parties concerning this Settlement Agreement, including without limitation, a dispute involving the interpretation, application, or compliance with the specific terms and conditions of this Settlement Agreement, the dispute shall be submitted to the applicable local, federal, or appellate courts located in New York, New York.

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the day and year first above written.

**Shea Development Corp.**

_____          By: _____
Elizabeth Anne Conley                        Francis E. Wilde
                                                          President & CEO

**Bravera, Inc.**

                                                By: _____
                                                          Francis E. Wilde
                                                          President & CEO

# TERRY ANN RICKSON, ESQ., INC.

102 WAPPOO CREEK DRIVE, NO. 8
CHARLESTON, SOUTH CAROLINA 29412

(843) 722-1500
FAX (843) 722-7080
terry@ricksonlaw.com

CERTIFIED SPECIALIST IN
EMPLOYMENT AND LABOR LAW

December 4, 2007

FOR SETTLEMENT PURPOSES ONLY - SUBJECT TO RULE 408 AND INADMISSIBLE

<u>Via E-Mail and U.S. Mail</u>
Gayle Taylor, Esq.
Dunnington, Bartholow & Miller, LLP
477 Madison Avenue, 12th Floor
New York New York 10022

RE:  Anne Conley v. Bravera

Dear Ms. Taylor:

We received your client's proposed affidavit and associated settlement agreement on November 19 and 20, and have now had a chance to discuss it with our client.

A review of the draft affidavit confirms an issue that you and I discussed during the course of our phone conversations.  Specifically, our client does not have, and never has had, the level of knowledge regarding sales, sales projections, or merger-related representations that would allow her to sign the affidavit dated 11/19/07, nor does she have any of the documents referenced.

Ms. Conley was employed by Bravera, under the control of Chris Watson (hereinafter "Bravera/Watson"), as Vice-President of Sales from December 2006 to July 17, 2007 (not VP of Strategic Accounts as stated in the affidavit).  Despite this title, she was primarily responsible for her own sales and customers, and had little more than incidental knowledge of sales activity of other salespeople or Chris Watson, all of whom had their own customers.  Her regular duties never involved tracking other people's sales or providing reports of projected sales outside of her own.   She is listed as system administrator of SalesForce only because she renewed the software license, however, everyone at Bravera/Watson had access to it, and generally input his or her own sales tracking information.[1]

Her correct title at Bravera when it became a subsidiary of Shea (hereinafter "Bravera/Shea") was Vice-President of Strategic Accounts.  Again, her responsibility was for her own accounts.  In addition, she did not participate in preparing reports, or making presentations, nor representations regarding the merger.  She only attended two meetings with Mr. Wilde, one

---

[1] Due to the SalesForce software license renewal under her name, all information entered by anyone during the prior license period was listed in her name when the license was reactivated, until such time as the appropriate sales people went back in and changed it.  Some of the customer information was never updated.

Gayle Taylor, Esq.
12/4/2007
Page 2

pre-merger, and one post-merger. She had no input or prior knowledge of what would be presented at either meeting. To her recollection, the only time she spoke at those meetings was to clarify information that she heard at the presentations regarding her own accounts.

In light of the above, clearly she cannot sign the affidavit. She will testify truthfully when required, however, she is clearly uncomfortable with being paid her contractual entitlement in exchange for her testimony. Despite all assurances that these documents would be confidential, we feel that the affidavit/settlement documents or their substance would be discoverable, to the detriment of all parties involved.

This returns us back to the original position, that Ms. Conley's severance is a matter of contract. It is agreed that Ms. Conley was terminated without cause by letter dated October 15, 2007. As of that time, she had already earned, but has yet been paid, Q3 guaranteed commission, 50 hours accrued PTO, and equity based compensation as part of her regular compensation. While our client still holds the position that the change of control clause applies, and without prejudice to that position, she is still at this time willing to consider her reasonable offer to settle under the "Termination without Cause" clause of her agreement. Under the terms of that contract, her severance after October 15, 2007 includes 6 months salary, Q4 - 2007, Q1 and Q2, 2008, PTO that would accrue over that six months and all unvested shares that would accelerate to vested under the agreement.

Under Florida contract law, ambiguities in a contract are interpreted against the drafter. The termination without cause refers to " all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) and all benefits for a period of six (6) months after the termination date". While the sections and paragraphs are not numbered in Ms. Conley's Employment Agreement of June 26, 2007, one only needs to count the paragraphs and subparagraphs to find that 4(c) points to the paragraph entitled "Commissions" on page one, wherein it refers to "guarantee commission for Q3 and Q4" in the amounts of $28,700 and $28,750 respectively.

Also, contrary to your client's assertions that the company was not on notice of the sexual harassment claim, Ms. Conley complained to Mr. Watson about Joe Vitetta's actions, and she was informed that Mr. Watson conveyed that original complaint to Mr. Wilde. In fact, Mr. Watson was told at a post-merger party that Mr. Vitetta had been terminated from one of Mr. Wilde's prior companies for similar misconduct, and that Mr. Wilde admitted that "Joe is a liability". This puts the post-merger Bravera/Shea on notice of his actions, and therefore liable. At one point post-merger, when Ms. Conley was trying to set up an interview dinner at a sushi restaurant with a potential employee, including herself and Mr. Vitetta, he e-mailed her back that "I love sushi especially if the ginger juices are mingled with yours." She immediately cancelled the meeting. This e-mail is still under the control of Bravera/Shea, and by our first letter and this letter, your client's records custodian is on notice to preserve all company e-mails generated between July 17, 2007 and October 15, 2007.

Gayle Taylor, Esq.
12/4/2007
Page 3

For all of the above reasons, Ms. Conley cannot sign the affidavit, nor enter into the settlement agreement presented.  However, in light of the above, including her termination without cause and the seriousness of the sexual harassment complaint, you will find that her demand for $140,000 — the approximate value of her salary, commissions, bonuses, accrued PTO and 100,500 vested stock options, all provided under the terms of the "Termination Without Cause" clause in her Employment Agreement — to be very reasonable.

If we are unable to reach a settlement, my client fully intends to pursue litigation in order to protect her statutory and contractual rights.

We look forward to hearing from you, and to a resolution to this matter.

Very truly yours,

Anne E. Mjaatvedt

Cc:    Anne Conley

**E-mail**

From:        Gayle Taylor
Date:        Fri Dec 14, 07 - 5:21 PM - E-mail
To:          amjaatvedt@ricksonlaw.com
CC:
Subject:     RE: Conley _Bravera

Contact:     Taylor, Esq., Gayle
File:        Conley, Anne - Conley, Anne

Anne,
Attached please find a copy of the Complaint that was filed.  The
Company is currently re-commencing settlement negotiations with Chris,
in which a Separation and Release Agreement with Anne would be
incorporated.  We will keep you apprised of any further progress with
respect to that.  Absent the execution of a Settlement Agreement with
Chris and a Separation and Release Agreement with Anne (a revised form
of which will be provided to you on Monday) next week, the Company will
proceed with the prosecution of the lawsuit.


Regards,

Gayle A. Taylor, Esq.
Dunnington, Bartholow & Miller LLP
477 Madison Avenue, 12th floor
New York, New York 10022
Phone: 212-682-8811
Fax:    212-661-7769
Email:  gtaylor@dunnington.com

_____

CONFIDENTIALITY NOTE: The information contained in this e-mail message and any attachment is confidential information
intended for the use of the individual or entity named in this message. This information may be protected by attorney/client
privilege, work product  privilege  or other  laws, rules, and regulations providing for the protection of confidential
communications. If you are not the intended recipient, you are hereby notified that any retention, use, copying or forwarding
of this message is prohibited. If you have received this e-mail message in error, please contact the sender of this message
by return e-mail and delete this message and any attachments.
_____

IRS CIRCULAR 230 DISCLOSURE:
To ensure our compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this
document cannot be used for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any transaction or matter that is contained in this document.  Despite the
Confidentiality Note above, there is no limitation on disclosure by the intended recipient of the tax treatment or tax structure
of the transaction that is the subject of the written advice.

Attachments: Complaint 12-12-07.pdf