UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                               :

SHEA DEVELOPMENT CORP., BRAVERA, INC., :
and IP HOLDING OF NEVADA CORP.,

                               :

             Plaintiffs,          :   Civil Action No. 07-CV-11201 (DLC)

                               :

             v.                 :

                               :

CHRISTOPHER WATSON and ELIZABETH   :
ANNE CONLEY,

                               :

             Defendants.      :

                               :

-------------------------------------------------------------X

**SUPPLEMENTAL DECLARATION OF DEFENDANT CHRISTOPHER WATSON**

CHRISTOPHER WATSON, the undersigned, hereby declares and says:

    1.      I am Christopher Watson and have been named as a Defendant in this action.

    2.      I reside in the State of Florida and was residing in the State of Florida at the time the Complaint was filed.  My permanent address is 3910 South Roosevelt, Key West, Florida 33040.

    3.      I am currently separated from my wife, who resides with my children in South Carolina.  I decided to move to Florida several years ago, at or around the same time as I incorporated my companies Bravera, Inc. and Intellectus, LLC in Florida.  Florida reminds me of Southern California, where I was born; and with a private plane, it is close enough to visit my children frequently. In May of 2007, considerably prior to the sale of Bravera to Shea Development Corp., I moved to Key West from St. Augustine, Florida.  It was my separation from my wife, and a desire to live in a more tropical location, that induced me to move to Florida many years before the initiation of this lawsuit.  I became separated from my wife in January

2005.  My wife and I are very focused on our children and, generally, are able to work together for the benefit of the children.  I am very focused on having and maintaining a good life for my children and seeing them frequently.  I do not anticipate reconciling with my wife in the immediate future.

4.    I began to search for Florida properties to live in as early as 2005.  (Attached as Exhibit A is a true and correct copy of property search results I performed for Jacksonville and Neptune Beach, Florida in 2005.)

5.    I first moved to St. Augustine, Florida in 2005, residing at 890 A1A Beach Blvd. I resided there for slightly over a year but discovered that while I like Florida, I don't like St. Augustine.  Realizing my Florida address would quite possibly be changing frequently as I searched for a location in Florida for a more permanent home, I established a "permanent" mail address in Florida in Jacksonville Florida in late 2005 – early 2006.  Jacksonville, Orlando and Key West were my primary locations of interest in Florida and I have looked for both rental and purchase property in the locations.  In May of 2007, I moved to Key West, Florida, my current place of residence, where I currently rent a home.

6.    Currently, and at the time this lawsuit was filed, I live in an apartment 3910 South Roosevelt, Key West, Florida.  I moved into that apartment on May 2007.  I lease that apartment, and my lease runs until March 2008.  It is currently my intention either to renew that lease, or to find another place in Key West, Florida to rent or own as my primary residence.  (A true and correct copy of excerpts of my lease, with redactions to omit irrelevant details of a personal or confidential nature, is attached as Exhibit B hereto.)

7.    I am registered to vote in Florida.  (A true and correct copy of my voter registration card is attached hereto as Exhibit C.)  I registered to vote in Florida on May 2,

2007—approximately seven months before this lawsuit was filed.

8.    I drive a Mini Cooper. The car is owned by my company, Intellectus, and I drive it as my primary car in Florida. I park it at my residence in Key West, which comes with a parking space. The car is registered and insured in Florida and it bears Florida license plates. The car is registered and licensed in Florida because I live in Florida and I understand I am required to license and register my car in Florida as a result. (True and correct copies of my registration and insurance, with redactions to omit irrelevant details of a personal or confidential nature, are attached as Exhibits D and E hereto.)

9.    My driver's licensed is issued by Florida. (A true and correct copy of my driver's license, with redactions to omit irrelevant details of a personal or confidential nature, is attached as Exhibit F hereto.) My license was issued on May 2, 2007—some seven months prior to when Plaintiffs initiated this lawsuit.

10.    I keep my personal effects, clothing, furniture, etc. in my apartment in Key West, Florida and have done so since well before this lawsuit began. I have maintained apartments in Virginia and South Carolina where I also store certain clothing and other personal effects. I travel frequently on business. I like to have effects, business or personal, "pre-positioned" to more efficiently and comfortably travel. As someone who is very mobile and has substantial demands on my time, I first keep my obligations to my children and then to my businesses, leaving me with far less time to spend in my residence than I would prefer.

11.    The sale of my business, Bravera, to Shea Development Corp. (which is located in Florida) was supposed to move my locus of business activity to Florida, as well as provide an increased amount of capital to maintain my lifestyle. As a result of Shea's non-performance on the terms of the merger and related agreements, which is the subject of multiple lawsuits against

3

them, I have spent more time attending to business outside of Florida than I had originally anticipated. Nonetheless, I consider Florida my home and this is where I return when I am finished traveling for business or other purposes.

12.     I have purchased renter's insurance for my Florida apartment. My renter's insurance is issued from a Florida company by the name of American Bankers Insurance Company of Florida. I obtained that insurance in April 2007—about eight months before the Plaintiffs started this lawsuit. (A true and correct copy of an April 20, 2007 e-mail confirming my renter's insurance is attached hereto as Exhibit G.)

13.     My tax returns reflect that I live in Florida. My Federal Form W-2 Wage and Tax Statement from Bravera, Inc., my Federal Form 1040 Individual Tax Return for 2006, and the Federal Form 1065 Partnership Income Tax Return for Intellectus, LLC for 2005 reflect that I am a Florida resident and taxpayer. Plaintiffs seem to be confusing my statement that I pay taxes in Florida as relating to the payment of personal state income tax, which does not exist in Florida, although I pay the various other taxes that Florida does have, such as the asset based corporate taxes, sales and the various other taxes that I and other Florida residents pay both indirectly and directly. (True and correct excerpted copies of these documents, with redactions to omit irrelevant details of a personal or confidential nature, are attached as Exhibits H through J hereto.) My tax returns since 2005 reflect that although my wife and I are "married, filing jointly", she and I have separate mailing addresses on the returns.

14.     I have a doctor in Florida whom I visit periodically. I began to see this doctor when I lived in the St. Augustine area and I have continued to visit him occasionally since then. I have no doctor in South Carolina. I have a doctor in Washington, D.C. whom I also see periodically.

15.   Because it is my intention to remain in Florida and because I enjoy living here, I have periodically made inquiries about purchasing property in Florida. At various times, I have considered purchasing properties in Jacksonville, Orlando, and Key West area. I have reviewed realtors' listings for properties in these areas and have spoken with realtors from time to time about the possibility of purchasing Florida property. Because the real estate market has not been favorable over the last several months, I have delayed making a purchase until market conditions and my personal finances improve.

16.   Because I travel frequently and have moved a number of times within Florida since my separation from my wife, I have chosen to maintain a stable mailing address at 4446-1A Hendricks, Jacksonville, Florida 32207. This address is reflected on my Employment Agreement with Bravera, Inc., my Federal Form W-2 Wage and Tax Statement from Bravera, Inc., my Federal Form 1040 Individual Tax Return for 2006, and the Federal Form 1065 Partnership Income Tax Return for Intellectus, LLC for 2005. Once I purchase a property in Florida, I will have a long-term address that I will use for such purposes.

17.   Because I am a businessman and travel frequently, I do not maintain a permanent telephone line in Florida, but instead rely on my cell phone as my primary phone. My cell phone has a Washington, DC area code (202), although I do not live in Washington, D.C.

18.   I currently own three businesses, Daniel Partners LLC, Intellectus LLC and SD2R LLC. Daniel Island Partners, is a South Carolina real estate company and holds my real estate investments in South Carolina. Intellectus is an Information Technology company and a Florida corporation. SD2R LLC is a real estate company and holds my real estate investments in Virginia and is a Virginia corporation. These businesses each have a common mailing address of 300 Bucksley lane #305 in South Carolina, but their business does not all relate to or take place

in South Carolina. With my diverse interests it would be highly chaotic if I did not have a single "back office" location to manage the mail and other routine business activities. Important mail items are scanned and sent to me electronically as I do not have a set schedule for visiting the mailing address for my companies.

19.    I perform most of my work for these companies "on the road" and do not have to spend significant amounts of time in either South Carolina or Virginia to maintain and develop these businesses. These businesses are located where they were simply because it was convenient for me to do so at the time those businesses were created, which was well before the current lawsuit was initiated.

20.    I grew up in Southern California. I have family members in California and Colorado (as well as my children in South Carolina).

21.    My accountants are located in Maryland.

22.    My primary litigation attorneys are located in New York. I also frequently consult with counsel in Maryland.

23.    The Plaintiffs have implied that I live in South Carolina. This is false. While I do visit South Carolina often, this is because my children live there and because I have continuing business there (as well as elsewhere). Although I do spend several months of the year in South Carolina visiting my family and conducting business, I do not reside in South Carolina and do not consider that state my home.

24.    In fact, I have never been a permanent resident of South Carolina. I moved from Maryland to Florida in 2005 at or around the same time I moved my wife and Children to Daniel Island, South Carolina, which represented an ideal environment and safe haven for my children.

25.    I have put one of the South Carolina investment properties owned by Daniel

Island Partners up for sale approximately a year ago. I have not yet been able to sell that property because market conditions have not been favorable. I would like to sell it in the near future. In fact, I recently put the South Carolina property back on the market.

26.    In his Affidavit, Mr. Frederick makes references to a golf club. This property has the club membership associated with it although it is a "social" membership with no golf privileges. I don't like golf, haven't played in well over a year and rarely go to the club except occasionally during the summer when I take my children to the pool.

27.    I never held a South Carolina's driver's license, nor was I ever registered to vote there.

28.    I have  my primary personal bank accounts in South Carolina with a large multi state bank for the same reason I receive mail for my business at one location in South Carolina: it is convenient for my secretary to be able to handle my personal banking at the same bank and locations as she handles my corporate banking.

29.    I do not view South Carolina as my home and my preference and intention is to continue to live in Florida.

30.    In the past, I used my personal airplane to visit my children in South Carolina. I understand from the Affidavit of R. Dodge Frederick that only certain flight plans for this aircraft indicated Key West as destination.  (Frederick Aff. ¶ 20, Jan. 31, 2008.)  However, generally only "instrument flight rule" or "IFR" plans are filed and stored long term. In accordance with general aviation practice, I also fly under "visual flight rules" or "VFR."  When I fly VFR, I don't file flight plans. Instrument flight rule is mandated for adverse weather and visibility conditions, and VFR is available and convenient when weather conditions are favorable. Thus, the filings that Mr. Frederick has cited do not reflect all of my flights, and understate the number

LIBNY/4694757.4

of flights I have made to Florida and Key West. My flight logs show that I flew to and from Key West on over 15 occasions in 2006 and 2007. Of course, I also return home by means other than my airplane, such as by driving.

31.     Plaintiffs' affidavits make incorrect assertions about various properties in South Carolina. On October 1, 2007—more than two months before this lawsuit began—I conveyed the house in South Carolina that my wife and children occupy to my wife as part of our separation.

32.     Plaintiffs' affidavits note that I have filed a lawsuit against Shea in South Carolina. I have also filed lawsuits against Shea and Shea affiliates in Virginia and New York relating to different claims. I do not reside in any of those states, notwithstanding the fact that I have valid claims against Shea and its affiliates that are properly asserted in those fora.

33.     Plaintiffs' affidavits assert that I belong to a golf club in South Carolina. That is false. The lot on Hidden Bottom has a "social" club membership attached to it. I do not have any golf club memberships in South Carolina. The last time I played golf at the Daniel Island Golf Club was over a year ago.

34.     Plaintiffs' affidavits make incorrect statements about a BMW automobile which I previously used when I was employed by Plaintiff Bravera. The BMW was purchased through an installment loan in my personal name, although the title is held by Bravera. That car is and at all relevant times was registered in Maryland. Since the termination of my employment, Bravera has refused to convey the title to me despite the fact that I am personally and solely on the lease, am paying for the car and they have previously agreed to transfer the title to me or my company Intellectus. I am currently engaged in a dispute with Bravera about the payment and ownership of this car. I have generally left it the former Bravera offices at the Bucksley Lane address in

8

South Carolina pending the resolution of the dispute. I rarely drive that car, but instead use my Mini Cooper as my primary automobile.

35.    Various statements in Plaintiffs' affidavits are incorrect and mutually inconsistent. For example, Mr. Wilde asserts that I told him that I purchased a home In South Carolina for $2 million dollars. That is false, and, indeed, Mr. Frederick's Affidavit makes clear that I paid $499,900 for my former South Carolina home which I later conveyed to my wife. I have never purchased a $2 million home.

36.    Mr. Wilde asserts that I told him that I come to Florida occasionally as a "tax dodge." That is false. I never said that to Mr. Wilde, nor is it true. I pay a portion of my income in Florida, Virginia and South Carolina either directly or from my various companies as advised by my CPAs in accordance with their recommendations as to appropriate apportionment of income owed by my businesses to the various localities. Residing in Florida costs me more in total expenditures than it would for me to maintain my primary residence in either Virginia or South Carolina and drop Florida as my residence. Nonetheless, I have chosen to live in Florida.

37.    The Plaintiffs are well aware that my primary residence is in Florida. They previously hired me to be the head of all sales for Shea Development Corporation, which is located in Florida. I have discussed with Mr. Wilde and others that I live in Florida. I have listed my Florida addresses in my contracts with Plaintiffs and my W-2 and other tax forms.

38.    My Employment Agreement with Shea and Bravera indicated that I am a Florida resident. In fact, the parties chose a Florida venue for their disputes under that agreement precisely because they knew that I was living and working in Florida. (Attached as Exhibit K is a true and correct copy of my Senior Management Employment Agreement.)

39.    I would be pleased to proceed in this Court with respect to my various disputes

against Shea and its affiliates. But I live in Florida and I understand that this case therefore cannot proceed here. I offer this Declaration and my original Declaration because I do not want to engage in weeks or months of litigation only to learn that this Court lacks the authority to resolve the various disputes among the parties.

40.    Shea Development Corporation is in a difficult financial position and has not been able to meet many of its commitments to investors and creditors. Shea Development Corp. owes me and others substantial amounts of money. I believe that the fact that Shea would spend its money on private investigators and attorneys to spy on my children, among other things, shows that they are motivated by animus towards me and are not making decisions that are in the best interests of their shareholders.

LIBNY/4694757.4

I declare that the foregoing is correct under the penalties of perjury.  Executed this ___4th___

day of February 2008.

Christopher Watson

# Exhibit A





(C)2005 NEFMLS, Inc.

## JACKSONVILLE, FL32250

**$419,000**
2 Bed, 2.5 Bath
1,540 Sq. Ft.
MLS ID#: 252198



**JAMI SHAPIRO**

Representation you trust.
Competency you can count
on.

Office: (904) 477-7084
Office: (904) 739-3353
Fax: (904) 262-7910
Broker: (904) 739-3353

Look out your windows and see the Intacoastal. This waterfront home is a boaters dream. The townhome is 2 bedroom/2 1/2 bath totally updated including a kitchen with stainless steel appliances, solid surface coutertops, 42" maple cabinets, tile backsplash, recessed lighting the rest of the home features raised and knocked down ceilings, tile throughout the downstairs and new plumbing and electricity. Walk out your door and onto your dock. The dock can accommodate a 50 foot boat and has electricity and plumbing.

Condo/Townhome/Coop Property, Area: INTRACOASTAL WEST, Subdivision: THE MOORINGS, County: Duval, Year Built: 1974, View, Waterview, Waterfront property, Two story, Central air conditioning, Community swimming pool(s)

To access this listing directly, use http://www.realtor.com/Prop/1049526711

## Property Features

- Condo/Townhome/Coop Property
- Area: INTRACOASTAL WEST
- County: Duval
- Subdivision: THE MOORINGS
- Year Built: 1974
- 2 total bedroom(s)
- 2.5 total bath(s)
- 2 total full bath(s)
- 1 total half bath(s)

- Approximately 1540 sq. ft.
- Two story
- Style: Condo
- Heating features: Central
- Central air conditioning
- Interior features: Breakfast bar, Clothes dryer, Clothes washer, Dining area, Dishwasher, Microwave, Pantry, Range and oven, Refrigerator, Security feats, Storage rm, Tile flrs
- Exterior features: Balcony, Public sewer srvc, Public water supply, Waterfront property, Waterview
- Community boat facilities
- Community clubhouse(s)

- Community recreation facilities
- Community swimming pool(s)
- Community tennis court(s)
- View
- Waterview
- Waterfront property
- Elementary School: Seabreeze
- Middle School: Fletcher Jr High
- High School: Sandalwood

Formatted for easy printing so you can take this with you. Remember to say you found it on REALTOR.com®.

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information.  You must verify the information and bear all risk for inaccuracies.

Case 1:07-cv-11201-DLC-GWG    Document 24-2    Filed 02/05/2008    Page 3 of 7








©2005 REFMLS, Inc.

**JACKSONVILLE, FL 32210**
MLS ID#: 251976

**$209,500**
2 Bed, 2 Bath
1,016 Sq. Ft.

Estimated payment:
**$942 Per Month***
Change Assumptions
Check Local Rates

Map & Directions
Save This Listing
Send to a Friend
Send to your REALTOR®

Condo/Townhome/Coop Property, Area: ORTEGA/VENETIA, Subdivision: THE VENETIAN, County: Duval, Year Built: 1961, Waterfront property, Central air conditioning, Community swimming pool(s), Dining room

This listing is brokered by: **ALEXANDER REALTY**
Office: (904)287-2712

## Property Features

- Condo/Townhome/Coop Property
- Area: ORTEGA/VENETIA
- County: Duval
- Subdivision: THE VENETIAN
- Year Built: 1961
- 2 total bedroom(s)
- 2 total bath(s)
- 2 total full bath(s)
- Approximately 1016 sq. ft.
- Style: Condo, Multi-lvl

- Dining room
- Heating features: Central
- Central air conditioning
- Interior features: Breakfast bar, Carpet, Clothes dryer, Clothes washer, Dishwasher, Disposal, Formal dining rm, Range and oven, Tile flrs, Wood flrs
- Exterior features: Public sewer srvc, Public water supply, Waterfront property
- Community clubhouse(s)
- Community recreation facilities
- Community swimming pool(s)
- Waterfront property



Do more with your digital pictures.
Get Started

## Found Your Dream Home? Here's How to Get It:

**Finance It**
- Get your FREE Credit Report and FREE Score now!
- Find a Lender
- Can You Afford It?
- Find the Monthly Payment

**Move In**
- Find a Mover
- Get Packed and Organized

**Settle In**
- Check the School Quality
- Get a City Report
- Compare Neighborhoods
- Find Local Businesses

## Next Steps in Buying a Home                Sponsored Links

Help is just a click away.



Get Your FREE $250 Starbucks Card!

Enter Zip Code

Next

FREE $250 Starbucks Card!

UNIVERSITY OF PHOENIX ONLINE

Choose a degree:
ASSOCIATE'S ▶
BACHELOR'S ▶
MASTER'S ▶

**Bad Credit Problem?**

If you are experiencing financial difficulty, our firm can help you. We offer credit and debt counseling services.

www.legaldebtsolutions.com (sponsored listing)

**Secrets to Solve Bad Credit Problem**

Stop worrying about your bad credit. With these secrets, you'll have a fresh start with a clean credit report. The Credit Secrets Bible is the solution to your bad credit problem.

www.credit-secrets-bible-online.com (sponsored listing)

**Looking for something else? Search the web**



* (Based on a 30-year fixed rate of 5.4047% with 20% down.) Change assumptions.
The Estimated Payment and Mortgage Calculator are offered as a tool for your convenience and is not an offer of credit. Based on U.S. rates. Actual mortgage rates and fees may vary, so check with your local lender for information.

All information provided by the listing agent/broker is deemed reliable but is not guaranteed and should be independently verified.

## For Professionals

REALTORS®, did you know that you could have special features like Virtual Tours on your listings? Click here to find out more!

< BACK TO SEARCH RESULTS                              < PREVIOUS  **32 of 541 Listings**  NEXT >

Search in popular metros:
Atlanta | Austin | Boston | Chicago | Dallas | Denver | Houston | Las Vegas | Long Island | Los Angeles |
Memphis | Miami | New York City | Orange County | Palm Beach | Phoenix | Sacramento | San Diego | Seattle

Site Map | Corporate News & Info | Contact Us | Advertise With Us | Join our staff
Terms of Use and Privacy Policy

© 1995-2005 NATIONAL ASSOCIATION OF REALTORS® and Homestore, Inc. All rights reserved.  ⌂  Equal Housing Opportunity
REALTOR.com® is the official site of the National Association of REALTORS® and is operated by Homestore, Inc.

REALTOR® -- A Registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and subscribes to its strict Code of Ethics. Inquiries regarding the Code of Ethics should be directed to the board in which a REALTOR® holds membership.



## JACKSONVILLE, FL32210

**$229,500**
2 Bed, 2 Bath
1,100 Sq. Ft.
MLS ID#: 259673



**COLDWELL BANKER WALTER WILLIAMS REALTY, INC.**

EXPECT MORE. Experience. Exposure. Exceptional Results.

Office: (904) 268-3000
Fax: (904) 268-3923
Toll Free: (877) 482-3411

(C)2005 NEFMLS, Inc.

Condo/Townhome/Coop Property, Area: ORTEGA/VENETIA, Subdivision: THE VENETIAN, County: Duval, Year Built: 1969, Waterfront property, Two story, Central air conditioning

To access this listing directly, use http://www.realtor.com/Prop/1051089788

## Property Features

- Condo/Townhome/Coop Property
- Area: ORTEGA/VENETIA
- County: Duval
- Subdivision: THE VENETIAN
- Year Built: 1969
- 2 total bedroom(s)

- 2 total bath(s)
- 2 total full bath(s)
- Approximately 1100 sq. ft.
- Two story
- Style: Condo

- Heating features: Central
- Central air conditioning
- Interior features: Clothes dryer, Clothes washer, Dining area, Dishwasher, Disposal, Eat-in kitchen, Microwave, Range and oven, Refrigerator, Security feats
- Exterior features: Public sewer srvc, Public water supply, Waterfront property
- Waterfront property



Formatted for easy printing so you can take this with you. Remember to say you found it on REALTOR.com®.

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. You must verify the information and bear all risk for inaccuracies.

REALTOR.com: Find a Home - Listing Detail            http://www.realtor.com/FindHome/HomeListing.asp?snum=64&mlsttl=...




RetailReportCard
Wanted: Local Mystery Shoppers
Get $1000 to SHOP!   CLICK HERE
*subject to terms and conditions


| Find a Home | Apartments & Rentals | Home Finance | Moving | Home & Garden |

< BACK TO SEARCH RESULTS                  < PREVIOUS   **64 of 541 Listings**   NEXT >


©2005 NEFMLS, Inc.

**NEPTUNE BEACH, FL  32266**
MLS ID#: 247141

**$229,000**
2 Bed, 2.5 Bath
1,400 Sq. Ft.

Estimated payment:
**$1,029 Per Month***
Change Assumptions
Check Local Rates



🗺 Map & Directions
💾 Save This Listing
✉ Send to a Friend
✉ Send to your REALTOR®

Condo/Townhome/Coop Property, Area: NEPTUNE BEACH, County: Duval, Year Built: 1985, Two story, Carport, Central air conditioning

This listing is brokered by: **WATSON REALTY CORP**
Office: (904)249-3804

## Property Features

- Condo/Townhome/Coop Property
- Area: NEPTUNE BEACH
- County: Duval
- Year Built: 1985
- 2 total bedroom(s)
- 2.5 total bath(s)
- 2 total full bath(s)
- 1 total half bath(s)
- Approximately 1400 sq. ft.
- Two story
- Style: Townhouse style
- Master bedroom

- Kitchen
- Master bedroom is 14x15
- Kitchen is 15x11
- Carport
- Heating features: Central
- Central air conditioning
- Interior features: Clothes dryer, Clothes washer, Dining area, Dishwasher, Disposal, Eat-in kitchen, Furnished, Great rm, Microwave, Range and oven, Refrigerator, Washer/dryer hookups
- Exterior features: Porch, Public sewer srvc, Public water supply, Satellite dish, Storage/out-building(s)
- Elementary School: Neptune Beach
- Middle School: Fletcher Jr High
- Jr. High School: Fletcher

I Need House Insurance
Looking for building insurance? Answer Financial offers side-by-side quotes...
www.answerfinancial.com


3 Disney DVDs FOR $199 EA.
WITH FREE SHIPPING
CLICK HERE TO JOIN
PICK FROM 100'S OF DISNEY TITLES INCLUDING
THE INCREDIBLES
Aladdin
MARY POPPINS
© Disney   © Incredibles Pixar Disney

## Found Your Dream Home?  Here's How to Get It:

**Finance It**

Get your FREE Credit Report and FREE Score now!
Find a Lender
Can You Afford It?
Find the Monthly Payment

**Move In**

Find a Mover
Get Packed and Organized

**Settle In**

Check the School Quality
Get a City Report
Compare Neighborhoods
Find Local Businesses


UNIVERSITY OF PHOENIX ONLINE
Choose a degree:
ASSOCIATE'S ►
BACHELOR'S ►
MASTER'S ►

## Next Steps in Buying a Home

Sponsored Links

Help is just a click away.

**Bad Credit Problem?**
If you are experiencing financial difficulty, our firm can help you. We offer credit and debt counseling services.

www.legaldebtsolutions.com (sponsored listing)

**Repair Bad Credit Fast**
Legally remove negative credit report items. Customized programs with unlimited disputes, deletions from $34.95/month. Same day services. Couples discount. Exceptional customer service. BBB.

www.ovationlaw.com (sponsored listing)

**Looking for something else? Search the web**

---

\* (Based on a 30-year fixed rate of 5.4047% with 20% down.)  Change assumptions.
The Estimated Payment and Mortgage Calculator are offered as a tool for your convenience and is not an offer of credit. Based on U.S. rates. Actual mortgage rates and fees may vary, so check with your local lender for information.

All information provided by the listing agent/broker is deemed reliable but is not guaranteed and should be independently verified.

## For Professionals

REALTORS®, did you know that you could have special features like Virtual Tours on your listings?  Click here to find out more!

< BACK TO SEARCH RESULTS                                    < PREVIOUS  **64 of 541 Listings**  NEXT >

Search in popular metros:
Atlanta | Austin | Boston | Chicago | Dallas | Denver | Houston | Las Vegas | Long Island | Los Angeles | Memphis | Miami | New York City | Orange County | Palm Beach | Phoenix | Sacramento | San Diego | Seattle

Site Map | Corporate News & Info | Contact Us | Advertise With Us | Join our staff
Terms of Use and Privacy Policy.

© 1995-2005 NATIONAL ASSOCIATION OF REALTORS® and Homestore, Inc. All rights reserved.  ⌂ Equal Housing Opportunity
REALTOR.com® is the official site of the National Association of REALTORS® and is operated by Homestore, Inc.

REALTOR® -- A Registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and subscribes to its strict Code of Ethics. Inquiries regarding the Code of Ethics should be directed to the board in which a REALTOR® holds membership.

Exhibit B

## RESIDENTIAL APARTMENT LEASE - TERM SHEET

| | | | Lease Number |
|---|---|---|---|
| | | | 39302 - 010 - 203W - 2 |

**Lessor:** Equity Residential Management, L.L.C.,
as agent for owner of the Apartments

**Apartment:** 010 - 203W

**Community:** Ocean Walk

**Apartment Address:** 3910 S. Roosevelt Blvd. 203W
Key West, FL 33040

**Address:** 3900 S. Roosevelt Blvd.
Key West, FL 33040
(305) 292-1230

[X] Unfurnished    [ ] Furnished

---

**Residents:** Chris Watson
**Guarantor:**

**Occupants:**                          Date of Birth                          Date of Birth

---

**LEASE TERM** **Commencement Date:** 3/16/2007    **Expiration Date:** 3/15/2008    **Lease Type:** New

**Lease Term Expiration:** A written Notice to Vacate shall be given to lessor by Resident at least 60 days prior to the Expiration Date of the Lease Term. If Resident fails to provide such written Notice to Vacate, then, even if Resident vacates the Premises, this Lease Term will automatically be extended for one additional month following the Expiration Date.

---

**Total Deposits Req:** ███

---

**Total Monthly Rent:** ███                          ---------- Non Apartment ----------

| Charge Description | Amount | Type | Specific ID |
|---|---|---|---|
| Monthly Apartment Rent | ███ | | |
| RUBS Sewer | | | |
| RUBS Trash | | | |

**Concessions:**
Total Recurring Concession amount ███; Total One-Time/ Non-Recurring Concession amount ███. The Total Monthly Rent shown above will be adjusted by these lease concession amounts. If this Lease is terminated because of Resident's default, Resident must pay Lessor a portion of these total lease concessions as further provided in the Lease Concessions paragraph of the Lease.

---

**Total Other Fees and Charges:** ███



| Pets | Type | Breed | Weight | License / Tag |
|---|---|---|---|---|
| Approved | | | | |

© Equity Residential 2006. All Rights Reserved.

(Printed)                          3/15/2007                          Page      1

**LESSOR PAYS UNCHECKED UTILITIES / RESIDENT PAYS CHECKED UTILITIES**

| X | Electricity: | Utility provider will send bill directly to resident. |

|   | Gas/Heating Oil: |

| X | Water: | Utility provider will send bill directly to resident. |

|   | Sewer: | Flat monthly fee. Paid with monthly rent. |

|   | Central Boiler System: |

| X | Cable: | Utility provider will send bill directly to resident. |

|   | Garbage Removal: | Flat monthly fee. Paid with monthly rent. |

|   | Pest Control: |

**Late Charge Terms:**   If the Rent then due and owing is not paid in full on or before day 3 of the month, then the Resident will be obligated to pay to Lessor an amount for each day on which such a balance is due in accordance with the schedule below.

Late fee of 10% will be charged on day 4 of each month with an additional ████ per day until rent is received.

NSF Fee: ███ per check.

### Additional Agreements

Resident Apartment Lease - Terms and Conditions
Utilities Addendum
Move In/Move Out Checklist
Resident Handbook
Emergency Notification Form
Hurricane Checklist
Insurance Addendum (Insurance Required)

This Residential Apartment Lease - Term Sheet, along with the Residential Lease - Terms and Conditions, the Additional Agreements identified above, and any other written agreements executed by Lessor and Resident, shall constitute the "Lease". All capitalized terms not defined in this Term Sheet shall have the meaning given to such in the Terms and Conditions. By signing this Term Sheet, each Resident acknowledges that he or she has received, has read and agrees to all of the provisions of the Lease.

**Resident acknowledges that this Lease contains provisions extending the Lease Term in the event Resident fails to provide timely written notice of Resident's intent to vacate the Premises prior to the Expiration Date of the Lease Term.**

### READ THIS TERM SHEET BEFORE SIGNING

Residents (All Residents must sign):

X _Chris Watson_                                                     Date  _3/16/07_              Date

                                                                              Date                               Date

                                                                              Date                               Date

Lessor:    **Equity Residential Management, L.L.C.,**                as agent for owner of the Apartments

By: _____
Its: Authorized Representative                    Date

© Equity Residential 2006. All Rights Reserved.          (Printed)              3/15/2007                    Page    2

Exhibit C



HARRY L. SAWYER, JR.

Visit Our Web Site
www.keys-election.org

Teen Center
3455 S. Roosevelt Blvd

CHRISTOPHER RJ WATSON
3910 S ROOSEVELT BLVD 203W
KEY WEST FL 33040

18    39    120

0     1     1151166926

PRSRT STD
U.S. POSTAGE PAID
KEY WEST, FL 33040
PERMIT NO. XX

May/02/2007    1151166926

2.03

CHRISTOPHER RJ WATSON
4446-1A HENDRICKS AVENUE
SUITE 246
JACKSONVILLE FL 32207

# Exhibit D



Exhibit E

# Your Auto ID Card

**CNA**

TEAR OUT ALONG DOTTED LINES

**CNA** FLORIDA COMMERCIAL AUTOMOBILE
INSURANCE IDENTIFICATION CARD

Insurance
Company  Natl Fire Ins Co of Hartford
Company Code  01505
Policy
Number  2077310709                          Effective
                                            Date   03/24/2007
[X]  Personal Injury Protection Benefits/   [X] Bodily Injury Liability
     Property Damage Liability

Named  BRAVERA, INC
Insured

Vehicle I.D. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Year 2005    Make  MINI COOPER S
Producing Branch - Producer Code   420061602
G20530A09    12-99    Not Valid More Than One Year From Effective Date

**CNA** FLORIDA COMMERCIAL AUTOMOBILE
INSURANCE IDENTIFICATION CARD

Insurance
Company  Natl Fire Ins Co of Hartford
Company Code  01505
Policy
Number  2077310709                          Effective
                                            Date   03/24/2007
[X]  Personal Injury Protection Benefits/   [X] Bodily Injury Liability
     Property Damage Liability

Named  BRAVERA, INC
Insured

Vehicle I.D. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Year 2005    Make  MINI COOPER S
Producing Branch - Producer Code   420061602
G20530A09    12-99    Not Valid More Than One Year From Effective Date

Exhibit F



Exhibit G

**Chris Watson**

| | |
|---|---|
| **From:** | Renters Mail [rentersmail@assurant.com] |
| **Sent:** | Friday, April 20, 2007 5:21 PM |
| **To:** | vendor |
| **Subject:** | Insurance |

Thank you for choosing American Bankers Insurance Company of Florida for your rental insurance needs. Your application for Renters Insurance Plan A has been received. The coverage for CHRISTOPHER WATSON, located at 3910 S ROOSEVELT APT 230W Key West, FL 33040 will become effective on 04/23/07. Your policy number for this coverage is RIN0248125.The above description of coverage and benefits is merely descriptive and is subject to conditions, limitations and exclusions set forth in your policy. You must refer to your policy for full description of the coverages and benefit amounts.

In Texas, property coverage is underwritten by Ranchers and Farmers Mutual Insurance Company and personal liability is underwritten by American Bankers Insurance Company of Florida. In Minnesota, coverage is underwritten by American Security Insurance Company.

You will be receiving your policy and explanation of coverages within the next 10 working days. These will be mailed to you at the address provided by you. The policy represents the contract between American Bankers Insurance Company of Florida and Ranchers and Farmers Mutual Insurance Company (if in Texas) or American Security Insurance Company (if in Minnesota) and you regarding your rental insurance.

**Please note, all installments will be billed to the payment method selected.**

If you have any questions, please contact us at 1-800-432-8612, Monday through Friday from 8 a.m. to 8 p.m. EST. Coverage can be modified by submitting a written request to the renters customer service department. Please fax us at 1-305-259-4569 or email us at rentersmail@assurant.com. Be sure to include your name, address, policy number, policy type and the type of modification you wish to make.

**This is being sent to your e-mail address, as agreed by you at the time you enrolled for this coverage.**

This e-mail message and all attachments transmitted with it may contain legally privileged and/or confidential information intended solely for the use of the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, forwarding or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this message and all copies and backups thereof.

Thank you.

1

# Exhibit H

b Employer identification number (EIN)
c Employer's name, address, and ZIP code

BRAVERA, INC.
1801 ROBERT FULTON DR
SUITE 250
RESTON VA 20191-5461

e Employee's first name and initial    Last name    Suff

351005479
CHRISTOPHER R WATSON
    SUITE 246
4446-1A HENDRICKS AVENUE
JACKSONVILLE FL 32207

12a See instructions for box 12
D
12b
12c
12d

1 Wages, tips, other compensation    2 Federal income tax withheld
3 Social security wages    4 Social security tax withheld
5 Medicare wages and tips    6 Medicare tax withheld
7 Social security tips    8 Allocated tips
9 Advance EIC payment    10 Dependent care benefits
11 Nonqualified plans    13 Statutory employee / Retirement plan / Third-party sick pay  X
14 Other

Copy B To Be Filed With
Employee's FEDERAL
Tax Return

a Employee's social security number

f Employee's address and ZIP code
15 State    Employer's state ID number    16 State wages, tips, etc.    17 State income tax    18 Local wages, tips, etc.    19 Local income tax    20 Locality name
FL

Form W-2 Wage and Tax Statement 2007    Department of the Treasury–Internal Revenue Service    OMB No. 1545-0008    Copy B To Be Filed With Employee's FEDERAL Tax Return

---

b Employer identification number (EIN)
c Employer's name, address, and ZIP code

BRAVERA, INC.
1801 ROBERT FULTON DR
SUITE 250
RESTON VA 20191-5461

e Employee's first name and initial    Last name    Suff
0522603    NM    T    2506
351005479
CHRISTOPHER R WATSON
    SUITE 246
4446-1A HENDRICKS AVENUE
JACKSONVILLE FL 32207

12a
D
12b
12c
12d

1 Wages, tips, other compensation    2 Federal income tax withheld
3 Social security wages    4 Social security tax withheld
5 Medicare wages and tips    6 Medicare tax withheld
7 Social security tips    8 Allocated tips
9 Advance EIC payment    10 Dependent care benefits
11 Nonqualified plans    13    X
14 Other

Copy 2 To Be Filed With
Employee's STATE, CITY or
LOCAL Income Tax Return

a Employee's social security number

f Employee's address and ZIP code
15 State    Employer's state ID number    16 State wages, tips, etc.    17 State income tax    18 Local wages, tips, etc.    19 Local income tax    20 Locality name
FL

Form W-2 Wage and Tax Statement 2007    Department of the Treasury–Internal Revenue Service    OMB No. 1545-0008    Copy 2 To Be Filed With Employee's STATE, CITY or LOCAL Income Tax Return

---

b Employer identification number (EIN)
c Employer's name, address, and ZIP code

BRAVERA, INC.
1801 ROBERT FULTON DR
SUITE 250
RESTON VA 20191-5461

e Employee's first name and initial    Last name    Suff
0522603    NM    T    2506
351005479
CHRISTOPHER R WATSON
    SUITE 246
4446-1A HENDRICKS AVENUE
JACKSONVILLE FL 32207

12a
D
12b
12c
12d

1 Wages, tips, other compensation    2 Federal income tax withheld
3 Social security wages    4 Social security tax withheld
5 Medicare wages and tips    6 Medicare tax withheld
7 Social security tips    8 Allocated tips
9 Advance EIC payment    10 Dependent care benefits
11 Nonqualified plans    13    X
14 Other

Copy 2 To Be Filed With
Employee's STATE, CITY or
LOCAL Income Tax Return

a Employee's social security number

f Employee's address and ZIP code
15 State    Employer's state ID number    16 State wages, tips, etc.    17 State income tax    18 Local wages, tips, etc.    19 Local income tax    20 Locality name
FL

Form W-2 Wage and Tax Statement 2007    Department of the Treasury–Internal Revenue Service    OMB No. 1545-0008    Copy 2 To Be Filed With Employee's STATE, CITY or LOCAL Income Tax Return

---

b Employer identification number (EIN)
c Employer's name, address, and ZIP code

BRAVERA, INC.
1801 ROBERT FULTON DR
SUITE 250
RESTON VA 20191-5461

351005479
CHRISTOPHER R WATSON
    SUITE 246
4446-1A HENDRICKS AVENUE
JACKSONVILLE FL 32207

12a See instructions for box 12
D

1 Wages, tips, other compensation    2 Federal income tax withheld
3 Social security wages    4 Social security tax withheld
5 Medicare wages and tips    6 Medicare tax withheld
11 Nonqualified plans    X
14 Other

Copy C For EMPLOYEE'S
RECORDS. See Notice to
Employee on back.

a Employee's social security number

f Employee's address and ZIP code
15 State    Employer's state ID number    16 State wages, tips, etc.    17 State income tax    18 Local wages, tips, etc.    19 Local income tax    20 Locality name
FL

## Form W-2 Wage and Tax Statement 2007

OMB No. 1545-0008

**c** Employer's name, address, and ZIP code
**d** Control number

RSSI CORPORATE SERVICES INC.
3452 LAKE LYNDA DRIVE, SUITE 350
ORLANDO FL 32817

**e** Employee's name, address, and ZIP code

CHRISTOPHER WATSON
4446-1A HENDRICKS AVE
JACKSONVILLE FL 32207-6326

7 Social security tips   1 Wages, tips, other comp.   2 Federal income tax withheld
8 Allocated tips   3 Social security wages   4 Social security tax withheld
9 Advance EIC payment   5 Medicare wages and tips   6 Medicare tax withheld
10 Dependent care benefits   11 Nonqualified plans   12a Code D
13 Statutory Employee / Retirement Plan X / Third-Party Sick Pay   14 Other   12b-12d Codes
b Employer ID number
a Employee's social security number
15 State   Employer's state ID no.   16 State wages, tips, etc.   17 State income tax   18 Local wages, tips, etc.   19 Local income tax   20 Locality name

Copy B To Be Filed With Employee's FEDERAL Tax Return. This information is being furnished to the Internal Revenue Service. Dept. of the Treasury -- IRS
This information is being furnished to IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable & you fail to report it.

## Form W-2 Wage and Tax Statement 2007

**c** Employer's name, address, and ZIP code   Control number

RSSI CORPORATE SERVICES INC.
3452 LAKE LYNDA DRIVE, SUITE 350
ORLANDO FL 32817

**e** Employee's name, address, and ZIP code

3745  ************MIXED AADC 836

CHRISTOPHER WATSON
4446-1A HENDRICKS AVE
JACKSONVILLE FL 32207-6326

7 Social Security Tips   1 Wages, tips, other comp.   2 Federal income tax withheld
8 Allocated tips   3 Social security wages   4 Social security tax withheld
9 Advance EIC payment   5 Medicare wages and tips   6 Medicare tax withheld
10 Dependent care benefits   11 Nonqualified plans   12a Code D
13 Statutory Employee / Retirement Plan X / Third-Party Sick Pay   14 Other   12b-12d Codes
b Employer ID number
a Employee's social security number
15 State   Employer's state ID no.   16 State wages, tips, etc.   17 State income tax   18 Local wages, tips, etc.   19 Local income tax   20 Locality name

Copy C For EMPLOYEE'S RECORDS.   (See Notice to Employee)

OMB No. 1545-0008   Dept. of the Treasury -- IRS

## Form W-2 Wage and Tax Statement 2007

**c** Employer's name, address, and ZIP code   **d** Control number

RSSI CORPORATE SERVICES INC.
3452 LAKE LYNDA DRIVE, SUITE 350
ORLANDO FL 32817

**e** Employee's name, address, and ZIP code

CHRISTOPHER WATSON
4446-1A HENDRICKS AVE
JACKSONVILLE FL 32207-6326

7 Social security tips   1 Wages, tips, other comp.   2 Federal income tax withheld
8 Allocated tips   3 Social security wages   4 Social security tax withheld
9 Advance EIC payment   5 Medicare wages and tips   6 Medicare tax withheld
10 Dependent care benefits   11 Non qualified plans   12a Code D
13 Statutory Employee / Retirement Plan X / Third-Party Sick-Pay   14 Other   12b-12d Codes
b Employer ID number
a Employee's social security number
15 State   Employer's state ID no.   16 State wages, tips, etc.   17 State income tax   18 Local wages, tips, etc.   19 Local income tax   20 Locality name

Copy 2 to be filed with Employee's State, City or Local Income Tax Return   Dept. of the Treasury -- IRS

OMB No. 1545-0008

## Form W-2 Wage and Tax Statement 2007

**c** Employer's name, address, and ZIP code   **d** Control number

RSSI CORPORATE SERVICES INC.
3452 LAKE LYNDA DRIVE, SUITE 350
ORLANDO FL 32817

**e** Employee's name, address, and ZIP code

CHRISTOPHER WATSON
4446-1A HENDRICKS AVE
JACKSONVILLE FL 32207-6326

7 Social security tips   1 Wages, tips, other comp.   2 Federal income tax withheld
8 Allocated tips   3 Social security wages   4 Social security tax withheld
9 Advance EIC payment   5 Medicare wages and tips   6 Medicare tax withheld
10 Dependent care benefits   11 Non qualified plans   12a Code D
13 Statutory Employee / Retirement Plan X / Third-Party Sick-Pay   14 Other   12b-12d Codes
b Employer ID number
a Employee's social security number
15 State   Employer's state ID no.   16 State wages, tips, etc.   17 State income tax   18 Local wages, tips, etc.   19 Local income tax   20 Locality name

Copy 2 to be filed with Employee's State, City or Local Income Tax Return

0003746

Exhibit I

Form **1040**  **U.S. Individual Income Tax Return**  **2006**  (99)    IRS Use Only - Do not write or staple in this space.

OMB No. 1545-0074

For the year Jan. 1-Dec. 31, 2006, or other tax year beginning _____ , 2006, ending _____ , 20 _____

| | |
|---|---|
| **Label** (See instructions on page 16.) | Your first name and initial: CHRISTOPHER R    Last name: WATSON |
| | If a joint return, spouse's first name and initial: CARMEN S    Last name: WATSON |
| **Use the IRS label.** Otherwise, please print or type. | Home address (number and street). If you have a P.O. box, see page 16.    Apt. no. 4446-1A HENDRICKS AVENUE SUITE 246 |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 16. JACKSONVILLE, FL 32207 |

Your social security number: _____

Spouse's social security number: _____

**You must enter ▲ your SSN(s) above. ▲**

Checking a box below will not change your tax or refund.

**Presidential Election Campaign ▶** Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see page 16)    ☐ You    ☐ Spouse

**Filing Status**

Check only one box.

1. ☐ Single
2. ☒ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child (see page 17)

**Exemptions**

6a ☒ **Yourself.** If someone can claim you as a dependent, **do not** check box 6a

b ☒ **Spouse**

Boxes checked on 6a and 6b: **2**

No. of children on 6c who:
- lived with you: **2**
- did not live with you due to divorce or separation (see page 20)

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 19) |
|---|---|---|---|
| ZOE WATSON | | DAUGHTER | X |
| THOMAS S WATSON | | SON | X |

If more than four dependents, see page 19.

Dependents on 6c not entered above

d Total number of exemptions claimed

Add numbers on lines above ▶ **4**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 23.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | |
| 8a | Taxable interest. Attach Schedule B if required | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | 1. |
| b | Qualified dividends (see page 23) | 9b | 1. |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes STMT 1 STMT 3 | 10 | 0. |
| 11 | Alimony received    STMT 4 | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions    15a | b Taxable amount | 15b | |
| 16a | Pensions and annuities    16a | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits    20a | b Taxable amount (see page 27) | 20b | |
| 21 | Other income. List type and amount (see page 29) CONSULTING INCOME - BRAVERA, INC. | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | Archer MSA deduction. Attach Form 8853 | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | |
| 26 | Moving expenses. Attach Form 3903 | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | |
| 29 | Self-employed health insurance deduction (see page 29) | 29 | |
| 30 | Penalty on early withdrawal of savings | 30 | |
| 31a | Alimony paid  b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction (see page 31) | 32 | |
| 33 | Student loan interest deduction (see page 33) | 33 | |
| 34 | Jury duty pay you gave to your employer | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 31a and 32 through 35 | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** ▶ | 37 | |

610001
03-19-07

LHA    **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 80.**    Form **1040** (2006)

Exhibit J

| Form **1065** | **U.S. Return of Partnership Income** | OMB No. 1545-0099 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2005, or tax year beginning **JUN 3**, **2005**, and ending **SEP 30**, **2005** | **2005** |

| **A** Principal business activity | Use the IRS label. Otherwise, print or type. | Name of partnership | **D** Employer identification number |
|---|---|---|---|
| SOFTWARE DEVELOPMENT | | INTELLECTUS, LLC C/O CHRISTOPHER R. WATSON | ███████████ |
| **B** Principal product or service | | Number, street, and room or suite no. If a P.O. box, see the instructions. | **E** Date business started |
| SOFTWARE | | 4446-1A HENDRICKS AVENUE SUITE 246 | 06/03/2005 |
| **C** Business code number | | City or town, state, and ZIP code | **F** Total assets |
| 541519 | | JACKSONVILLE, FL  32207 | $ ███████ |

**G** Check applicable boxes: (1) ☒ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☒ Address change  (5) ☐ Amended return

**H** Check accounting method: (1) ☒ Cash  (2) ☐ Accrual  (3) ☐ Other (specify)

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

### Income

| | | | |
|---|---|---|---|
| 1 a | Gross receipts or sales | 1a ███████ | |
| b | Less returns and allowances | 1b | 1c ███████ |
| 2 | Cost of goods sold (Schedule A, line 8) | | 2 |
| 3 | Gross profit. Subtract line 2 from line 1c | | 3 ███████ |
| 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach schedule) | | 4 |
| 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) | | 5 |
| 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | 6 |
| 7 | Other income (loss) (attach schedule) | | 7 |
| 8 | **Total income (loss).** Combine lines 3 through 7 | | 8 ███████ |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| 9 | Salaries and wages (other than to partners) (less employment credits) | | 9 |
| 10 | Guaranteed payments to partners | | 10 |
| 11 | Repairs and maintenance | | 11 |
| 12 | Bad debts | | 12 |
| 13 | Rent | | 13 |
| 14 | Taxes and licenses | | 14 |
| 15 | Interest | | 15 ███████ |
| 16 a | Depreciation (if required, attach Form 4562) | 16a | |
| b | Less depreciation reported on Schedule A and elsewhere on return | 16b | 16c |
| 17 | Depletion (Do not deduct oil and gas depletion.) | | 17 |
| 18 | Retirement plans, etc. | | 18 |
| 19 | Employee benefit programs | | 19 |
| 20 | Other deductions (attach schedule)    SEE STATEMENT 1 | | 20 ███████ |
| 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | 21 ███████ |
| 22 | **Ordinary business income (loss).** Subtract line 21 from line 8 | | 22 ███████ |

CLIENT COPY

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member) is based on all information of which preparer has any knowledge.

Signature of general partner or limited liability company member    Date

May the IRS discuss this return with the preparer shown below (see instr.)? ☒ Yes ☐ No

| **Paid Preparer's Use Only** | Preparer's signature | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ HERTZBACH & COMPANY, P.A. | | EIN | |
| | 10 MUSIC FAIR ROAD | | Phone no. 410-363-3200 | |
| | OWINGS MILLS, MD  21117 | | | |

511001 12-29-05   JWA   For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.    Form **1065** (2005)

Exhibit K

## SENIOR MANAGEMENT EMPLOYMENT AGREEMENT

This SENIOR MANAGEMENT EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of July 15, 2007 by and between Bravera, Inc., a Florida corporation (the "Company"), and Christopher Watson, an employee of the Company ("Employee").

RECITAL:

WHEREAS, the Company and Employee desire to enter into a written agreement for the Company's employment of Employee as an employee, on the terms specified herein.

NOW, THEREFORE, in consideration of the mutual promises, agreements and mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

1.      Employment.  The Company hereby employs Employee, and Employee hereby accepts employment with the Company, upon the terms and subject to the conditions set forth in this Agreement.

2.      Position and Duties.  Employee shall be employed as the Chief Sales Officer and the Chief Marketing Officer of the Company and shall report directly to the CEO of the Company's parent company, Shea Development Corporation.  Employee shall also serve in such additional capacities as may be assigned to him from time to time by the Board of Directors of the Company (the "Board").  Employee shall devote substantially all of his business time, attention, skill and best efforts to the diligent performance of his duties hereunder; provided, however, that while employed by the Company, the Employee shall be able to engage in Outside Activities (hereinafter defined).

3.      Term.  The term of employment hereunder shall commence as of the date hereof (the "Commencement Date") and shall continue for a period of three (3) years unless sooner terminated in accordance with the provisions of this Agreement (the "Term").

4.      Compensation.  As compensation for all services rendered by Employee under this Agreement, the Company shall pay Employee compensation as follows:

        a.      Annual Salary.  For all services rendered by Employee during his employment under this Agreement, beginning on the Commencement Date, the Company shall pay Employee an annual salary of $250,000, payable in installments every two (2) weeks in accordance with the Company's standard payroll policies, subject to annual increases of five percent (5%) throughout the Term.  Each such increase shall become effective on each annual anniversary date of the Commencement Date, for each year throughout the Term.

        b.      Taxes and Withholdings.  All taxes and governmentally required withholdings, and such additional withholdings as requested by Employee, if any, shall be deducted from any amount paid by the Company to Employee hereunder, all in conformity with applicable laws.

c.     Employee is an Officer of the Company and shall receive such Restricted Stock Grants as are granted to all Officers of the Company as determined from time to time by the Board, in such amount as is proportionate to Employee's position as an Officer of the Company.

5.     Benefits and Fringes.

a.     Benefits.   During the Term, Employee shall be eligible to participate in the Company's standard benefits for key executives of the Company in accordance with the Company's policies.

b.     Vacation.   Employee shall be entitled to four (4) weeks of paid vacation in each calendar year during the Term in accordance with the Company's policies.   Employee shall take vacations at such time or times as shall be reasonable as mutually determined by Employee and the parent company's CEO, based upon the Employee's current duties.

c.     Other. Employee shall be entitled to receive from the Company the following items and service according to policies and practices established by Company from time to time:

A Corporate Credit Card;

A Cell Phone;

High Speed Internet Service; and

A Laptop Computer

d.     Expenses Reimbursement.   The Company shall reimburse Employee for all reasonable substantiated expenses incurred by Employee during the Term in the course of performing Employee's duties under this Agreement that are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, including cellular phone charges and mileage related to Company business, subject to the Company's requirements applicable generally with respect to reporting and documentation of such expenses.   Expenses shall be reimbursed in accordance with the Company's policies in effect from time to time.

e.     Aviation.   Employee shall be permitted to use his personal aircraft, a Columbia 400, to travel on Company business and for the use of such aircraft the Company will reimburse Employee Three Hundred Dollars ($300.00) per hour promptly upon Employee's submission of documentation evidencing such expenses.   Employee covenants and agrees that he will not use the aircraft for transporting other Company employees on Company business, except that one other Company employee may be carried if that employee is a rated pilot.   In order to use the aircraft and obtain the reimbursement provided for herein, Employee shall maintain at least Two Million Five Hundred Thousand Dollars ($2,500,000.00) of aviation insurance coverage on the aircraft.

6.     Severance.   Upon termination of his employment by the Company, Employee shall be entitled to the following:

a.    For "Cause".   If the Company terminates Employee's employment with the Company for "Cause" (as hereinafter defined", Employee shall be entitled to receive any compensation and benefits due him through the Termination Date (hereinafter defined).

b.    If the Employee's employment with the Company terminates for any other reason, including a termination without "Cause" pursuant to Section 8, upon death or disability pursuant to Section 9, by Employee pursuant to Section 10, by mutual agreement of Employee and the Company pursuant to Section 11or by failure of a successor to continue Employee's employment following a Change in Control (hereinafter defined), then: all earnout and other consideration due Employee under that certain Merger Agreement dated April 26, 2007 and due Employee's affiliate, Intellectus, LLC, under that certain Software License and Assets Purchase Agreement dated as of even date herewith shall be accelerated and paid on the Termination Date.   If the Employee's employment with the Company terminates for any reason other than for "Cause" or by mutual agreement of Employee and the Company pursuant to Section 11, including a termination without "Cause" pursuant to Section 8, upon death or disability pursuant to Section 9, by Employee pursuant to Section 10 or by failure of a successor to continue Employee's employment following a Change in Control (hereinafter defined), then Employee shall receive the following: (i) an amount equal to one (1) year of Employee's salary, at the rate in effect as of the date of the notice of termination, (ii) a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) for the year as well as the quarter in which such termination occurs, (iii) all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) and all benefits for a period of six (6) months after the Termination Date, and (iv) the same medical coverage Employee carried while an active employee at Company's expense for a period of six (6) months after the Termination Date, after which Employee will be eligible under Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended ("COBRA") to continue such coverage at his own expense.  All of the foregoing shall be payable in accordance with the Company's then effective payroll schedule applicable to Employee.  All such payments shall be in full settlement and discharge of the Company's obligation to Employee, and the obligation of the Company to make such payments shall be conditioned upon the execution by Employee of a separation and release agreement in a form satisfactory to the Company and reasonably acceptable to Employee.

7.    Termination by Company for Cause.  The Company shall have the right at any time to terminate the employment of Employee for Cause effective immediately (such date of termination, the "Termination Date") by delivering to Employee a written notice specifying such Cause.  If the Company exercises such right, in full settlement and discharge of the Company's obligation to Employee, the Company shall make a payment to Employee in a lump sum amount equal to all compensation accrued and unpaid as of the Termination Date and the Company's obligation under this Agreement to make any further payments to Employee shall thereupon cease and terminate.   This Section 7 in no way limits the Company's right to terminate Employee's employment without cause pursuant to Section 8 of this Agreement.  As used herein, the term "Cause" means (i) willful misconduct or gross negligence of Employee in the performance of his duties and services to the Company or any of its subsidiaries; (ii) the

commission of a felony, whether or not committed in the course of performing services for the Company or any of its subsidiaries; (iii) Employee's deliberate dishonesty or breach of fiduciary duty owed to the Company or its subsidiaries; (iv) the commission by Employee in the course of performing any services for the Company or any of its subsidiaries of embezzlement, theft or any other criminal act; (v) the intentional and unauthorized disclosure by Employee of any material trade secret or material confidential information of the Company or any of its subsidiaries; (vi) the intentional commission by Employee of an act which constitutes unfair competition with the Company or any of its subsidiaries, including, without limitation, inducing any employee or customer of the Company to breach a contract with the Company or any of its subsidiaries; (vii) the repeated refusal or failure by Employee to comply with any policies of the Company or any lawful directives of the Board of Directors of the Company; or (viii) the intentional and material breach by Employee of any contract to which the Company and Employee are parties, which material breach remains uncured by Employee for a period of ten (10) days after the Company has given Employee written notice thereof.

8.     Termination by Company Without Cause.  The Company shall have the right at any time and for any reason or for no reason to terminate the employment of Employee and this Agreement without cause effective immediately upon written notice to Employee

9.     Termination Upon Death or Disability.  The Company may terminate the employment of Employee and this Agreement effective upon notice to Employee (or his heirs or legal representatives, as the case may be) if Employee either dies or is disabled.  As used herein, the term "disabled" shall mean the inability or failure of Employee to perform the essential functions of the position with or without reasonable accommodation as a result of a mental or physical disability for a period of ninety (90) or more days consecutive days during any twelve (12) month period, all as determined in good faith by the Board of Directors of the Company.

10.    Termination by Employee.

a.     Employee may terminate his employment under this Agreement at any time upon thirty (30) days written notice to the Company, as provided in Section 18(e) of this Agreement. Employee, at the request of the Company and for a period not to exceed such thirty (30) days as requested by the Company, shall continue to render his services in accordance with this Agreement and shall be paid his regular salary and receive his normal benefits up to the Termination Date.

b.     Employee may terminate his employment with the Company under this Agreement at any time for Good Reason (as defined below).  The term "Good Reason" means Employee's resignation as an Employee of the Company as a result of (i) the Company materially violating any of its obligations to Employee under this Agreement or any other agreement of the Company or its affiliates to which the Employee or any affiliate of Employee (including, Intellectus, LLC) is a party, (ii) a substantial change in Employee's duties to which Employee does not consent, (iii) a decrease in Employee's salary or performance bonuses to which Employee does not consent, or (iv) the Company failing to enter into a new employment agreement with the Employee not later than thirty (30) days prior to the expiration of the Term of this Agreement, on terms and subject to conditions substantially identical to or, with respect to the Employee, more favorable than the terms and conditions set forth in this Agreement.  Such

4

termination for Good Reason shall only be effective if Employee gives the Company a minimum of thirty (30) days' written notice, provided that the occurrence of such violation shall have occurred within the sixty (60) day period preceding such notice and that the Company shall have failed to cure such violation within thirty (30) days after receipt of such notice.

11.    <u>Mutual Termination</u>.

If both Company and employee decide mutually to terminate his employment under this Agreement at any time upon thirty (30) days' written notice to the Company, as provided in Section 18(e) of this Agreement. Employee, at the request of the Company and for a period not to exceed such thirty (30) days as requested by the Company, shall continue to render his services in accordance with this Agreement and shall be paid his regular salary and receive his normal benefits for up to two (2) years.

12.    <u>Post- Termination Licensing</u>.

If the Employee's employment with the Company terminates pursuant to Sections 8, 10(a), 10(b) or 11, the Company shall grant the Employee a non-exclusive, perpetual code-stream license, in written form that is reasonably satisfactory to the Company, to market, copy, sublicense, modify, customize, translate, adapt, publish, display or create derivative works of the then current versions of the software listed on **Exhibit A**, attached hereto and incorporated herein by this reference (the "Software") and its derivative works, in exchange for a royalty fee of ten percent (10%) of the gross revenues received by Employee (or any affiliate of Employee) from sales of the Software or its derivative works, which shall be paid to the Company on a quarterly basis. The aforementioned license agreement shall provide the Company with the right to review and audit revenues derived by Employee from the Software and its derivative works. Both Parties mutually agree, and the aforementioned license agreement shall provide, that beginning on that date which is the last day of the sixth complete calendar month after the month in which the Termination Date occurs, the Company shall have an option, for a period of _____ (___) years to license back any and all derivative works Employee has created from the Software in exchange for a royalty fee of ten percent (10%) of the gross revenues received by the Company or its affiliates, successors or assigns, from sales of the Software or its derivative works, which shall be paid to the Employee on a quarterly basis. The aforementioned license agreement shall provide the Employee with the right to review and audit revenues derived by the Company (or its affiliates, successors or assigns) from the Software and its derivative works. In either case, the Employee and the Company shall each commit in writing pursuant to the licensing agreements set forth in this section that neither will sell license maintenance or help desk services to the customers of the other party without prior written consent from the other party.

13.    <u>Consideration Due Under Other Agreements</u>.

Termination of the Employee's employment by the Company, whether under Sections 7, 8, 9, 10(a) or (b) or 11 of this Agreement and whether separation is voluntary or involuntary and with or without Cause, shall not affect in any respect the consideration (cash and/or common stock or warrants to purchase common stock) due Employee under any agreement with the Company or

any affiliate of the Company, including, without limitation, that certain Merger Agreement dated April 26, 2007 and that certain License and Assets Purchase Agreement of even date with this Agreement.

14.    Covenants of Confidentiality and Non-Competition

     a.    Definitions.    As used in this Agreement, the following terms shall have the meanings specified below:

        "Person" shall mean any individual, corporation, partnership, association, unincorporated organization or other entity.

        "Termination Date" shall mean the last day Employee is employed by Company, whether separation is voluntary or involuntary and with or without Cause.

        "Confidential Information" shall mean information relating to Company's customers, suppliers, distributors, operations, finances, and business that derives value from not being generally known to other Persons, including, but not limited to, technical or non technical data, formulas, patterns, compilations (including compilations of customer information), programs (including computer programs and software), devices, methods, techniques, drawings, processes, financial data (including sales and sales forecasts), and lists of actual or potential customers or suppliers (including identifying information about those customers), without regard to form and whether or not reduced to writing. Confidential Information includes information owned or disclosed to Company by third parties that Company treats as or is obligated to maintain as confidential. Confidential Information subject to this Agreement may include information that is not a trade secret under applicable law, but information not constituting a trade secret shall only be treated as Confidential Information under this Agreement for a one-year period after the Termination Date.

        "Competing Business" shall mean any one or more of the following: (i) the Company's Business, or (ii) any other business in which the Company or its subsidiaries develops an intention, with full knowledge of Employee, to engage on or before the Termination Date and (a) for which the Company or its subsidiaries prepared an existing business plan or study on or before the Termination Date, or (b) for which the Board of Directors of the Company, with the knowledge of Employee, commissioned a business plan or study on or before the Termination Date.

        "Company's Business" Company's Business means the business of offering comprehensive software solutions and strategies internationally through custom programming, consulting, and off-site software development throughout the Territory.

        "Company's Products" means the products of the Company related to the Company's Business.

"Outside Activities" means Employee's pursuit of any work or project that is not competitive with the Company's Business and, in the reasonable judgment of the Employee, is complimentary to the Company's Business, with respect to which, on a weekly basis, during each work week, Employee may devote up to six (6) hours of time that otherwise would be spent by Employee on Company Business and any non-employment time as determined by the Employee.

"Territory" means the United States and, with respect to any country other than the United States, any state or province in which the Company sells products.

b.     Confidential Information.    Employee shall use his best efforts to protect Confidential Information.    At all times, both during and after Employee's employment, Employee will not use, reproduce or disclose any Confidential Information, except as may be necessary in connection with work for Company.

c.     Return of Materials.   On the Termination Date or for any reason or at any time at Company's request, Employee will deliver promptly to Company all materials, documents, plans, records, notes, or other papers or electronically-stored materials and any copies in Employee's possession or control relating in any way to Company's Business, which at all times shall be the property of Company.

d.     Disparagement.   Employee shall not at any time make false, misleading or disparaging statements about the Company, including its products, services, management, employees, and customers.   The Company shall not make false, misleading or disparaging statements about Employee.

e.     Non-Solicitation of Customers.  Employee agrees that, for a period of twelve (12) months following the Termination Date, Employee shall not, directly or indirectly, solicit, or assist in the solicitation of, any Person who is, or was during the period of Employee's employment with Company, a customer of Company, including actively sought prospective customers, with whom Employee had personal business contact with during his employment with the Company.

f.     Non-Solicitation of Employees, Consultants and Contractors.  Employee agrees that, for a period of twelve (12) months following the Termination Date, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, Persons who were employees, consultants or independent contractors of the Company at the time of Employee's employment with Company, or who continue to be employed or engaged by Company, or with whom Employee had personal business contact with during his employment with the Company, to leave their employment or engagement with the Company.

g.     Covenant Against Competition.   Employee covenants and agrees with the Company that, except on behalf of Company, at any time during the period of his employment with Company and continuing for a period of twelve (12) months after the Termination Date, Employee will not in any manner (other than as an employee of or as a consultant to Company),

7

directly or by assisting others, engage in or perform for any Competing Business in the Territory any of the specific duties or activities which Employee performed for the Company during his employment. Employee further agrees that during the period of his employment with the Company and continuing for a period of twelve (12) months after the Termination Date, Employee will not own or invest in any Competing Business; except that Employee may own securities of the Company or acquire either directly or indirectly and solely as an investment, up to five percent (5%) of the securities of any Competing Business issuer that is publicly traded on any United States national securities exchange or quoted on the NASDAQ system. During the Term, the Employee may engage in Outside Activities.

Since the Company may be irreparably damaged if the provisions of Sections 14 (e), (f), and (g) are not specifically enforced, in the event of a breach or threatened breach of any of the terms thereof by the Employee, in addition to any other remedy that may be available to it, the Company shall be entitled to injunctive relief without showing that monetary damages will not provide an adequate remedy.

h.    Prior Agreements. Employee warrants that Employee is not under any obligation, contractual or otherwise, limiting or affecting Employee's ability or right to render to Company the services for which Employee has been or is being hired. Upon execution of this Agreement, Employee will give Company a copy of any agreement, or notify Company in writing of any agreement if a written agreement is not available, with a prior employer or other Person purporting to limit or affect Employee's ability or right to render to Company the services for which Employee has been or is being hired, to solicit customers or potential customers, or to use any type of information.

i.    Future Employment Opportunities. At any time before, and for six (6) months after, the Termination Date, Employee upon accepting any employment with another Person, shall provide Company with the employer's name and a general description of the services Employee will provide.

j.    Tolling. In the event the enforceability of any terms of this Section 14 are challenged in a lawsuit instituted during the Term or for a period of twelve (12) months following the Termination Date and Employee is not enjoined from breaching any of the protective covenants, then if a court of competent jurisdiction finds that the challenged protective covenant is enforceable, the time period shall be tolled during the pendency of the lawsuit until the dispute is finally resolved and all periods of appeal have expired.

k.    Survival. If any of the covenants contained in this Section 14, or any part hereof, are held to be unenforceable because of the duration of such provision or the area covered thereby, or for any other over-inclusiveness, the Parties agree that the duration of such provision or the area covered thereby or such other over-inclusiveness shall be automatically reduced to the maximum scope permitted by law, and that, in its reduced form, said provision shall then be fully enforceable. If any provision contained in this Section 14 (or any part thereof) is construed to be invalid or unenforceable, the same shall not affect the remainder of the provision or provisions which shall be given full effect without regard to the invalid portions.

8

l.  Outside Activities.  The foregoing terms and conditions of this Section 14 shall not be construed to prohibit Employee from engaging in Outside Activities.

15.    Work For Hire Acknowledgment; Assignment.    Employee and Company each acknowledge and agree that Employee's Outside Activities do not constitute "work for hire". Employee, however, acknowledges that except for any Outside Activities that may relate to the Company's Business or the Company's Products, which shall be excluded from the definition of "works for hire" hereunder, Employee's work on and contributions to documents, programs, and other expressions in any tangible medium that relate to the Company's Business or the Company's Products (collectively, "Works") beginning on the date of employment and thereafter through the Termination Date are within the scope of Employee's employment and part of Employee's duties and responsibilities.  Employee's work on and contributions to the Works will be rendered and made by Employee for, at the instigation of, and under the overall direction of, Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States Copyright Laws.    Without limiting this acknowledgment, Employee assigns, grants, and delivers exclusively to Company all rights, titles, and interests in and to any Works, and all copies and versions, including all copyrights and renewals.    Employee will execute and deliver to Company, its successors and assigns, any assignments and documents Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual, and worldwide ownership of all rights, titles, and interests of every kind and nature, including all copyrights, in and to the Works, and Employee constitutes and appoints Company as his agent to execute and deliver any such assignments or documents Employee fails or refuses to execute and deliver, this power and agency being coupled with an interest and being irrevocable.

16.    Inventions, Ideas and Patents.  Employee and Company each acknowledge and agree that the Company intends for the Employee to engage in Outside Activities.    Employee acknowledges shall disclose promptly to Company (which shall receive it in confidence), and only to Company, any invention or idea of Employee (developed alone or with others) that relates to the Company's Business or the Company's Products, whether made or conceived during Employee's employment with the Company or pursuant to an Outside Activity.

a.    Any such invention or idea relating to the Company's Business or the Company's Products made or conceived during Employee's employment with the Company shall be the property of the Company; provided, however, that following the date which is six (6) months after the Termination Date, upon request from the Employee, the Company shall grant the Employee a non-exclusive, perpetual license, in written form that is reasonably satisfactory to the Company, to market, copy, sublicense, modify, customize, translate, adapt, publish, display or create derivative works with respect thereto, in exchange for a royalty fee of ten percent (10%) of the gross revenues received by Employee (or any affiliate of Employee) from sales generated therefrom, which shall be paid to the Company on a quarterly basis.

b.    Any such invention or idea relating to the Company's Business or the Company's Products made or conceived during or pursuant to an Outside Activity shall be the property of the Employee; provided, however, that upon request from the Company, the Employee shall grant the Company a non-exclusive, perpetual license, in written form that is reasonably

satisfactory to the Company, to market, copy, sublicense, modify, customize, translate, adapt, publish, display or create derivative works with respect thereto, in exchange for a royalty fee of ten percent (10%) of the gross revenues received by the Company (or any affiliate of the Company) from sales generated therefrom, which shall be paid to the Employee on a quarterly basis.

17.    Both Parties mutually agree, and the aforementioned license agreement shall provide, that beginning on that date which is the last day of the sixth complete calendar month after the month in which the Termination Date occurs, the Company shall have an option, for a period of 3 years to license back any and all derivative works Employee has created from the Software in exchange for a royalty fee of ten percent (10%) of the gross revenues received by the Company or its affiliates, successors or assigns, from sales of the Software or its derivative works, which shall be paid to the Employee on a quarterly basis

18.    <u>Representations and Disclosures</u>.  Employee represents and warrants that he has the legal capacity to execute and deliver this Agreement, and that the execution, delivery and performance of this Agreement by the Employee will not violate any agreement made by the Employee or to which the Employee is subject.  Employee represents and warrants that there are no inventions or ideas of which Employee claims ownership as of the date of this Agreement other than the inventions or ideas described on **Appendix 1**.  If no inventions or ideas are listed on **Appendix 1**, Employee represents that there are no such inventions or ideas at the time of signing this Agreement.  Employee represents and warrants that performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Employee in confidence or in trust prior to the execution of this Agreement.  Employee has not entered into, and Employee agrees not to enter into, any agreement either written or oral that conflicts with Employee's employment or Employee's performance under this Agreement. Except as described on **Appendix 1**, Employee is not bound by any agreement regarding confidentiality or ownership of intellectual property with any person or entity other than the Company.  Employee agrees not to disclose to the Company or use on its behalf any confidential information belonging to others that is known to have been improperly acquired or acquired from a Person known to be subject to a duty not to disclose it.

19.    <u>Continuing Employment Upon a Change of Control</u>.  Upon the occurrence of a Change of Control (as defined below), the Company covenants that it shall cause the acquiring company to offer Employee an employment agreement containing (i) an employment period of not less than one (1) year, (ii) duties and responsibilities consistent with Employee's then current position in the Company and (iii) such other terms consistent with and comparable to the terms set forth in this Agreement, as and if amended, in all material respects, including without limitation, compensation and benefits.  Such employment agreement will not require relocation unless mutually agreed upon by the Company and Employee.  If the acquiring company fails to offer Employee an employment agreement containing such terms, then Employee shall be entitled to a lump sum severance in an amount not less than twice Employee's aggregate compensation (including salary, bonuses, and commission, whether or not paid) for the prior twelve (12) month period (or if Employee has not been employed by the Company for twelve (12) months, then sums earned by Employee during such period shall be extrapolated to cover a twelve (12) month period), plus the continuation of all benefits for a period of twelve (12) months after the

Termination Date. If the acquiring company terminates Employee's employment or if Employee terminates employment for Good Reason within one (1) year after the Change of Control, then Employee shall be entitled to a lump sum severance in an amount equal to the lump sum severance Employee would have received in the prior sentence, plus the continuation of all benefits for a period of twelve (12) months after the Termination Date. The provisions of this Section 19 shall be binding upon and enforceable against all successors and assigns of the Company. A "Change of Control" shall be deemed to have occurred after (a) the sale of all or substantially all of the assets of the Company, whether in a single transaction or in a series of transactions occurring within any single twelve (12) month period, (b) the sale by one or more shareholders of the Company, in a single transaction or in a series of transactions occurring within any single twelve (12) month period, of more than fifty percent (50%) of the issued and outstanding capital stock of the Company to any individual, corporation, trust or other entity; or (c) a merger, reorganization, exchange of stock or other securities, or other business combination between the Company and another individual, corporation, trust or other entity comprised of a single transaction or a series of transactions occurring within any single twelve (12) month period, resulting in any individual, corporation, trust or other entity owning more than fifty percent (50%) of the issued and outstanding capital stock of the Company.

20.    Interpretation; Severability. Rights and restrictions in this Agreement may be exercised and are applicable only to the extent they do not violate any applicable laws, and are intended to be limited to the extent necessary so they will not render this Agreement illegal, invalid or unenforceable. If any term shall be held illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. This Agreement does not in any way limit Company's rights under the laws of agency, fiduciary obligation, unfair competition, trade secret, copyright, patent, trademark or any other applicable law(s), or under any other agreement or instrument, all of which are in addition to rights under this Agreement. The existence of a claim by Employee, whether predicated on this Agreement or otherwise, shall not constitute a defense to Company's enforcement of this Agreement.

21.    Remedies for Breach. Notwithstanding any other provisions set forth herein, Employee understands and agrees that any breach of this Agreement may cause the Company great and irreparable harm and that it would be difficult or impossible to establish the full monetary value of such damage. Consequently:

Employee covenants and agrees that any breach by Employee of the Agreement during Employee's employment with the Company shall be grounds for disciplinary actions up to and including dismissal of Employee for Cause.

Employee further covenants and agrees that in the event of any Employee breach of this Agreement, Employee consents to the entry of appropriate preliminary and permanent injunctions in a court of appropriate jurisdiction, without the posting of a bond or other security, in addition to whatever other remedies the Company may have. Injunctive relief is in addition to any other available remedy, including damages.

Employee agrees that Employee will indemnify and hold the Company harmless from any loss, cost, damage or expense (including attorneys' fees) incurred by the

Company arising out of Employee's breach of any portion of this Agreement, whether or not such breach results in litigation or other formal proceedings.

22.    Miscellaneous.

a.    Counterparts.  This Agreement may be executed in several counterparts each of which is an original.  This Agreement and any counterpart so executed shall be deemed to be one and the same instrument.  It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

b.    Contents of Agreement; Parties In Interest, Etc.  This Agreement sets forth the entire understanding of the Parties.  Any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and superseded by this Agreement.  If there are any inconsistencies between the terms of this Agreement and the Company's Employee Handbook, this Agreement shall control.  All representations, warranties, covenants, terms, conditions and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, legal representatives, successors and permitted assigns of the Company and Employee.  Neither this Agreement nor any rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the other Party hereto.

c.    GOVERNING LAW.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS.  Each Party irrevocably (a) consents to the exclusive jurisdiction and venue of the federal and state courts located in State of Florida, in any action arising under or relating to this Agreement, and (b) waives any jurisdictional defenses (including personal jurisdiction and venue) to any such action.

d.    Section Headings.  The section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

e.    Notices.  All notices, requests, demands and other communications which are required or permitted hereunder shall be sufficient if given in writing and delivered personally or by registered or certified mail, postage prepaid, by a nationally recognized overnight courier service, or by facsimile transmission (with a copy simultaneously sent by registered or certified mail, postage prepaid), as follows (or to such other address as shall be set forth in a notice given in the same manner):

> (1)    If to the Company, to:
> Bravera, Inc.
> c/o Shea Development Corp.
> 1351 Dividend Drive, Suite G
> Marietta, GA  30067
> Attn:  Francis E. Wilde
>
> with a copy to:

12

Dunnington, Bartholow and Miller
477 Madison Avenue
12th Floor
New York, NY 10022
Attention: Robert T. Lincoln, Esq.

(2)    If to Employee, to:
Christopher Watson
4446-1A Hendricks Avenue, Suite 246
Jacksonville, Fla. 32207

All such notices shall be deemed to have been received on the date of delivery.

f.    Location of Employment. The location of employment of Employee shall be the State of Florida. This Agreement will not require relocation unless mutually agreed upon by the Company and Employee.

g.    Modification and Waiver. Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof, and this Agreement may be modified or amended at any time by the Company and Employee. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by each of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof nor shall such waiver constitute a continuing waiver.

h.    Arbitration. Any claim or controversy arising out of or relating to this Agreement or any breach thereof shall be settled by arbitration. The venue for any such arbitration shall be Orlando, Florida, or such other location as the parties may mutually agree. Except as expressly set forth herein, all arbitration proceedings under this Section 22(h) shall be undertaken in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in force. Only individuals who are (i) lawyers engaged full-time in the practice of law and (ii) on the AAA register of arbitrators shall be selected as an arbitrator. There shall be one arbitrator who shall be chosen in accordance with the rules of the AAA. Within twenty (20) days of the conclusion of the arbitration hearing, the arbitrator shall prepare written findings of fact and conclusions of law. Judgment on the written award may be entered and enforced in any court of competent jurisdiction. It is mutually agreed that the written decision of the arbitrator shall be valid, binding, final and non-appealable; provided however, that the parties hereto agree that the arbitrator shall not be empowered to award punitive damages against any party to such arbitration. The arbitrator shall require the non-prevailing party to pay the arbitrator's full fees and expenses or, if in the arbitrator's opinion there is no prevailing party, the arbitrator's fees and expenses will be borne equally by the parties thereto. In the event action is brought to enforce the provisions of this Agreement pursuant to this Section 22(h), the non-prevailing parties shall be required to pay the reasonable attorneys' fees and expenses of the prevailing parties, except that if in the opinion of the court or arbitrator deciding such action there is no prevailing party, each party shall pay its own attorneys' fees and expenses.

**[Signatures on Following Page]**

**I HAVE READ THIS AGREEMENT CAREFULLY.  I ACKNOWLEDGE THAT THIS AGREEMENT DESCRIBES THE BASIC LEGAL AND ETHICAL RESPONSIBILITIES THAT I AM REQUIRED TO OBSERVE AS AN EMPLOYEE EXPOSED TO HIGHLY SENSITIVE TECHNOLOGY AND STRATEGIC INFORMATION.**

**IN WITNESS WHEREOF**, the parties hereto have executed or have caused this Agreement to be duly executed as of the date first above written.

EMPLOYEE

_____
Name: Christopher Watson

COMPANY

Bravera, Inc.

By:
Name: E. Joseph Vitetta, Jr.
Title:   Secretary

AGREED TO & ACCEPTED:

15

Shea Development Corp.


By: _____ ___
Name: Francis E. Wilde
Title:   Chairman and CEO

**EXHIBIT A**
**Software**


"Bravera Process Director"
"Bravera Content Director"
"Bravera RAPID Workplace" which includes the prior versions branded as "Bravera RAPID"

# APPENDIX 1

**List of Agreements regarding confidentiality or ownership
of intellectual property between Employee
and any person or entity other than the Company**