UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHEA DEVELOPMENT CORP., BRAVERA,
INC., and IP HOLDING OF NEVADA CORP.,

                            Plaintiffs,        07 Civ. 11201(DLC) (GWG)

    -  against -

CHRISTOPHER WATSON, and ELIZABETH ANNE
CONLEY,
                         Defendants.
-------------------------------------------------------------------X

## DECLARATION IN OPPOSITION

FRANCIS J. MOONEY, under penalty of perjury, deposes and says:

    1.    I am of counsel to the law firm of Dunnington, Bartholow & Miller LLP

(the "Firm"), which represented Plaintiff Shea Development Corp., now known as

Riptide Worldwide, Inc. ("Shea"), in connection with the merger of Bravera, Inc.

("Bravera") with a wholly-owned subsidiary of Shea. I submit this declaration in

opposition to defendant Conley's motion.

    2.    I am generally familiar with the negotiations and matters pertaining to

Shea's acquisition of Bravera.

    3.    The Firm was responsible for collecting signatures from Shea and Bravera

on the Articles of Merger that were filed in Florida and Nevada in connection with the

closing of the acquisition.

    4.    The effective date of the acquisition of Bravera by Shea's wholly-owned

subsidiary, as agreed to in the April 26, 2007 Agreement and Plan of Merger (the

"Acquisition Agreement") entered into by Bravera and Shea, was on the date that the

Articles of Merger were filed in Nevada and Florida, which was July 17, 2007.

5.      Section 1.2 of the Acquisition Agreement  provides in relevant part as

follows:

> On the Closing Date:  (a) the parties hereto will cause the Merger to be
> consummated by filing with the Secretaries of State of the State of Florida
> and the State of Nevada a certificate of merger, a plan of merger and any
> required related documents, in such form or forms as are required by, and
> executed in accordance with, applicable law (the date and time of such
> filing being the "Effective Time" and the date upon which the Effective
> Time occurs, being the "Effective Date.")"

6.      The Articles of Merger were incorporated into the Acquisition Agreement

by reference.  The Acquisition Agreement provides in  Section 9.11 that it shall be:

> [G]overned by and construed in accordance with the domestic laws of the
> State of New York, without giving effect to any choice of law or conflict
> of law provision.  The parties hereto expressly and irrevocably consent
> and submit to the exclusive jurisdiction of the applicable local, federal, or
> appellate courts located in New York, New York in connection with any
> proceeding arising from or out of this Agreement.

7.      Section 9.2 of the Acquisition Agreement, which is the merger clause of

that agreement, provides as follows:

> This Agreement *supersedes* all prior discussions and agreements between
> the parties with respect to the subject matter hereof and thereof and
> contains the sole and entire agreement between the parties hereto with
> respect to the subject matter hereof and thereof.  (Emphasis added.)

8.  The Acquisition Agreement  provides that "Agreement" shall mean:

> [T]his Agreement and Plan of Merger, the Schedules the Exhibits, and the
> certificates and instruments delivered in connection herewith, or
> incorporated by reference.

9.      The employment agreements of the senior management team including,

but not limited to, those of Christopher Watson and Elizabeth Anne Conley, had been

negotiated by Christopher Watson with Joseph Vitetta and Francis Wilde, and were

incorporated into the Acquisition Agreement as Schedule 1.14 Part II.

10.     The intent of the merger clause of the Acquisition Agreement provision was to supersede any other choice of law, governing law, arbitration or mediation clauses contained in any earlier dated agreements, since the governing law provision of the Acquisition Agreement applied not only to the agreement itself, but also to all of the Schedules and Exhibits thereto, which includes the senior management employment agreements of Christopher Watson and Elizabeth Anne Conley.

11.     Shea has a principal place of business in Oviedo, Florida and has operations in Texas and Georgia. Bravera's business operations are located in Florida and South Carolina. Prior to the merger, through at least September 2007, Bravera conducted most operations out of a facility in Reston, Virginia.

12.     The key witnesses in this action are Bravera's customers, who are located all over the country. These witnesses have knowledge of pre and post merger contacts with defendants. They are expected to testify about the dates when they awarded the contracts to Bravera or its competitors as well as the dates when these customers notified Watson and Conley of the fact that most of these contracts were going to be awarded to Bravera's competitors. In addition, Bravera's customers would also have knowledge of Watson's and Conley's more recent violations of the non-competition clauses in defendants' employment agreements.

13.     Upon information and belief, Bravera's former employees are still residing in the Reston, Virginia area.

14.     Defendant Watson conducts his business in the Washington, D.C. metropolitan area, South Carolina and Florida.

15.    Upon information and belief, Conley herself worked with customers in several eastern states including the Washington, D.C. metropolitan area.

16.    Despite the fact that Conley now argues that the arbitration clause in the employment agreements negotiated by Watson on their joint behalf governs the choice of forum in this case, on January 15, 2008, Watson himself (as well as Intellectus, LLC, a company which Watson controls), filed an action in the Supreme Court, New York County against plaintiffs in this action, seeking damages for breach of the Acquisition Agreement, breach of License Agreement, *breach of employment agreement* and declaratory judgment. (A copy of the complaint is annexed as Exhibit A, hereto.) Obviously, Watson and his counsel believe that the choice of forum clause in the Acquisition Agreement supersedes the arbitration clause in the employment agreements that he negotiated.

I, Francis J. Mooney, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury that the foregoing is true and correct. Executed this 25th day of February, 2008 in New York, New York.

_____
Francis J. Mooney

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - x

CHRISTOPHER WATSON and INTELLECTUS,
LLC.

Plaintiffs,

-against-

RIPTIDE WORLDWIDE, INC. (f/k/a SHEA
DEVELOPMENT CORP.), BRAVERA, INC. and
IP HOLDING OF NEVADA CORP.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

08600614

Index No.
Date Purchased:

Plaintiffs designate New York County as the
venue of this action. The basis of the choice of
venue is pursuant to a contractual provision
fixing venue in the Merger Agreement made
by and between the parties.

**SUMMONS**

Plaintiff resides at
3910 South Roosevelt
Key West, Florida 33040

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the Complaint of the plaintiffs in this
action, and serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, upon the undersigned attorneys for the plaintiff within twenty (20)
days after service of the above, exclusive of the date of service or within thirty (30) days after
service is complete if service is made by any method other than personal delivery to you within
the State of New York.

In the case of your failure to answer the Complaint of the plaintiff, judgment will be
taken against you on default for the relief sought in the complaint.

**FILED**

Dated: New York, New York
January 14, 2008

JAN 15 2008

NEW YORK
COUNTY CLERK'S OFFICE

GOODWIN PROCTER LLP

By: _____
Jeffrey A. Simes
599 Lexington Avenue
New York, New York 10022
Tel: (212) 813-8800
Fax: (212) 355-3333

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -

CHRISTOPHER WATSON and INTELLECTUS, LLC,

                Plaintiffs,

      -against-

RIPTIDE WORLDWIDE, INC. (f/k/a SHEA
DEVELOPMENT CORP.), BRAVERA, INC. and IP
HOLDING OF NEVADA CORP.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Index No.:

**COMPLAINT**

08600114

FILED

Jury Trial Demanded

JAN 15 2008

NEW YORK
COUNTY CLERK'S OFFICE

Plaintiffs Christopher Watson ("Mr. Watson") and Intellectus, LLC ("Intellectus"), by their undersigned attorneys Goodwin Procter LLP, hereby allege as and for their Complaint against Defendants Riptide Worldwide, Inc. (formerly known as Shea Development Corp.) ("Shea"), Bravera, Inc. ("Bravera") and IP Holding of Nevada Corp. ("IP Holding") as follows:

### INTRODUCTION

1.     This case involves the sale of a business—Bravera, Inc.—by Mr. Watson to Shea under an April 26, 2007 Agreement and Plan of Merger ("Merger Agreement"), and Shea's refusal to honor its various commitments surrounding that sale. Although the merger closed on July 16, 2007, Shea and its affiliates have still failed to make the various payments they were obligated to make under the contracts that memorialize the transaction.

2.     First, Shea failed to pay what it owes Mr. Watson under the Merger Agreement, and breached its representations and warranties under the Merger Agreement. Shea has not paid nearly half of the consideration it promised to pay Mr. Watson and the shares of Shea stock it did issue to him are substantially less valuable because Shea misrepresented its financial condition. Shea falsely stated the number of authorized and issued outstanding shares, distorting the true

value of the shares Mr. Watson agreed to accept. Moreover, it promised that it was not granting liens or taking on significant debt, when in fact, it was taking on enormous debt to finance a transaction that it lacked the means to pursue. Although Shea entered into a series of onerous agreements with investors just prior to the merger that materially altered its financial picture, it shared none of this with Mr. Watson, in breach of its representations and warranties under the Merger Agreement. In short, Shea engaged in a pattern of deception, misrepresenting key aspects of its capitalization and finances, which wrongfully induced Mr. Watson to sell his company for substantially less than it was worth.

3. Second, as part of the merger and at the time of the closing, Intellectus licensed certain intellectual property to IP Holding for Bravera's use under a July 16, 2007 Software License and Asset Purchase Agreement (the "License Agreement"). The License Agreement provided that if Mr. Watson's continuing employment with Bravera was terminated for any reason, Intellectus would immediately be entitled to payments amounting to $3.75 million. Following the termination of Mr. Watson's employment at Bravera, Intellectus requested the payments at issue, but IP Holding refused to pay. Making matters worse, IP Holding (and its affiliates, including Bravera) have indicated that they intend to continue using the licensed intellectual property despite Intellectus's termination of the License Agreement as a result of IP Holding's breach. Thus, Defendants are infringing Intellectus's property rights on a continuing basis by their failure to acknowledge the termination of rights to which they no longer hold a valid license.

4. Third, at around the time of the closing of the merger and as part of the same transaction, Mr. Watson also entered into a July 15, 2007 Senior Management Employment Agreement (The "Employment Agreement") with Bravera and Shea under which Mr. Watson

2

was placed in charge of sales for Shea and Bravera. The Employment Agreement provided that any payments to Mr. Watson listed in the Merger Agreement would be accelerated, and become immediately due to Mr. Watson in the event that his employment ended for any reason. Although his employment with Shea and Bravera ended as of October 29, 2007, Bravera and Shea have not paid Mr. Watson what they owe him—specifically, "earn-out" payments of at least $1.25 million. Additionally, the Employment Agreement required that Bravera and Shea make a $250,000 termination payment to Mr. Watson, make payments for his medical benefits and return his 401(k) investments to him. Bravera and Shea have honored none of these obligations.

5.      As a result of the foregoing, Mr. Watson and Intellectus are entitled to damages from Shea, Bravera and IP Holding in excess of $6,000,000 plus interest.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Christopher Watson resides at 3910 South Roosevelt, Key West, Florida 33040. He is a member and principal of Plaintiff Intellectus, LLC at all times relevant to the allegations herein.

7.      Plaintiff Intellectus, LLC is a limited liability company organized under the laws of the State of Florida with its principal place of business at 300 Bucksley Lane, #305, Daniel Island, South Carolina 29492.

8.      On information and belief, Defendant Riptide Worldwide, Inc. (formerly known as Shea Development Corp.) is a corporation organized under the laws of the State of Nevada with its principal place of business at 200 East Palm Valley Drive, 2nd Floor, Oviedo, FL 32765.

LIBNY/4672895.1

9.     On information and belief, Defendant Bravera, Inc. is a corporation organized under the laws of the State of Florida with its principal place of business at 200 East Palm Valley Drive, 2nd Floor, Oviedo, FL 32765.

10.     On information and belief, Defendant IP Holding of Nevada Corp. is a corporation organized under the laws of the State of Nevada with its principal place of business at 200 East Palm Valley Drive, 2nd Floor, Oviedo, FL 32765.

11.     On information and belief, Riptide Worldwide, Inc.—which until recently was known as Shea Development Corp.—was at all relevant times the parent corporation of Defendant IP Holding of Nevada Corp. After the consummation of the merger on July 16, 2007. Shea Development Corp., now Riptide Worldwide, Inc., also became the parent entity of Defendant Bravera, Inc.

12.     On information and belief, Shea controls the actions of Defendants Bravera and IP Holding.

13.     Jurisdiction and venue for this action is proper in New York County pursuant to CPLR § 501 as a result of Defendants' express prior written consent in paragraph 9.11 of the Merger Agreement and Article IV, § 9 of the License Agreement to exclusive jurisdiction in New York and the jurisdiction of this Court, and because of the Defendant's presence or transaction of business in New York under the instruments at issue in this matter.

## FACTUAL ALLEGATIONS

14.     Chris Watson, a software engineer by training, created Bravera and built its business of workflow solutions directed primarily to governmental customers. Bravera, among other things, designed and supplied software and services that enable the Federal Emergency Management Agency to track claims following a natural disaster.

4

15.     In or about March 2007, Shea expressed an interest in a potential acquisition of Bravera.

16.     Shea, Bravera and Mr. Watson entered into a letter of intent in early April of 2007, and on April 26, 2007 the parties signed the Agreement and Plan of Merger which set forth the terms of the transaction.

*The Merger Agreement*

17.     Although the Merger Agreement was dated as of April 26, 2007, the transaction closed several months later, as contemplated by the parties, on or about July 16, 2007.

18.     The Merger Agreement was by and among Shea, Mr. Watson, Bravera and "Shea Development Acquisition No. 3 Corp."—an entity Shea established for the purpose of acquiring and effectuating a merger with Bravera.

19.     The transaction involved a merger of Bravera into "Shea Development Acquisition No. 3 Corp." in which Mr. Watson's shares of Bravera stock were to be converted into shares of Shea common stock.

20.     Specifically, upon the closing of the merger, each of Mr. Watson's shares of Bravera stock was to convert into a prorated portion of the 3,000,000 shares of Shea stock that Shea was issuing as merger consideration, as well as a pro rata share of $1,500,000, which was the cash consideration for the merger. Merger Agreement, § 1.6.

21.     In addition, the Merger Agreement provides for potential "earn-out" payments to Mr. Watson if Bravera met certain annual targets following the merger of Bravera into Shea.

22.     The Merger Agreement provided, in section 1.13, that Mr. Watson would be entitled to these "earn-out" payments—including both cash and warrants to receive additional Shea stock—one year and two years after the closing of the merger if Bravera satisfied certain

5

agreed-upon performance targets based on Bravera's revenues and earnings before income taxes, depreciation and amortization (or "EBITDA").

23.    The parties further agreed that EBITDA, for purposes of calculating Mr. Watson's entitlement to an earn-out payment, would include the earnings of Bravera and all of its affiliates.

### Shea's Representations and Warranties Concerning Capitalization

24.    Because Mr. Watson was to receive Shea common stock and was agreeing to accept future shares and/or warrants as part of the consideration he agreed to accept for selling Bravera, it was of critical importance that Mr. Watson be able to assess the true value of that stock, and that Shea not take actions that might dilute the value of his holdings or increase the risk of his investment in Shea.

25.    Accordingly, in the Merger Agreement, Shea made specific representations and warranties about its capital structure. Among other things, Shea represented and warranted that:

> 24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock, respectively, are issued and outstanding as set forth in the Capitalization Table attached hereto and incorporated herein as Schedule 3.2. Other than as set forth on Schedule 3.2, there are no shares of Parent Common Stock or Series A Preferred Stock outstanding.

Merger Agreement, § 3.2.

26.    The Merger Agreement further provided that other than what the Merger Agreement disclosed, there were "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Shea] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Shea] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock." Merger Agreement, § 3.2.

6

27.     Despite the reference to a Capitalization Table and a Schedule 3.2, no such documents were provided to Mr. Watson or included in the final, executed Merger Agreement. Therefore, Shea represented and warranted that the capitalization structure described in Section 3.2 was accurate.  In fact, although Mr. Watson repeatedly asked whether Shea had prepared a Capitalization Table or Schedule 3.2 that modified section 3.2, Shea never provided any such Capitalization Table or Schedule.

28.     The representations that Shea made in section 3.2 of the Merger Agreement were false.  Shea had more shares outstanding and issued, and/or had committed itself to issue more shares, than were disclosed to Mr. Watson in Section 3.2.

29.     For example, on July 13, 2007, immediately prior to the closing of the merger, Shea entered into a "Securities Purchase Agreement" which obligated Shea to issue an additional 12,797,500 shares of Shea Common Stock, par value $0.001 per share, and warrants to purchase 3,500,000 shares of Shea Common Stock.

30.     Shea entered into the Securities Purchase Agreement immediately prior to the closing of the merger with Bravera, but Shea did not inform Mr. Watson that it was doing so, nor did it disclose the terms of the Securities Purchase Agreement.

31.     Also on July 13, 2007, Shea issued an additional 1,000,000 shares of Series A convertible preferred stock.  Shea also altered the price of its Series A stock.

32.     On July 12, 2007, Shea amended its Articles of Incorporation to increase the authorized number of shares of preferred stock from 20,000,000—the amount Shea represented in Section 3.1 of the Merger Agreement—to 60,000,000.

33.     Shea did not inform Mr. Watson that it was issuing these additional shares of Series A stock, that it was altering the rights of Series A shareholders, or that it had amended its

LIBNY/4672895.1

Articles of Incorporation to permit a threefold increase in the number of preferred shares it was authorized to issue.

34.    On July 13, 2007, Shea entered into a "Series B Preferred Stock Purchase Agreement" with certain investors under which Shea issued a new series of stock—convertible Series B preferred stock. These Series B shares—4,600,000 were issued—could be converted at any time into an aggregate of 9,200,000 shares of common stock.

35.    On information and belief, the Series B shares had preferred rights, including the right to receive dividends, the right of redemption and the right to convert to common stock and the shareholder's request.

36.    Shea did not inform Mr. Watson of the Series B Preferred Stock Purchase Agreement or its terms prior to the closing of the transaction.

*Shea's Representations and Warranties Concerning its Finances and Debt*

37.    It was also of key importance to Mr. Watson that Shea have the financial wherewithal to effectuate the merger, and that it not have debts or liabilities that would jeopardize the value of Shea stock that Mr. Watson agreed to accept as currency for the transaction. Thus, Shea represented and warranted, in Section 3.4 of the Merger Agreement, that:

> Except as and to the extent set forth or reserved against on the consolidated balance sheet of Parent, none of Parent or any Subsidiary of Parent has any Liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) that would be required to be reflected on a balance sheet or in notes thereto, except for Liabilities or obligations incurred in the ordinary course of business consistent with past practice since January 1, 2007.

38.     Shea also represented and warranted that its financial statements were "correct and complete in all material respects and each present fairly, in all material respects," Shea's financial position and results of operations.

39.     These representations and warranties were false.  In fact, Shea had assumed substantial liabilities which it did not disclose to Mr. Watson.

40.     As noted above, Shea entered into significant commitments on July 13, 2007 in connection with the Securities Purchase Agreement (under which it was obligated to issue additional common stock) and the Series B Preferred Stock Purchase Agreement (under which it issued the Series B preferred stock).

41.     Moreover, the Securities Purchase Agreement required Shea to issue debt—senior secured notes—in an aggregate principal amount of $7,222,222.22.  Shea would be required, beginning January 1, 2008, to pay in cash, 1/30th of this principal amount, or approximately $241,000 per month, plus unpaid accrued interest, to the note holders.

42.     The various agreements that Shea entered into concerning the senior notes and the issuance of additional shares caused it to incur substantial amounts of costs and fees.

43.     For example, as of July 13, 2007, Shea estimated that it had incurred some $1,280,000 in expenses in connection with the Securities Purchase Agreement from investment bankers, attorneys and other professionals which it knew it would have to pay in cash and/or warrants.  (Following the closing of the merger, Mr. Watson has requested additional information from Shea concerning Shea's expenses and use of funds, but Shea has refused to provide that information to Mr. Watson.)

44.     Although these agreements and expenses significantly altered the financial picture of Shea and constituted liabilities of Shea, they were not disclosed to Mr. Watson, who relied

9

upon a version of Shea's financial statements that did not reflect these significant commitments Shea had made.

45.    In Section 3.5(c) of the Merger Agreement, Shea represented and warranted that the merger would not "result in the creation or imposition of (or the obligation to create or impose) any Lien upon [Shea] or Merger Sub or any of their Assets and Properties . . . ." The Merger Agreement defines Lien to mean "any mortgage, pledge, assessment, security interest, lease, lien, easement, charge or adverse claim or other encumbrance of any kind . . . ." Merger Agreement, § 10.1.

46.    This representation and warranty was false when made, and Shea knew it was false.

47.    The senior notes that Shea issued on July 13, 2007—prior to the merger—under the Securities Purchase Agreement are secured by a first lien on all of the assets of Shea.

48.    Shea did not inform Mr. Watson, prior to the July 16, 2007 closing of the merger, that Shea had given a lien on all of its assets in connection with the Securities Purchase Agreement.

49.    Shea further represented and warranted, in Section 3.7 of the Merger Agreement, that:

>    There is no agreement, judgment, injunction, Order or decree binding upon the Parent or Merger Sub, or any of their Assets and Properties which has had or could reasonably be expected to have the effect of prohibiting or impairing any current or future business practice of the Parent or Merger Sub, respectively, any acquisition of property by the Parent or Merger Sub or the conduct of business by the Parent or Merger Sub as currently conducted or as proposed to be conducted by the Parent or Merger Sub, directly related to this Agreement.

10

50.     This representation was false because the Security Purchase Agreement and other actions Shea had taken would inevitably and severely impair Shea's business.

51.     Shea represented and warranted, in Section 3.6 of the Merger Agreement, that "[t]he minute books, including the share registers, and other similar records of [Shea] . . . are complete and correct in all material respects and have been maintained in accordance with sound business practices."

52.     This representation and warranty was false and Shea knew it was false when it was made.

53.     As noted above, Shea entered into a series of agreements to incur debt and significantly alter its capital structure. The minute books and records made available to Mr. Watson either did not reflect these transactions, or inaccurately depicted Shea's actions.

54.     Moreover, on July 12, 2007, Shea amended its Articles of Incorporation to increase the authorized number of shares of preferred stock from 20,000,000—the amount Shea represented in Section 3.1 of the Merger Agreement—to 60,000,000.

55.     Shea did not inform Mr. Watson of this amendment to its Articles of Incorporation nor did it provide him with the relevant documentation memorializing that change.

56.     Shea represented and warranted that it had "or shall obtain funds sufficient to pay at Closing" the cash portion of Mr. Watson's consideration. Merger Agreement, § 3.18.

57.     This provision required that Shea have or obtain the necessary funds to complete the merger without (a) altering the financial picture of Shea as portrayed by its financial statements; (b) granting liens against Shea's assets; or (c) materially altering the capital structure of Shea.

11

58.     This representation and warranty was false, and Shea knew that it was false when it was made, as Shea knew or should have known that it lacked available finances to complete the merger without incurring significant debt and other financial obligations.

59.     The various representations and warranties of Shea under the Merger Agreement were to be accurate as of the Closing Date (*i.e.*, July 16, 2007).  Shea never supplemented or corrected its representations and warranties.

***The Closing***

60.     The merger closed on or about July 16, 2007.

61.     At or around the closing, Shea paid Mr. Watson $800,000 in cash of the $1,500,000 it was committed to pay.

62.     In its securities filings, Shea disclosed that $700,000 was "payable" to Mr. Watson "at a second closing."

63.     In fact, this second closing never occurred and, to date, Shea has not paid Mr. Watson the remaining $700,000 it owes.

64.     Shea issued to Mr. Watson 3,300,000 shares of Shea Common Stock and an additional 5,000,000 shares of Shea Common Stock that vest ratably over thirty-six months beginning on July 1, 2007.

65.     Shea also gave Mr. Watson warrants to acquire up to 2,937,500 shares of Shea Common Stock at an exercise price of $1.00 per share with a five year term, exercisable over time.

66.     Shea has wrongfully denied that it has any obligation to pay Mr. Watson the remainder of what it owes him under the Merger Agreement.

LIBNY/4672895.1

67.     Shea wrongfully and unilaterally "canceled" future payments due to Mr. Watson and Intellectus, stating publicly that it refuted its obligation to make any further payments to Mr. Watson or Intellectus.

*The Software License and Asset Purchase Agreement*

68.     On the same day the merger closed—July 16, 2007—and as part of the same basic transaction as the merger, Intellectus (a company owned in part by Chris Watson) and IP Holding (a wholly-owned subsidiary of Shea) entered into a July 16, 2007 Software License and Asset Purchase Agreement (the "License Agreement") under which Intellectus licensed the intellectual property that Bravera needed to operate.

69.     The License Agreement granted a revocable license to IP Holding and its affiliates (including Shea and Bravera) to use Intellectus's software and other IP assets, including the trademark "Bravera" and the domain name "www.bravera.com."

70.     The License Agreement provided that it was to run until July 15, 2008, but could be terminated in the event of a material breach.

71.     One of the key provisions of the License Agreement was IP Holding's agreement to make significant payments to Intellectus in the event that Mr. Watson no longer remained employed by Bravera.

72.     Article IV, § 15 of the License Agreement specifically provided that:

> All consideration set forth on Exhibit C shall be deemed earned, accelerated and due and payable sixty (60) days after the termination of employment of Christopher Watson by Bravera, Inc. (or its successor), a Florida corporation and a subsidiary of Shea, for any reason other than for "Cause" as defined in that certain Senior Management Employment Agreement between Bravera, Inc. and Christopher Watson dated as of July 15, 2007.

13

73.    Exhibit C to the License Agreement sets forth a series of payments totaling $3,750,000 in cash and including the issuance of warrants to purchase 450,000 shares of Shea's common stock over a three-year period.

74.    Mr. Watson's employment with Bravera terminated on October 29, 2007.

75.    Bravera did not terminate Mr. Watson's employment for cause.

76.    IP Holding was thus obligated to pay Intellectus $3,750,000 and cause to be issued warrants to purchase 450,000 shares of Shea's common stock.

77.    Despite written demands from Intellectus, IP Holding has paid no portion of the sums it owes.

78.    As a result, Intellectus terminated the License Agreement, requiring that IP Holding and its affiliates discontinue use of the intellectual property licensed by Intellectus.

79.    IP Holdings and its affiliates Shea and Bravera have indicated that they intend to continue to use the intellectual property of Intellectus even after the effective termination date of the license.

80.    On information and belief, Shea and Bravera have informed clients that they will continue to make available products and services that require that Shea and/or Bravera make use of the intellectual property that Intellectus licensed to IP Holding even after the effective date of the termination of the License Agreement.

***The Employment Agreement***

81.    As part of Shea's acquisition of Bravera, the parties entered into a third contract—the July, 15 2007 Senior Management Employment Agreement ("Employment Agreement") among Bravera, Shea and Watson.

14

82.     The Employment Agreement provided that Mr. Watson would be Chief Sales Officer and Chief Marketing Officer of Bravera, and would "report directly to the CEO of [Bravera's] parent company," Shea Development Corporation.

83.     The Employment Agreement provided that Mr. Watson was to remain employed by Bravera and Shea for a period of three years, unless his employment terminated sooner.

84.     The Employment Agreement provided that Mr. Watson could terminate his employment "at any time" with thirty days' written notice to Bravera.

85.     The Employment Agreement provided that if Mr. Watson's "employment with the Company terminates for any other reason" than "Cause," as defined in the contract, then:

> all earnout and other consideration due Employee under that certain Merger Agreement dated April 26, 2007 and due Employee's affiliates, Intellectus, LLC, under the certain Software License and Assets Purchase Agreement [sic] dated as of even date herewith shall be accelerated and paid on the Termination Date.

Employment Agreement, § 6(b).

86.     In addition, the Employment Agreement provided that if Mr. Watson's employment terminated for any reason other than "Cause," he would be entitled to the following additional benefits:

> a.     "an amount equal to one (1) year of Employee's salary, at the rate in effect as of the date of the notice of termination"—then $250,000;
>
> b.     "a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by the Company and achieved all goals and objectives . . . .";
>
> c.     "all benefits for a period of six (6) months after the Termination Date";
>
> d.     "the same medical coverage Employee carried while an active employee at Company's expense for a period of six (6) months after the Termination Date";

Employment Agreement, § 6(b).

15

87.     Although Mr. Watson terminated his employment with the requisite thirty days' written notice on October 29, 2007, and although Bravera did not terminate his employment for "Cause," neither Bravera nor Shea has made any portion of these required payments to Mr. Watson.

88.     In addition, Mr. Watson has requested, but has not received, the return of the funds he invested under Bravera's 401(k) Plan.

## COUNT I
### (Breach of Merger Agreement)
### (Asserted by Mr. Watson against Shea)

89.     Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs of this Complaint.

90.     Mr. Watson and Shea entered into the written Merger Agreement which is a valid, binding contract supported by adequate consideration.

91.     Mr. Watson performed his obligations under the Merger Agreement by, among other things, conveying the shares of Bravera to Shea's subsidiary in accordance with the Merger Agreement.

92.     Shea has failed to perform or has refused to perform its obligations under the Merger Agreement to pay Mr. Watson what it owes him.

93.     Among other things, Shea has failed to pay Mr. Watson $700,000 of the cash consideration it agreed to pay, and which it acknowledged in its securities filings it owes.

94.     Shea has also failed to convey to Mr. Watson other consideration it owes him under the Merger Agreement, including warrants to purchase additional shares of Shea common stock.

16

95.     Shea has further breached the Merger Agreement by, among other things, falsely representing and warranting:

a.     in breach of Section 3.2 of the Merger Agreement, that Shea's outstanding and issued shares consisted of "24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock" when Shea knew that it had previously committed to issue substantially more than the disclosed number and class of shares;

b.     in breach of Section 3.2 of the Merger Agreement, that Shea was authorized to issue 20,000,000 preferred shares when Shea had previously amended its Articles of Incorporation to authorize the issuance of triple that number;

c.     in breach of Section 3.2 of the Merger Agreement, that "no existing options, warrants, calls, convertible securities or commitments of any kind obligating [Shea] to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does [Shea] have any obligation to repurchase, reacquire or redeem any of its outstanding capital stock," when Shea knew that it had previously entered into agreements committing it to issue additional shares of stock and warrants to buy stock;

d.     in breach of Section 3.4(b) of the Merger Agreement, that Shea had no Liabilities other than what was disclosed on its balance sheet, when Shea knew that it had more than $7.2 million in undisclosed debt from the senior notes it had issued prior to closing;

e.     in breach of Section 3.4(a) of the Merger Agreement, that Shea's financial statements were correct in all respects, when they failed to disclose the senior notes, Securities Purchase Agreement or related agreements entered into prior to the closing of the merger;

f.     in breach of Section 3.5(c) of the Merger Agreement that merger would not result in any liens against Shea's assets when Shea had previously incurred substantial debt to pay for the merger that involved a lien against all of Shea's assets;

g.     in breach of Section 3.7 of the Merger agreement, that the merger would not impair the business of Shea, when Shea knew that the massive debt it had incurred to pay for the merger (which it had not disclosed to Mr. Watson) would cripple it.

h.     in breach of Section 3.6 of the Merger Agreement, that Shea's minute books and corporate records were "complete and correct in all respects,"

17

when Shea knew that it had amended its Articles of Incorporation to allow a tripling of its preferred shares without disclosing this to Mr. Watson; and

i.   in breach of Section 3.18 of the Merger Agreement, that Shea had "or shall obtain funds sufficient to pay at Closing" the cash portion of Mr. Watson's consideration, when Shea knew or should have known that it did not have such funds and that the debt it incurred to permit the merger would render it unable to meet its obligations.

96.   Each of these express representations in the Merger Agreement was false and Shea knew or should have known they were false when made.

97.   Mr. Watson was unaware of the true facts and relied on Shea's false statements in entering into the Merger Agreement and accepting the consideration and terms set forth therein.

98.   As a direct and proximate result of Shea's breaches of the Merger Agreement (including its representations and warranties), Mr. Watson has been injured and is entitled to damages in an amount to be determined at trial.

## COUNT II
### (Breach of License Agreement)
### (Asserted by Intellectus against IP Holding)

99.   Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs of this Complaint.

100.   Intellectus and IP Holding entered into the written License Agreement, which is a valid, binding contract supported by adequate consideration.

101.   Intellectus performed its obligations under the License Agreement by, among other things, licensing certain intellectual property to IP Holding.

102.   IP Holding has failed to perform or has refused to perform its obligations under the License Agreement to pay Intellectus what it owes it.

18

103.    The License Agreement provided that if Mr. Watson's employment with Bravera were terminated for any reason other than "Cause," Intellectus would be entitled to accelerated payments of the consideration set forth in Exhibit C of the License Agreement within sixty days.

104.    Mr. Watson's employment with Bravera terminated on October 29, 2007 for reasons other than "Cause."

105.    IP Holding has paid no portion of the payments due under Article IV, § 15 and Exhibit C of the License Agreement—which total at least $3,750,000—despite Intellectus's written demand for payment.

106.    In addition, Intellectus terminated the License Agreement for failure of IP Holding to make the required payments.

107.    The License Agreement provides that if the contract is terminated, IP Holding "shall convey to [Intellectus] all right, title and interest held by [IP Holding] or any [IP Holding] subsidiary or affiliate" any derivative works made based on the intellectual property Intellectus licensed to IP Holding.

108.    On information and belief, IP Holding and/or its affiliates Shea and Bravera have developed "Derivative Works" based on Intellectus's intellectual property, but they have failed to convey their right, title and interest to those derivative works as required by the License Agreement.

109.    As a direct and proximate result of IP Holding's breaches of the License Agreement, Intellectus has been injured and is entitled to damages in an amount to be determined at trial, but not less than $3,750,000.

19

## COUNT III
### (Declaratory Judgment and Injunctive Relief)
### (Asserted by Intellectus against IP Holding)

110.   Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs of this Complaint.

111.   As a consequence of IP Holding's failure and/or refusal to pay Intellectus what it owes, Intellectus notified IP Holding that the License Agreement is terminated.

112.   One consequence of termination is that IP Holding and its affiliates (including Shea and Bravera) lose the right to use all of the intellectual property conveyed by Intellectus.

113.   Notwithstanding the termination, IP Holdings' affiliates Shea and Bravera have made clear that they intend to continue to sell products and services utilizing the intellectual property previously licensed from Intellectus.

114.   Any such use of Intellectus's intellectual property by Shea, Bravera or IP Holding would be unauthorized, in breach of the License Agreement and in violation of Intellectus's intellectual property rights.

115.   An actual controversy exists between the parties in that Intellectus has terminated the License Agreement and Defendants, by their statements and conduct, have denied the validity of Intellectus's termination of the License Agreement.

116.   Intellectus is entitled to a binding and judicial declaration that the License Agreement is terminated, and that Defendants have no further rights with respect to Intellectus's intellectual property, pursuant to the terms of the License Agreement.

117.   Declaratory relief declaring the rights, duties and other legal relations of the parties is necessary to protect Intellectus's rights.

20

118.    Intellectus faces irreparable harm in the event that Defendants use its intellectual property after the date on which their rights under the License Agreement have terminated.

119.    Intellectus requests that the Court issue a permanent injunction against the Defendants, enjoining them from any further use of Intellectus's intellectual property, including without limitation the software, trade names, trademarks and domain names previously licensed under the License Agreement.

## COUNT IV
### (Breach of Employment Agreement)
### (Asserted by Mr. Watson against Shea and Bravera)

120.    Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs of this Complaint.

121.    Mr. Watson, Shea and Bravera entered into the written Employment Agreement, which is a valid, binding contract supported by adequate consideration.

122.    Mr. Watson performed his obligations under the Employment Agreement by, among other things, working for Shea and Bravera as the head of their sales groups.

123.    Shea and Bravera have failed to perform or have refused to perform their obligations under the Employment Agreement to pay Mr. Watson what they owe him.

124.    Among other things, Shea and Bravera breached their obligations by failing to pay to Mr. Watson, upon the termination of this employment:

      a.      "all earnout and other consideration" under the Merger Agreement that accelerated upon the termination of Mr. Watson's employment;

      b.      "an amount equal to one (1) year of Employee's salary, at the rate in effect as of the date of the notice of termination" or $250,000;

      c.      "a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by the Company and achieved all goals and objectives . . . .";

21

d.    "all benefits for a period of six (6) months after the Termination Date"; and

e.    "the same medical coverage Employee carried while an active employee at Company's expense for a period of six (6) months after the Termination Date."

125.    Although Mr. Watson terminated his employment with the requisite thirty days' written notice on October 29, 2007, and although Bravera did not terminate his employment for "Cause," neither Bravera nor Shea has made any portion of these required payments to Mr. Watson.

126.    As a direct and proximate result of Shea's and Bravera's breaches of the Employment Agreement, Mr. Watson has been injured and is entitled to damages in an amount to be determined at trial.

## Jury Trial Demand

127.    Mr. Watson and Intellectus request a trial by jury on all issues so triable.

WHEREFORE, Plaintiffs Chris Watson and Intellectus, LLC ask the Court enter judgment in their favor, and against the Defendants, as follows:

(a)    On Count I, in favor of Plaintiff Christopher Watson against Defendant Shea, awarding Plaintiff damages in an amount to be proved at the trial of this action, together with interest accrued and accruing thereon;

(b)    On Count II, in favor of Plaintiff Intellectus against Defendant IP Holding, awarding Plaintiff damages in an amount to be proved at the trial of this action, together with interest accrued and accruing thereon;

(c)    On Count III, in favor of Plaintiff Intellectus against Defendants, declaring that Intellectus's termination of the License Agreement was effective and bars further use by

22

Defendants of Intellectus's intellectual property, and enjoining Defendants from using Intellectus's intellectual property following the termination date;

       (d)     On Count IV, in favor of Plaintiff Christopher Watson against Defendants Shea and Bravera, awarding Plaintiff damages in an amount to be proved at the trial of this action, together with interest accrued and accruing thereon;

       (e)     awarding Plaintiffs' costs, expenses and attorneys' fees;

       (f)     awarding pre-and post-judgment interest to Plaintiffs;

       (g)     together with such other and further relief as this Court deems just and proper.

Dated: January 14, 2008

Respectfully submitted,

CHRISTOPHER WATSON and
INTELLECTUS, LLC

By their attorneys,

Jeffrey A. Simes
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
Tel.: 212.813.8800
Fax: 212.355.3333
e-mail: jsimes@goodwinprocter.com

23

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CHRISTOPHER WATSON and INTELLECTUS, LLC,

Plaintiffs,

- against -

RIPTIDE WORLDWIDE, INC. (f/k/a SHEA
DEVELOPMENT CORP.), BRAVERA, INC. and IP
HOLDING OF NEVADA CORP.,

Defendants.

SUMMONS AND COMPLAINT

GOODWIN PROCTER, LLP

Attorneys Plaintiffs

CHRISTOPHER WATSON
and INTELLECTUS, LLC C

Offices and Post Office Address
Jeffrey A. Simes, Esq.
599 Lexington Avenue
New York, NY 10022
Tel. (212) 813-8800
Fax: (212) 355-3333

To

Attorney for

Service of a copy of the within
Dated,                                    is hereby admitted

Attorneys for

NOTICE OF ENTRY

Sir :
—Please take notice that the within is a
(certified) true copy of a
duly entered in the office of the clerk of the within named
court on.

Dated,

Yours, etc.

GOODWIN PROCTER, LLP

Offices and Post Office Address
599 Lexington Avenue
NEW YORK, NY 10022

To

Attorney for

NOTICE OF CHANGE OF ATTORNEYS

Sir :
—Please take notice that an order
Of which the within is a true copy will be presented for
settlement to the Hon.

One of the judges of the within named Court, at
at
on the         M.        day of
Dated,

Yours, etc.

GOODWIN PROCTER, LLP

Offices and Post Office Address
599 Lexington Avenue
NEW YORK, NY 10022

To

Attorney for