UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SHEA DEVELOPMENT CORP., BRAVERA INC., and IP HOLDING OF NEVADA CORP.,

Plaintiffs,

- against -

CHRISTOPHER WATSON and ELIZABETH ANNE CONLEY,

Defendants.

---------------------------------------------------------------x

07 Civ. 11201 (DLC) (GWG)

DECLARATION OF JAMES DAVIES

James Davies, hereby declares as follows:

1. I am a member of the law firm of Landman Corsi Ballaine & Ford P.C., attorneys for Defendant Christopher Watson ("Watson") in the above matter.

2. I make this certification in support of Watson's Order to Show Cause seeking an Order Enforcing the July 10, 2008 Settlement Agreement and for an Order awarding Watson costs and attorneys fees incurred since July 11, 2008 pursuant to 28 U.S.C. § 1927 and the Court's inherent power.

3. Attached hereto as Exhibit A is a true and correct copy of the Merger Agreement entered into on April 26, 2007.

4. Attached hereto as Exhibit B is a true and correct copy of the Employment Agreement dated July 15, 2007.

5. Attached hereto as Exhibit C is a true and correct copy of the Licensing Agreement dated July 16, 2007.

6. Attached hereto as Exhibit D is a true and correct copy of the transcript of the July

10, 2008 proceedings before the Honorable Gabriel W. Gorenstein.

7.     Attached hereto as Exhibit E is a true and correct copy of a July 11, 2008 e-mail from James Davies regarding and attaching Powers of Attorney forms.

8.     Attached hereto as Exhibit F is a true and correct copy of Shea Development Corp.'s ("Shea") July 17, 2008 proposed written settlement agreement.

9.     Attached hereto as Exhibit G is a true and correct copy of Watson's proposed revisions to Shea's July 17, 2008 proposed written settlement agreement.

10.     Attached hereto as Exhibit H is a true and correct copy of the July 21, 2008 e-mail from James Davies to Stephen Baril.

11.     Attached hereto as Exhibit I is a true and correct copy of the July 23, 2008 e-mail from James Davies to Stephen Baril regarding intention to seek Court intervention

12.     Attached hereto as Exhibit J is a true and correct copy of the July 23, 2008 letter from James Davies to Honorable Gabriel W Gorenstein.

13.     Attached hereto as Exhibit K is a true and correct copy of the July 30, 2008 e-mail from James Davies to Stephen Baril requesting a proposed timeline for resolution of the settlement.

14.     Attached hereto as Exhibit L is a true and correct copy of the July 31, 2008 e-mail from Stephen Baril to James Davies with attachments.

15.     Attached hereto as Exhibit M is a true and correct copy of the August 1, 2008 e-mail from Cristi Luckow to Stephen Baril.

16.     Attached hereto as Exhibit N is a true and correct copy of the August 4, 2008 e-mail from Stephen Baril to James Davies with attachments.

17.     Attached hereto as Exhibit O is a true and correct copy of the August 5, 2008 e-mail from James Davies to Stephen Baril.

18.     Attached hereto as Exhibit P is a true and correct copy of the August 6, 2008 e-mail from Stephen Baril to James Davies.

19.     Attached hereto as Exhibit Q is a true and correct copy of the August 7, 2008 e-mail from Cristi Luckow to Stephen Baril.

20.     Attached hereto as Exhibit R is a true and correct copy of the August 12, 2008 letter from James Davies to Stephen Baril.

21.     Attached hereto as Exhibit S is a true and correct copy of the August 13, 2008 e-mail from Stephen Baril to James Davies.

22.     Attached hereto as Exhibit T is a true and correct copy of a letter from Stephen Baril to James Davies dated and received August 14, 2008.

23.     This motion is being made by Order to Show Cause, pursuant to Local Civil Rule 6.1 (d), because during colloquy at a July 29, 2008 conference held before the Hon. Gabriel W. Gorenstein, Magistrate Gorenstein suggested that an Order to Show Cause would be the appropriate vehicle to seek enforcement of the July 10, 2008 settlement in the event the parties could not further agree.

**NO PRIOR REQUEST HAS BEEN MADE FOR THE RELIEF REQUESTED HEREIN**

I declare that the foregoing is correct under the penalties of perjury. Executed this 15th day of August 2008.

LANDMAN CORSI BALLAINE & FORD P.C.
Attorneys for Defendant Christopher Watson

James Davies (JD- 0599)

# Exhibit A

**Execution Copy**

# AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "**Agreement**") is made and entered into as of April 26, 2007, by and among Shea Development Corp., a Nevada corporation ("**Parent**"), Shea Development Acquisition No. 3 Corp., a Nevada corporation and a wholly-owned subsidiary of Parent ("**Merger Sub**"), Bravera, Inc. a Florida corporation (the "**Company**"), and Christopher Watson, the holder of all of the outstanding capital stock of the Company (the "**Shareholder**"). Capitalized terms used and not otherwise defined herein have the meanings set forth in Article 10.

## RECITALS

A. The respective Boards of Directors of Parent, Merger Sub and the Company each have approved and declared advisable this Agreement and the merger of Merger Sub with and into the Company (the "**Merger**"), upon the terms and subject to the conditions set forth in this Agreement, whereby each issued and outstanding share of common stock, par value $0.01 per share, of the Company ("**Company Common Stock**") will be converted into the right to receive common stock, par value $0.001 per share, of Parent ("**Parent Common Stock**") and cash as provided herein.

B. The respective shareholders of Parent, Merger Sub and the Company have, or will have, prior to the Closing Date, by the legally required vote, approved and adopted the Merger.

C. In connection with the Merger, the parties desire to make certain representations, warranties, covenants and agreements and also to prescribe various conditions to the Merger, upon the terms and subject to the conditions contained herein.

NOW, THEREFORE, in consideration of the covenants, promises, representations and warranties set forth herein, and for other good and valuable consideration, intending to be legally bound hereby the parties agree as follows:

## ARTICLE 1
## THE MERGER

1.1 Merger. At the Effective Time as defined below, in accordance with this Agreement and applicable law Section 607.1105 of the Florida Statutes and Nevada Revised Statutes Section 92A.200, Merger Sub will be merged with and into the Company, the separate corporate existence of Merger Sub will cease and the Company will continue as the surviving corporation in the Merger and shall become a wholly-owned Subsidiary of Parent. The Company, as the surviving corporation after the Merger, is sometimes referred to herein as the "**Surviving Corporation.**"

1.2 Closing. Subject to the terms and conditions of this Agreement, the closing of the Merger (the "**Closing**") will take place at the offices of Dunnington, Bartholow & Miller, LLP located at 477 Madison Avenue, New York, NY 10022 or at such other place as Parent and the Company mutually agree, at 10:00 a.m. local time on the later to occur of June 15, 2007 or the

second Business Day after the day on which the last of the closing conditions set forth in Article 6 below has been satisfied or waived, or such other date as Parent and the Company mutually agree upon in writing (the "**Closing Date**").  On the Closing Date: (a) the parties hereto will cause the Merger to be consummated by filing with the Secretaries of State of the State of Florida and the State of Nevada a certificate of merger, a plan of merger and any required related documents, in such form or forms as are required by, and executed in accordance with, applicable law (the date and time of such filing being the "**Effective Time**" and the date upon which the Effective Time occurs, being the "**Effective Date**"); (b) Parent will deliver the merger consideration to the Shareholder in accordance with Section 1.6; and (c) Merger Sub, Company and Parent will cross-deliver the certificates and other documents and instruments to be cross-delivered pursuant to Article 6 below.

1.3     Effect of the Merger.  (a) At the Effective Time, the effect of the Merger will be as provided in this Agreement and as provided in Section 607.1105 of the Florida Statutes and Section 92A.200 of the Nevada Revised Statutes. Without limiting the generality of the foregoing and in accordance with Section 1.18 herein, and subject thereto, at the Effective Time all the property, rights, privileges, powers and franchises of Merger Sub and the Company will vest in the Surviving Corporation, and in accordance with the terms outlined herein all debts, liabilities and duties of Merger Sub and the Company will become the debts, liabilities and duties of the Surviving Corporation and all corporate acts, plans, policies, contracts, approvals and authorizations of Merger Sub and the Company and their respective shareholders, boards of directors, committees elected or appointed thereby, officers and agents, which were valid and effective immediately prior to the Effective Time, shall be taken for all purposes as the acts, plans, policies, contracts, approvals and authorizations of the Surviving Corporation and shall be as effective and binding thereon as the same were with respect to Merger Sub and the Company, respectively, as of the Effective Time.  As of the Effective Time, the Surviving Corporation will be a wholly-owned subsidiary of Parent.

(b) At the Effective Time, all rights, franchises and interests of Merger Sub and the Company, respectively, in and to any type of property and chooses in action shall be vested in the Surviving Corporation by virtue of the Merger without any deed or other transfer. The Surviving Corporation, without any order or other action on the part of any court or otherwise, shall hold and enjoy all rights of property, franchises and interests, including appointments, designations and nominations, and all other rights and interests as trustee, executor, administrator, transfer agent or registrar of stocks and bonds, guardian, assignee, receiver and in every other fiduciary capacity, in the same manner and to the same extent as such rights, franchises and interests were held or enjoyed by Merger Sub and the Company, respectively, as of the Effective Time.

1.4     Effect of Merger on Capital Stock of the Parent.   Each share of capital stock of Parent issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding from and after the Effective Time.

1.5     Effect of Merger on Capital Stock of Merger Sub.  At the Effective Time, each share of common stock, par value $0.001 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the holders thereof, be converted into and become one validly issued, fully paid and

non-assessable share of common stock, par value $0.01 par value per share, of the Surviving Corporation.

1.6 Effect of Merger on Capital Stock of Company.

(a) *Company Common Stock.* At the Effective Time, each share of Company Common Stock shall, by virtue of the Merger and without any action on the part of the holders thereof, be converted into the right to receive the following (the "**Merger Consideration**"):

(i) a pro rata share of 3,000,000 shares of Parent Common Stock (referred to collectively herein as the "**Parent's Shares**") as set forth on Schedule 1.6(a)(i), which shares shall not have been registered under the Securities Act and shall be "restricted securities" as that term is defined in Rule 144 under the Securities Act.

(ii) a pro rata share of $1,500,000 payable in cash as set forth on Schedule 1.6(a)(ii) by wire transfer of same day funds to the account designated by the Shareholder.

(b) As a result of the Merger and without any action on the part of the Shareholder, at the Effective Time, all shares of Company Common Stock shall cease to be outstanding and shall be cancelled and retired and shall cease to exist, and each holder of a share of Company Common Stock (other than the Parent) shall thereafter cease to have any rights with respect to such shares of Company Common Stock, except that the Shareholder shall have the right to receive, without interest, the Merger Consideration in accordance with Section 1.6(a) upon the surrender of the certificate or certificates representing such shares of Company Common Stock (if any such certificates had been issued by the Company with respect to such shares of Company Common Stock).

(c) At the Effective Time, each share of Company Common Stock held in the Company's treasury, if any, shall, by virtue of the Merger and without any action on the part of any Person, cease to be outstanding and shall be cancelled and retired without payment of any Merger Consideration or any other consideration therefor.

1.7 Delivery of Certificates. At and after the Effective Time, Parent will make available, and Shareholder shall be entitled to receive, (i) upon surrender to Parent or its representatives of any certificates evidencing Company Common Stock (the "**Certificates**") for cancellation and a letter of transmittal or assignment separate from certificate in customary form (which will be in such form and have such other provisions as Parent will reasonably specify) (the "**Transmittal Letter**"), the Merger Consideration into which such Company Common Stock shall have been converted pursuant to the Merger, and upon such surrender of each Certificate and delivery by Parent of the aggregate Merger Consideration in exchange therefor, all such Company Common Stock will forthwith be cancelled upon the transfer books and records of the Company. Until surrendered or delivered as contemplated by this Section 1.7, each Certificate will be deemed at any time after the Effective Time for all purposes to evidence only the right to receive upon such surrender the corresponding pro rata portion of the Merger Consideration.

1.8 Stock Transfer Books. From and after the Effective Time, the stock transfer books of the Company will be closed, and there will be no further registration or transfers of capital stock thereafter on the records of the Company until such time, if any, as determined by the Parent.

1.9 No Further Ownership Rights. The Merger Consideration delivered upon the surrender for exchange of Certificates in accordance with the terms hereof will be deemed to have been issued in full satisfaction of all rights pertaining to such Company Common Stock, and there will be no further registration of transfers of such shares which were outstanding immediately prior to the Effective Time on the records of the Surviving Corporation. If, after the Effective Time, Certificates are presented to the Surviving Corporation, they will be cancelled and exchanged as provided in this Article 1.

1.10 Lost, Stolen or Destroyed Certificates. In the event any Certificates are lost, stolen or destroyed, Parent will issue in exchange for such lost, stolen or destroyed Certificates, upon the making of an affidavit of that fact by the holder thereof and the other deliveries required above, the applicable Merger Consideration; provided, however, that the Surviving Corporation may, in its sole discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed Certificates to deliver an indemnity agreement in form reasonably satisfactory to it against any claim that may be made against it with respect to the Certificates alleged to have been lost, stolen or destroyed.

1.11 Charter Documents; Directors and Officers. Unless otherwise agreed by the Company and Parent prior to the Closing, at and as of the Effective Time, without any further action on the part of Parent, Merger Sub or the Company: (i) the Articles of Incorporation and the Bylaws of the Company as in effect immediately prior to the Effective Time will be the Articles of Incorporation and Bylaws of the Surviving Corporation at and after the Effective Time until thereafter amended as provided by applicable law; (ii) the directors of the Company immediately prior to the Effective Time will be the initial directors of the Surviving Corporation from and after the Effective Time, until their successors are elected and qualified or until their resignation or removal; (iii) the officers of the Company immediately prior to the Effective Time shall serve in their respective offices of the Surviving Corporation from and after the Effective Time, until their successors are elected or appointed and qualified or until their resignation or removal. The Board of Directors of the Company will adopt a resolution to be effective as of the Effective Time electing Francis E. Wilde to the Surviving Corporation's Board of Directors and appointing E. Joseph Vitetta, Jr. as Corporate Secretary of the Surviving Corporation.

1.12 Purchase of Intellectual Property. At or prior to the Effective Time, a wholly-owned Nevada subsidiary of Parent, and Intellectus, LLC, a Florida limited liability company managed by the Shareholder, shall enter into an Asset Purchase Agreement in substantially the form of Exhibit A hereto.

1.13 Earn-Out Payments.

(a) *Year 1 Earn-Out Payments*. Subject to the Surviving Corporation's gross revenue(s) exceeding ninety percent (90%) of $6,850,000 and the Surviving Corporation's EBITDA (the "**Year 1 EBITDA**"), exceeding ninety percent (90%) of $2,500,000 for the first

twelve (12) month period following the Effective Date (the "**Year 1 Earn-Out Period**"), Parent shall pay the following amounts:

(i) to the Shareholder a Warrant in the form attached hereto as Exhibit B.

(ii) to the Shareholder $750,000 payable in cash by wire transfer to an account designated by the Shareholder.

(iii) to the Shareholder twenty percent (20%) of the Surviving Corporation's Year 1 EBITDA payable in cash by wire transfer to the account designated by the Shareholder.

(b) *Year 2 Earn-Out Payments*. Subject to the Surviving Corporation's gross revenue(s) exceeding eighty percent (80%) of $8,900,000 and the Surviving Corporation's EBITDA (the "**Year 2 EBITDA**"), exceeding eighty percent (80%) of $4,500,000 for the twelve (12) month period following the first anniversary of the Effective Date (the "**Year 2 Earn-Out Period**"), Parent shall pay the following amounts:

(i) to the Shareholder a Warrant in the form attached hereto as Exhibit C.

(ii) to the Shareholder $500,000 payable in cash by wire transfer to an account designated by the Shareholder.

(iii) to the Shareholder, a pro rata share of twenty percent (20%) of the Surviving Corporation's Year 2 EBITDA payable in cash by wire transfer to the account designated by the Shareholder.

(c) *Equity Earn-Out.* Parent shall provide a warrant to the Shareholder in the form attached hereto as Exhibit D.

(d) *EBITDA Calculations*. The parties agree that, for the purpose of computing the Earn-Out Payments, the Surviving Corporation shall be credited with the entire revenue(s) of the Surviving Corporation and its Affiliates, including revenues derived from any joint ventures, license agreements or products developed or co-developed by the Surviving Corporation with Parent or its Subsidiaries or Affiliates, and EBITDA recognized by the Parent (and/or its Subsidiaries and other Affiliates) associated with each such joint venture, license agreement, product, service and/or solution developed or co-developed by the Surviving Corporation with the Parent and/or its Subsidiaries and Affiliates.

1.14 Employment Agreements. At the Effective Time, the Surviving Corporation will offer employment to and will employ the senior management team listed in Schedule 1.14 Part I (the "**Senior Management Team**") for a period of three (3) years under the terms and conditions of Senior Management Employment Agreements, in the form set forth at Schedule 1.14 Part II, such employment agreements to be executed concurrently with the Closing.

1.15 Stock Options. Parent will establish an incentive stock option program with respect to shares of the Parent Common Stock in which employees of the Surviving Corporation are eligible to participate (the "**ISO Plan**") and will use its best efforts to establish such ISO Plan

within sixty (60) days of the Closing Date. The attached Schedule 1.15 outlines the Shareholder's initial recommended allocation of the incentive stock option pool to Company employees. It is understood by the parties that such recommendation shall require approval of the Parent's Board of Directors and that the Parent's Board of Directors shall, in its sole discretion, finally determine those Surviving Corporation employees to whom incentive stock options will be granted.

1.16 Company Audit and CPA Expenses. Notwithstanding the terms contained herein, the Surviving Corporation shall pay up to $150,000 in PCAOB Audit expenses associated with the Company's PCAOB Audit, incurred by the Company at, or prior to, Closing (the "**Audit Expense Cap**"). Any amounts owed by the Surviving Corporation for the PCAOB Audit in excess of the Audit Expense Cap shall be (i) deducted from the cash component of the Merger Consideration at Closing and (ii) promptly thereafter paid by the Surviving Corporation to the audit firm providing the PCAOB Audit.

1.17 Billing Dispute Resolution. Notwithstanding the terms contained herein, the Surviving Corporation shall pay up to $400,000 (the "**Settlement Commitment**") to the DFSA, the GSA or other federal governmental agency (as directed) arising out of or associated with settlement of a dispute among Company, Navy CNIC, DFAS and GSA regarding services and the RAPID software product provided by the Company to Navy CNIC (the "**Navy Billing Dispute**") incurred by the Company at, or prior to, Closing or by the Surviving Corporation subsequent to the Closing. Any amounts due or owed to DFAS, the GSA or other federal government agency in respect of the Navy Billing Dispute that exceed the Settlement Commitment shall be (i) deducted from the cash component of the Merger Consideration at Closing and (ii) promptly thereafter paid by the Surviving Corporation to GSA. Notwithstanding any provisions of this section to the contrary, in the event the Navy Billing Dispute is not fully and finally resolved on or before the Closing Date, and in order that Closing occur in a prompt and timely manner, on the Closing Date the Shareholder shall execute a written commitment to the Surviving Corporation to tender within five (5) days of demand from the Surviving Corporation such amount, in excess of the Settlement Commitment, as may be required to be paid to DFAS, the GSA or other federal governmental agency to satisfy the Navy Billing Dispute.

1.18 Company Liabilities. Notwithstanding the terms contained herein, the Surviving Corporation shall assume an aggregate amount of not greater than $50,000 in aggregate (x) short-term debt and long-term debt plus (y) short-term debt, long-term debt, and other Company liabilities to Shareholder and Affiliates of Shareholders, incurred by the Company at, or prior to Closing. Any liabilities in excess of such amount shall be (i) deducted from the cash component of the Merger Consideration at Closing, and (ii) promptly thereafter paid by the Surviving Corporation to the designated payee.

1.19 Taking of Necessary Action; Further Action. Each of Parent, Merger Sub and the Company will take all such reasonable lawful action as may be necessary or appropriate in order to effect the Merger in accordance with this Agreement as promptly as practicable. If, at any time after the Effective Time, any such further action is necessary or desirable to carry out the purposes of this Agreement and to vest the Surviving Corporation with full right, title and possession to all the property, rights, privileges, power and franchises of the Company and

Merger Sub, the officers and directors of the Company and Merger Sub immediately prior to the Effective Time are fully authorized in the name of their respective corporations or otherwise to take, and will take, all such lawful and necessary action

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND SHAREHOLDER

The Company and the Shareholder hereby represent and warrant, jointly and severally, to Parent subject to such exceptions as are disclosed in the corresponding Schedules with respect to specific sections of this Article 2 and subject to the right of the Company and the Shareholder to update, revise, supplement and/or correct such Schedules through the Closing Date, as follows:

2.1 Organization and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and has full corporate power and authority to conduct its business as now conducted and to own, use, license and lease its Assets and Properties. The Company holds no ownership or other interest in any Subsidiary To the best of Shareholder's knowledge, the Company is duly qualified, licensed or admitted to do business and is in good standing in each jurisdiction in which the ownership, use, licensing or leasing of its Assets and Properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for such jurisdictions in which the failure to be so qualified would not have a Material Adverse Effect on the Company. Schedule 2.1(b) sets forth each jurisdiction where the Company is so qualified, licensed or admitted to do business.

2.2 Authority Relative to this Agreement. The Company has full corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby, and the performance by the Company of its obligations hereunder, have been duly and validly authorized by all necessary action by the Board of Directors of the Company, and no other action on the part of the Board of Directors of the Company is required to authorize the execution, delivery and performance of this Agreement and the consummation by the Company of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery hereof by Parent and Merger Sub, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws relating to the enforcement of creditors' rights generally and by general principles of equity.

2.3 Capital Stock. As of the date hereof, the authorized capital stock of the Company consists of 25,000 shares of Company Common Stock, $0.01 par value per share, of which 100 shares are issued and outstanding. There are no options exercisable or convertible into shares of Company Common Stock. All of the issued and outstanding shares of Company Common Stock are validly issued, fully paid and nonassessable, and have been issued in compliance with all

applicable federal, state and foreign securities Laws. Schedule I lists the name and state of residence of each holder of Company Common Stock provided to the Company by such holder and the number of shares of Company Common Stock held by each such holder. Except as disclosed in Schedule 2.3, there are no other Equity Equivalents, commitments or agreements of any character (whether created by statute, the Articles of Incorporation or Bylaws of the Company, or any agreement or otherwise) to which the Company is a party or by which it is bound, obligating the Company to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of capital stock of the Company or obligating the Company to grant, extend, accelerate the vesting of, change the price or otherwise amend or enter into any such option, warrant, call, right, commitment or agreement. Except as set forth in Schedule 2.3(a), the Company is not a party or subject to any agreement or understanding, and, to the Shareholder's knowledge, there is no agreement, arrangement or understanding between or among any Persons, which affects, restricts or relates to voting, giving of written consents, dividend rights or transferability of shares with respect to the shares of Company Common Stock, including without limitation any voting trust agreement or proxy.

2.4 No Conflicts. Except as set forth in Schedule 2.4, the execution and delivery by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby do not and will not:

(a) conflict with or result in a violation or breach of any terms, conditions or provisions of the Articles of Incorporation or Bylaws, as amended, or equivalent documents of the Company except for any of the foregoing which would not reasonably be expected to give rise to a Material Adverse Effect;

(b) conflict with or result in a violation or breach of any Law or Order by which any of the Company's Assets and Properties is bound or affected, except which would not reasonably be expected to give rise to a Material Adverse Effect; or

(c) (i) conflict with or result in a violation or breach of, (ii) constitute a default (or an event that, with or without notice or lapse of time or both, would constitute a default) under, (iii) require the Company to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (iv) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments or performance under, (vi) result in the creation or imposition of (or the obligation to create or impose) any Lien upon the Company or any of its Assets and Properties under or (vii) result in the loss of a material benefit under, any of the terms, conditions or provisions of any Contract or License to which the Company is a party or by which the Company or its Assets and Properties is bound or affected, except (x) where the Company or any of its Subsidiaries has obtained or will obtain prior to the Closing the necessary written agreements, waivers or consents of the other parties to any Company Contracts or Licenses to avoid, release or waive any such default, conflict, breach, violation, termination, right to terminate or accelerate, or triggering of payment with respect to such Company Contracts or Licenses, or (y) where any such default, conflict, breach, violation, termination, right to terminate or accelerate, or triggering of payment with respect to such Company Contracts or Licenses would not constitute a Material Adverse Effect.

2.5 Books and Records; Organizational Documents. The minute books, including the share registers, and other similar records of the Company that have been provided or made available to Parent, its representatives or its counsel prior to the execution of this Agreement, are complete and correct in all material respects. Such minute books contain a true and complete record of all material actions taken at all meetings and by all written consents in lieu of meetings of the directors, shareholders and committees of the Board of Directors of the Company through the date hereof. The Company has delivered a true, correct and complete copy of its Articles of Incorporation, as set forth in Schedule 2.5(a), and its Bylaws, as set forth in Schedule 2.5(b), or other charter documents, as applicable, of the Company as amended to date, to Parent. To Shareholder's knowledge, the Company is not in violation of any provisions of its Articles of Incorporation.

2.6 Company Financial Statements.

(a) The Company Financials, as set forth in Schedule 2.6(a), have been delivered to the Parent. The Company Financials delivered to Parent have been audited by a Public Company Accounting Oversight Board ("**PCAOB**") registered Auditor and, to Shareholder's knowledge, were correct and complete in all material respects as at the dates thereof. The Company Financials present fairly and accurately the financial condition and operating results of the Company as of the dates and during the periods indicated therein, subject, in the case of any interim financial statements, to normal year-end adjustments, which adjustments will not be material in amount or significance and except that any interim financial statements may not contain footnotes. Except for the Navy Billing Dispute and as set forth in Schedule 2.6(a), since the Financial Statement Date, there has been no change in any accounting policies, principles, methods or practices, including any change with respect to reserves (whether for bad debts, contingent liabilities or otherwise), of the Company that would be likely to have a Material Adverse Effect.

(b) Neither the Company nor, to the knowledge of the Shareholder, the Company's independent auditors has identified or been made aware of (i) any fraud, whether or not material, that involves the management of the Company or other employees of the Company who have a role in the preparation of financial statements or the internal accounting controls utilized by the Company or (ii) any claim or allegation regarding any of the foregoing.

(c) The Company has maintained and utilized an information system and set of financial and accounting tools that have substantiated the information gathered in connection with the preparation of the Company Financials in accordance with GAAP, including policies and procedures that the Company deems appropriate for a company of its size that: a) require the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and disposition of the assets of the company, b) provide reasonable assurances that the transactions are recorded as necessary to permit the preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company are being made with appropriate authorizations of management and the Board of Directors of the Company and c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Company, except where the failure to maintain or utilize any of the foregoing would not reasonably be expected to give rise to a Material Adverse Effect.

  2.7 Absence of Changes. Since the Financial Statement Date, other than the Navy Billing Dispute, there has not been any Material Adverse Change in the Business or Condition of the Company or any occurrence or event, which, individually or in the aggregate could be reasonably expected to have any Material Adverse Change in the Business or Condition of the Company. In addition, without limiting the foregoing, except as expressly contemplated hereby, there has not occurred, on the part of the Company, during the period commencing on the Financial Statement Date and terminating on the date hereof:

(a) except with respect to the facility lease disclosed on Schedule 2.29, the entering into of any Contract, commitment or transaction or the incurrence of any Liabilities outside of the ordinary course of business consistent with the Company's past practice;

(b) the entering into of any Contract in connection with any transaction involving a Business Combination other than this Agreement and the transactions related to the Merger;

(c) the alteration, or entering into of any Contract or other commitment to alter, its interest in any Person in which the Company directly or indirectly holds a greater than 1% interest on the date hereof;

(d) the entering into of any strategic alliance, joint development or joint marketing Contract other than joint marketing or development efforts in the ordinary course of business consistent with the Company's past practice;

(e) any material amendment or other modification (or agreement to do so), except in the ordinary course of business consistent with the Company's past practice, or violation of a material term of, any of the Contracts set forth or described herein;

(f) the entering into of any material transaction with any officer, director, shareholder, Affiliate or Associate of the Company, other than pursuant to any Contract in effect on the Financial Statement Date and disclosed to Parent pursuant to the Schedules or otherwise contemplated by this Agreement or any agreement or instrument related to this Agreement;

(g) the entering into or amendment of any Contract pursuant to which any other Person is granted manufacturing, marketing, distribution, licensing or similar rights of any type or scope with respect to any products of the Company or Company Intellectual Property other than as contemplated by the Contracts or Licenses of the Company disclosed herein or otherwise in the ordinary course of business consistent with the Company's past practice or which would not have a Material Adverse Effect;

(h) to the Shareholder's knowledge, the commencement of any Action or Proceeding other than any Action or Proceeding arising out of the Navy Billing Dispute;

(i) except as set forth in Schedule 2.7(i), the declaration, setting aside or payment of any dividends on or making of any other distributions (whether in cash, stock or property) in respect of any Company Common Stock, or any split, combination or reclassification of any shares of Company Common Stock or issuance or authorization of the

issuance of any other securities in respect of, in lieu of or in substitution for shares of Company Common Stock, or the repurchase, redemption or other acquisition, directly or indirectly, of any shares of Company Common Stock by the Company except for repurchases of shares of Company Common Stock upon termination of employment;

(j)    except as set forth in Schedule 2.7(j), the issuance, grant, delivery, sale or authorization of or proposal to issue, grant, deliver or sell, or purchase or proposal to purchase, any shares of Company Common Stock or modification or amendment of the rights of any holder of any outstanding shares of Company Common Stock, nor have there been any agreements, arrangements, plans or understandings with respect to any such modification or amendment except as contemplated by this Agreement;

(k)    except as set forth in Schedule 2.7(k), any amendments to the Company's Articles of Incorporation or Bylaws;

(l)    any transfer (by way of a License or otherwise) to any Person of rights to any Company Intellectual Property other than non-exclusive transfers to the Company's customers, distributors or other licensees in the ordinary course of business consistent with the Company's past practice;

(m)    to the Shareholder's knowledge, any disposition or sale of, waiver of rights to, license or lease of, or incurrence of any Lien on, any Assets and Properties (including Company Intellectual Property) of the Company, other than dispositions of inventory, or licenses of products to Persons in the ordinary course of business of the Company consistent with the Company's past practice;

(n)    any purchase or lease of any Assets and Properties of any Person or the making of any capital expenditures, lease commitments or other capital commitments by the Company other than acquisitions of inventory, leasing of office space, or licenses of products, in the ordinary course of business of the Company, consistent with Company's past practice and in an amount not in excess of one hundred thousand dollars ($100,000) unless otherwise approved by Parent;

(o)    the making of any capital expenditures or commitments by the Company for additions to property, plant or equipment of the Company constituting capital assets individually or in the aggregate in an amount exceeding twenty-five thousand dollars ($25,000) except in the ordinary course of business consistent with the Company's past practice;

(p)    except as set forth in Schedule 2.7(p), the write-off or write-down or making of any determination to write off or write-down, or revalue, any of the Assets and Properties of the Company, or change in any reserves or liabilities associated therewith;

(q)    except as set forth in Schedule 2.7(q), the payment, discharge or satisfaction of any material claim or Liability, other than the payment, discharge or satisfaction in the ordinary course of business of Liabilities reflected or reserved against in the Company Financials or incurred in the ordinary course of the Company's business since the Financial Statement Date;

(r) except as set forth in Schedule 2.7(r), the failure to pay or otherwise satisfy material Liabilities of the Company or its Subsidiaries when due;

(s) the incurrence of any Indebtedness or guarantee of any such Indebtedness or issuance or sale of any debt securities of the Company or guarantee of any debt securities of others, except as otherwise incurred in the ordinary course of the Company's business;

(t) the grant of any severance or termination pay to any director, officer employee or consultant, except payments made as required by Law or pursuant to written Contracts outstanding on the date hereof,

(u) except as set forth in Schedule 2.7(u), a change to salary, rate of commissions, rate of consulting fees or any other compensation of any current officer, director, shareholder, employee, independent contractor or consultant of the Company except in the ordinary course of business consistent with the Company's past practice;

(v) except as set forth in Schedule 2.7(v), the payment of any consideration of any nature whatsoever (other than, in the ordinary course of business, salary, bonus, commissions or consulting fees and customary benefits and out of pocket expenses paid to any current or former officer, director, shareholder, employee or consultant of the Company) to any current or former officer, director, shareholder, employee, independent contractor or consultant of the Company;

(w) the establishment or modification of (i) targets, goals or similar provisions under any employment Contract or other employee compensation arrangement or independent contractor Contract or other compensation arrangement or (ii) salary ranges, increased guidelines or similar provisions in respect of any employment Contract or other employee compensation arrangement or independent contractor Contract or other compensation arrangement, except for those made in the ordinary course of the Company's business;

(x) the adoption, entering into, amendment, modification or termination (partial or complete) of any Benefit Plan;

(y) the payment of any discretionary or stay bonus except in the ordinary course of business consistent with the Company's past practice;

(z) the making or changing of any election in respect of Taxes, adoption or change in any accounting method in respect of Taxes, the entering into of any tax allocation agreement, tax sharing agreement, tax indemnity agreement or closing agreement, settlement or compromise of any claim or assessment in respect of Taxes, or consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes with any Taxing Authority or otherwise, except for any of the foregoing which would not reasonably be expected to give rise to a Material Adverse Effect;

(aa) Except as set forth in Schedule 2.7(aa), the making of any change in the accounting policies, principles, methods, practices or procedures of the Company (including without limitation for bad debts, contingent liabilities or otherwise, respecting capitalization or expense of research and development expenditures, depreciation or amortization rates or timing

of recognition of income and expense), except for any of the foregoing which would not reasonably be expected to give rise to a Material Adverse Effect;

(bb) other than in the ordinary course of the Company's business, the making of any representation or proposal to, or engagement in substantive discussions with, any of the holders (or their representatives) of any Indebtedness, or to or with any party which has issued a letter of credit which benefits the Company;

(cc) the commencement or termination of, or change in, any line of business of the Company other than in the ordinary course of business;

(dd) the cancellation, amendment or failure to renew any insurance policy other than in the ordinary course of business consistent with past practice, or failure to use commercially reasonable efforts to give all notices and present all claims under all such policies in a timely fashion, except for any of the foregoing which do not give rise to a Material Adverse Effect;

(ee) any amendment, failure to renew, or failure to use commercially reasonable efforts to maintain, its existing Approvals or failure to observe any Law or Order applicable to the conduct of the business of the Company or the Assets and Properties of the Company, except for any of the foregoing which would not reasonably be expected to give rise to a Material Adverse Effect;

(ff) to Shareholder's knowledge, any failure to pay or otherwise satisfy any obligations to procure, maintain, renew, extend or enforce any Company Intellectual Property, including, but not limited to, submission of required documents or fees during the prosecution of patent, trademark or other applications for Registered Intellectual Property rights other than in the ordinary course of business or which would not reasonably be expected to give rise to a Material Adverse Effect;

(gg) any physical damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the real or personal property or equipment of the Company individually or in the aggregate in an amount exceeding fifteen thousand dollars ($15,000);

(hh) the repurchase, cancellation or modification of the terms of any Company Common Stock, or other financial instrument that derives the majority of its value from its convertibility into Company Common Stock, other than transactions entered into in the ordinary course of business and pursuant to contractual provisions in effect at the date of this Agreement; or

(ii) any entering into any agreement to do any of the foregoing.

2.8 No Undisclosed Liabilities. Except for the Navy Billing Dispute and as set forth in Schedule 2.8, the Company has no obligations or liabilities of any nature (matured or unmatured, fixed or contingent) other than (i) those set forth or reserved against in the Company Financials, (ii) those incurred in connection with this Agreement or the transactions

contemplated hereby, (iii) those incurred in the ordinary course of business consistent with the Company's past practice, and (iv) those set forth in this Agreement or the Schedules hereto.

2.9    Restrictions on Business Activities. Except as set forth in Schedule 2.9, there is no agreement or Order binding upon the Company, or any of its assets or properties which has had or could reasonably be expected to have the effect of prohibiting or impairing any current or future business practice of the Company, any acquisition of property by the Company or the conduct of business by the Company as currently conducted or as proposed to be conducted by the Company other than in the ordinary course of business or which would not reasonably be expected to give rise to a Material Adverse Effect.

2.10    Taxes.

(a)    The Company has timely filed and paid any taxes due through the Tax year ended December 31, 2005 and through Tax year ended December 31, 2006. The Company has prepared and maintained adequate records so as to facilitate the prompt filing of Tax Returns when they become due.

(b)    The Company has not incurred any material liability for Taxes other than as reflected on the Company Financials. The unpaid Taxes of the Company (i) did not, as of the most recent fiscal month end, exceed by any material amount the reserve for liability for Income Tax (other than the reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Company's most recent balance sheet and (ii) will not, to Shareholder's knowledge, exceed by any material amount that reserve as adjusted for operations and transactions through the Closing Date.

(c)    The Company is not presently a party to any agreement extending the time within which to file any Tax Return. To Shareholder's knowledge, no claim has ever been made by a Taxing Authority of any jurisdiction in which the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.

(d)    To Shareholder's knowledge, the Company or its agents, if applicable, have collected or withheld all amounts required to be collected or withheld by it on account of Taxes or otherwise, and have remitted the same to the appropriate governmental authority in the manner and within the time required under any applicable legislation or, if it is not yet due, have set it aside in appropriate accounts for payment when due.

(e)    The Shareholder does not have knowledge of any actions by any Taxing Authority in connection with assessing a material amount of additional Taxes against and in respect of the Company for any past period. There is no dispute or claim concerning any Tax liability of the Company (i) threatened, claimed or raised by any Taxing Authority and (ii) of which the Company is aware. There are no Liens for Taxes upon the Assets and Properties of the Company other than liens for Taxes not yet due or which are being contested by the Company in good faith.

(f)    There are no outstanding agreements or waivers extending the statutory period of limitation applicable to any Tax Returns required to be filed by, or which include or are

treated as including, the Company with respect to any Tax assessment or deficiency affecting the Company.

(g) The Company has not received any written ruling related to Taxes or entered into any agreement with a Taxing Authority relating to Taxes.

(h) The Company has no material liability for the Taxes of any Person other than the Company or (i) as a transferee or successor, or (ii) by Contract or (iii) otherwise.

(i) The Company has not agreed to make and is not required to make any adjustment under Section 481 or 263A of the Code or any comparable provision under state laws by reason of a change in accounting method or as a result of transactions or events prior to the date hereof.

(j) The Company is not a party to or bound by any obligations under any Tax sharing, Tax allocation, Tax indemnity or similar agreement or arrangement.

(k) The Company is not involved in, subject to, or a party to any joint venture, partnership, Contract or other arrangement that is treated as a partnership for federal, state, local or foreign Income Tax purposes.

(l) The Company was not included and is not includible in the Tax Return of any parent corporation other than such a return of which the Company is the common parent corporation.

(m) Except as set forth in Schedule 2.10(m), the Company has not:

(i) acquired or had the use of any property from a Person with whom it was not dealing at arm's length other than at fair market value; or

(ii) disposed of any material asset to a Person with whom it was not dealing at arm's length for proceeds less than the fair market value thereof.

(n) The Company is not nor has it ever been a United States real property holding corporation within the meaning of Section 897(c)(1)(A)(ii) of the Code.

(o) The Company is not a personal holding company.

(p) To Shareholder's knowledge, the Company is in full compliance with all terms and conditions of any Tax exemptions or other Tax-sharing agreement or Order of a foreign government and the consummation of the transactions contemplated hereby will not have any Material Adverse Effect on the continued validity and effectiveness of any such Tax exemptions or other Tax-sharing agreement or Order.

2.11 Legal Proceedings.

(a) Except for the Navy Billing Dispute and as set forth in Schedule 2.11:

      (i) there are no Actions or Proceedings brought or, to the knowledge of the Shareholder, pending or threatened against the Company or its Assets and Properties;

(ii) there are no facts or circumstances known to the Company that could reasonably be expected to give rise to any material Action or Proceeding against the Company; and

(iii) the Shareholder has not received notice of, and does not otherwise have knowledge of, any Orders outstanding against the Company.

(b) Prior to the execution of this Agreement, the Company has delivered to Parent upon Parent's written request, all responses of counsel for the Company to auditor's requests for information (together with any updates provided by such counsel) for the last three (3) years regarding Actions or Proceedings pending or, to the knowledge of the Shareholder, threatened against, relating to or affecting the Company. Schedule 2.11 sets forth all Actions or Proceedings against or by the Company during the last three (3) years.

2.12 Compliance With Laws and Orders. To Shareholder's knowledge, the Company has not violated, and is not currently in violation or default under, any material Law or Order applicable to the Company or any of its Assets and Properties.

2.13 Benefit Plans. The Company has provided summary information regarding its Benefit Plans to the Parent as set forth in Schedule 2.13.

2.14 Title to Property. The Company has good and marketable title to all of its properties, interests in properties and assets, real and personal, reflected in the Company Financials or acquired after the Financial Statement Date (except properties, interests in properties and assets sold or otherwise disposed of since the Financial Statement Date in the ordinary course of business), or with respect to leased properties and assets, valid leasehold interests in, free and clear of all mortgages, liens, pledges, charges or encumbrances of any kind or character, except (i) the lien of current Taxes not yet due and payable or which are being contested by the Company in good faith, (ii) such imperfections of title, liens and easements as do not and will not materially detract from or interfere with the use of the properties subject thereto or affected thereby, or otherwise materially impair business operations involving such properties, (iii) liens securing debt which is reflected on the Company Financials and (iv) Liens listed on Schedule 2.14. The property and equipment of the Company that are used in the operations of its business are in good operating condition subject to normal wear and tear. All material properties used in the operations of the Company are reflected in the Company Financials. The Company owns no real property.

2.15 Intellectual Property At the Effective Time, Parent or Parent's wholly owned subsidiary shall assign to the Surviving Corporation all of its rights and interest in the Company Intellectual Property as listed in Schedule II, which shall include but not be limited to the entries listed on the Intangible Appraisers, Inc. valuation report dated November 9, 2006.

(a) Except as set forth on Schedule 2.15(a), the Company owns, or is licensed or otherwise possesses legally enforceable rights to use, all Intellectual Property that is used or

currently proposed to be used in the business of the Company as currently conducted or as presently proposed by the Company to be conducted in the immediate future.

(b) Except as set forth in Schedule 2.15(b), the Company has not (i) licensed any Company Intellectual Property in source code form to any third party or (ii) entered into any exclusive agreements relating to any Company Intellectual Property with any third party.

(c) Schedule 2.15(c) lists (i) all patents and patent applications and all registered trademarks, trade names and service marks, registered copyrights, domain names, and maskworks, included in the Company Intellectual Property, including the jurisdictions in which each such Intellectual Property right has been issued or registered or in which any application for such issuance and registration has been filed, (ii) all licenses, sublicenses and other agreements as to which the Company is a party and pursuant to which any other Person is authorized to use any Intellectual Property, and (iii) all licenses, sublicenses and other agreements as to which the Company is a party and pursuant to which the Company is authorized to use any third-party Intellectual Property ("**Third Party Intellectual Property Rights**") which are incorporated in, are, or form a part of any Company product or which are otherwise used (or currently proposed to be used) by the Company in the business of the Company as currently conducted or as proposed to be conducted by the Company, other than off-the-shelf software programs licensed under standard Shrink Wrap License Agreements.

(d) To Shareholder's knowledge, no Person (including employees and former employees of the Company) is infringing, misappropriating or otherwise making any unauthorized use or disclosure of any Intellectual Property rights of the Company or any Third Party Intellectual Property Rights to the extent licensed by or through the Company. The Company has not entered into any agreement to indemnify any other Person against any charge of infringement of any Company Intellectual Property, except as set forth in Schedule 2.15(d).

(e) To Shareholder's knowledge, the Company is not, nor will it be as a result of the execution and delivery of this Agreement or the performance of its obligations under this Agreement, in breach of any license, sublicense or other agreement relating to the Company Intellectual Property or Third Party Intellectual Property Rights.

(f) To Shareholder's knowledge, all patents, registered trademarks, domain names, service marks and copyrights held by the Company are valid and subsisting, and the marketing, licensing or sale of its products, to the knowledge of the Shareholder does not infringe any patent, trademark, service mark, copyright, trade secret or other proprietary right of any third party. Except as set forth on Schedule 2.15(f), during the last three (3) years, the Company (i) has not been sued in any suit, action or proceeding which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party; and (ii) has not brought any action, suit or proceeding for infringement of Intellectual Property or breach of any license or agreement involving Intellectual Property against any third party.

(g) Subsequent to June 1, 2003, the Company has secured valid written assignments and waivers of any rights from consultants and employees who contributed to the creation or development of Company Intellectual Property of the rights to such contributions that

the Company does not already own by operation of law. To the best of Shareholder's knowledge, prior to June 1, 2003 Intellectus, LLC had all of these foregoing rights.

(h)    The Company has taken what it considers to be commercially reasonable and appropriate steps to protect and preserve the confidentiality of all Company Intellectual Property not otherwise protected by patents, patent applications or copyright ("**Confidential Information**"). All use, disclosure or appropriation of Confidential Information by the Company by or to a third party has been pursuant to the terms of a written agreement between the Company and such third party, except where the failure to do so would not constitute a Material Adverse Effect.

2.16    Contracts.

(a)    Schedule 2.16(a) contains a true and complete list of each of the material Contracts (true and complete copies or, if none, reasonably complete and accurate written descriptions of which, together with all amendments and supplements thereto and all continuing waivers of any material terms thereof, have been made available to Parent prior to the execution of this Agreement) of the Company. Schedule 2.16(a) contains a true and complete list of each Contract (denoted with an asterisk) of the Company not terminable by the Company upon 30 days (or less) notice by the Company without penalty or obligation to make payments based on such termination.

(b)    Each Contract disclosed in Schedule 2.16(a), unless otherwise stated therein, is in full force and effect and constitutes, to Shareholder's knowledge, a legal, valid and binding agreement, enforceable in accordance with its terms, and, to the knowledge of the Shareholder, no party to such Contract is, nor has received notice that it is, in violation or breach of or default under any such Contract (or with notice or lapse of time or both, would be in violation or breach of or default under any such Contract).

(c)    Except as set forth on Schedule 2.16(c), the Company is not a party to or bound by any Contract that (i) automatically terminates or allows termination by the other party thereto upon consummation of the transactions contemplated by this Agreement or (ii) contains any covenant or other provision which limits the ability of the Company to compete with any Person in any line of business or in any area or territory.

2.17    Insurance.    The Company's current insurance policies, if any, are listed on Schedule 2.17.

2.18    Affiliate Transactions.

(a)    Except as disclosed in Schedule 2.18(a) or as otherwise disclosed or discussed herein or contemplated hereby, (i) there are no Contracts or Liabilities between the Company, on the one hand, and (1) any current or former officer, director, shareholder, or to the knowledge of the Shareholder, any Affiliate or Associate of the Company or (2) any Person who, to the knowledge of the Shareholder, is an Associate of any such officer, director, shareholder or Affiliate, on the other hand, (ii) the Company does not provide or cause to be provided any assets, services or facilities to any current or former officer, director, shareholder, Affiliate or Associate of the Company, (iii) no current or former officer, director, shareholder, Affiliate or

Associate of the Company provides or causes to be provided any assets, services or facilities to the Company and (iv) the Company does not beneficially own, directly or indirectly, any Investment Assets of any current or former officer, director, shareholder, Affiliate or Associate of the Company.

(b) Each of the Contracts and Liabilities listed in Schedule 2.18(a), if any, was entered into or incurred, as the case may be, on terms no less favorable to the Company (in the reasonable judgment of the Company) than if such Contract or Liability was entered into or negotiated on an arm's length basis on competitive terms. Any Contract to which the Company is a party and in which any director of the Company has a financial interest in such Contract was approved in accordance with applicable law.

2.19 Employees; Labor Relations.

(a) Except as set forth on Schedule 2.19(a), to Shareholder's knowledge, the Company is in compliance in all material respects with all currently applicable laws and regulations respecting employment, discrimination in employment, terms and conditions of employment, wages, hours and occupational safety and health and employment practices, and is not engaged in any material respect in any unfair labor practice except where non-compliance with any of the foregoing by the Company will not constitute a Material Adverse Effect. Except as set forth on Schedule 2.19(a), to Shareholder's knowledge, the Company is not liable for any payment to any trust or other fund or to any governmental or administrative authority, with respect to employment insurance, social security, workers compensation, health or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistent with past practice). There are no pending claims against the Company under any workers compensation plan or policy or for long term disability which constitutes a Material Adverse Effect. There are no controversies pending or, to the knowledge of the Shareholder, threatened, between the Company and any of its employees, which controversies have or could reasonably be expected to result in an action, suit, proceeding, claim, arbitration or investigation before any agency, court or tribunal, foreign or domestic, which, in any of the foregoing cases, constitutes a Material Adverse Effect. The Company is not a party to any collective bargaining agreement or other labor union Contract nor does the Company know of any activities or proceedings of any labor union to organize any such employees. To Shareholder's knowledge, no employees of the Company are in violation of any term of any employment Contract, patent disclosure agreement, non-competition agreement, or any restrictive covenant to a former employer relating to the right of any such employee to be employed by the Company because of the nature of the business conducted or proposed to be conducted by the Company or to the use of trade secrets or proprietary information of others. No employees of the Company have given notice to the Company, nor is the Company otherwise aware, that any such employee intends to terminate his or her employment with the Company.

(b) Except as set forth in Schedule 2.19(b), all employees of the Company are terminable by the Company upon reasonable notice in accordance with applicable Law. Schedule 2.19(b) sets forth, individually and by category, the name of each officer, employee and consultant, together with such person's position or function, annual base salary or wage and any incentive, severance or bonus arrangements with respect to such person. The completion of the transactions contemplated by this Agreement will not result in any payment or increased

payment becoming due from the Company to any officer, director, or employee of, or consultant to, the Company other than as set forth in Article 1 hereof. To Shareholder's knowledge, the Company is not a party to any agreement for the provision of labor from any outside agency that would result in treatment of such providers of labor as an employee of the Company. To Shareholder's knowledge, there have been no claims by employees of such outside agencies, if any, with regard to employees assigned to work for the Company, and no claims by any governmental agency with regard to such employees.

(c)     Except as disclosed on Schedule 2.19(c), during the last three (3) years, there have been no federal or state claims based on employment equity, sex, sexual or other harassment, age, disability, race or other discrimination or common law claims, including claims of wrongful dismissal, severance pay, payment in lieu of notice or bad faith termination, by any employees of the Company or by any of the employees performing work for the Company but provided by an outside employment agency, and there are no facts or circumstances known to the Company that could reasonably be expected to give rise to such complaint or claim.

(d)     The Company has written employment policies and/or employee handbooks or manuals to the extent required by Law. To the knowledge of the Shareholder, no officer, employee or consultant of the Company is obligated under any Contract or other agreement or subject to any Order or Law that would interfere with the Company's business as currently conducted.

2.20    Environmental Matters. The Company does not now own, and has never owned, any fee simple interest in real property.

2.21    Substantial Customers and Suppliers. Schedule 2.21 lists the 15 largest customers of the Company, collectively, on the basis of revenues collected or accrued for the most recent completed fiscal year. Schedule 2.21 also lists the 15 largest suppliers of the Company on the basis of cost of goods or services purchased for the most recent fiscal year ended. To the knowledge of the Shareholder no such customer or supplier is threatened with bankruptcy or insolvency.

2.22    Accounts Receivable. To Shareholder's knowledge, except as set forth in Schedule 2.22 the accounts and notes receivable of the Company reflected on the Company Financials, and all accounts and notes receivable arising subsequent to the Financial Statement Date, (a) arose from bona fide sales transactions in the ordinary course of business, consistent with past practice, and are payable on ordinary trade terms, (b) are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, (c) are not subject to any valid set-off or counterclaim and (d) do not represent obligations for goods sold on consignment, on approval or on a sale-or-return basis or subject to any other repurchase or return arrangement.

2.23    Inventory. The Company maintains inventory, as listed in Schedule 2.23, to ensure the timely delivery of products sold to end customers. This inventory is maintained in storage facilities in and around Reston, Virginia. The Company also maintains small quantities of immaterial office supplies inventory in its offices in Reston, Virginia and Charleston, South Carolina.

2.24 Other Negotiations; Brokers; Third Party Expenses. Except as set forth in Schedule 2.24, neither the Company nor, to the knowledge of the Shareholder, any of its Affiliates (nor any investment banker, financial advisor, attorney, accountant or other Person retained by, and in connection with its actions, for or on behalf of the Company or any such Affiliate) (i) has entered into any Contract that conflicts with any of the transactions contemplated by this Agreement or (ii) has entered into any Contract or had any discussions with any Person regarding any transaction involving the Company which could result in the Company's being subject to any claim for liability to said Person as a result of entering into this Agreement or consummating the transactions contemplated hereby. Without limiting the foregoing, except as set forth in Schedule 2.24, no finder, broker, agent, financial advisor, or other intermediary has acted on behalf of the Company in connection with the Merger or the negotiation or consummation of this Agreement or any of the transactions contemplated hereby. Schedule 2.24 sets forth a reasonable estimate of all Third Party Expenses expected to be incurred by the Company through the Closing Date in connection with the negotiation of the terms and conditions of this Agreement and the Closing of the transactions contemplated hereby.

2.25 Warranty Obligations; Maintenance Contracts.

(a) Schedule 2.25 sets forth (a) a list of all forms of written warranties, guarantees and written warranty policies of the Company in respect of any of the Company's products and services, which are currently in effect (the "**Warranty Obligations**"), and the duration of each such Warranty Obligation, (b) each of the Warranty Obligations which is subject to any dispute or, to the knowledge of the Shareholder, threatened dispute and (c) a brief description of any claims during the last three (3) years made under or with respect to warranties, guarantees and warranty policies of or relating to the Company's products and services. True and correct copies of the Warranty Obligations have been delivered to Parent prior to the execution of this Agreement. To Shareholder's knowledge, there have not been any material deviations from the Warranty Obligations, and salespersons, employees and agents of the Company are not authorized to undertake obligations to any customer or other Person in excess of such Warranty Obligations. All products manufactured, designed, licensed, leased, rented or sold by the Company (i) were, when sold by the Company, free from material defects in construction and design and (ii) satisfy any and all Contract or other specifications related thereto to the extent stated in writing in such Contracts or specifications, in each case, in all material respects, in each case other than as a result of software "bugs" that are remediable in the ordinary course without material cost to the Company.

(b) The Company has no prepaid maintenance contracts.

2.26 Foreign Corrupt Practices Act. Neither the Company, nor to the knowledge of the Shareholder, any agent, employee or other Person acting on behalf of the Company has, directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, made any unlawful payment to any government official or employee or to any political party or campaign from corporate funds, violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment which will would reasonably be expected to give rise to a Material Adverse Effect.

2.27    Financial Projections. Any and all financial projections discussed in presentations to investors, bankers and Parent, if any, made by the Company with respect to the Company's business were prepared for internal use only. The Company makes no representation or warranty of any kind whatsoever regarding the accuracy of any such projections or as to whether any such projections will be achieved, except that (i) all future payments to the Shareholder, as outlined in Article 1 herein, are contingent on the Company achieving such financial projections and (ii) the Company represents and warrants that any such projections were prepared in good faith and were based on assumptions believed by it to be reasonable at the time.

2.28    Approvals.

(a)    No Approvals of Governmental or Regulatory Authorities relating to the business conducted by the Company are required to be given to or obtained by the Company from any and all Governmental or Regulatory Authorities in connection with the consummation of the transactions contemplated by this Agreement, except (i) Approvals related to the filings contemplated by Section 1.2 or (ii) where the failure to obtain such Approval would not constitute a Material Adverse Effect.

(b)    Except as set forth in Schedule 2.28(b), no non-Governmental or Regulatory Authority Approvals are required to be given to or obtained by the Company from any third parties in connection with the consummation of the transactions contemplated by this Agreement, except where the failure to obtain such Approvals would not constitute a Material Adverse Effect.

(c)    To Shareholder's knowledge, the Company has obtained all Approvals from Governmental or Regulatory Authorities necessary to conduct the business conducted by the Company in the manner as it is currently being conducted, except where the failure to obtain such Approvals would not constitute a Material Adverse Effect, and, during the last three (3) years, there has been no written notice received by the Company of any violation or non-compliance with any such Approvals. All Approvals from Governmental or Regulatory Authorities necessary to conduct the business conducted by the Company as it is currently being conducted are set forth in Schedule 2.28(c).

2.29    Leases in Effect. The Company has real property leases or subleases, priced at market rates, as set forth in Schedule 2.29 relating to premises which accommodate not less than 35 employees in locations within the Reston, Virginia and the Charleston, South Carolina metro areas.

2.30    Disclosure. To the Shareholder's knowledge, no representation or warranty contained in this Agreement or any related Schedule or in any certificate, list or other writing furnished to Parent pursuant to any provision of this Agreement (including the Company Financials and the notes thereto) contains any untrue statement of a material fact or omits a material fact necessary in order to make the statements herein or therein, in the light of the circumstances under which they were made, not misleading.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Parent and Merger Sub hereby represent and warrant, jointly and severally, to the Company and the Shareholder, subject to such exceptions as are disclosed in the corresponding Schedules with respect to specific sections of this Article 3, and subject to the right of the Parent and Merger Sub to update, revise, supplement and/or correct such Schedules through the Closing Date, as follows:

3.1 Organization, Standing and Power. Parent and Merger Sub are each corporations duly organized, validly existing and in good standing under the laws of the State of Nevada. Parent and Merger Sub each have the corporate power to own their properties and to carry on their business as now being conducted and as proposed to be conducted and are duly qualified to do business and are in good standing in each jurisdiction in which the ownership, use, licensing or leasing of their Assets and Properties, or the conduct or nature of their business, makes such qualification, licensing or admission necessary, except for such failures to be so duly qualified, licensed or admitted and in good standing that could not reasonably be expected to have a material adverse effect on the Business or Condition of Parent or Merger Sub. Neither Parent nor Merger Sub is in violation of any of the provisions of its Articles of Incorporation or Bylaws or any similar governing instruments or agreements.

3.2 Capital Structure of Parent and Merger Sub. (a) The authorized capital stock of Parent consists of 800,000,000 shares of Parent Common Stock and 20,000,000 shares of Parent Preferred Stock, all $0.001 par value per share, 10,000,000 shares of Parent Preferred Stock are designated Series A Preferred Stock. 24,945,000 shares of Parent Common Stock and 2,300,000 shares of Series A Preferred Stock, respectively, are issued and outstanding as set forth in the Capitalization Table attached hereto and incorporated herein as Schedule 3.2. Other than as set forth on Schedule 3.2, there are no shares of Parent Common Stock or Series A Preferred Stock outstanding. All outstanding shares of Parent Common Stock and Series A Preferred Stock have been duly authorized, validly issued, fully paid and are nonassessable and free of any liens or encumbrances other than any liens or encumbrances created by or imposed upon the holders thereof. Except as set forth on Schedule 3.2(a), there are no existing options, warrants, calls, convertible securities or commitments of any kind obligating the Parent to issue any authorized and unissued Parent Common Stock or Series A Preferred Stock, nor does Parent have any outstanding commitment or obligation to repurchase, reacquire or redeem any of its outstanding capital stock. There are no stock appreciation or similar rights to receive cash payment in respect or in lieu of options to purchase shares of Parent Common Stock or Series A Preferred Stock or otherwise. Except as disclosed in Schedule 3.2(a), there are no voting trusts, voting agreements, buy-sell agreements or other agreements or arrangements affecting Parent Common Stock or Series A Preferred Stock. The shares of Parent Common Stock to be issued pursuant to the transactions contemplated herein will, upon issuance pursuant to the terms hereof, be duly authorized, validly issued, fully paid, and non-assessable shares of Parent Common Stock. Parent has delivered a true, correct and complete copy of its Articles of Incorporation, as set forth in Schedule 3.2(a)(i), and its Bylaws, as set forth in Schedule 3.2(a)(ii), as amended to date, to Company.

(b) The authorized capital stock of Merger Sub consists solely of 1,000 shares of Common Stock, $0.001 par value per share, of which 1,000 shares are issued and outstanding and all of which are owned by Parent. All issued and outstanding shares of capital stock of Merger Sub have been duly authorized and validly issued and are fully paid and are nonassessable and free of any liens or encumbrances. The Merger Sub has delivered a true, correct and complete copy of its Articles of Incorporation, as set forth in Schedule 3.2(b)(i), and its Bylaws, as set forth in Schedule 3.2(b)(ii), as amended to date, to Company.

3.3 Authority. Parent and Merger Sub each has full corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Parent and Merger Sub, and, assuming the due authorization, execution and delivery hereof by the Company and the Shareholder, constitutes a legal, valid and binding obligation of Parent and Merger Sub enforceable against Parent and Merger Sub in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws relating to the enforcement of creditors' rights generally and by general principles of equity. Merger Sub has been recently formed for the purpose of effecting the Merger and has not conducted any business except in connection with preparation for the Merger. Parent owns all of the issued and outstanding capital stock of Merger Sub. The execution, delivery and performance of each of this Agreement and any agreements contemplated hereby to which it is a party have been duly authorized by all necessary action on the part of each of Parent and Merger Sub, their respective boards of directors, and the sole stockholder of Merger Sub. A vote of Parent's stockholders will be required to approve the Merger and the related transactions contemplated hereby.

3.4 Financial Statements of Parent.

(a) All financial statements of Parent, as set forth in Schedule 3.4(a) and provided to the Company and to the Shareholder (including, in each case, any notes thereto), were prepared in accordance with GAAP on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto), are correct and complete in all material respects and each present fairly, in all material respects, the financial position and results of operations of Parent as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements, to normal and recurring immaterial year-end adjustments). The Parent's consolidated financial statements have been filed with the U.S. Securities and Exchange Commission. Since the date of the last financial statements of Parent, there has been no change in any accounting policies, principles, methods or practices, including any change with respect to reserves (whether for bad debts, contingent liabilities or otherwise), of Parent.

(b) Except as and to the extent set forth or reserved against on the consolidated balance sheet of Parent, none of Parent or any Subsidiary of Parent has any Liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) that would be required to be reflected on a balance sheet or in notes thereto, except for Liabilities or obligations incurred in the ordinary course of business consistent with past practice since January 1, 2007.

3.5 No Conflicts. The consummation by the Parent and Merger Sub of the transactions contemplated hereby do not and will not:

(a) conflict with or result in a violation or breach of any terms, conditions or provisions of the Articles of Incorporation or Bylaws, as amended, or equivalent documents of the Parent and Merger Sub;

(b) conflict with or result in a violation or breach of any Law or Order applicable to the Parent and Merger Sub or by which any of their Assets and Properties are bound or affected; or

(c) (i) conflict with or result in a violation or breach of, (ii) constitute a default (or an event that, with or without notice or lapse of time or both, would constitute a default) under, (iii) require the Parent or Merger Sub to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of (except for filings with the Nevada Secretary of State and the Securities and Exchange Commission, as necessitated by this transaction and described on Schedule 3.5(c), (iv) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments or performance under, (vi) result in the creation or imposition of (or the obligation to create or impose) any Lien upon the Parent or Merger Sub or any of their Assets and Properties under or (vii) result in the loss of a material benefit under, any of the terms, conditions or provisions of any Contract or License to which the Parent or Merger Sub are a party or by which the Parent or Merger Sub or their Assets and Properties are bound or affected.

3.6 Books and Records; Organizational Documents. The minute books, including the share registers, and other similar records of the Parent and Merger Sub have been provided or made available to Company or its counsel prior to the execution of this Agreement, are complete and correct in all material respects and have been maintained in accordance with sound business practices. Such minute books contain a true and complete record of all material actions taken at all meetings and by all written consents in lieu of meetings of the directors, shareholders and committees of the Board of Directors of the Merger Sub through the date hereof.

3.7 Restrictions on Business Activities. There is no agreement, judgment, injunction, Order or decree binding upon the Parent or Merger Sub, or any of their Assets and Properties which has had or could reasonably be expected to have the effect of prohibiting or impairing any current or future business practice of the Parent or Merger Sub, respectively, any acquisition of property by the Parent or Merger Sub or the conduct of business by the Parent or Merger Sub as currently conducted or as proposed to be conducted by the Parent or Merger Sub, directly related to this Agreement.

3.8 Taxes.

(a) The Parent and Merger Sub have, if required by statutes, properly filed and paid any Taxes due in connection herewith. The Parent and Merger Sub are not required to, and do not expect to, file and pay Taxes on their operations for the Tax year 2006, by the due

date, or the extension thereof. The Parent and Merger Sub have prepared and maintained adequate records so as to facilitate the prompt filing of Tax Returns when they become due, if required to be filed.

(b)    The Parent and Merger Sub have not incurred any material liability for Taxes other than as reflected on their financials.

(c)    The Parent and Merger Sub do not have knowledge of any actions by any Taxing Authority in connection with assessing additional Taxes against and in respect of the Parent and Merger Sub for any past period. There is no dispute or claim concerning any Tax Liability of the Parent and Merger Sub (i) threatened, claimed or raised by any Taxing Authority and (ii) of which the Parent and Merger Sub are aware. There are no Liens for Taxes upon the Assets and Properties of the Parent and Merger Sub other than Liens for Taxes not yet due.

3.9    Legal Proceedings. Except as set forth on Schedule 3.9:

(a)    at the present and since the Parent's incorporation, there are not and have not been any Actions or Proceedings brought or, to the knowledge of the Parent or Merger Sub, pending or threatened against the Parent or Merger Sub or its Assets and Properties;

(b)    there are no facts or circumstances known to the Parent or Merger Sub that could reasonably be expected to give rise to any Action or Proceeding against, relating to or affecting the Parent and Merger Sub; and

(c)    the Parent and Merger Sub have not received notice, and do not otherwise have knowledge of any Orders outstanding against the Parent and Merger Sub, respectively.

3.10    Compliance With Laws and Orders.    The Parent and Merger Sub have not violated, and are not currently in violation or default under, any Law or Order applicable to the Parent and Merger Sub or any of their Assets and Properties.

3.11    Benefit Plans. Neither the Parent nor the Merger Sub has any Benefit Plans.

3.12    Securities Compliance. The Parent at the time of Closing will be in compliance with applicable federal and state securities laws and regulations as they apply to this transaction.

3.13    Title to Property. Neither the Parent nor the Merger Sub has title to any property except, with respect to Parent, the shares of its Subsidiaries, all of which are listed on Schedule 3.13.

3.14    Environmental Matters. Neither Parent nor Merger Sub now own, license or lease any real property and neither Parent nor Merger Sub has ever owned, licensed or leased any real property. The Parent and Merger Sub and all of the Subsidiaries and Affiliates of Parent and Merger Sub (a) are in compliance with all environmental laws; and (b) are in possession of, and in compliance with, all permits, certificates, licenses, approvals, tariffs and other authorizations of or issued by Governmental or Regulatory Authorities with respect to environmental matters

relating to the operations of such Subsidiaries or Affiliates. There are no current environmental claims pending, or to the knowledge of the Parent and the Merger Sub threatened, against any such Subsidiary or Affiliate. Neither the Parent nor the Merger Sub or any of their respective Subsidiaries or Affiliates has either expressly or, to the Parent's knowledge, by operation of law, assumed or undertaken any liability or corrective, investigatory or remedial obligation of any other Person relating to any environmental claims.

3.15    Other Negotiations; Brokers; Third Party Expenses.  Neither the Parent nor Merger Sub, to the knowledge of the Parent and Merger Sub, or any of their Affiliates (nor any investment banker, financial advisor, attorney, accountant or other Person retained by or acting for or on behalf of the Parent and Merger Sub or any such Affiliate) (i) has entered into any Contract that conflicts with any of the transactions contemplated by this Agreement or (ii) has entered into any Contract or had any discussions with any Person regarding any transaction involving the Parent and Merger Sub which could result in the Parent or Merger Sub's being subject to any claim for liability to said Person as a result of entering into this Agreement or consummating the transactions contemplated hereby. Without limiting the foregoing, except as set forth in Schedule 3.14, no finder, broker, agent, financial advisor, or other intermediary has acted on behalf of Parent or Merger Sub in connection with the Merger or the negotiation or consummation of this Agreement or any of the transactions contemplated hereby.

3.16    Foreign Corrupt Practices Act.  Neither the Parent nor Merger Sub, nor to the knowledge of the Parent and Merger Sub, any agent, employee or other Person associated with or acting on behalf of the Parent and Merger Sub has, directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, made any unlawful payment to any government official or employee or to any political party or campaign from corporate funds, violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

3.17    Approvals.

(a)    No Approvals of Governmental or Regulatory Authorities relating to the business conducted by the Parent and Merger Sub are required to be given to or obtained by the Parent and Merger Sub from any and all Governmental or Regulatory Authorities in connection with the consummation of the transactions contemplated by this Agreement, except for filings with the Nevada Secretary of State and the National Association of Securities Dealers (NASD) as described on Schedule 3.16(a).

(b)    No non-Governmental or Regulatory Authority Approvals are required to be given to or obtained by the Parent and Merger Sub from any third parties in connection with the consummation of the transactions contemplated by this Agreement.

(c)    The Parent and Merger Sub have obtained all Approvals from Governmental or Regulatory Authorities necessary to conduct the business conducted by the Parent and Merger Sub in the manner as it is currently being conducted and has been conducted since the date of incorporation of the Parent and Merger Sub, and there has been no written

notice received by the Parent and Merger Sub of any violation or non-compliance with any such Approvals.

3.18 Financing. The Parent and Merger Sub have or shall obtain funds sufficient to pay at Closing the amounts provided for under Section 1.6(a)(ii).

3.19 SEC Status; Securities Issuances. The Parent is subject to the reporting provisions of Section 15(d) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the SEC promulgated under the Exchange Act. All issuances of securities by the Parent and its Subsidiaries and Affiliates were conducted in compliance with the provisions of all applicable securities laws and regulations.

## ARTICLE 4
## CONDUCT PRIOR TO THE CLOSING

4.1 Conduct of Business of the Company. All parties mutually agree that during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to the provisions of Section 8.1 hereof or the Closing, the Company, Parent and Merger Sub each shall (unless otherwise required by this Agreement or Company has given its prior written consent to Parent or Merger Sub or Parent has given its prior written consent to the Company, as the case may be) carry on its business in the ordinary course consistent with past practice, to pay its Liabilities and Taxes consistent with its past practices, to pay or perform other obligations when due consistent with its past practices, subject to any good faith disputes over such Liabilities, Taxes and other obligations and, to the extent consistent with such business, to use reasonable efforts and institute all policies to preserve intact its present business organization, keep available the services of its present officers and key employees, preserve its relationships with customers, suppliers, distributors, licensors, licensees, independent contractors and other Persons having business dealings with it and to cause its Subsidiaries to do the same, all with the express purpose and intent of preserving unimpaired its goodwill and ongoing businesses at the Closing. Notwithstanding any other provisions in this Agreement, the Company shall have the right to negotiate and settle the Navy Billing Dispute. Except as expressly contemplated by this Agreement or disclosed in Schedules, neither (1) Company, on the one hand, nor (2) Parent or Merger Sub on the other hand, will, without the prior written consent of the other, voluntarily take or agree in writing or otherwise to take any action that would make any of its representations or warranties contained in this Agreement untrue or incorrect or prevent the applicable party (or parties) from performing or cause the applicable party (or parties) not to perform its agreements and covenants hereunder.

Except as expressly contemplated by this Agreement or disclosed in Schedules, the Company will not, without the prior written consent of the Parent, voluntarily take or agree in writing or otherwise to:

(a) take any of the actions described in Section 2.7;

(b) issue additional shares of its or their, as applicable, capital stock or grant any warrants, options or other rights to acquire shares of its or their, as applicable, capital stock;

(c) make any capital expenditures or commitments for additions to property, plant or equipment of the Company constituting capital assets individually in an amount exceeding twenty-five thousand dollars ($25,000);

(d) incur any additional long-term debt, short-term debt or liabilities to Company Shareholders or their Affiliates;

(e) distribute any assets or make any payments of any kind to Company Shareholders or their Affiliates, except for reasonable rent payments and travel related expenses;

(f) enter into or continue any commercial relationships of any kind with Company Shareholders or their Affiliates, except for facilities and travel related matters.

4.2 No Solicitation. Until the earlier of the Closing or the date of termination of this Agreement pursuant to the provisions of Section 8.1 hereof, neither Company nor Parent or Merger Sub, nor the Shareholder, officers, directors, agents, investment bankers or other representatives of any of them (collectively, the "**Representatives**") will, directly or indirectly, (i) solicit, engage in discussions or negotiate with any Person (regardless of who initiates such discussions or negotiations), or take any other action intended or designed to facilitate the efforts of any Person, other than the parties hereto, relating to the possible acquisition of the Company, Parent or Merger Sub (whether by way of purchase of capital stock, purchase of assets or otherwise) or any significant portion of its capital stock or assets by any Person other than the parties hereto (an "**Alternative Acquisition**"), (ii) provide information with respect to the Company, Parent or Merger Sub to any Person relating to a possible Alternative Acquisition by any Person, (iii) enter into an agreement with any Person providing for a possible Alternative Acquisition, or (iv) make or authorize any statement, recommendation or solicitation in support of any possible Alternative Acquisition by any Person. The Company, Parent, or Merger Sub, as the case may be, shall cause its Representatives to immediately cease and cause to be terminated all existing discussions or negotiations with any Person heretofore conducted with respect to any possible Alternative Acquisition.

Each of the Company, the Shareholder, Parent and Merger Sub acknowledge that the terms of this Section 4.2 are a significant inducement for the Company, the Shareholder, Parent and Merger Sub to enter into this Agreement and the absence of such provision would have resulted in either (i) a material change in the terms hereof or (ii) a failure to induce the parties hereto to enter into this Agreement.

## ARTICLE 5
## ADDITIONAL AGREEMENTS

5.1 Access to Information. Between the date of this Agreement and the earlier of the Closing or the termination of this Agreement, upon reasonable advance notice given to the Company, the Company will (i) give Parent and its respective officers, employees, accountants, counsel, financing sources and other agents and representatives reasonable access to all buildings, offices, and other facilities of the Company and to the extent permitted by law to all Books and Records of the Company, regardless of where located; (ii) permit Parent to make such

inspections as it may require; (iii) cause its officers to furnish Parent such financial, operating, technical and product data and other information with respect to the business and Assets and Properties of the Company as Parent from time to time may reasonably request to verify the representations and warranties provided herein and for integration planning purposes, including without limitation financial statements and schedules; (iv) allow Parent the opportunity to interview non-clerical employees and other personnel and Affiliates of the Company during normal business hours with the Company's prior written consent, which consent will not be unreasonably withheld or delayed; and (v) assist and cooperate with Parent in the development of integration plans for implementation by Parent and the Company following the Closing; provided, however, that no investigation pursuant to this Section 5.1 will affect or be deemed to modify any representation or warranty made by the Company herein.

    5.2    Confidentiality.  Parent, Merger Sub and Company acknowledge and agree that the terms and conditions described in this Agreement, including its existence, as well as the non-public information and data furnished to them or their respective Representatives from the first introduction of the parties and throughout the negotiation and drafting of this Agreement is confidential and will not be disclosed to any third party, or used for any purpose not specifically contemplated herein, without prior written consent of the other party, unless otherwise required by Law or unless it ceases to be confidential through no breach of the receiving party.

    5.3    Expenses.    Whether or not the transactions contemplated hereby are consummated, all fees and expenses incurred in connection with this Agreement including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties ("**Third Party Expenses**"), as set forth in Schedule 5.3, incurred by a party in connection with the negotiation and effectuation of the terms and conditions of the transactions contemplated hereby, including this Agreement, and the transactions contemplated hereby will be the obligation of the respective party incurring such Third Party Expenses.  Notwithstanding the foregoing, the Parent will pay all reasonable closing costs and Company Shareholders will be jointly and severally responsible for the payment of any fees and expenses they incur for advice given to them by their own advisors.

    5.4    Public Disclosure.    The parties agree that prior to making any public announcement with respect to this Agreement or any other matter relating to the transactions contemplated hereby, each will consult with the other and will use reasonable efforts either to agree upon the text of a proposed joint announcement or to obtain the other's approval of the text of an announcement to be made solely on behalf of such party, provided that any party may make such disclosures or statements as it reasonably believes, after consulting with counsel, may be required by Law, regulation or rule of any Governmental or Regulatory Authority or any stock exchange, though the disclosing party will provide advance notice to the other party of such required disclosure as far in advance as is reasonably practicable.

    5.5    Approvals.    The Company and Parent will cooperate and use commercially reasonable efforts to obtain the Approvals, if any, from Governmental or Regulatory Authorities or under any of the Contracts or other agreements as may be required in connection with the transactions contemplated hereby as to preserve all rights of and benefits to the Company thereunder.  Parent will provide the Company with such assistance and information as is reasonably required to obtain such Approvals.

5.6     Notification of Certain Matters.  The Company will give prompt notice to Parent and Merger Sub, and Parent and Merger Sub will give prompt notice to the Company, of (i) the occurrence or non-occurrence of any event, the occurrence or nonoccurrence of which is likely to cause any representation or warranty of the Company, the Shareholder, or the Parent or Merger Sub, respectively, contained in this Agreement to be untrue or inaccurate at or prior to the Closing Date and (ii) any failure of the Company, the Shareholder, or Parent or Merger Sub, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that the delivery of any notice pursuant to this Section 5.6 will not limit or otherwise affect any remedies available to the party receiving such notice.

5.7     Additional Documents and Further Assurances.  Each party hereto, at the request of the other party hereto, will execute and deliver such other instruments and documents per Schedule 5.7 and do and perform such other acts and things (including, but not limited to, all action reasonably necessary to seek and obtain any and all consents and approvals of any Government or Regulatory Authority or Person, if any are necessary hereunder; provided, however, that Parent will not be obligated to consent to any divestitures or operational limitations or activities in connection therewith and no party will be obligated to make a payment of money as a condition to obtaining any such condition or approval) as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

5.8     Company's Accountants.  The Company will use commercially reasonable efforts to cause its management and its accountants to facilitate on a timely basis (i) the preparation of interim financial statements prepared in accordance with GAAP through the date of Closing, and reviewed by the Company's accountants, (ii) the review of any Company audit or review work papers for up to the past two (2) complete fiscal years including the examination of selected interim financial statements and data, and (iii) the delivery of such reports from the Company's independent accountants as may be reasonably requested by Parent or its accountants.  In addition, for the purposes of the requirements of Internal Revenue Service Revenue Ruling 59-60 and the accounting requirements pursuant to the accounting for business combinations, the Company shall deliver within ten (10) days of the Closing a balance sheet of the Company as of the Closing Date (the "**Closing Date Balance Sheet**") that has been reviewed and approved by its independent accounting firm.  Within fifteen (15) days after the delivery of the Closing Date Balance Sheet, Parent will provide to the Company a proposed allocation of the Merger Consideration which shall have been prepared by an independent valuation accountant or consultant.

5.9     Conveyance Taxes.  Parent, Merger Sub, and the Company will cooperate in the preparation, execution and filing of all returns, questionnaires, applications or other documents regarding any sales, use, transfer, value added, and stock transfer, any transfer, recording, registration and other fees, and any similar Taxes which become payable in connection with the transactions contemplated hereby that are required or permitted to be filed on or before the Closing.

5.10    Commercially Reasonable Efforts.  Each party hereto will use its commercially reasonable efforts to perform and fulfill all obligations to be performed and fulfilled under this

Agreement, and to cause all conditions precedent to the consummation of the transactions to be timely satisfied, to the end that the transactions contemplated by this Agreement will be consummated substantially in accordance with its terms.

5.11    Breach of Representations, Warranties, Agreements and Covenants.  Subject to its rights under Section 8.1, each party hereto will not voluntarily take, or fail to take, any action which from the date hereof through the Closing would cause or constitute a material breach of any of its representations, warranties, agreements and covenants set forth in this Agreement.  In the event of, and promptly after becoming aware of, the actual, pending or threatened occurrence of any event which would cause or constitute such a breach or inaccuracy, such party will give detailed notice thereof to the other parties hereto and will use its commercially reasonable efforts to prevent or promptly remedy such breach or inaccuracy.

5.12    Agreement to Defend and Indemnify.

(a)    Parent will cause all rights to indemnification by the Company in favor of each present and former officer or director of the Company (hereinafter referred to as the "**Company Indemnified Parties**") as provided in the Company's Articles of Incorporation or Bylaws (or both) or similar constitutive documents or pursuant to other instruments or agreements, including insurances, in effect on the date hereof, to survive the Closing and to continue in full force and effect following the Closing Date until the expiration of the applicable statute of limitations.

(b)    Subject to the terms set forth herein, Parent will, as an absolute and unconditional guarantor of performance and payment, and will cause the Company to, indemnify and hold harmless, to the fullest extent permitted under applicable Law (and will also advance expenses as incurred by a Company Indemnified Party to the fullest extent permitted under applicable Law), each Company Indemnified Party against any costs or expenses (including reasonable legal fees and expenses) judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to any action, alleged action, omission or alleged omission by such Company Indemnified Party on or prior to the Closing Date (including any claims, action, suits, proceedings and investigations which arise out of or relate to the transactions contemplated by this Agreement) until the expiration of the applicable statute of limitations; provided that, in the event any claim, action, suit, proceeding or investigation is asserted or made or otherwise becomes known to Parent or the Company or is commenced prior to the expiration of the applicable statute of limitations, all rights to indemnification in respect of any such claim, action, suit, proceeding or investigation will continue until the final disposition thereof.

(c)    The covenants contained in this Section 5.12 will survive the Closing Date until fully discharged and are intended to benefit the Shareholder and each of the Company Indemnified Parties.

## ARTICLE 6
## CONDITIONS TO THE ACQUISITION

6.1 Conditions to Obligations of Each Party to Effect the Merger. The respective obligations of each party to this Agreement to effect the transactions contemplated hereby will be subject to the satisfaction at or prior to the Closing of the following conditions:

(a) *No Injunctions or Regulatory Restraints; Illegality*. No temporary restraining order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction or Governmental or Regulatory Authority or other legal or regulatory restraint or prohibition preventing the consummation of the transactions contemplated hereby shall be in effect; nor shall there be any action taken, or any Law or Order enacted, entered, enforced or deemed applicable to the transactions contemplated hereby or the other transactions contemplated by the terms of the Agreement that would prohibit the consummation of the transactions contemplated hereby or which would permit consummation of the transactions contemplated hereby only if certain divestitures were made or if Parent and Merger Sub were to agree to limitations on its business activities or operations.

(b) *Existence of Board Approval*. Each party will provide to the other party certified copies of Board minutes or consents, or certified extracts thereof, Schedule 6.1(b), indicating Board approval has been granted on or prior to the date hereof for the satisfaction of all obligations hereunder and the consummation of the transaction.

6.2 Additional Conditions to Obligations of the Company and the Shareholder. The obligations of the Company and the Shareholder to effect the transactions contemplated hereby will be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by the Company and the Shareholder:

(a) *Representations and Warranties*. Each of the representations and warranties made by Parent and Merger Sub in this Agreement shall be materially true and correct when made and on and as of the Closing Date as though such representation or warranty was made on and as of the Closing Date, except that any representation or warranty that expressly speaks as of a specified date earlier than the Closing Date shall have been true and correct on and as of such earlier date, and further provided that Parent and Merger Sub shall be permitted to update, revise, supplement and/or correct the Schedules through the Closing Date.

(b) *Performance*. Parent and Merger Sub shall have performed and complied with each agreement, covenant and obligation required by this Agreement to be so performed or complied with by Parent and Merger Sub at or before the Closing Date, including, without limitation, payment and delivery of the Merger Consideration.

(c) *Officers' Certificates*. Each of Parent and Merger Sub will have delivered to the Company a certificate or certificates, dated the Closing Date and executed by its respective President and/or its Chief Executive Officer, certifying as to the resolutions delivered pursuant to Section 6.1(b) and Parent's and Merger Sub's compliance with the condition set forth in Section 6.2(a).

(d) *Third Party Consents.* Parent and Merger Sub will have been furnished with evidence satisfactory to them that the Company has obtained the consents, approvals and waivers, if any, listed in Schedule 2.28(b).

(e) *No Material Adverse Change.* There will have occurred no Material Adverse Change in the Business or Condition of Parent or Merger Sub since the date hereof.

(f) *Legal Proceedings.* No Governmental or Regulatory Authority will have notified any party to this Agreement that it intends to commence proceedings to restrain or prohibit the transactions contemplated hereby or force rescission, unless such Governmental or Regulatory Authority will have withdrawn such notice and abandoned any such proceedings prior to the time which otherwise would have been the Closing Date.

(g) *Proceedings and Documents.* All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions will be in form and substance reasonably satisfactory to the Company and its counsel, and the Company will have received all such counterpart originals or certified or other copies of such documents as they may reasonably request.

6.3 Additional Conditions to the Obligations of Parent and Merger Sub. The obligations of Parent and Merger Sub to effect the transactions contemplated hereby will be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Parent and Merger Sub:

(a) *Representations and Warranties.* Each of the representations and warranties made by the Company and the Shareholder in this Agreement shall be materially true and correct when made and on and as of the Closing Date as though such representation or warranty was made on and as of the Closing Date, except that any representation or warranty that expressly speaks as of a specified date earlier than the Closing Date shall have been true and correct on and as of such earlier date, and further provided that Company and the Shareholder shall be permitted to update, revise, supplement and/or correct the Schedules through the Closing Date.

(b) *Performance.* The Company shall have performed and complied with each agreement, covenant and obligation required by this Agreement to be so performed or complied with by the Company on or before the Closing Date.

(c) *Officers' Certificates.* The Company and the Shareholder shall have delivered to Parent and Merger Sub a certificate or certificates, dated the Closing Date and executed by the President and/or the Chief Executive Officer of the Company, certifying as to the resolutions delivered pursuant to Section 6.1(b) and Company's and the Shareholder's compliance with the condition set forth in Section 6.3(a).

(d) *Third Party Consents.* Parent and Merger Sub will have been furnished with evidence satisfactory to them that the Company has obtained the consents, approvals and waivers, if any, listed in Schedule 2.28(b).

     (e) *Non-Competition and Employment Agreements*. Each of the members of the Senior Management Team shall have executed and delivered to Parent, Company, and/or Merger Sub an employment and non-competition agreement in the form attached hereto as Schedule 6.3 (each, a "**Non Competition and Employment Agreement**").

(f) *No Material Adverse Change*. There will have occurred no Material Adverse Change in the Business or Condition of the Company since the date hereof.

(g) *Legal Proceedings*. No Governmental or Regulatory Authority will have notified any party to this Agreement that it intends to commence proceedings to restrain or prohibit the transactions contemplated hereby or force rescission, unless such Governmental or Regulatory Authority will have withdrawn such notice and abandoned any such proceedings prior to the time which otherwise would have been the Closing Date.

(h) *Employees*. Not less than 95% of those employees listed in Schedule 2.19(b), will be employed by the Company at the Closing (and will have not given any notice or other indication that they will not continue to be willing to be employed by the Company as a wholly-owned subsidiary of Parent following the transactions contemplated hereby). Each employee of the Company to be employed by Company as a wholly-owned subsidiary of Parent following the Closing shall have executed Parent's standard form Proprietary Rights and Inventions Assignment Agreement, substantially in the form set forth in Exhibit E hereto.

(i) *Proceedings and Documents*. All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions will be in form and substance reasonably satisfactory to Parent and Merger Sub and their counsel, and Parent and Merger Sub will have received all such counterpart originals or certified or other copies of such documents as they may reasonably request.

(j) *Equity Equivalents*. There will be no un-expired and unexercised Equity Equivalents of the Company outstanding as of the Closing.

(k) *Financial Performance*. The Company's fiscal year 2006 gross revenue, and recasted EBITDA will have been determined, to the reasonable satisfaction of the Parent, to be not less than 99% of: $4,300,000, and $1,300,000, respectively. As of the Closing Date, the Company has represented to the Parent that it has achieved the foregoing numbers.

(l) *IP Asset Purchase Agreement*. Intellectus, LLC and a wholly-owned Nevada subsidiary of Parent shall have entered into the Asset Purchase Agreement.

## ARTICLE 7
## SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS; INDEMNIFICATION

7.1 Survival of Representations, Warranties, Covenants and Agreements. The representations and warranties set forth in Articles 2 and 3 will survive until the first anniversary of the Closing Date; provided, however that the representations and warranties in (i) Sections 2.3, 2.15, 2.16, 2.21, 3.2, 3.16, 3.17, 3.22 and (ii) the representations and warranties contained in

Sections 2.11 will survive until the expiration of the statute of limitations applicable to claims with respect to the matters covered thereby. The one-year limitation in this Section 7.1 will not apply under circumstances involving any fraud or willful misrepresentation or other misconduct by any party to this Agreement or the officers or directors of any such party, in which case there shall be no limitation that shall apply to bar a claim.

7.2    Indemnification.

(a)    Subject to the terms, conditions and limitations set forth herein, the Shareholder will indemnify and hold harmless Parent, Merger Sub and their respective officers, directors and consultants (hereinafter referred to individually as a "**Parent Indemnified Person**" and collectively as "**Parent Indemnified Persons**") from and against any and all Losses arising out of any misrepresentation or breach of the representations, warranties, covenants and agreements given or made by the Company or the Shareholder in this Agreement, or any certificate, instrument or document delivered by the Company or the Shareholder pursuant to this Agreement.

(b)    Parent shall indemnify and hold harmless  the Shareholder "**The Indemnified Person**" and, from and against any and all Losses arising out of any misrepresentation or breach of the representations, warranties, covenants and agreements given or made by the Parent or Merger Sub in this Agreement, or any certificate, instrument or document delivered by the Parent or Merger Sub pursuant to this Agreement.

7.3    Third-Party Claims.    In the event a Parent Indemnified Person(s) or the "**Indemnified Person**" and, collectively, the "**Indemnified Parties**") becomes aware of a third-party claim based on any misrepresentation or breach of or default in connection with any of the representations, warranties, covenants and agreements given or made by the other party in this Agreement (each, an "**Indemnifying Party**"), which the Indemnified Party believes may result in a claim against it (a "**Third Party Claim**"), the Indemnified Party will promptly notify the Indemnifying Party of such Third Party Claim. By written notice to the Indemnified Party within twenty (20) days after delivery of notice of such a claim, the Indemnifying Party's representative (on behalf of the Indemnifying Party) will be entitled, at the Indemnifying Party's expense, to participate in any defense of such claim by the Indemnified Party, which will direct the defense and settlement of such claims. Notwithstanding the foregoing, however, the Indemnified Party may consent to a settlement or compromise of, or the entry of any judgment arising from, the Third Party Claim without the prior written consent of the Indemnifying Party if, and only if, the proposed settlement, compromise, or judgment: (a) does not contain an admission of guilt or wrongdoing on the part of the Indemnifying Party; and (b) does not provide for any remedy or sanction against the Indemnifying Party other than the payment of money which the Indemnifying Party agrees and is able to pay. In the event that the Indemnifying Party has consented to any such settlement amount, the Indemnifying Party will have no power or authority to object under any provision of this Article 7 to any claim by the Indemnified Party for indemnity with respect to such settlement amount.

7.4    Recovery of Losses.

     (a) Subject to the limitations in Sections 7.4(b) and 7.5 below: (i) a Parent Indemnified Person will recover any claim for indemnity under Sections 7.2(a) or 7.3 relating to breaches of representations or warranties directly from the breaching Shareholder, who will be individually liable for such amounts.

(b) No claim by a Parent Indemnified Person for indemnity under Sections 7.2(a) or 7.3 relating to breaches of representations or warranties will be recoverable unless the aggregate amount owing exceeds ten thousand dollars ($10,000) per occurrence. In no event will the aggregate amount recoverable from the Shareholder for all claims for indemnity under this Agreement, including, but not limited to, Sections 7.2(a) or 7.3, exceed one hundred thousand dollars ($100,000).

7.5 Limitations on Claims. Notwithstanding anything herein to the contrary, the obligations of the Shareholder arising under this Article 7 will be limited to valid written claims received by the Shareholder within twelve (12) months of the Effective Time, and will be deemed fully satisfied by surrender of that portion of Parent's Shares received by the Shareholder in connection with the Merger, valued at their then current fair market value, necessary to satisfy the Shareholder's obligation but subject to the following sentence. The indemnification mechanism provided for by this Article 7 shall be the sole remedy for breaches of representations or warranties under this Agreement.

## ARTICLE 8
## TERMINATION, AMENDMENT AND WAIVER

8.1 Termination. Except as provided in Section 8.2 below, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a) by mutual agreement of the Company and the Shareholder and Parent and Merger Sub;

(b) by Parent and Merger Sub or the Company (or with respect to the obligations of the Shareholder) if (i) the Closing has not occurred before 10:00 am (Eastern Standard Time) on the date which is 90 days after the date of this Agreement or on such later date as the parties hereto may mutually agree (provided, however, that the right to terminate this Agreement under this sub clause 8.1(b) (i) will not be available to any party whose willful failure to fulfill any obligation hereunder has been the cause of, or resulted in, the failure of the Closing to occur on or before such date); (ii) there will be a final nonappealable order of United States federal or state court in effect preventing consummation of the transactions contemplated hereby; or (iii) there will be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the transactions contemplated hereby by any Governmental or Regulatory Authority that would make consummation of the transactions contemplated hereby illegal;

(c) by Parent and Merger Sub if there shall be any action taken, or any Law or Order enacted, promulgated or issued or deemed applicable to the transactions contemplated hereby, by any Governmental or Regulatory Authority, which would: (i) prohibit Parent's ownership or operation of all or any material portion of the business of the Company or (ii) compel Parent or the Surviving Corporation to dispose of or hold separate all or a substantial

portion of the Assets and Properties of the Company as a result of the transactions contemplated hereby;

(d) by Parent and Merger Sub if there has been a breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Company or the Shareholder and (i) the Company or the Shareholder, as the case may be, have not cured such breach within thirty (30) days following receipt by the Company or the Shareholder, as the case may be, of written notice of such breach or is not using its reasonable efforts to cure such breach after written notice of such breach to the Company or the Shareholder, as the case may be, (provided, however, that, no cure period will be required for a breach which by its nature cannot be cured) and (ii) as a result of such breach the conditions set forth in Section 6.3(a) or 6.3(b), as the case may be, would not then be satisfied;

(e) by the Company if there has been a breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Parent or Merger Sub and (i) Parent or Merger Sub have not cured such breach within thirty (30) days following receipt by the Company of written notice of such breach or is not using its reasonable efforts to cure such breach after written notice of such breach to Parent or Merger Sub (provided, however, that no cure period will be required for a breach which by its nature cannot be cured), and (ii) as a result of such breach the conditions set forth in Section 6.2(a) or 6.2(b), as the case may be, would not then be satisfied;

8.2 Effect of Termination. In the event of a valid termination of this Agreement as provided in Section 8.1, this Agreement will forthwith become void and there will be no liability or obligation on the part of Parent, Merger Sub, the Shareholder, or the Company, or their respective officers, directors or shareholders or Affiliates or Associates; provided, however, that the provisions of Sections 5.2, 5.3, 5.4, 8.2, 9.6, 9.9, 9.10 and 9.11 of this Agreement will remain in full force and effect and survive any termination of this Agreement.

**ARTICLE 9**
**MISCELLANEOUS PROVISIONS**

9.1 Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally against written receipt or mailed by prepaid first class registered or certified mail, return receipt requested, or sent by overnight courier prepaid, to the parties at the following addresses or facsimile numbers:

If to Parent or Merger Sub to:
Francis E. Wilde, Chairman & CEO
Shea Development Corp.
1351 Dividend Drive, Suite G
Marietta, GA 30067
Telephone: 770-919-2209

with a copy to:
Francis J. Mooney, Jr. / Robert T. Lincoln
Dunnington, Bartholow & Miller LLP

477 Madison Avenue, 12th Floor
New York, NY 10022
Telephone:   212-682-8811
Facsimile:   212-661-7769

If to the Company or the Shareholder to:
 Christopher Watson
 President
 300 Bucksley Lane #305
 Daniel Island, SC 29492
 Telephone:   703-310-6850  x302
 Facsimile:   703-310-6837

with a copy to:
Michael L. Jennings
OBER | KALER
120 East Baltimore Street
Baltimore, Maryland 21202
Telephone:   410-347-7348
Facsimile:   410-547-0699

9.2   Entire Agreement.   This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and thereof and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof. Except for the representations and warranties contained in this Agreement or in any instrument delivered pursuant to this Agreement, each of the parties to this Agreement acknowledges that no other representations or warranties have been relied upon by that party or made by any other party or its officers, directors, employees, agents, financial and legal advisors or other representatives.

9.3   Further Assurances; Post-Closing Cooperation.   At any time or from time to time after the Closing, the parties will execute and deliver to the other party such other documents and instruments, provide such materials and information and take such other actions as the other party may reasonably request to consummate the transactions contemplated by this Agreement and otherwise to cause the other party to fulfill its obligations under this Agreement and the transactions contemplated hereby. Each party agrees to use commercially reasonable efforts to cause the conditions to its obligations to consummate the transactions contemplated hereby to be satisfied.

9.4   Amendment.   This Agreement may be amended by the parties hereto at any time before the Closing by execution of an instrument in writing signed on behalf of each of the parties hereto by execution of an instrument in writing signed on behalf of Parent, the Surviving Corporation and the Shareholder.

9.5   Extension.   At any time prior to the Closing, Parent, Merger Sub, the Shareholder and the Company may, to the extent legally allowed, extend the time for the performance of any of the obligations of the other party hereto.

9.6    Waiver. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, will be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

9.7    Third Party Beneficiaries. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights, and this Agreement does not confer any such rights, upon any other Person other than any Person entitled to indemnity as described in Article 7.

9.8    No Assignment; Binding Effect. Neither this Agreement nor any right, interest or obligation hereunder may be assigned (by operation of law or otherwise) by any party without the prior written consent of the other parties and any attempt to do so will be void. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

9.9    Headings. The headings and table of contents used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

9.10    Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

9.11    Governing Law. This Agreement will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision. The parties hereto expressly and irrevocably consent and submit to the exclusive jurisdiction of the applicable local, federal, or appellate courts located in New York, New York, in connection with any proceeding arising from or out of this Agreement. Each party agrees that such courts shall be deemed to be a convenient forum in any such legal proceeding, and agrees not to assert (by way of motion, as a defense or otherwise) any claim that such party is not subject personally to the jurisdiction of any such courts, that such legal proceeding has been brought in an inconvenient forum, that the venue of such legal proceeding is improper or, that this Agreement or the subject matter hereof may not be enforced in, or by, any such courts.

9.12    Construction. The parties hereto agree that this Agreement is the product of negotiation between sophisticated parties and individuals, all of whom were represented by

counsel, and each of whom had an opportunity to participate in and did participate in, the drafting of each provision hereof. Accordingly, ambiguities in this Agreement, if any, will not be construed strictly or in favor of or against any party hereto but rather will be given a fair and reasonable construction without regard to the rule of contra proferentum.

9.13 Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

9.14 Specific Performance. The parties hereto agree that irreparable damage would occur in the event that Section 5.2 of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is agreed that the parties will be entitled to an injunction or injunctions to prevent breaches of Section 5.2 of this Agreement and to enforce specifically the terms and provisions thereof in any court having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

## ARTICLE 10
## DEFINITIONS

**10.1 Definitions.**

(a) As used in this Agreement, the following defined terms will have the meanings indicated below:

"$" means United States Dollars unless otherwise indicated.

"**Actions or Proceedings**" means any action, suit, petition, investigation, proceeding, arbitration, litigation or Governmental or Regulatory Authority investigation, audit or other proceeding, whether civil or criminal, in law or in equity, or before any arbitrator or Governmental or Regulatory Authority.

"**Affiliate**" means, as applied to any Person, (a) any other Person directly or indirectly controlling, controlled by or under common control with, that Person, (b) any other Person that owns or controls 10% or more of any class of equity securities of that Person or any of its Affiliates (including any equity securities issuable upon the exercise of any option or convertible security) of that Person or any of its Affiliates, or (c) any director, partner or officer of such Person. For the purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by", and "under common control with") as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Agreement and Plan of Merger, the Schedules the Exhibits, and the certificates and instruments delivered in connection herewith, or incorporated by reference, as the same may be amended or supplemented from time to time in accordance with the terms hereof.

"**Alternative Acquisition**" has the meaning ascribed to it in Section 4.2.

"**Approval**" means any approval, authorization, consent, permit, qualification or registration, or any waiver of any of the foregoing, required to be obtained from or made with, or any notice, statement or other communication required to be filed with or delivered to, any Governmental or Regulatory Authority or any other Person.

"**Assets and Properties**" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned, licensed or leased by such Person, including cash, cash equivalents, Investment Assets, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"**Associate**" means, with respect to any Person, any corporation or other business organization of which such Person is an officer or partner or is the beneficial owner, directly or indirectly, of 10% or more of any class of equity securities, any trust or estate in which such Person has a substantial beneficial interest or as to which such Person serves as a trustee or in a similar capacity and any relative or spouse of such Person, or any relative of such spouse, who has the same home as such Person.

"**Benefit Plan**" means an employee benefit plan maintained by any of Company, Parent or Merger Sub.

"**Books and Records**" means all files, documents, instruments, papers, books and records relating to the Business or Condition of the Company, including financial statements, internal reports, Tax Returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, minute books, stock certificates and books, stock transfer ledgers, Contracts, Licenses, customer lists, computer files and programs (including data processing files and records), retrieval programs, operating data and plans and environmental studies and plans.

"**Business Combination**" means, with respect to any Person, (i) any amalgamation, consolidation or other business combination to which such Person is a party, (ii) any sale or other disposition of any capital stock or other equity interests of such Person, (iii) any tender offer (including a self tender), exchange offer, recapitalization, restructuring, liquidation, dissolution or similar or extraordinary transaction, (iv) any sale, dividend or other disposition of all or a material portion of the Assets and Properties of such Person or (v) the entering into of any agreement or understanding, the granting of any rights or options, or the acquiescence of the Person, with respect to any of the foregoing.

"**Business Day**" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"**Business or Condition of Parent or Merger Sub**" means the business, condition (financial or otherwise), results of operations, prospects or Assets and Properties of Parent or Merger Sub and each of its Subsidiaries, taken as a whole.

"**Business or Condition of the Company**" means the business, condition (financial or otherwise), results of operations, prospects or Assets and Properties of the Company, taken as a whole.

"**Company Indemnified Person(s)**" has the meaning ascribed to it in Section 7.2(b).

"**Certificates**" has the meaning ascribed to it in Section 1.7.

"**Closing**" has the meaning ascribed to it in Section 1.2.

"**Closing Date**" has the meaning ascribed to it in Section 1.2.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Company**" has the meaning ascribed to it in the forepart of this Agreement.

"**Company Common Stock**" has the meaning ascribed to it in the Recitals to this Agreement.

"**Company Financials**" means the audited financial statements (balance sheet and statements of operations and cash flow, including schedules and notes thereto) of the Company as of and for the periods ended December 31, 2005 and December 31, 2006.

"**Company Indemnified Parties**" has the meaning ascribed to it in Section 5.12(a).

"**Company Intellectual Property**" means any Intellectual Property of commercial value that is (i) owned by; (ii) licensed to; or (iii) was developed or created by or for the Company.

"**Confidential Information**" has the meaning ascribed to it in Section 2.15(h).

"**Contract**" means any material contract, including without limitation:

      (i)     any distributor, sales, advertising, agency or manufacturer's representative contract;

      (ii)     any continuing contract for the purchase of materials, supplies, equipment or services involving in the case of any such contract more than $5,000 over the life of the contract;

      (iii)     any contract that expires or may be renewed at the option of any person other than the Company so as to expire more than one year after the date of this Agreement;

      (iv)     any trust indenture, mortgage, promissory note, loan agreement or other contract for the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction of the type required to be capitalized in accordance with generally accepted accounting principles;

(v)    any contract for capital expenditures in excess of $5,000 in the aggregate;

(vi)    any contract limiting the freedom of the Company to engage in any line of business or to compete with any other Person;

(vii)    any contract pursuant to which the Company is a lessor of any machinery, equipment, motor vehicles, office furniture, fixtures or other personal property having an original cost of more than $25,000;

(viii)    any contract with any person with whom the Company does not deal at arm's length; or

(ix)    any agreement of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the obligations, liabilities (whether accrued, absolute, contingent or otherwise) or indebtedness of any other Person.

"**Corporate Flow Downs**" means all expenses incurred by the Parent before or after the Closing Date that are (i) unrelated to the operation of the Company (including but not limited to stock compensation expenses associated with the issuance of stock options) and (ii) are either assigned to the Company by the Parent or paid by the Company on behalf of the Parent.

"**Earn-Out Payments**" has the meaning ascribed to it in Section 1.13.

"**EBITDA**" means, for any specified period, the earnings before interest, taxes, depreciation and amortization of the Company as calculated in accordance with GAAP consistently applied; provided, however, that solely for purposes of calculating EBITDA of the Company under this Agreement, (i) the Company's pre-Closing integration costs, (ii) the Surviving Corporation's post-Closing integration costs, and (iii) any Corporate Flow Downs shall be disregarded and have no effect on the amount so calculated.

"**Effective Date**" has the meaning ascribed to it in Section 1.2.

"**Effective Time**" has the meaning ascribed to it in Section 1.2.

"**Equity Equivalents**" means securities (including Options) which, by their terms, are or may be exercisable, convertible or exchangeable for or into common shares, preferred shares, or other securities of the Company at the election of the holder thereof.

"**Financial Statement Date**" means December 31, 2006.

"**GAAP**" means accounting principles generally accepted in the United States, as in effect from time to time.

"**Governmental or Regulatory Authority**" means any court, tribunal, arbitrator, authority, agency, bureau, board, commission, department, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

"**Income Tax**" means (i) any income, alternative or add-on minimum tax, gross income, gross receipts, franchise, profits, including estimated taxes relating to any of the foregoing, or other similar tax or other like assessment or charge of similar kind whatsoever, excluding any Other Tax, together with any interest and any penalty, addition to tax or additional amount imposed by any Taxing Authority responsible for the imposition of any such Tax (domestic or foreign); or (ii) any liability of a Person for the payment of any taxes, interest, penalty, addition to tax or like additional amount resulting from the application of Treas. Reg. § 1,1502-6.

"**Indebtedness**" of any Person means all obligations of such Person (a) for borrowed money, (b) evidenced by notes, bonds, debentures or similar instruments, (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business), (d) under capital leases and (e) in the nature of guarantees of the obligations described in clauses (a) through (d) above of any other Person.

"**Indemnified Party(ies)**" has the meaning ascribed to it in Section 7.3.

"**Intellectual Property**" means all trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service names and service name rights, patents and patent rights, utility models and utility model rights, copyrights, mask work rights, brand names, trade dress, product designs, product packaging, business and product names, logos, slogans, rights of publicity, trade secrets, inventions (whether patentable or not), invention disclosures, improvements, processes, formulae, industrial models, processes, designs, specifications, technology, methodologies, computer software (including all source code and object code), firmware, development tools, flow charts, annotations, all Web addresses, sites and domain names, all data bases and data collections and all rights therein, any other confidential and proprietary right or information, whether or not subject to statutory registration, and all related technical information, the information set forth in manufacturing, engineering and technical drawings, know-how and all pending applications for and registrations of patents, utility models, trademarks, service marks and copyrights, and the right to sue for past infringement, if any, in connection with any of the foregoing.

"**Investment Assets**" means all debentures, notes and other evidences of Indebtedness, stocks, securities (including rights to purchase and securities convertible into or exchangeable for other securities), interests in joint ventures and general and limited partnerships, mortgage loans and other investment or portfolio assets owned of record or beneficially by the Company.

"**ISO Plans**" has the meaning ascribed to it in Section 1.15.

"**knowledge**" or "**known to**" or any similar phrase means, when used with respect to: (i) any Person who is an individual, the actual knowledge of such Person; (ii) the Company, the actual knowledge of Christopher Watson; and (iii) the Parent or Merger Sub, the actual knowledge of Francis E. Wilde, Tom Wheeler, E. Joseph Vitetta, Jr.

"**Law**" or "**Laws**" means any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in the United States, any foreign country, or any domestic or foreign state, province, county, city or other political subdivision or of any Governmental or Regulatory Authority.

"**Liabilities**" means all Indebtedness, obligations and other liabilities of a Person, whether absolute, accrued, contingent (or based upon any contingency), known or unknown, fixed or otherwise, or whether due or to become due.

"**License**" means any Contract that grants a Person the right to use or otherwise enjoy the benefits of any Intellectual Property (including without limitation any covenants not to sue with respect to any Intellectual Property).

"**Lien**" or "**Liens**" means any mortgage, pledge, assessment, security interest, lease, lien, easement, charge or adverse claim or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing, except for any restrictions on transfer generally arising under any applicable federal, provincial or state securities law.

"**Loss(es)**" means any and all damages, fines, fees, Taxes, penalties, deficiencies, losses and expenses, including interest, reasonable expenses of investigation, court costs, reasonable fees and expenses of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment (such fees and expenses to include all fees and expenses, including fees and expenses of attorneys, incurred in connection with (i) the investigation or defense of any Third Party Claims or (ii) asserting or disputing any rights under this Agreement against any party hereto or otherwise).

"**Material Adverse Change**" means, when used with respect to:

(a)    the Company, any change in the financial condition and operation of the Company that would either individually or, if aggregated with other effects on the financial condition of the Company, result in a deterioration of the balance sheet of the Company by an amount equal or greater than $500,000.00; or

(b)    the Parent, Merger Sub or any of their respective Subsidiaries, any change in the financial condition and operation of the Parent, Merger Sub or any of their respective Subsidiaries that would either individually or, if aggregated with other effects on the financial condition of the Parent, Merger Sub or any of their respective Subsidiaries, result in a deterioration of the consolidated balance sheet of the Parent by an amount equal or greater than $500,000.00; provided, however, that none of the following shall be taken into account in determining whether there has been or would be a "Material Adverse Effect": (i) any adverse change resulting from conditions affecting any nation's economy generally, (ii) any adverse change resulting from or relating to financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (iii) any adverse change in applicable Laws or the interpretation thereof, (iv) any adverse change arising primarily out of, or resulting primarily from, actions taken by any party in connection with (but not in breach of) this Agreement and the transactions contemplated hereunder, or which is primarily attributable to the announcement of this Agreement and the Merger (including any litigation, employee attrition or any loss or postponement of business resulting from termination or modification of any vendor, customer or other business relationships, delay of customer order or otherwise and any corresponding change in the margins, profitability or financial condition of a party), and (v) any adverse change in any Company business that is cured (including by the

payment of money), to the extent curable, by Company before the earlier of (a) the Closing Date, or (b) the date on which this Agreement is terminated pursuant to Article 8 hereof.

"**Material Adverse Effect**" means any event or condition of any character which results in, has resulted in, or could reasonably be expected to result in, a Material Adverse Change on the condition (financial or otherwise), results of operations, assets, liabilities, properties, or business of a Person and its Subsidiaries, taken as a whole, or would prevent or unreasonably delay consummation of the transactions contemplated hereby.

"**Merger**" has the meaning ascribed to it in the Recitals to this Agreement.

"**Merger Consideration**" has the meaning ascribed to it in Section 1.6.

"**Merger Sub**" has the meaning ascribed to it in the forepart of this Agreement.

"**Officer's Certificate**" has the meaning ascribed to it in Sections 6.2 and 6.3 hereof.

"**Option**" with respect to any Person means any security, right, subscription, warrant, option, "phantom" stock right or other Contract that gives the right to (i) purchase or otherwise receive or be issued any shares of capital stock or other equity interests of such Person or any security of any kind convertible into or exchangeable or exercisable for any shares of capital stock or other equity interests of such Person or (ii) receive any benefits or rights similar to any rights enjoyed by or accruing to the holder of shares of capital stock or other equity interests of such Person, including any rights to participate in the equity, income or election of directors or officers of such Person.

"**Order**" means any writ, judgment, decree, injunction or similar order of any Governmental or Regulatory Authority (in each such case whether preliminary or final).

"**Other Tax**" means any sales, use, ad valorem, business license, withholding, payroll, employment, excise, stamp, transfer, recording, occupation, premium, property, value added, custom duty, severance, windfall profit or license tax, governmental fee or other similar assessment or charge, together with any interest and any penalty, addition to tax or additional by any Taxing Authority responsible for the imposition of any such tax (domestic or foreign).

"**Outstanding Company Shares**" means all issued and outstanding shares of Company Common Stock immediately prior to the Effective Time.

"**Parent**" has the meaning ascribed to it in the forepart of this Agreement.

"**Parent Common Stock**" has the meaning ascribed to it in the Recitals to this Agreement.

"**Parent Indemnified Person(s)**" has the meaning ascribed to it in Section 7.2(a).

"**Parent's Shares**" has the meaning ascribed to it in Section 1.6(a)(i).

"**Participating Company Shares**" shall mean any Outstanding Company Shares other than shares of Company Common Stock, if any, cancelled pursuant to Section 1.6(d).

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability company or partnership, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority.

"**Registered Intellectual Property**" will mean all United States, international and foreign: (i) patents, patent applications (including provisional applications); (ii) registered trademarks and service marks, applications to register trademarks, intent-to-use applications, other registrations or applications to trademarks or service marks, or trademarks or service marks in which common law rights are owned or otherwise controlled; (iii) registered copyrights and applications for copyright registration; (iv) any mask work registrations and applications to register mask works; and (v) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued by, filed with, or recorded by, any state, government or other public legal authority.

"**Representatives**" has the meaning ascribed to it in Section 4.2.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Senior Management Team**" means those persons listed in Schedule 1.13(i).

"**Series A Preferred Stock**" means the Preferred Stock, par value $0.001 per share, of Parent designated as "Series A Preferred Stock".

"**Shareholder**" means Christopher Watson, who owns all of the Company's Common Shares.

"**Shrink Wrap License Agreements**" means the granting conditions and terms of use that are presumed to be acknowledged and agreed to by breaking a thermoplastic seal.

"**Subsidiary**" of any specified Person shall mean any corporation fifty percent (50%) or more of the outstanding voting power of which, or any partnership, joint venture, limited liability company or other entity fifty percent (50%) or more of the total equity interest of which, is directly or indirectly owned by such specified Person.

"**Surviving Corporation**" has the meaning ascribed to it in Section 1.1.

"**Tax**" or "**Taxes**" means all present and future taxes, surtaxes, duties, levies, imposts, rates, fees, assessments, withholdings, dues and other charges of any nature imposed by any Governmental or Regulatory Authority (including income, capital (including large corporations), withholding, consumption, sales, use, transfer, goods and services or other value-added, excise, customs, anti-dumping, stumpage, countervail, net worth, stamp, registration, franchise, payroll, employment, health, education, business, school, property, local improvement, development, education development and occupation taxes, surtaxes, duties, levies, imposts, rates, fees, assessments, withholdings, dues and charges) together with all fines, interest, penalties on or in

respect of, or in lieu of or for non-collection of, those taxes, surtaxes, duties, levies, imposts, rates, fees, assessments, withholdings, dues and other charges.

"**Tax Liability**" has the meaning ascribed to it in Section 1.16.

"**Tax Returns**" means any return, report, information return, schedule, certificate, statement or other document (including any related or supporting information) filed or required to be filed with, or, where none is required to be filed with a Taxing Authority, the statement or other document issued by, a Taxing Authority in connection with any Tax.

"**Taxing Authority**" means any governmental agency, board, bureau, body, department or authority of any United States federal, state or local jurisdiction or any foreign jurisdiction, having or purporting to exercise jurisdiction with respect to any Tax.

"**Third Party Claim**" has the meaning ascribed to it in Section 7.3.

"**Third Party Expenses**" has the meaning ascribed to it in Section 5.3.

"**Third Party Intellectual Property Rights**" has the meaning ascribed to it in Section 2.15(c).

"**Transmittal Letter**" has the meaning ascribed to it in Section 1.7.

"**Warranty Obligations**" has the meaning ascribed to it in Section 2.25.

(b)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender, (ii) words using the singular or plural number also include the plural or singular number, respectively, (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement as a whole and not to any particular Article, Section or other subdivision, (iv) the terms "Article" or "Section" or other subdivision refer to the specified Article, Section or other subdivision of the body of this Agreement, (v) the phrases "ordinary course of business" and "ordinary course of business consistent with past practice" refer to the business and practice of the Company, (vi) the words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation," and (vii) when a reference is made in this Agreement to Schedules or Exhibits, such reference will be to a Schedule or an Exhibit, respectively, to this Agreement unless otherwise indicated. The term "party" or "parties" when used herein refer to Parent and Merger Sub, on the one hand, and the Company and the Shareholder, on the other.

[Signatures on Following Page]

IN WITNESS WHEREOF, Parent, Merger Sub, the Shareholder and the Company have caused this Agreement to be signed by their duly authorized representatives, all as of the date first written above.

**BRAVERA, INC.**

By: ______________________
Christopher Watson
President and CEO

**SHEA DEVELOPMENT CORP.**

By: ______________________
Francis E. Wilde
Chairman and CEO

**SHAREHOLDER**

By: ______________________
Christopher Watson

**SHEA DEVELOPMENT ACQUISITION NO. 3 CORP.**

By: ______________________
E. Joseph Vitetta, Jr.
Secretary

# Exhibit B

**SENIOR MANAGEMENT EMPLOYMENT AGREEMENT**

This SENIOR MANAGEMENT EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of July 15, 2007 by and between Bravera, Inc., a Florida corporation (the "Company"), and Christopher Watson, an employee of the Company ("Employee").

RECITAL:

WHEREAS, the Company and Employee desire to enter into a written agreement for the Company's employment of Employee as an employee, on the terms specified herein.

NOW, THEREFORE, in consideration of the mutual promises, agreements and mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

1. Employment. The Company hereby employs Employee, and Employee hereby accepts employment with the Company, upon the terms and subject to the conditions set forth in this Agreement.

2. Position and Duties. Employee shall be employed as the Chief Sales Officer and the Chief Marketing Officer of the Company and shall report directly to the CEO of the Company's parent company, Shea Development Corporation. Employee shall also serve in such additional capacities as may be assigned to him from time to time by the Board of Directors of the Company (the "Board"). Employee shall devote substantially all of his business time, attention, skill and best efforts to the diligent performance of his duties hereunder; provided, however, that while employed by the Company, the Employee shall be able to engage in Outside Activities (hereinafter defined).

3. Term. The term of employment hereunder shall commence as of the date hereof (the "Commencement Date") and shall continue for a period of three (3) years unless sooner terminated in accordance with the provisions of this Agreement (the "Term").

4. Compensation. As compensation for all services rendered by Employee under this Agreement, the Company shall pay Employee compensation as follows:

a. Annual Salary. For all services rendered by Employee during his employment under this Agreement, beginning on the Commencement Date, the Company shall pay Employee an annual salary of $250,000, payable in installments every two (2) weeks in accordance with the Company's standard payroll policies, subject to annual increases of five percent (5%) throughout the Term. Each such increase shall become effective on each annual anniversary date of the Commencement Date, for each year throughout the Term.

b. Taxes and Withholdings. All taxes and governmentally required withholdings, and such additional withholdings as requested by Employee, if any, shall be deducted from any amount paid by the Company to Employee hereunder, all in conformity with applicable laws.

c. Employee is an Officer of the Company and shall receive such Restricted Stock Grants as are granted to all Officers of the Company as determined from time to time by the Board, in such amount as is proportionate to Employee's position as an Officer of the Company.

5. Benefits and Fringes.

a. Benefits. During the Term, Employee shall be eligible to participate in the Company's standard benefits for key executives of the Company in accordance with the Company's policies.

b. Vacation. Employee shall be entitled to four (4) weeks of paid vacation in each calendar year during the Term in accordance with the Company's policies. Employee shall take vacations at such time or times as shall be reasonable as mutually determined by Employee and the parent company's CEO, based upon the Employee's current duties.

c. Other. Employee shall be entitled to receive from the Company the following items and service according to policies and practices established by Company from time to time:

A Corporate Credit Card;

A Cell Phone;

High Speed Internet Service; and

A Laptop Computer

d. Expenses Reimbursement. The Company shall reimburse Employee for all reasonable substantiated expenses incurred by Employee during the Term in the course of performing Employee's duties under this Agreement that are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, including cellular phone charges and mileage related to Company business, subject to the Company's requirements applicable generally with respect to reporting and documentation of such expenses. Expenses shall be reimbursed in accordance with the Company's policies in effect from time to time.

e. Aviation. Employee shall be permitted to use his personal aircraft, a Columbia 400, to travel on Company business and for the use of such aircraft the Company will reimburse Employee Three Hundred Dollars ($300.00) per hour promptly upon Employee's submission of documentation evidencing such expenses. Employee covenants and agrees that he will not use the aircraft for transporting other Company employees on Company business, except that one other Company employee may be carried if that employee is a rated pilot. In order to use the aircraft and obtain the reimbursement provided for herein, Employee shall maintain at least Two Million Five Hundred Thousand Dollars ($2,500,000.00) of aviation insurance coverage on the aircraft.

6. Severance. Upon termination of his employment by the Company, Employee shall be entitled to the following:

a. For "Cause". If the Company terminates Employee's employment with the Company for "Cause" (as hereinafter defined", Employee shall be entitled to receive any compensation and benefits due him through the Termination Date (hereinafter defined).

b. If the Employee's employment with the Company terminates for any other reason, including a termination without "Cause" pursuant to Section 8, upon death or disability pursuant to Section 9, by Employee pursuant to Section 10, by mutual agreement of Employee and the Company pursuant to Section 11or by failure of a successor to continue Employee's employment following a Change in Control (hereinafter defined), then: all earnout and other consideration due Employee under that certain Merger Agreement dated April 26, 2007 and due Employee's affiliate, Intellectus, LLC, under that certain Software License and Assets Purchase Agreement dated as of even date herewith shall be accelerated and paid on the Termination Date. If the Employee's employment with the Company terminates for any reason other than for "Cause" or by mutual agreement of Employee and the Company pursuant to Section 11, including a termination without "Cause" pursuant to Section 8, upon death or disability pursuant to Section 9, by Employee pursuant to Section 10 or by failure of a successor to continue Employee's employment following a Change in Control (hereinafter defined), then Employee shall receive the following: (i) an amount equal to one (1) year of Employee's salary, at the rate in effect as of the date of the notice of termination, (ii) a pro rated portion of any and all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) for the year as well as the quarter in which such termination occurs, (iii) all performance bonuses to which Employee would have been entitled as if Employee had remained employed by Company and achieved all goals and objectives under Section 4(c) and all benefits for a period of six (6) months after the Termination Date, and (iv) the same medical coverage Employee carried while an active employee at Company's expense for a period of six (6) months after the Termination Date, after which Employee will be eligible under Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended ("COBRA") to continue such coverage at his own expense. All of the foregoing shall be payable in accordance with the Company's then effective payroll schedule applicable to Employee. All such payments shall be in full settlement and discharge of the Company's obligation to Employee, and the obligation of the Company to make such payments shall be conditioned upon the execution by Employee of a separation and release agreement in a form satisfactory to the Company and reasonably acceptable to Employee.

7. Termination by Company for Cause. The Company shall have the right at any time to terminate the employment of Employee for Cause effective immediately (such date of termination, the "Termination Date") by delivering to Employee a written notice specifying such Cause. If the Company exercises such right, in full settlement and discharge of the Company's obligation to Employee, the Company shall make a payment to Employee in a lump sum amount equal to all compensation accrued and unpaid as of the Termination Date and the Company's obligation under this Agreement to make any further payments to Employee shall thereupon cease and terminate. This Section 7 in no way limits the Company's right to terminate Employee's employment without cause pursuant to Section 8 of this Agreement. As used herein, the term "Cause" means (i) willful misconduct or gross negligence of Employee in the performance of his duties and services to the Company or any of its subsidiaries; (ii) the

commission of a felony, whether or not committed in the course of performing services for the Company or any of its subsidiaries; (iii) Employee's deliberate dishonesty or breach of fiduciary duty owed to the Company or its subsidiaries; (iv) the commission by Employee in the course of performing any services for the Company or any of its subsidiaries of embezzlement, theft or any other criminal act; (v) the intentional and unauthorized disclosure by Employee of any material trade secret or material confidential information of the Company or any of its subsidiaries; (vi) the intentional commission by Employee of an act which constitutes unfair competition with the Company or any of its subsidiaries, including, without limitation, inducing any employee or customer of the Company to breach a contract with the Company or any of its subsidiaries; (vii) the repeated refusal or failure by Employee to comply with any policies of the Company or any lawful directives of the Board of Directors of the Company; or (viii) the intentional and material breach by Employee of any contract to which the Company and Employee are parties, which material breach remains uncured by Employee for a period of ten (10) days after the Company has given Employee written notice thereof.

8. <u>Termination by Company Without Cause</u>. The Company shall have the right at any time and for any reason or for no reason to terminate the employment of Employee and this Agreement without cause effective immediately upon written notice to Employee

9. <u>Termination Upon Death or Disability</u>. The Company may terminate the employment of Employee and this Agreement effective upon notice to Employee (or his heirs or legal representatives, as the case may be) if Employee either dies or is disabled. As used herein, the term "disabled" shall mean the inability or failure of Employee to perform the essential functions of the position with or without reasonable accommodation as a result of a mental or physical disability for a period of ninety (90) or more days consecutive days during any twelve (12) month period, all as determined in good faith by the Board of Directors of the Company.

10. <u>Termination by Employee</u>.

a. Employee may terminate his employment under this Agreement at any time upon thirty (30) days written notice to the Company, as provided in Section 18(e) of this Agreement. Employee, at the request of the Company and for a period not to exceed such thirty (30) days as requested by the Company, shall continue to render his services in accordance with this Agreement and shall be paid his regular salary and receive his normal benefits up to the Termination Date.

b. Employee may terminate his employment with the Company under this Agreement at any time for Good Reason (as defined below). The term "Good Reason" means Employee's resignation as an Employee of the Company as a result of (i) the Company materially violating any of its obligations to Employee under this Agreement or any other agreement of the Company or its affiliates to which the Employee or any affiliate of Employee (including, Intellectus, LLC) is a party, (ii) a substantial change in Employee's duties to which Employee does not consent, (iii) a decrease in Employee's salary or performance bonuses to which Employee does not consent, or (iv) the Company failing to enter into a new employment agreement with the Employee not later than thirty (30) days prior to the expiration of the Term of this Agreement, on terms and subject to conditions substantially identical to or, with respect to the Employee, more favorable than the terms and conditions set forth in this Agreement. Such

termination for Good Reason shall only be effective if Employee gives the Company a minimum of thirty (30) days' written notice, provided that the occurrence of such violation shall have occurred within the sixty (60) day period preceding such notice and that the Company shall have failed to cure such violation within thirty (30) days after receipt of such notice.

11. <u>Mutual Termination</u>.

If both Company and employee decide mutually to terminate his employment under this Agreement at any time upon thirty (30) days' written notice to the Company, as provided in Section 18(e) of this Agreement. Employee, at the request of the Company and for a period not to exceed such thirty (30) days as requested by the Company, shall continue to render his services in accordance with this Agreement and shall be paid his regular salary and receive his normal benefits for up to two (2) years.

12. <u>Post- Termination Licensing</u>.

If the Employee's employment with the Company terminates pursuant to Sections 8, 10(a), 10(b) or 11, the Company shall grant the Employee a non-exclusive, perpetual code-stream license, in written form that is reasonably satisfactory to the Company, to market, copy, sublicense, modify, customize, translate, adapt, publish, display or create derivative works of the then current versions of the software listed on **<u>Exhibit A</u>**, attached hereto and incorporated herein by this reference (the "Software") and its derivative works, in exchange for a royalty fee of ten percent (10%) of the gross revenues received by Employee (or any affiliate of Employee) from sales of the Software or its derivative works, which shall be paid to the Company on a quarterly basis. The aforementioned license agreement shall provide the Company with the right to review and audit revenues derived by Employee from the Software and its derivative works. Both Parties mutually agree, and the aforementioned license agreement shall provide, that beginning on that date which is the last day of the sixth complete calendar month after the month in which the Termination Date occurs, the Company shall have an option, for a period of ______ (___) years to license back any and all derivative works Employee has created from the Software in exchange for a royalty fee of ten percent (10%) of the gross revenues received by the Company or its affiliates, successors or assigns, from sales of the Software or its derivative works, which shall be paid to the Employee on a quarterly basis. The aforementioned license agreement shall provide the Employee with the right to review and audit revenues derived by the Company (or its affiliates, successors or assigns) from the Software and its derivative works. In either case, the Employee and the Company shall each commit in writing pursuant to the licensing agreements set forth in this section that neither will sell license maintenance or help desk services to the customers of the other party without prior written consent from the other party.

13. <u>Consideration Due Under Other Agreements</u>.

Termination of the Employee's employment by the Company, whether under Sections 7, 8, 9, 10(a) or (b) or 11 of this Agreement and whether separation is voluntary or involuntary and with or without Cause, shall not affect in any respect the consideration (cash and/or common stock or warrants to purchase common stock) due Employee under any agreement with the Company or

any affiliate of the Company, including, without limitation, that certain Merger Agreement dated April 26, 2007 and that certain License and Assets Purchase Agreement of even date with this Agreement.

14.     Covenants of Confidentiality and Non-Competition

     a.     Definitions.   As used in this Agreement, the following terms shall have the meanings specified below:

     "Person" shall mean any individual, corporation, partnership, association, unincorporated organization or other entity.

     "Termination Date" shall mean the last day Employee is employed by Company, whether separation is voluntary or involuntary and with or without Cause.

     "Confidential Information" shall mean information relating to Company's customers, suppliers, distributors, operations, finances, and business that derives value from not being generally known to other Persons, including, but not limited to, technical or non technical data, formulas, patterns, compilations (including compilations of customer information), programs (including computer programs and software), devices, methods, techniques, drawings, processes, financial data (including sales and sales forecasts), and lists of actual or potential customers or suppliers (including identifying information about those customers), without regard to form and whether or not reduced to writing. Confidential Information includes information owned or disclosed to Company by third parties that Company treats as or is obligated to maintain as confidential. Confidential Information subject to this Agreement may include information that is not a trade secret under applicable law, but information not constituting a trade secret shall only be treated as Confidential Information under this Agreement for a one-year period after the Termination Date.

     "Competing Business" shall mean any one or more of the following: (i) the Company's Business, or (ii) any other business in which the Company or its subsidiaries develops an intention, with full knowledge of Employee, to engage on or before the Termination Date and (a) for which the Company or its subsidiaries prepared an existing business plan or study on or before the Termination Date, or (b) for which the Board of Directors of the Company, with the knowledge of Employee, commissioned a business plan or study on or before the Termination Date.

     "Company's Business" Company's Business means the business of offering comprehensive software solutions and strategies internationally through custom programming, consulting, and off-site software development throughout the Territory.

     "Company's Products" means the products of the Company related to the Company's Business.

"Outside Activities" means Employee's pursuit of any work or project that is not competitive with the Company's Business and, in the reasonable judgment of the Employee, is complimentary to the Company's Business, with respect to which, on a weekly basis, during each work week, Employee may devote up to six (6) hours of time that otherwise would be spent by Employee on Company Business and any non-employment time as determined by the Employee.

"Territory" means the United States and, with respect to any country other than the United States, any state or province in which the Company sells products.

b. Confidential Information. Employee shall use his best efforts to protect Confidential Information. At all times, both during and after Employee's employment, Employee will not use, reproduce or disclose any Confidential Information, except as may be necessary in connection with work for Company.

c. Return of Materials. On the Termination Date or for any reason or at any time at Company's request, Employee will deliver promptly to Company all materials, documents, plans, records, notes, or other papers or electronically-stored materials and any copies in Employee's possession or control relating in any way to Company's Business, which at all times shall be the property of Company.

d. Disparagement. Employee shall not at any time make false, misleading or disparaging statements about the Company, including its products, services, management, employees, and customers. The Company shall not make false, misleading or disparaging statements about Employee.

e. Non-Solicitation of Customers. Employee agrees that, for a period of twelve (12) months following the Termination Date, Employee shall not, directly or indirectly, solicit, or assist in the solicitation of, any Person who is, or was during the period of Employee's employment with Company, a customer of Company, including actively sought prospective customers, with whom Employee had personal business contact with during his employment with the Company.

f. Non-Solicitation of Employees, Consultants and Contractors. Employee agrees that, for a period of twelve (12) months following the Termination Date, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, Persons who were employees, consultants or independent contractors of the Company at the time of Employee's employment with Company, or who continue to be employed or engaged by Company, or with whom Employee had personal business contact with during his employment with the Company, to leave their employment or engagement with the Company.

g. Covenant Against Competition. Employee covenants and agrees with the Company that, except on behalf of Company, at any time during the period of his employment with Company and continuing for a period of twelve (12) months after the Termination Date, Employee will not in any manner (other than as an employee of or as a consultant to Company), directly or by assisting others, engage in or perform for any Competing Business in the Territory

any of the specific duties or activities which Employee performed for the Company during his employment. Employee further agrees that during the period of his employment with the Company and continuing for a period of twelve (12) months after the Termination Date, Employee will not own or invest in any Competing Business; except that Employee may own securities of the Company or acquire either directly or indirectly and solely as an investment, up to five percent (5%) of the securities of any Competing Business issuer that is publicly traded on any United States national securities exchange or quoted on the NASDAQ system. During the Term, the Employee may engage in Outside Activities.

Since the Company may be irreparably damaged if the provisions of Sections 14 (e), (f), and (g) are not specifically enforced, in the event of a breach or threatened breach of any of the terms thereof by the Employee, in addition to any other remedy that may be available to it, the Company shall be entitled to injunctive relief without showing that monetary damages will not provide an adequate remedy.

h. Prior Agreements. Employee warrants that Employee is not under any obligation, contractual or otherwise, limiting or affecting Employee's ability or right to render to Company the services for which Employee has been or is being hired. Upon execution of this Agreement, Employee will give Company a copy of any agreement, or notify Company in writing of any agreement if a written agreement is not available, with a prior employer or other Person purporting to limit or affect Employee's ability or right to render to Company the services for which Employee has been or is being hired, to solicit customers or potential customers, or to use any type of information.

i. Future Employment Opportunities. At any time before, and for six (6) months after, the Termination Date, Employee upon accepting any employment with another Person, shall provide Company with the employer's name and a general description of the services Employee will provide.

j. Tolling. In the event the enforceability of any terms of this Section 14 are challenged in a lawsuit instituted during the Term or for a period of twelve (12) months following the Termination Date and Employee is not enjoined from breaching any of the protective covenants, then if a court of competent jurisdiction finds that the challenged protective covenant is enforceable, the time period shall be tolled during the pendency of the lawsuit until the dispute is finally resolved and all periods of appeal have expired.

k. Survival. If any of the covenants contained in this Section 14, or any part hereof, are held to be unenforceable because of the duration of such provision or the area covered thereby, or for any other over-inclusiveness, the Parties agree that the duration of such provision or the area covered thereby or such other over-inclusiveness shall be automatically reduced to the maximum scope permitted by law, and that, in its reduced form, said provision shall then be fully enforceable. If any provision contained in this Section 14 (or any part thereof) is construed to be invalid or unenforceable, the same shall not affect the remainder of the provision or provisions which shall be given full effect without regard to the invalid portions.

l. Outside Activities. The foregoing terms and conditions of this Section 14 shall not be

construed to prohibit Employee from engaging in Outside Activities.

15. Work For Hire Acknowledgment; Assignment. Employee and Company each acknowledge and agree that Employee's Outside Activities do not constitute "work for hire". Employee, however, acknowledges that except for any Outside Activities that may relate to the Company's Business or the Company's Products, which shall be excluded from the definition of "works for hire" hereunder, Employee's work on and contributions to documents, programs, and other expressions in any tangible medium that relate to the Company's Business or the Company's Products (collectively, "Works") beginning on the date of employment and thereafter through the Termination Date are within the scope of Employee's employment and part of Employee's duties and responsibilities. Employee's work on and contributions to the Works will be rendered and made by Employee for, at the instigation of, and under the overall direction of, Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States Copyright Laws. Without limiting this acknowledgment, Employee assigns, grants, and delivers exclusively to Company all rights, titles, and interests in and to any Works, and all copies and versions, including all copyrights and renewals. Employee will execute and deliver to Company, its successors and assigns, any assignments and documents Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual, and worldwide ownership of all rights, titles, and interests of every kind and nature, including all copyrights, in and to the Works, and Employee constitutes and appoints Company as his agent to execute and deliver any such assignments or documents Employee fails or refuses to execute and deliver, this power and agency being coupled with an interest and being irrevocable.

16. Inventions, Ideas and Patents. Employee and Company each acknowledge and agree that the Company intends for the Employee to engage in Outside Activities. Employee acknowledges shall disclose promptly to Company (which shall receive it in confidence), and only to Company, any invention or idea of Employee (developed alone or with others) that relates to the Company's Business or the Company's Products, whether made or conceived during Employee's employment with the Company or pursuant to an Outside Activity.

a. Any such invention or idea relating to the Company's Business or the Company's Products made or conceived during Employee's employment with the Company shall be the property of the Company; provided, however, that following the date which is six (6) months after the Termination Date, upon request from the Employee, the Company shall grant the Employee a non-exclusive, perpetual license, in written form that is reasonably satisfactory to the Company, to market, copy, sublicense, modify, customize, translate, adapt, publish, display or create derivative works with respect thereto, in exchange for a royalty fee of ten percent (10%) of the gross revenues received by Employee (or any affiliate of Employee) from sales generated therefrom, which shall be paid to the Company on a quarterly basis.

b. Any such invention or idea relating to the Company's Business or the Company's Products made or conceived during or pursuant to an Outside Activity shall be the property of the Employee; provided, however, that upon request from the Company, the Employee shall grant the Company a non-exclusive, perpetual license, in written form that is reasonably satisfactory to the Company, to market, copy, sublicense, modify, customize, translate, adapt,

publish, display or create derivative works with respect thereto, in exchange for a royalty fee of ten percent (10%) of the gross revenues received by the Company (or any affiliate of the Company) from sales generated therefrom, which shall be paid to the Employee on a quarterly basis.

17. Both Parties mutually agree, and the aforementioned license agreement shall provide, that beginning on that date which is the last day of the sixth complete calendar month after the month in which the Termination Date occurs, the Company shall have an option, for a period of 3 years to license back any and all derivative works Employee has created from the Software in exchange for a royalty fee of ten percent (10%) of the gross revenues received by the Company or its affiliates, successors or assigns, from sales of the Software or its derivative works, which shall be paid to the Employee on a quarterly basis

18. Representations and Disclosures. Employee represents and warrants that he has the legal capacity to execute and deliver this Agreement, and that the execution, delivery and performance of this Agreement by the Employee will not violate any agreement made by the Employee or to which the Employee is subject. Employee represents and warrants that there are no inventions or ideas of which Employee claims ownership as of the date of this Agreement other than the inventions or ideas described on **Appendix 1**. If no inventions or ideas are listed on **Appendix 1**, Employee represents that there are no such inventions or ideas at the time of signing this Agreement. Employee represents and warrants that performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Employee in confidence or in trust prior to the execution of this Agreement. Employee has not entered into, and Employee agrees not to enter into, any agreement either written or oral that conflicts with Employee's employment or Employee's performance under this Agreement. Except as described on **Appendix 1**, Employee is not bound by any agreement regarding confidentiality or ownership of intellectual property with any person or entity other than the Company. Employee agrees not to disclose to the Company or use on its behalf any confidential information belonging to others that is known to have been improperly acquired or acquired from a Person known to be subject to a duty not to disclose it.

19. Continuing Employment Upon a Change of Control. Upon the occurrence of a Change of Control (as defined below), the Company covenants that it shall cause the acquiring company to offer Employee an employment agreement containing (i) an employment period of not less than one (1) year, (ii) duties and responsibilities consistent with Employee's then current position in the Company and (iii) such other terms consistent with and comparable to the terms set forth in this Agreement, as and if amended, in all material respects, including without limitation, compensation and benefits. Such employment agreement will not require relocation unless mutually agreed upon by the Company and Employee. If the acquiring company fails to offer Employee an employment agreement containing such terms, then Employee shall be entitled to a lump sum severance in an amount not less than twice Employee's aggregate compensation (including salary, bonuses, and commission, whether or not paid) for the prior twelve (12) month period (or if Employee has not been employed by the Company for twelve (12) months, then sums earned by Employee during such period shall be extrapolated to cover a twelve (12) month period), plus the continuation of all benefits for a period of twelve (12) months after the Termination Date. If the acquiring company terminates Employee's employment or if Employee

terminates employment for Good Reason within one (1) year after the Change of Control, then Employee shall be entitled to a lump sum severance in an amount equal to the lump sum severance Employee would have received in the prior sentence, plus the continuation of all benefits for a period of twelve (12) months after the Termination Date. The provisions of this Section 19 shall be binding upon and enforceable against all successors and assigns of the Company. A "Change of Control" shall be deemed to have occurred after (a) the sale of all or substantially all of the assets of the Company, whether in a single transaction or in a series of transactions occurring within any single twelve (12) month period, (b) the sale by one or more shareholders of the Company, in a single transaction or in a series of transactions occurring within any single twelve (12) month period, of more than fifty percent (50%) of the issued and outstanding capital stock of the Company to any individual, corporation, trust or other entity; or (c) a merger, reorganization, exchange of stock or other securities, or other business combination between the Company and another individual, corporation, trust or other entity comprised of a single transaction or a series of transactions occurring within any single twelve (12) month period, resulting in any individual, corporation, trust or other entity owning more than fifty percent (50%) of the issued and outstanding capital stock of the Company.

20. Interpretation; Severability. Rights and restrictions in this Agreement may be exercised and are applicable only to the extent they do not violate any applicable laws, and are intended to be limited to the extent necessary so they will not render this Agreement illegal, invalid or unenforceable. If any term shall be held illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. This Agreement does not in any way limit Company's rights under the laws of agency, fiduciary obligation, unfair competition, trade secret, copyright, patent, trademark or any other applicable law(s), or under any other agreement or instrument, all of which are in addition to rights under this Agreement. The existence of a claim by Employee, whether predicated on this Agreement or otherwise, shall not constitute a defense to Company's enforcement of this Agreement.

21. Remedies for Breach. Notwithstanding any other provisions set forth herein, Employee understands and agrees that any breach of this Agreement may cause the Company great and irreparable harm and that it would be difficult or impossible to establish the full monetary value of such damage. Consequently:

Employee covenants and agrees that any breach by Employee of the Agreement during Employee's employment with the Company shall be grounds for disciplinary actions up to and including dismissal of Employee for Cause.

Employee further covenants and agrees that in the event of any Employee breach of this Agreement, Employee consents to the entry of appropriate preliminary and permanent injunctions in a court of appropriate jurisdiction, without the posting of a bond or other security, in addition to whatever other remedies the Company may have. Injunctive relief is in addition to any other available remedy, including damages.

Employee agrees that Employee will indemnify and hold the Company harmless from any loss, cost, damage or expense (including attorneys' fees) incurred by the Company arising out of Employee's breach of any portion of this Agreement, whether or not such breach results in litigation or other formal proceedings.

22. Miscellaneous.

a. Counterparts. This Agreement may be executed in several counterparts each of which is an original. This Agreement and any counterpart so executed shall be deemed to be one and the same instrument. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

b. Contents of Agreement; Parties In Interest, Etc. This Agreement sets forth the entire understanding of the Parties. Any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and superseded by this Agreement. If there are any inconsistencies between the terms of this Agreement and the Company's Employee Handbook, this Agreement shall control. All representations, warranties, covenants, terms, conditions and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, legal representatives, successors and permitted assigns of the Company and Employee. Neither this Agreement nor any rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the other Party hereto.

c. GOVERNING LAW. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS. Each Party irrevocably (a) consents to the exclusive jurisdiction and venue of the federal and state courts located in State of Florida, in any action arising under or relating to this Agreement, and (b) waives any jurisdictional defenses (including personal jurisdiction and venue) to any such action.

d. Section Headings. The section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

e. Notices. All notices, requests, demands and other communications which are required or permitted hereunder shall be sufficient if given in writing and delivered personally or by registered or certified mail, postage prepaid, by a nationally recognized overnight courier service, or by facsimile transmission (with a copy simultaneously sent by registered or certified mail, postage prepaid), as follows (or to such other address as shall be set forth in a notice given in the same manner):

(1) If to the Company, to:
Bravera, Inc.
c/o Shea Development Corp.
1351 Dividend Drive, Suite G
Marietta, GA 30067
Attn: Francis E. Wilde

with a copy to:
Dunnington, Bartholow and Miller
477 Madison Avenue
12th Floor

New York, NY 10022
Attention: Robert T. Lincoln, Esq.

(2) If to Employee, to:
Christopher Watson
4446-1A Hendricks Avenue, Suite 246
Jacksonville, Fla. 32207

All such notices shall be deemed to have been received on the date of delivery.

f. Location of Employment. The location of employment of Employee shall be the State of Florida. This Agreement will not require relocation unless mutually agreed upon by the Company and Employee.

g. Modification and Waiver. Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof, and this Agreement may be modified or amended at any time by the Company and Employee. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by each of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof nor shall such waiver constitute a continuing waiver.

h. Arbitration. Any claim or controversy arising out of or relating to this Agreement or any breach thereof shall be settled by arbitration. The venue for any such arbitration shall be Orlando, Florida, or such other location as the parties may mutually agree. Except as expressly set forth herein, all arbitration proceedings under this Section 22(h) shall be undertaken in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in force. Only individuals who are (i) lawyers engaged full-time in the practice of law and (ii) on the AAA register of arbitrators shall be selected as an arbitrator. There shall be one arbitrator who shall be chosen in accordance with the rules of the AAA. Within twenty (20) days of the conclusion of the arbitration hearing, the arbitrator shall prepare written findings of fact and conclusions of law. Judgment on the written award may be entered and enforced in any court of competent jurisdiction. It is mutually agreed that the written decision of the arbitrator shall be valid, binding, final and non-appealable; provided however, that the parties hereto agree that the arbitrator shall not be empowered to award punitive damages against any party to such arbitration. The arbitrator shall require the non-prevailing party to pay the arbitrator's full fees and expenses or, if in the arbitrator's opinion there is no prevailing party, the arbitrator's fees and expenses will be borne equally by the parties thereto. In the event action is brought to enforce the provisions of this Agreement pursuant to this Section 22(h), the non-prevailing parties shall be required to pay the reasonable attorneys' fees and expenses of the prevailing parties, except that if in the opinion of the court or arbitrator deciding such action there is no prevailing party, each party shall pay its own attorneys' fees and expenses.

**[Signatures on Following Page]**

**I HAVE READ THIS AGREEMENT CAREFULLY. I ACKNOWLEDGE THAT THIS AGREEMENT DESCRIBES THE BASIC LEGAL AND ETHICAL RESPONSIBILITIES THAT I AM REQUIRED TO OBSERVE AS AN EMPLOYEE EXPOSED TO HIGHLY SENSITIVE TECHNOLOGY AND STRATEGIC INFORMATION.**

**IN WITNESS WHEREOF**, the parties hereto have executed or have caused this Agreement to be duly executed as of the date first above written.

EMPLOYEE

Christopher Watson

Name: Christopher Watson

COMPANY

Bravera, Inc.

By:
Name: E. Joseph Vitetta, Jr.
Title: Secretary

AGREED TO & ACCEPTED:

Shea Development Corp.

By: ____________________
Name: Francis E. Wilde
Title: Chairman and CEO

**EXHIBIT A**
**Software**


"Bravera Process Director"
"Bravera Content Director"
"Bravera RAPID Workplace" which includes the prior versions branded as "Bravera RAPID"

**APPENDIX 1**

**List of Agreements regarding confidentiality or ownership of intellectual property between Employee and any person or entity other than the Company**

# Exhibit C

**Execution copy**

# SOFTWARE LICENSE AND ASSET PURCHASE AGREEMENT

THIS SOFTWARE LICENSE AND ASSET PURCHASE AGREEMENT ("Agreement") is entered into as of the 16th day of July, 2007 by and between Intellectus, LLC, a Florida limited liability company with its principal offices located at 300 Bucksley Lane, #305, Daniel Island, South Carolina 29492 ("Owner") and IP Holding of Nevada Corp., a Nevada corporation with its principal offices located at 1351 Dividend Drive, Suite G, Marietta, Georgia 30067 ("Licensee"), a subsidiary of Shea Development Corp. ("Shea").

**WITNESSETH:**

**WHEREAS,** Owner is in the business of designing, developing, manufacturing and licensing computer software ("Software"); and

**WHEREAS,** Owner has rights in certain Software identified as "Bravera Process Director", "Bravera Content Director" and "Bravera RAPID Workplace" (collectively, the "Software");

**WHEREAS,** the Owner has taken what Owner believes are reasonable steps to register and protect the Software and certain other intellectual property identified more fully in **Exhibit A** attached hereto and incorporated herein by this reference (collectively, the "Intellectual Property Assets"); and

**WHEREAS,** Licensee desires to obtain, effective as of the date of this Agreement, an exclusive, royalty free, worldwide license from the Owner with respect to the Intellectual Property Assets and subsequently to acquire all of Owner's right, title and interest to the Intellectual Property Assets in accordance with the terms and conditions identified more fully in **Exhibit B** and **Exhibit C**.

**NOW, THEREFORE** in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

## Article I. Definitions

For purposes of this Agreement, the following definitions apply:

"Agreement" shall mean this Software License and Asset Purchase Agreement.

"Confidential Information" shall mean the Source Code and the source code to the Derivative Works.

"Customer" shall mean the end users of the Software.

"Derivative Works" shall include any work, revision, elaboration, enhancement, modification, translation, abridgement, condensation or other expansion that is based upon the Software or a portion thereof. For purposes of this Agreement, Derivative Works shall not include works that remain separable from, or merely link to the interfaces of the work and Derivative Works thereof.

"Domain" shall mean the Owner's domain names listed on **Exhibit A**.

"Effective Date" shall mean July 16, 2007.

"Intellectual Property Assets" shall have the meaning set forth in the recitals.

"License" shall have the meaning set forth in Article II, Section 1.

"License Term" shall mean the period commencing as of the Effective Date and ending on the earlier of July 15, 2008, or the date on which the Owner has received the initial $1,000,000.00 in consideration due the Owner pursuant to the terms of this Agreement, or the date on which this Agreement is terminated for any reason.

"Marks" shall mean those certain trademarks listed on **Exhibit A**.

"Material Breach" shall mean a breach of an essential and inducing feature of the Agreement.

"Merger Agreement" shall mean the Agreement and Plan of Merger by and among Shea Development Corp., Shea Development Acquisition No. 3 Corp., Bravera, Inc. and Christopher Watson, dated April 26, 2007.

"Purchase Price" shall have the meaning set forth in Article III, Section 4.

"Software" shall have the meaning set forth in the recitals.

"Source Code" shall mean the computer programming code of the Software or any computer instructions necessary to compile the underlying Software, whether in print, magnetic or some other form.

## Article II. License and Software Rights

### 1. GRANT OF LICENSE

Subject to the terms and conditions of this Agreement, Owner hereby grants to Licensee and Licensee hereby accepts a royalty-free, worldwide and exclusive right and license ("License") to use, market, copy, sublicense (subject to the sublicensing restrictions provided herein), modify, customize, translate, adapt, publish, display or create Derivative Works of the Software during the License Term. During the License Term, Licensee may sub-license the Software to Bravera, Inc. or any other parent, subsidiary, or affiliated company of Licensee; provided, however, any such sublicense shall be for a term that will extend no longer than the License Term.

### 2. PROTECTION OF CONFIDENTIAL INFORMATION

Notwithstanding anything in this Agreement to the contrary, the parties recognize that throughout the License Term, the Software Source Code is Owner's Confidential Information, to be protected by Licensee from unauthorized disclosure with the greater of a commercially reasonable degree of care or the same degree of care as Licensee uses for the Customer's own confidential information. Licensee may not resell, rent, lease or distribute the Source Code alone, it shall be distributed only as a compiled component of an application.

### 3. DERIVATIVE WORKS

In the event that Owner creates any Derivative Works during the License Term, the original portion of such Derivative Works shall, upon creation, be jointly owned by Owner and Licensee as joint authors,

C.W

and all right, title and interest in the original portion of such Derivative Works shall be held by Owner and Licensee as joint authors; provided that (i) upon the earlier to occur of July 15, 2008 or Owner's receipt of the initial $1,000,000.00 in consideration due the Owner pursuant to the terms of this Agreement, Owner shall transfer all of its rights in such Derivative Works to Licensee, and (ii) in the event that the License Term ends prior to July 15, 2008 for any reason otherwise provided herein Owner shall convey, effective immediately upon such termination, all of its right, title and interest in and to the Derivative Works to Licensee.

4. **LICENSE TERM**

Upon the conclusion of the License Term prior to July 15, 2008 for any reason other than Owner having received the initial $1,000,000.00 in consideration due the Owner pursuant to the terms of this Agreement, (i) all rights granted to Licensee in the Intellectual Property Assets hereunder shall immediately terminate and revert to Owner; (ii) Licensee shall immediately return to Owner all embodiments of any of the Intellectual Property Assets in Licensee's or Licensee's licensees' or subsidiaries' presence, including such embodiments present on computer systems, or certify the destruction of such embodiments; and (iii) Licensee shall immediately amend any Licensee Filings to indicate that Licensee has no interest in the Intellectual Property Assets.

5. **TERMINATION**

In the event Licensee shall materially breach and upon thirty (30) days' written notice, shall fail to cure such breach of the terms of this Agreement, including, without limitation, the terms set forth in **Exhibit B** and **Exhibit C**, upon a further thirty (30) days' written notice from Owner, the License Term shall terminate, Licensee's license to use the Intellectual Property shall terminate and Licensee shall transfer to Owner all right, title and interest held by Licensee or any Licensee subsidiary or affiliate in the Derivative Works.

In the event Owner shall breach the terms of this Agreement, including, without limitation, the terms set forth in **Exhibit B** and **Exhibit C**, upon written notice from Licensee the License Term shall terminate, Licensee's license to use the Intellectual Property shall terminate and Licensee shall convey to Owner all right, title and interest held by Licensee or any Licensee subsidiary or affiliate in the Derivative Works.

Any cause of action or claim of Licensee or Owner, accrued or to accrue because of any breach or default by the other party of any provision of this Agreement, shall survive the termination or expiration of this Agreement for a period of two (2) years.

**Article III. Purchase of Intellectual Property Assets**

1. **TRANSFER OF TITLE TO INTELLECTUAL PROPERTY ASSETS**

Upon receipt of the payments set forth in Section 1.1 of **Exhibit C**, attached hereto and incorporated herein by reference, Owner shall convey title to the Marks, Domains and logos to Licensee. It is the intent of the Owner and Licensee that Licensee will receive a full, unimpeded title and sole and exclusive ownership of the Intellectual Property Assets in accordance with and upon satisfaction of the terms and conditions set forth more fully in **Exhibit B** and **Exhibit C**.

**2. THE CLOSING**

Subject to the terms and conditions of this Agreement, the transactions that are contemplated hereunder, will take place at the offices of Dunnington, Bartholow & Miller LLP located at 477 Madison Avenue, New York, NY 10022 or at such other place as the parties mutually agree, at 10:00 a.m. local time on July 16, 2007, or such other date as the parties hereto mutually agree upon in writing (the "Closing").

**3. ITEMS TO BE DELIVERED AT CLOSING**

At the Closing and subject to the terms and conditions set forth herein:

Owner shall deliver to Licensee an editable copy of each source code for the Software together with all backup documentation. In addition, Owner shall deliver, or cause to be delivered, to Licensee, subject to the terms (including, but not limited to, installation and usage instructions) herein, control of the Intellectual Property Assets by delivering to Licensee possession of any necessary instruments and documents and taking all such action as may be required to permit Licensee to use the Intellectual Property Assets, subject to the terms of such license, such that thereafter during the License Term, Licensee will be able to maintain and further develop the Software and will be able to deliver to customers and provide support for customers using the version of the Software as it exists on the date hereof, and as modified during the License Term.

Licensee should receive the latest production version of the code (source code) and application (object code) as well as any work in process enhancements of the software that is in testing or development stages or have been envisioned and in documentation (use cases, object models, whitepapers, etc.) form only. Also Licensee should receive any derivative software and IP products that are currently held by Owner.

In addition to the backup documentation for the software application, Licensee will receive all Design and Analysis documents for the future versions of the software as well as any training and user manuals that have been developed for deploying the software.

Owner shall deliver to Licensee:

A. A copy of all Owner company resolutions adopted by the Members of Owner relative to the transactions contemplated by this Agreement, certified by a Member of Owner to be complete and correct and not to have been amended or rescinded.

B. A certificate of a Member or Manager of Owner, dated the Closing Date, certifying that (1) Owner has performed and complied with all agreements and conditions required by this Agreement to be performed and complied with by Owner prior to or at the Closing (except to the extent waived by Licensee); and (2) the representations and warranties of Owner contained in this Agreement and the information contained in the Exhibits hereto are true and correct to the best knowledge of the-Owner on the Closing Date; and (3) there has been no material adverse change in the business, operations, assets, properties, prospects or conditions (financial or otherwise) of Owner between the date hereof and on the Closing Date.

**4. CONSIDERATION FOR ACQUIRED ASSETS**

The consideration payable by Licensee to the Owner for the Intellectual Property Assets shall be as set forth and on the dates as set forth in **Exhibit C** (the "Purchase Price"). Title to the Intellectual Property Assets shall be conveyed to Licensee as provided in **Exhibit B**. Accordingly, as security for payment in full

CW

of the payment amounts due Owner hereunder, Licensee hereby grants to Owner a continuing security interest ("Security Interest") in the Marks and Software, and hereby authorizes Owner to file a UCC-1 financing statement to memorialize such Security Interest in favor of Owner as well as such other documents, filings or instruments of security that Owner may deem necessary to enable Owner to secure, perfect and/or protect a security interest in and to the Marks and the Software.

**5. ASSUMPTIONS OF OBLIGATIONS**

Except as otherwise provided for herein, Licensee does not assume and shall not be liable for any obligations, commitments, or liabilities of Owner that now exist or may arise in the future with respect to the following types of matters occurring on or prior to the Closing:

A. To any supplier of merchandise that does not relate exclusively to the Intellectual Property Assets or relate exclusively to the Intellectual Property Assets and has been received and accepted by the Owner as of the date hereof;

B. Subject to other provisions in this Agreement, to any employee or former employee of the Owner or any of such employee's beneficiaries, heirs, or assigns arising out of such employee's or former employee's employment by the Owner, out of the transactions contemplated by this Agreement, or by virtue of any collective bargaining relationship or agreement or pursuant to any labor relations law;

C. With respect to any income, profits, property, excise, or similar taxes relating to products sold by the Owner prior to the date of the Closing; or

D. Under any statute, rule, regulation, code, or by-law including, but not limited to, workers' compensation, health, safety, labor, discrimination, and environmental laws, rules, regulations, codes, and by-laws for actions of the Owner occurring prior to the Closing.

**Article IV. General Provisions**

**1. REPRESENTATIONS, WARRANTIES, AND COVENANTS OF Licensee**

Licensee hereby represents, warrants, and covenants as follows:

A. Organization and Standing. Licensee is duly incorporated and validly existing in good standing under the laws of Nevada.

B. Corporate Authority. Licensee has full power and authority to enter into this Agreement, and to carry out the terms and provisions hereof applicable to it and, when executed and delivered, this Agreement shall constitute a valid and binding agreement of Licensee, enforceable against Licensee in accordance with its terms.

C. Corporate Action. The Board of Directors of Licensee has taken or will have taken by the Closing all corporate action required by law, its Articles of Incorporation and By-laws, or otherwise, to authorize the execution, delivery, and performance of this Agreement and all documents, agreements, and instruments delivered pursuant to this Agreement.

**2. REPRESENTATIONS, WARRANTIES, AND COVENANTS OF OWNER**

Owner hereby represents, warrants, and covenants as follows:

CW

A. Organization and Standing. Owner is a limited liability company duly incorporated and validly existing in good standing under the laws of Florida with full power and authority to conduct its business as it is presently conducting the same on the date of Closing.

B. Authority. Owner has full power and authority to enter into this Agreement, and to carry out the terms and provisions hereof applicable to it and, when executed and delivered, this Agreement shall constitute a valid and binding agreement of Owner, enforceable against Owner in accordance with its terms.

C. Company Action. The Manager of Owner has taken or will have taken by the Closing all action required by law or its Articles of Organization and Operating Agreement, to authorize the execution, delivery, and performance of this Agreement and all documents, agreements and instruments delivered pursuant to this Agreement.

D. Compliance With Agreements and Laws. The execution, delivery, and performance of this Agreement by Owner and the consummation by Owner of the transactions herein contemplated will not result in a material breach or violation of any of the terms and provisions of any statute, indenture, mortgage, deed of trust, loan agreement, note, subscription agreement, or instrument to which Owner is a party, or by which it or its property is bound, or any judgment, decree, order, rule, or regulation of any court or governmental agency or body having jurisdiction over Owner or over its properties. No consent, approval, authorization, or order of any court or governmental agency or body is required for the consummation by Owner of the transactions on its part herein contemplated.

E. Marketable Title. Owner has good title to all the Intellectual Property Assets, subject to no security interest, mortgage, pledge, lien or other encumbrance and has the authority and right to enter into the Agreement and to license and eventually transfer the legal and beneficial title and ownership in the Intellectual Property Assets to Licensee free and clear of any liens, charges, encumbrances, and any other rights of others except as set forth in this Agreement.

F. Litigation. There is no known or threatened litigation, arbitration, investigation, governmental action, or other proceeding pending against the Owner that would adversely affect the sale of the Software or the other Intellectual Property Assets, except as set forth on **Exhibit D**, nor does Owner know of any basis for any such litigation, arbitration, investigation, governmental action, or proceeding, nor is Owner contemplating the institution of any such litigation, arbitration, investigation, or proceeding. Owner is not a party to any judgment, order, writ, injunction, decree, or award of any court, arbitrator, or governmental or regulatory official, body, or authority with respect or relating to, or arising out of the development and production of the Software.

G. Third-Party Options. There are no existing agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Intellectual Property Assets or any interest therein except as set for herein.

**3. INDEMNIFICATION AND POST-CLOSING COVENANTS**

A. The representations, warranties, and covenants of the parties set forth herein shall survive the Closing for a period of the lesser of eighteen (18) months or the duration of the Earn Out Payments (as defined in the Merger Agreement). Neither party has made any representation, warranty, or covenant to the other, express or implied, written or oral, except as set forth herein or as set forth in the relevant sections of the Merger Agreement as those relevant sections specifically relate to the Intellectual Property Assets, or as

CW

set forth in a written certificate, instrument, or other document delivered pursuant to this Agreement. Either party may assert any claim for breach of warranty, misrepresentation, or omission to the other, which has not been expressly waived in writing, within the lesser of eighteen (18) months or the duration of the Earn Out Payments following the Closing; and any such claim not made or asserted within said period shall be barred. In no event shall any party be liable for any breach of warranty, misrepresentation, or omission where the facts underlying such breach, misrepresentation, or omission were specifically known to the other party on or prior to the Closing.

B. Each party agrees with respect to representations, warranties, and covenants in this Agreement or any other written certificate, instrument, or other document delivered or made available to the other party pursuant to this Agreement, to indemnify, defend, and hold the other party harmless against all actual liability, loss, or damage, including, but not limited to, all obligations and liabilities in respect of suits, proceedings, demands, judgments, expenses, and costs, together with all reasonable costs and expenses related thereto, including reasonable counsel and accounting fees and expenses, resulting from any knowing breach of warranty, knowing misrepresentation, knowing omission, or knowing failure to perform any covenant contained in this Agreement; provided, however, that in no event shall a party's obligation to indemnify hereunder exceed the amount of the other party's actual out-of-pocket losses; and, in such event, each such party shall be required to pay all of such liabilities, damages, losses, costs, claims, and expenses; provided, however, that Owner's responsibility for indemnification of Licensee shall not exceed, in the aggregate, the monetary (as opposed to Warrants) portion of the Purchase Price set forth in **Exhibit C** actually received by Owner.

C. Licensee agrees to cooperate with and make available to Owner after the Closing all records and documents which relate to all periods prior to the Closing to permit Owner to prepare any requisite tax returns.

**4. COVENANT NOT TO COMPETE**

Provided that neither party is in breach of its obligations under this Agreement, the Merger Agreement or that certain Senior Management Employment Agreement dated as of July 15, 2007, then provided that Licensee is performing its obligations hereunder and there under, Owner agrees that for a period of two (2) years from the Closing Date of this Agreement, Owner will not, directly or indirectly, own, manage, operate, finance, join, control, or participate in the ownership, management, operation, financing, or control of, or be connected as a partner, principal, agent, representative, consultant, or otherwise with, or use or permit its name to be used in connection with, any business or enterprise anywhere in the United States engaged in the business of developing software or hardware relating to or based on the subject matter of the Software and the industries to which it is marketed, licensed or sold. The parties agree and acknowledge that this Section does not proscribe or limit the Owner from developing or producing computer software or hardware unrelated to or not based on the Software.

B. In the event that the provisions of this section should ever be deemed to exceed the time, geographic, product or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product, or other limitations permitted by applicable law.

C. Owner specifically acknowledges and agrees that the foregoing restrictions are reasonable and necessary to protect the legitimate interests of Licensee, that Licensee would not have entered into this Agreement in the absence of such restrictions, that any violation of such restrictions will result in irreparable injury to Licensee, that the remedy at law for any breach of the foregoing restrictions will be inadequate,

QW

and that, in the event of any such breach, Licensee, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages. Owner specifically acknowledges and agrees that Licensee shall be entitled to an equitable accounting of all earnings, profits, and other benefits arising from any such breach, and further agrees to pay the reasonable legal fees and expenses incurred by Licensee or any successor or assign thereof in enforcing the restrictions contained in this section.

D. In the event the enforceability of any terms of this section are challenged in a lawsuit instituted during the protective term of the Covenant Not To Compete provided for in this section and the Owner or its affiliates are not enjoined from breaching any of the protective covenants, then if a court of competent jurisdiction finds that the challenged protective covenant is enforceable, the time period shall be tolled during the pendency of the lawsuit until the dispute is finally resolved and all periods of appeal have expired.

## 5. LIABILITY AND WARRANTY

A. Owner expressly retains (i) all liability and responsibility, including product liability and warranty obligation, whether express or implied, with respect to the Software that was shipped or sold in place or for services rendered by Owner or any predecessor in interest on or before the Closing for a period of the lesser of thirty-six (36) months or the duration of the Earn Out Payments and (ii) all liability and responsibility for any claims that the Software contains allegedly infringing systems or materials. Owner, in such regard, agrees to defend, indemnify, and hold Licensee harmless from any and all such claims, causes of action, debts, or actions (including, but not limited to, product liability claims) provided, however, that Licensee shall promptly notify Owner in writing as to the exact nature of the claim and Owner shall assume responsibility and liability for the defense thereof using counsel of its choice and Owner shall have full control of the defense thereof. Owner shall not be liable where Licensee is guilty of negligence or in the event that Licensee fails to give such written notice within ten (10) days after Licensee's receipt of such claim. In no event shall Owner be liable for any indirect, special, consequential or other damages, whether grounded in tort (including negligence), strict liability, contract or otherwise. Licensee agrees to fully cooperate with and support Owner in defense of any such action.

B. Licensee expressly assumes all liability and responsibility, including product liability and warranty obligations, whether express or implied, with respect to any product in inventory at the time of Closing or in the Software which was shipped, sold in place or manufactured or for services rendered by Licensee or any successor in interest after Closing. Licensee agrees to defend, indemnify, and hold Owner harmless from any and all such claims, causes of action, debts, or actions (including, but not limited to, products liability claims). Owner agrees to fully cooperate with and support Licensee in the defense of any such action.

## 6. FURTHER ASSURANCES

Each party agrees to, from time to time after the Closing, upon reasonable request, without undue delay or any additional charge, to execute, acknowledge, and deliver such other documents and instruments to the other party and will take such other proper actions and deliver such other documents, certifications, and further assurances as the party may reasonably request in order to do all acts and things required to effectively carry out this Agreement. After the Closing, the parties shall, upon reasonable request, without undue delay or any additional charge, cooperate with each other with respect to any reasonable transitional matters, and shall be available by telephone on a reasonable number of occasions and at reasonable times to respond to inquiries about the Assets or any other subjects related to this Agreement.

CW

7. **COSTS AND EXPENSES**

Each of the parties hereto shall pay their respective legal and accounting costs and expenses incurred in connection with the preparation, execution, and delivery of this Agreement and all documents and instruments executed pursuant hereto and any other costs and expenses whatsoever and howsoever incurred.

8. **PUBLIC ANNOUNCEMENTS AND PRESS RELEASES**

No public announcements or press releases concerning the sale and purchase of the Software shall be made by either party or their designees without the prior written consent of the other party unless as required by the U.S. Securities and Exchange Commission.

9. **JURISDICTION/DISPUTES**

This Agreement will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision. The parties hereto expressly and irrevocably consent and submit to the exclusive jurisdiction of the applicable local, federal, or appellate courts located in New York, New York, in connection with any proceeding arising from or out of this Agreement. Each party agrees that such courts shall be deemed to be a convenient forum in any such legal proceeding, and agrees not to assert (by way of motion, as a defense or otherwise) any claim that such party is not subject personally to the jurisdiction of any such courts, that such legal proceeding has been brought in an inconvenient forum, that the venue of such legal proceeding is improper or, that this Agreement or the subject matter hereof may not be enforced in, or by, any such courts.

10. **AGREEMENT BINDING ON SUCCESSORS**

This Agreement shall be binding on and shall inure to the benefit of the parties hereto, and their successors, and assigns.

11. **NOTICES**

A. Any notice required to be given under this Agreement shall be in writing and delivered personally to the other designated party at the above stated address by reputable overnight courier such as FedEx or postal express mail.

B. Either party may change the address to which notice or payment is to be sent by written notice to the other party pursuant to the provisions of this paragraph.

12. **WAIVER**

No waiver by either party of any default shall be deemed as a waiver of any prior or subsequent default of the same or other provisions of this Agreement.

13. **SEVERABILITY**

If any provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other provision and such invalid provision shall be deemed to be severed from the Agreement.

CW

**14. ASSIGNABILITY**

This Agreement and the rights and obligations there under are personal with respect to each party and may not be assigned by any act of either party or by operation of law without the prior written consent of thc other party.

**15. ACCELERATION**

All consideration set forth on **Exhibit C** shall be deemed earned, accelerated and due and payable sixty (60) days after the termination of the employment of Christopher Watson by Bravera, Inc. (or its successor), a Florida corporation and a subsidiary of Shea, for any reason other than for "Cause" as defined in that certain Senior Management Employment Agreement between Bravera, Inc. and Christopher Watson dated as of July 15, 2007.

**16. INTEGRATION**

This Agreement inclusive of the references to other agreements incorporated herein by reference constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may conflict with this Agreement.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his hand as of the day first set forth above.

INTELLECTUS, LLC

By::______________________
Name: Christopher Watson
Title: Member

IP Holding of Nevada Corp.

By::______________________
Name: Francis E. Wilde
Title: Chairman and CEO

**EXHIBITS for the AGREEMENT**

**Contents to follow:**
**EXHIBIT A: Intellectual Property Assets**
**EXHIBIT B: Transfer of Title Agreement**
**EXHIBIT C: Consideration for Assets**
**EXHIBIT D: List of Pending Litigation Matters**
**EXHIBIT E: IP Agreement Warrant**

**EXHIBIT A**
**Intellectual Property Assets**

As part of this Agreement, Intellectus, LLC is licensing and selling the following:

**Trademarks**

Bravera ®
http://tess2.uspto.gov/bin/showfield?f=doc&state=prrnhj.2.1
<http://tess2.uspto.gov/bin/showfield?f=doc&state=prrnhj.2.1>

RAPID Workplace (tm)
http://tess2.uspto.gov/bin/showfield?f=doc&state=prrnhj.3.1
<http://tess2.uspto.gov/bin/showfield?f=doc&state=prrnhj.3.1>

**Software**

"Bravera Process Director"
"Bravera Content Director"
"Bravera RAPID Workplace" which includes the prior versions branded as "Bravera RAPID" is being sold by Intellectus as part of the transaction.
InfoBridge
InfoDex
All software and development tools associated with Bravera, Rapid Workplace and any and all derivative works associated with the above
Any licenses held in Intellectus that are necessary for compiling or running any of Bravera, Inc.'s software. This should include latest code and all documentation (an example could be an Integrated Development Environment (IDE's like NetBeans, MS Visual Studio, etc.) or a SQL Server or Oracle license for the Web-based Content management service

**Domains**

www.bravera.com
www.braveraonline.com

**Logos**

Bravera and all associated Bravera logos

(insert example)

**EXHIBIT B**
**Transfer of Title Agreement**

The undersigned agree that when payments, as set forth in **Exhibit C**, paid to Intellectus, LLC equal or exceed $1,000,000, title to the Intellectual Property Assets set forth in **Exhibit A** shall be transferred by Intellectus, LLC to IP Holding of Nevada Corp. subject to the terms and conditions provided for herein, and IP Holding of Nevada Corp. may take all necessary action to register and record the said transfer. Intellectus, LLC agrees to cooperate fully by signing any necessary documents to register and record the transfer of ownership.

INTELLECTUS, LLC

By: ______________________
Name: Christopher Watson
Title: Member
Date: July 16, 2007

IP HOLDING of NEVADA CORP.

By: ______________________
Name: Francis E. Wilde
Title: Chairman and CEO
Date: July 16, 2007

**EXHIBIT C**
**Consideration for Intellectual Property Assets**

The following consideration shall be payable by Licensee to Owner for the Intellectual Property Assets as defined in the Agreement and Exhibit A thereto. All terms not otherwise defined herein shall have the meaning as set forth in the Agreement and Plan of Merger by and among Shea Development Corp., Shea Development Acquisition No. 3 Corp., Bravera, Inc. and Christopher Watson, dated April 26, 2007.

**1.1** **Payments**. At the:

(a) Effective Time: Warrants to purchase 450,000 shares of the common stock of Shea in the form attached hereto as **Exhibit E**

(b) 1st Closing Date Anniversary: $750,000

(c) 2nd Closing Date Anniversary: $375,000

(d) 3rd Closing Date Anniversary: $375,000

**1.2** **Fiscal Year 2007 Earn-Out Payments.**

(a) *Q3 2007 Earn-Out Payments.* Subject to the combined EBITDA (the "**Q3 EBITDA**") of Bravera, Inc., Owner and all of their affiliates and subsidiaries (the "Bravera Group") equaling or exceeding $750,000 (the "**Q3 EBITDA Floor**") for the first three (3) month period following the Effective Date (the "**Q3 Earn-Out Period**"), Licensee shall pay $500,000 to Owner.

*Q3 2007 EBITDA Deficit Event.* If the Q3 EBITDA is less than Q3 EBITDA Floor, Licensee shall pay a pro-rata portion of the $500,000 Earn-Out Payment to Owner calculated by (i) dividing the Q3 EBITDA by the Q3 EBITDA Floor and (ii) multiplying the result of subsection (a) (i) by $500,000.

(b) *Q4 2007 Earn-Out Payments.* Subject to the Bravera Group's EBITDA (the "**Q4 EBITDA**") equaling or exceeding $1,000,000 (the "**Q4 EBITDA Floor**") for the three (3) month period following the first 3 month anniversary of the Effective Date (the "**Q4 Earn-Out Period**"), Licensee shall pay $500,000 to Owner.

*Q4 2007 EBITDA Deficit Event.* If the Q4 EBITDA is less than Q4 EBITDA Floor, Licensee shall pay a pro-rata portion of the $500,000 Earn-Out Payment to Owner calculated by (i) dividing the Q4 EBITDA by the Q4 EBITDA Floor and (ii) multiplying the result of subsection (b) (i) by $500,000.

CW

(c) *2007 Make-Up Earn-Out Payments.* (i) If the Bravera Group's EBITDA (the "**2007 EBITDA**") equals or exceeds $2,000,000 (the "**2007 EBITDA Floor**") for the 2007 Fiscal Year and (ii) if a Q3 or Q4 EBITDA Deficit Event occurred, Licensee shall pay to Owner any amounts which were not paid to Owner based on the determination of a quarterly EBITDA Deficit, per Section 1.2, subsections (a) and (b). In no event shall the sum of payment to Owner per Section 1.2, subsections (a), (b) and (c) exceed an amount equal to $1,000,000.

**1.3 Other Earn-Out Payments.**

(a) *Year 1 Earn-Out Payments.* Subject to the Bravera Group's gross revenue(s) exceeding ninety percent (90%) of $6,850,000 and the the Bravera Group's EBITDA (the "**Year 1 EBITDA**"), exceeding ninety percent (90%) of $2,500,000 for the first twelve (12) month period following the Effective Date (the "**Year 1 Earn-Out Period**"), Licensee shall pay $500,000 to Owner.

(b) *Year 2 Earn-Out Payments.* Subject to the Bravera Group's gross revenue(s) exceeding eighty percent (80%) of $8,900,000 and the Bravera Group's EBITDA (the "**Year 2 EBITDA**"), exceeding eighty percent (80%) of $4,500,000 for the twelve (12) month period following the first anniversary of the Effective Date (the "**Year 2 Earn-Out Period**"), Licensee shall pay $375,000 to Owner.

(c) *Year 3 Earn-Out Payments.* Subject to the Bravera Group's gross revenue(s) exceeding eighty percent (80%) of $11,500,000 and the Bravera Group's EBITDA (the "**Year 3 EBITDA**"), exceeding eighty percent (80%) of $5,000,000 for the twelve (12) month period following the second anniversary of the Effective Date (the "**Year 3 Earn-Out Period**"), Licensee shall pay $375,000 to Owner.

**1.4 EBITDA Definition.**

(a) For the purposes of this **Exhibit C** only, the definition of EBITDA shall be as follows:

EBITDA shall mean: Invoices billed during the period for services performed and unconditionally accepted by the customer(s); plus, invoices billed during the period for products sold and unconditionally accepted by the customer(s); less, all operating expenses for the period; plus all interest expense for the period; plus all income tax expense for the period; plus all depreciation expense for the period; and plus all amortization expense for the period.



**Exhibit E**
**IP Agreement Warrant**

**THIS COMMON STOCK PURCHASE WARRANT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 ACT, AS AMENDED (THE "1933 ACT"). THE HOLDER HEREOF, BY PURCHASING THIS COMMON STOCK PURCHASE WARRANT, AGREES FOR THE BENEFIT OF THE COMPANY THAT SUCH SECURITIES MAY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED ONLY (A) TO THE COMPANY, (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT, OR (C) IF REGISTERED UNDER THE 1933 ACT AND ANY APPLICABLE STATE SECURITIES LAWS. IN ADDITION, A SECURITIES PURCHASE AGREEMENT ("PURCHASE AGREEMENT"), DATED THE DATE HEREOF, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICE, CONTAINS CERTAIN ADDITIONAL AGREEMENTS AMONG THE PARTIES, INCLUDING, WITHOUT LIMITATION, PROVISIONS WHICH LIMIT THE EXERCISE RIGHTS OF THE HOLDER AND SPECIFY MANDATORY REDEMPTION OBLIGATIONS OF THE COMPANY.**

---

Shea Development Corp.

COMMON STOCK PURCHASE WARRANT

**Number of shares:** **450,000**

**Holder:** **INTELLECTUS, LLC**

**Expiration Date:** **July 16, 2014**

**Exercise Price per Share:** **$1.00**

Shea Development Corp., a company organized and existing under the laws of the State of Nevada (the "**Company**"), hereby certifies that, for value received, INTELLECTUS, LLC, or its registered assigns (the "**Warrant Holder**"), is entitled, subject to the terms set forth below, to purchase from the Company 450,000 shares (the "**Warrant Shares**") of common stock, par value $0.001 per share (the "**Common Stock**"), (each such share, a "**Warrant Share**" and all such shares, the "**Warrant Shares**") at a price of $1.00 per Warrant Share (as adjusted from time to time as provided in Section 7, per Warrant Share (the "**Exercise Price**"), at any time and from time to time from and after the date thereof and through and including 5:00 p.m. New York City time on July 16, 2014 (or eighteen months of effectiveness of a Registration Statement subsequent to the issuance herein (such 18 months to be extended by one month for each month or portion of a month during which a Registration Statement's effectiveness has lapsed or been suspended), whichever is longer) (the "Expiration Date"), and subject to the following terms and conditions:

1. **Registration of Warrant.** The Company shall register this Warrant upon records to be maintained by the Company for that purpose (the "**Warrant Register**"), in the name of the record Warrant Holder hereof from time to time. The Company may deem and treat the registered Warrant Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Warrant Holder, and for all other purposes, and the Company shall not be affected by notice to the contrary.

2. **Investment Representation.** The Warrant Holder by accepting this Warrant represents that the Warrant Holder is acquiring this Warrant for its own account or the account of an accredited investor affiliate for investment purposes and not with the view to any offering or distribution and that the Warrant Holder will not sell or otherwise dispose of this Warrant or the underlying Warrant Shares in violation of applicable securities laws. The Warrant Holder acknowledges that the certificates representing any Warrant Shares will bear a legend indicating that they have not been registered under the United States Securities Act of 1933, as amended (the "**1933 Act**") and may not be sold by the Warrant Holder except pursuant to an effective registration statement or pursuant to an exemption from registration requirements of the 1933 Act and in accordance with federal and state securities laws. If this Warrant was acquired by the Warrant Holder pursuant to the exemption from the registration requirements of the 1933 Act afforded by Regulation S thereunder, the Warrant Holder acknowledges and covenants that this Warrant may not be exercised by or on behalf of a Person during the one year distribution compliance period (as defined in Regulation S) following the date hereof. "**Person**" means an individual, partnership, firm, limited liability company, trust, joint venture, association, corporation, or any other legal entity.

3. **Validity of Warrant and Issue of Shares.** The Company represents and warrants that this Warrant has been duly authorized and validly issued and warrants and agrees that all of Common Stock that may be issued upon the exercise of the rights represented by this Warrant will, when issued upon such exercise, be duly authorized, validly issued, fully paid and nonassessable and free from all taxes, liens and charges with respect to the issue thereof, excluding income, transfer and other similar taxes that may become due by Warrant Holder upon the exercise of the rights represented by this Warrant. The Company further warrants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Company will at all times have authorized and reserved a sufficient number of Common Stock to provide for the exercise of the rights represented by this Warrant.

4. **Registration of Transfers and Exchange of Warrants.**

**a.** Subject to compliance with the legend set forth on the face of this Warrant, the Company shall register the transfer of any portion of this Warrant in the Warrant Register, upon surrender of this Warrant with the Form of Assignment attached hereto duly completed and signed, to the Company at the office specified in or pursuant to Section 12. Upon any such registration or transfer, a new warrant to purchase Common Stock, in substantially the form of this Warrant (any such new warrant, a "**New Warrant**"), evidencing the portion of this Warrant so transferred shall be issued to the transferee and a New Warrant evidencing the remaining portion of this Warrant not so transferred, if any, shall be issued to the transferring Warrant Holder. The acceptance of the New Warrant by the transferee thereof shall be deemed the acceptance of such transferee of all of the rights and obligations of a Warrant Holder of a Warrant.

**b.** This Warrant is exchangeable, upon the surrender hereof by the Warrant Holder to the office of the Company specified in or pursuant to Section 12 for one or more New Warrants,

CW

evidencing in the aggregate the right to purchase the number of Warrant Shares which may then be purchased hereunder. Any such New Warrant will be dated the date of such exchange.

**5. Exercise of Warrants.**

a. Upon surrender of this Warrant with the Form of Election to Purchase attached hereto duly completed and signed to the Company, at its address set forth in Section 12, and upon payment and delivery of the Exercise Price per Warrant Share multiplied by the number of Warrant Shares that the Warrant Holder intends to purchase hereunder, in lawful money of the United States of America, in cash or by certified or official bank check or checks, to the Company, all as specified by the Warrant Holder in the Form of Election to Purchase, the Company shall promptly (but in no event later than 7 business days after the Date of Exercise [as defined herein]) issue or cause to be issued and cause to be delivered to or upon the written order of the Warrant Holder and in such name or names as the Warrant Holder may designate (subject to the restrictions on transfer described in the legend set forth on the face of this Warrant), a certificate for the Warrant Shares issuable upon such exercise, with such restrictive legend as required by the 1933 Act. Any person so designated by the Warrant Holder to receive Warrant Shares shall be deemed to have become holder of record of such Warrant Shares as of the Date of Exercise of this Warrant.

b. A "Date of Exercise" means the date on which the Company shall have received (i) this Warrant (or any New Warrant, as applicable), with the Form of Election to Purchase attached hereto (or attached to such New Warrant) appropriately completed and duly signed, and (ii) payment of the Exercise Price for the number of Warrant Shares so indicated by the Warrant Holder to be purchased.

c. This Warrant shall be exercisable at any time and from time to time for such number of Warrant Shares as is indicated in the attached Form of Election To Purchase. If less than all of the Warrant Shares which may be purchased under this Warrant are exercised at any time, the Company shall issue or cause to be issued, at its expense, a New Warrant evidencing the right to purchase the remaining number of Warrant Shares for which no exercise has been evidenced by this Warrant.

d. (i) Notwithstanding anything contained herein to the contrary, the holder of this Warrant may, at its election exercised in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "**Net Number**" of shares of Common Stock determined according to the following formula (a "**Cashless Exercise**"):

Net Number = (A x (B - C))/B

(ii) For purposes of the foregoing formula:

A= the total number shares with respect to which this Warrant is then being exercised.

B= the last reported sale price (as reported by Bloomberg) of the Common Stock on immediately preceding the date of the Exercise Notice.

CW

C= the Warrant Exercise Price then in effect at the time of such exercise.

6. **Maximum Exercise.** Reserved.

7. **Adjustment of Exercise Price and Number of Shares.** The character of the shares of stock or other securities at the time issuable upon exercise of this Warrant and the Exercise Price therefore, are subject to adjustment upon the occurrence of the following events, and all such adjustments shall be cumulative:

a. **Adjustment for Stock Splits, Stock Dividends, Recapitalizations, Etc.** The Exercise Price of this Warrant and the number of shares of Common Stock or other securities at the time issuable upon exercise of this Warrant shall be appropriately adjusted to reflect any stock dividend, stock split, combination of shares, reclassification, recapitalization or other similar event affecting the number of outstanding shares of stock or securities.

b. **Adjustment for Reorganization, Consolidation, Merger, Etc.** In case of any consolidation or merger of the Company with or into any other corporation, entity or person, or any other corporate reorganization, in which the Company shall not be the continuing or surviving entity of such consolidation, merger or reorganization (any such transaction being hereinafter referred to as a "**Reorganization**"), then, in each case, the holder of this Warrant, on exercise hereof at any time after the consummation or effective date of such Reorganization (the "**Effective Date**"), shall receive, in lieu of the shares of stock or other securities at any time issuable upon the exercise of the Warrant issuable on such exercise prior to the Effective Date, the stock and other securities and property (including cash) to which such holder would have been entitled upon the Effective Date if such holder had exercised this Warrant immediately prior thereto (all subject to further adjustment as provided in this Warrant).

c. **Certificate as to Adjustments.** In case of any adjustment or readjustment in the price or kind of securities issuable on the exercise of this Warrant, the Company will promptly give written notice thereof to the holder of this Warrant in the form of a certificate, certified and confirmed by the Board of Directors of the Company, setting forth such adjustment or readjustment and showing in reasonable detail the facts upon which such adjustment or readjustment is based.

8. **Fractional Shares.** The Company shall not be required to issue or cause to be issued fractional Warrant Shares on the exercise of this Warrant. The number of full Warrant Shares that shall be issuable upon the exercise of this Warrant shall be computed on the basis of the aggregate number of Warrants Shares purchasable on exercise of this Warrant so presented. If any fraction of a Warrant Share would, except for the provisions of this Section 8, be issuable on the exercise of this Warrant, the Company shall, at its option, (i) pay an amount in cash equal to the Exercise Price multiplied by such fraction or (ii) round the number of Warrant Shares issuable, up to the next whole number.

9. **Sale or Merger of the Company.** In the event of a sale of all or substantially all of the assets of the Company or the merger or consolidation of the Company in a transaction in which the Company is not the surviving entity, the Warrant Holder will have the right to exercise the warrants concurrent with the sale.

10. **Notice of Intent to Sell or Merge the Company.** The Company will give Warrant Holder 45 days notice before the event of a sale of all or substantially all of the assets of the Company or the merger or consolidation of the Company in a transaction in which the Company is not the surviving entity

CW

**11. Issuance of Substitute Warrant.** In the event of a merger, consolidation, recapitalization or reorganization of the Company or a reclassification of Company shares of stock, which results in an adjustment to the number of shares subject to this Warrant and/or the Exercise Price hereunder, the Company agrees to issue to the Warrant Holder a substitute Warrant reflecting the adjusted number of shares and/or Exercise Price upon the surrender of this Warrant to the Company.

**12. Notice.** All notices and other communications hereunder shall be in writing and shall be deemed to have been given (i) on the date they are delivered if delivered in person; (ii) on the date initially received if delivered by facsimile transmission followed by registered or certified mail confirmation; (iii) on the date delivered by an overnight courier service; or (iv) on the third business day after it is mailed by registered or certified mail, return receipt requested with postage and other fees prepaid as follows:

If to the Company, to:
Shea Development Corp.
1351 Dividend Drive, Suite G
Marietta, GA 30067
Attention: Richard Connelly

With a copy, which shall not constitute notice to:

Dunnington, Bartholow & Miller LLP
477 Madison Avenue, 12th floor
New York, NY 10022
Attention: Robert T. Lincoln, Esq.

If to the Warrant Holder, to:
Christopher Watson
300 Bucksley Lane #305
Daniel Island, SC 29492

**13. Miscellaneous.**

**a.** This Warrant shall be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Warrant may be amended only in writing and signed by the Company and the Warrant Holder.

**b.** Nothing in this Warrant shall be construed to give to any person or corporation other than the Company and the Warrant Holder any legal or equitable right, remedy or cause of action under this Warrant; this Warrant shall be for the sole and exclusive benefit of the Company and the Warrant Holder.

**c.** This Warrant shall be governed by, construed and enforced in accordance with the internal laws of the State of New York without regard to the principles of conflicts of law thereof.

**d.** The headings herein are for convenience only, do not constitute a part of this Warrant and shall not be deemed to limit or affect any of the provisions hereof.



e. In case any one or more of the provisions of this Warrant shall be invalid or unenforceable in any respect, the validity and enforceablilty of the remaining terms and provisions of this Warrant shall not in any way be affected or impaired thereby and the parties will attempt in good faith to agree upon a valid and enforceable provision which shall be a commercially reasonably substitute therefore, and upon so agreeing, shall incorporate such substitute provision in this Warrant.

f. The Warrant Holder shall not, by virtue hereof, be entitled to any voting or other rights of a shareholder of the Company, either at law or equity, and the rights of the Warrant Holder are limited to those expressed in this Warrant.

*[SIGNATURE PAGE FOLLOWS]*



IN WITNESS WHEREOF, the Company has caused this Warrant to be duly executed by the authorized officer as of July 16, 2007.

Shea Development Corp.

By: ______________________________
Name: Francis E. Wilde
Title: Chairman and CEO

**FORM OF ELECTION TO PURCHASE**

(To be executed by the Warrant Holder to exercise the right to purchase shares of Common Stock under the foregoing Warrant)

To: Shea Development Corp.:

In accordance with the Warrant enclosed with this Form of Election to Purchase, the undersigned hereby irrevocably elects to purchase ______________ shares of Common Stock, par value $0.001 per share ("Common Stock"), of Shea Development Corp. and encloses one warrant and $_________ for each Warrant Share being purchased or an aggregate of $_______________ in cash or certified or official bank check or checks, which sum represents the aggregate Exercise Price (as defined in the Warrant) together with any applicable taxes payable by the undersigned pursuant to the Warrant.

The undersigned requests that certificates for the shares of Common Stock issuable upon this exercise be issued in the name of:

_______________________________________

_______________________________________

_______________________________________
(Please print name and address)

_______________________________________
(Please insert Social Security or Tax Identification Number)

If the number of shares of Common Stock issuable upon this exercise shall not be all of the shares of Common Stock which the undersigned is entitled to purchase in accordance with the enclosed Warrant, the undersigned requests that a New Warrant (as defined in the Warrant) evidencing the right to purchase the shares of Common Stock not issuable pursuant to the exercise evidenced hereby be issued in the name of and delivered to:

_______________________________________

_______________________________________

_______________________________________
(Please print name and address)

Dated: _____________ Name of Warrant Holder:

(Print) ________________________________

(By:) ________________________________

Signature must conform in all respects to name of Warrant Holder as specified on the face of the Warrant.

**[FORM OF ASSIGNMENT PURSUANT TO SECTION 4(a)]**

(To be executed by the registered holder if such holder desires to transfer the Warrant Certificate.)

FOR VALUE RECEIVED hereby sells, assigns and transfers unto

________________________________________
(Please print name and address of transferee)

this Warrant Certificate, together with all right, title and interest therein, and hereby irrevocably constitutes and appoints ____________________________ Attorney, to transfer the within Warrant Certificate on the books of the within-named Company, with full power of substitution.

Dated:

Signature: ________________________________

(Signature must confirm in all respects to name of holder as specified on the face of the Warrant Certificate.)

_________________________
(Insert Social Security or Other Identifying Number of Assignee).

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

SHEA DEVELOPMENT CORP, et al.,

Plaintiffs

-vs-

CHRISTOPHER WATSON, et al.,

Defendants

-------------------------------x

DOCKET NO.: CV-07-11201 (DLC)
New York, New York
July 10, 2008

TRANSCRIPT OF CIVIL CAUSE FOR SETTLEMENT CONFERENCE

BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiffs:

STEPHEN E. BARIL, ESQ.
Williams Mullen P.C.
1021 East Cary Street, 17th Floor
Richmond, VA 23219

BRENDAN J. DOWD, ESQ.
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

FRANCIS J. MOONEY, JR., ESQ.
Dunnington Bartholow & Miller LLP
1359 Broadway, 6th Floor
New York, NY 10018

Audio Operator: No Audio Operator

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcription Service

---

**KRISTIN M. RUSIN**
217 Pine Meadows Circle
Hickory NC 28601
kmrusin@earthlink.net

ADDITIONAL APPEARANCES

For the Defendants:

JAMES E. DAVIES, ESQ.
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, NY 10271

(Recording on)

THE CLERK: -- versus Watson, docket zero seven civil one one two zero one.

Counsels, please state your name for the record and introduce your clients.

MR. BARIL: My name is Steve Baril. I represent the plaintiff.

With me is Brendan Dowd -- he's with the O'Melveny firm -- who is counsel of record for the plaintiff in the companion state court proceeding pending in the Supreme Court of New York.

Behind me, to my right, is Frank Wilde, who is the chairman and CEO of formerly Shea Development, now Riptide.

And standing directly behind me is Frank Mooney of the Dunnington firm, whose firm initiated the lawsuit back in December of 2007 and whose firm actually handled the merger and acquisition between these parties in 2007.

THE COURT: Okay.

MR. DAVIES: Yes, Your Honor. James Davis, from Landman Corsi Ballaine & Ford. I represent the defendant, Christopher Watson, who's standing next to me.

THE COURT: Okay.

Welcome, everyone. You can be seated. Let me tell you a little bit about our process. First --

(Audio gap)

THE COURT: -- so I'm asking the clerk to turn off the record.

(Recorder off/recorder on)

THE COURT: All right. We're back on the record. The parties have engaged in settlement negotiations, and we've reached a deal. I'm going to try saying the terms of that deal and will give -- after I do each term, I'll just check with the attorneys that I've correctly stated it. And after I'm finished, I'll ask the clients present whether they're agreeing to it.

The parties do expect to do some paperwork on this deal. However, they have reached an agreement as is going to be reflected during this conference. So even in the absence o the paperwork, this is an enforceable settlement. All right.

The tender of stocks and warrants that has been made by Mr. Watson will be accepted. He represents that these are all the stocks and warrants and that's going to be verified by the plaintiff.

Next is all pending litigation is to be dismissed with prejudice, and appropriate releases from all parties -- from parties to that litigation.

Next is the defendant, Mr. Watson, is going to be personally responsible for whatever tax liability is determined to exist with respect to the IRS and Virginia with respect to the particular tax problem that's been discussed.

As part of the process of determining that tax liability, Mr. Watson is going to be responsible for hiring any accountants that he needs in order to accomplish that. He will also have authority, final authority, with respect to any settlement of that tax liability with either the IRS or Virginia.

That tax liability is -- there's going to be some money held in escrow specifically for the purpose of paying that tax liability, but that money is going to be the property of Mr. Watson to be released to him for the purpose of the payment of that tax liability, and any remaining money will go to him personally.

The plaintiff will return to Mr. Watson -- will transfer to Mr. Watson the GSA MOBIS contract, a BMW, and certain business equipment that's been the subject of the settlement letters that every party appears to be familiar with.

The non-compete clauses that are in the contracts of any Bravera employees and of Mr. Watson will be released and deemed null and void from this day forward.

The plaintiff will have the option of terminating the Reston lease on thirty days' notice.

The escrow, by the way, will be put in an interest-bearing account that Mr. Watson will arrange and, of course, any interest earned on that will be his property. All right.

I'm going to ask the attorneys if there are any corrections -- oh, and the money. The amount of money in escrow is two hundred -- to be put in escrow that I mentioned is two hundred seventy-five thousand, and Mr. Watson is to be paid in cash the amount of one hundred seventy-five thousand.

And I don't think we specifically said it, but obviously, releases need to be executed by any parties to this litigation, general releases. And the payment should be made within thirty days of the execution, I would say, of any -- of the releases. Okay.

Does anyone want to add or change any terms that I've said?

MR. DAVIES: Just a clarification, Your Honor. The two hundred and seventy-five thousand dollars that is to be held in escrow for payment of any tax liability, the remainder of which is to be released to Mr. Watson or his holding company -- that is to be funded by the plaintiffs, is that correct?

THE COURT: That's correct.

MR. DAVIES: Thank you.

(Off the record discussion)

(Recorder off/recorder on)

THE COURT: -- some minor corrections and additional terms.

Mr. Davies?

MR. DAVIES: Yes. The parties have agreed that the

two hundred and seventy-five thousand dollars that is to be delivered in escrow will be available for delivery in escrow in fourteen days and will be so delivered.

With respect to the remaining one hundred and seventy-five thousand dollars in cash, that cash will be forwarded to my office as the attorney for Mr. Watson or pursuant to wiring instructions fifteen days after execution and completion of the final settlement agreement.

THE COURT: Something else from you, Mr. Baril, or your colleague?

MR. DOWD: This is Mr. Dowd. Yeah. With the -- Your Honor, with the GSA MOBIS contract, both parties understand that this is going to require the consent of the GSA. Therefore, what -- therefore, what Riptide will be doing is making its best efforts to novate the contract and obtain the GSA's consent to have this contract be in Mr. Watson's name or Intellectus's name.

MR. DAVIES: So stipulated.

THE COURT: Okay.

Any other terms? Mr. Davies?

MR. DAVIES: Nothing, Your Honor.

THE COURT: Mr. Baril?

MR. BARIL: No, sir.

THE COURT: Okay. Okay.

So, Mr. Baril, is this your understanding of the

agreement as we've stated it here on the record today?

MR. BARIL: It is, Your Honor.

THE COURT: Mr. Davies, is it your understanding?

MR. DAVIES: Yes, Your Honor.

THE COURT: Mr. Wilde, are you agreeing to this on behalf of Shea, Riptide, and any other related entities?

MR. WILDE: Yes, Your Honor.

THE COURT: Mr. Watson, are you agreeing to this on behalf of all -- of Intellectus, you yourself, and any other entities you control?

MR. WATSON: Yes, Your Honor.

THE COURT: Okay.

Thank you, everything.

MR. DAVIES: Thank you, Your Honor.

MR. BARIL: Thank you.

THE COURT: Oh, one other thing. This is going to be confidential, which means the parties are only to tell accountants, lawyers, immediate family members, or if they might be required to disclose anything about it by law or subpoena.

Anything else from anybody?

MR. BARIL: May we have a copy?

THE COURT: You can order it. I'll give you a form to do that.

MR. BARIL: Thank you.

THE COURT: All right.

Thank you, everyone.

MR. DAVIES: Thank you, Your Honor.

* * * * *

# Exhibit E

**Cristi Luckow**

**Subject:** FW: Bravera POAs

Bravera, Inc. Power of Attorne...

Bravera, Inc. VA Power of Atto...

-----Original Message-----
From: James Davies
Sent: Friday, July 11, 2008 1:49 PM
To: 'Dowd, Brendan'
Cc: Cristi Luckow
Subject: Bravera POAs

Brendan,

Attached please find Virginia and Federal Power of Attorney forms which will permit out accountants, Hertzbach & Company, PA, to investigate the Federal and Virginia tax claims. As you can see, these authorizations are very limited to Payroll taxes in 2005 and the specified forms (960/941 US and VA-5 Virginia). Please have the appropriate Bravera/Riptide officer sign these forms and get them back to us as soon as possible. Thank you. Jed.

Form **2848** (Rev. June 2008) Department of the Treasury Internal Revenue Service

# Power of Attorney and Declaration of Representative

▶ Type or print. ▶ See the separate instructions.

OMB No. 1545-0150

**For IRS Use Only**
Received by:
Name
Telephone
Function
Date / /

## Part I Power of Attorney

**Caution:** *Form 2848 will not be honored for any purpose other than representation before the IRS.*

**1 Taxpayer information.** Taxpayer(s) must sign and date this form on page 2, line 9.

| Taxpayer name(s) and address | Social security number(s) | Employer identification number |
|---|---|---|
| BRAVERA, INC.<br>300 BUCKSLEY LANE, # 305<br>DANIEL ISLAND, SC 29492 | | 20 - 3010278 |
| | Daytime telephone number<br>( 202 ) 255-8092 | Plan number (if applicable) |

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2 Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| JOEL B. CHAZEN<br>800 RED BROOK BOULEVARD, SUITE 300<br>OWINGS MILLS, MD 21117 | CAF No. 2605-12290R<br>Telephone No. 410-363-3200<br>Fax No. 410-356-0058<br>Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |
| MARK R. TOPOLSKI<br>800 RED BROOK BOULEVARD, SUITE 300<br>OWINGS MILLS, MD 21117 | CAF No. 2605-38487R<br>Telephone No. 410-363-3200<br>Fax No. 410-356-0058<br>Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |
| DANIEL J. WAHLBERG<br>800 RED BROOK BOULEVARD, SUITE 300<br>OWINGS MILLS, MD 21117 | CAF No. 03-0039891R<br>Telephone No. 410-363-3200<br>Fax No. 410-356-0058<br>Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3 Tax matters**

| Type of Tax (Income, Employment, Excise, etc.) or Civil Penalty (see the instructions for line 3) | Tax Form Number (1040, 941, 720, etc.) | Year(s) or Period(s) (see the instructions for line 3) |
|---|---|---|
| PAYROLL | 941 / 940 | 2005 - ALL QUARTERS |
| | | |
| | | |

**4 Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for **Line 4. Specific Uses Not Recorded on CAF** . . . . . . . . . . . . . . . . ▶ ☐

**5 Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative or add additional representatives, the power to sign certain returns, or the power to execute a request for disclosure of tax returns or return information to a third party. See the line 5 instructions for more information.

**Exceptions.** An unenrolled return preparer cannot sign any document for a taxpayer and may only represent taxpayers in limited situations. See **Unenrolled Return Preparer** on page 1 of the instructions. An enrolled actuary may only represent taxpayers to the extent provided in section 10.3(d) of Treasury Department Circular No. 230 (Circular 230). An enrolled retirement plan administrator may only represent taxpayers to the extent provided in section 10.3(e) of Circular 230. See the line 5 instructions for restrictions on tax matters partners. In most cases, the student practitioner's (levels k and l) authority is limited (for example, they may only practice under the supervision of another practitioner).

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ____________

**6 Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, **BUT NOT TO ENDORSE OR CASH**, refund checks, initial here ________ and list the name of that representative below.

Name of representative to receive refund check(s) ▶

**7 Notices and communications.** Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2.

**a** If you also want the second representative listed to receive a copy of notices and communications, check this box . . . . . ▶ ☐

**b** If you do not want any notices or communications sent to your representative(s), check this box . . . . . . . . . . . . ▶ ☐

**8 Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here. . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**9 Signature of taxpayer(s).** If a tax matter concerns a joint return, **both** husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

**▶ IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.**

Signature | Date | Title (if applicable)

Print Name | ☐☐☐☐☐ PIN Number | Print name of taxpayer from line 1 if other than individual

Signature | Date | Title (if applicable)

Print Name | ☐☐☐☐☐ PIN Number

## Part II Declaration of Representative

**Caution:** *Students with a special order to represent taxpayers in qualified Low Income Taxpayer Clinics or the Student Tax Clinic Program (levels k and l), see the instructions for Part II.*

Under penalties of perjury, I declare that:

- I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
- I am aware of regulations contained in Circular 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
- I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
- I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
**b** Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
**c** Enrolled Agent—enrolled as an agent under the requirements of Circular 230.
**d** Officer—a bona fide officer of the taxpayer's organization.
**e** Full-Time Employee—a full-time employee of the taxpayer.
**f** Family Member—a member of the taxpayer's immediate family (for example, spouse, parent, child, brother, or sister).
**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).
**h** Unenrolled Return Preparer—the authority to practice before the Internal Revenue Service is limited by Circular 230, section 10.7(c)(1)(viii). You must have prepared the return in question and the return must be under examination by the IRS. See **Unenrolled Return Preparer** on page 1 of the instructions.
**k** Student Attorney—student who receives permission to practice before the IRS by virtue of their status as a law student under section 10.7(d) of Circular 230.
**l** Student CPA—student who receives permission to practice before the IRS by virtue of their status as a CPA student under section 10.7(d) of Circular 230.
**r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

**▶ IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED.** See the Part II instructions.

| Designation—Insert above letter (a–r) | Jurisdiction (state) or identification | Signature | Date |
|---|---|---|---|
| b | MD, PA | | |
| b | MD | | |
| b | MD, VA | | |

**FORM PAR 101**
**VIRGINIA DEPARTMENT OF TAXATION**
**P.O. BOX 1880**
**RICHMOND, VA 23218-1880**

# POWER OF ATTORNEY AND DECLARATION OF REPRESENTATIVE

**1 Taxpayer Information** - Taxpayer(s) must sign and date this form.

| Taxpayer name(s) and address | Social Security Number(s) | VA Account Number |
|---|---|---|
| | Daytime Telephone Number | Employer ID Number |

*hereby appoint(s) the following representative(s) as attorney(s)-in-fact:*

**2 Representative(s)** - All representative(s) must sign and date this form.

| Name and address | Telephone Number<br>Fax Number<br>E-Mail Address |
|---|---|
| Name and address | Telephone Number<br>Fax Number<br>E-Mail Address |
| Name and address | Telephone Number<br>Fax Number<br>E-Mail Address |

*to represent the taxpayer(s) before the Virginia Department of Taxation for the following tax matters:*

**3 Tax Matter** - Enter type of tax and year(s) or period(s) or date of death if Estate Tax.

| Type of Tax | Tax Form Number | Year(s) or Period(s) |
|---|---|---|
| | | |
| | | |
| | | |

**4 Acts authorized** - The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3. The authority does not include the power to receive refund checks, the power to substitute another representative, the authority to execute a request for a tax return or the power to sign certain returns, or a consent to disclose tax information unless specifically added below.
List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ____________________

This Power of Attorney and Release revokes all previous Powers of Attorney and Releases received by the Department of Taxation for the matters and years or periods covered by this form, except the following:

(Specify to whom granted, date and address including ZIP code, and attach copies of earlier power(s) and authorizations.)

**Signature of taxpayer(s)** - If a tax matter concerns a joint return, **both** husband and wife must sign if joint representation is requested. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

Signature Title, if applicable Date

Print Name

Signature Title, if applicable Date

Print Name

## Declaration of Representative

Under penalties of perjury, I declare that:

- I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
- I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
- I am authorized to represent the taxpayer(s) identified on line 2 for the tax matter(s) specified on line 3; and
- I am one of the following:
  - **a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
  - **b** Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
  - **c** Enrolled agent
  - **d** Officer—a bona fide officer of the taxpayer's organization.
  - **e** Full-Time Employee—a full-time employee of the taxpayer.
  - **f** Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).
  - **g** Other (explain) ______________________

**IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED.**

| Designation—Insert above letter (a–g) | Jurisdiction (state) or Enrollment Card No. | Signature | Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## INSTRUCTIONS

### LINE 1 - Taxpayer Information

**Individuals.** Enter your name, Social Security Number (SSN), Employer Identification Number (EIN), if applicable, and your street address or post office box. Do not use your representative's address or post office box for your own. If a joint return is, or will be, filed and you and your spouse are designating the same representative(s), also enter your spouse's name and SSN and your spouse's address if different from yours.

**Corporations, partnerships, or associations.** Enter the name, EIN, and business address. If this form is being prepared for corporations filing a consolidated tax return do not attach a list of subsidiaries to this form. Only the parent corporation information is required on line 1. A subsidiary must file its own PAR 101 for returns that must be filed separately from the consolidated return.

**Trust.** Enter the name, title, and address of the trustee, and the name and EIN of the trust.

**Estate.** Enter the name, title, and address of the decedent's executor/personal representative, and the name and identification number of the estate. The identification number for an estate includes both the EIN and the decedent's SSN.

### LINE 2 - Representative

Enter your representative's full name. Only individuals may be named as representatives. Use the identical full name on all submissions and correspondence. If you want to name more than three representatives, indicate so on this line and attach a list of additional representatives.

### LINE 3 - Tax Matters

Enter the type of tax (Individual, Corporate, Withholding, etc.), the tax form number (760, 500, VA-15, etc.), and the year(s) or period(s) in order for the power of attorney to be valid. Representation can only be granted for the years or periods listed on line 3. If the type of tax, tax form number, or years or periods does not apply to the matter, specifically describe the matter to which the power of attorney pertains and enter "Not Applicable" in the appropriate column(s).

### LINE 4 - Acts Authorized

Use this line to modify the acts your representative(s) can perform. In the space provided, describe any additions or deletions.

### Signature of Taxpayers

**Individuals.** You must sign and date the power of attorney. If a joint return has been filed and both husband and wife will be represented by the same individual(s), both must sign the power of attorney. However, if a joint return has been filed and the husband and wife will be represented by different individuals, each spouse must execute his or her own power of attorney.

**Corporations or associations.** An officer having authority to bind the taxpayer must sign.

**Partnerships.** All partners must sign unless one partner is authorized to act in the name of the partnership. A partner is authorized to act in the name of the partnership if the partner has authority to bind the partnership. A copy of such authorization must be attached.

### Declaration of Representative

The representative(s) you name must sign and date this declaration and enter the designation (i.e., items a-g).

# Exhibit F

# CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Confidential Settlement Agreement and Mutual Release (the "Agreement") is entered into this ___ day of July 2008, by and among Riptide Worldwide, Inc. (formerly Shea Development Corp.); RTWW Business Services, Inc. (formerly Bravera, Inc.); and IP Holding of Nevada Corp. (collectively, the "Shea Parties"), and Christopher Watson; Intellectus, LLC; SD2R Partners, LLC (a/k/a SD2R, LLC); Daniel Island Partners, LLC; and Intellectus Business Services, LLC (collectively, the "Watson Parties"). The Shea Parties and the Watson Parties are collectively referred to as the "Parties."

## RECITALS

WHEREAS, Shea Development Corp. ("Shea") (n/k/a Riptide Worldwide, Inc.) and Bravera, Inc. (n/k/a RTWW Business Services, Inc.) ("Bravera") entered into an Agreement and Plan of Merger dated as of April 26, 2007 (the "Merger Agreement"). The Merger became effective July 16, 2007, with Bravera becoming a wholly-owned subsidiary of Shea.

WHEREAS, as contemplated by the Merger Agreement, Christopher Watson ("Mr. Watson") and Bravera entered into a Senior Management Employment Agreement dated July 15, 2007 (the "Employment Agreement"), whereby Mr. Watson accepted employment with Bravera.

WHEREAS, as contemplated by the Merger Agreement, IP Holding of Nevada Corp. ("IP Holding") and Intellectus, LLC ("Intellectus") entered into a Software License and Asset Purchase Agreement dated as of July 16, 2007 (the "Licensing Agreement"), whereby IP Holding acquired from Intellectus a worldwide license in regard to certain intellectual property assets described more fully in the Licensing Agreement. Intellectus also received warrants to purchase Shea stock.

WHEREAS, pursuant to the Merger Agreement, Mr. Watson received shares of Shea stock (the "Shea Stock"), and warrants to purchase shares of Shea stock.

WHEREAS, at the time of the Merger, Bravera was a party to a 2005 contract with the Federal Emergency Management Agency (the "FEMA Contract"). Shea assumed the FEMA Contract pursuant to the Merger. The FEMA Contract is scheduled to expire on September 30, 2008.

WHEREAS, at the time of the Merger, Bravera was the lessee of certain leased premises in Reston, Virginia, as described below; owned certain business equipment; and employed certain personnel for the purpose of servicing the FEMA Contract. Pursuant to the Merger, Shea assumed the leasehold, took legal title to the equipment, and employed the personnel.

WHEREAS, in mid-September 2007, a dispute arose between Shea/Bravera and Mr. Watson about certain pre-Merger sales projections. On September 29, 2007, Mr. Watson gave written notice of his voluntary termination of his employment under the Employment Agreement.

WHEREAS, the Merger Agreement stated that Bravera had filed and paid all taxes through the tax year ended December 31, 2006. In mid-November 2007, Shea/Bravera received a notice from the United States Internal Revenue Service of unpaid taxes for the tax year ended December 31, 2005 in the amount of $258,367.91, not including interest or penalties. In early December 2007, Shea/Bravera received a notice from the Commonwealth of Virginia of unpaid withholding taxes for the period October 2005 through December 2005 in the amount of $9,300.20, including interest and penalties. In May 2008, Shea/Bravera received a notice from the County of Fairfax, Virginia of Bravera's failure to notice the County of business personal

property located in the County in 2006 and 2007. The various notices of and liabilities for unpaid taxes shall be referred to herein collectively as the "Tax Liability Issue."

WHEREAS, Shea filed a lawsuit against Mr. Watson in the U.S. District Court for the Southern District of New York, styled *Shea Development Corp., et al. v. Watson, et al.*, Case No. CV-07-11201, alleging fraud, constructive fraud, breach of fiduciary duty, breach of the Employment Agreement, and breach of the Merger Agreement (the "New York Federal Lawsuit").

WHEREAS, Mr. Watson filed a lawsuit against Riptide Worldwide, Inc. (f/k/a/ Shea) in the Supreme Court of New York, New York County, styled *Watson, et al. v. Riptide Worldwide, Inc. (f/k/a Shea Development Corp.), et al.*, Case No. 600114/08, alleging breach of the Merger Agreement, breach of the Licensing Agreement, and breach of the Employment Agreement, as well as seeking declaratory and injunctive relief (the "New York State Lawsuit").

WHEREAS, Mr. Watson filed a lawsuit against Shea and Bravera in the Ninth Judicial Circuit, In the Court of Common Pleas, State of South Carolina, County of Charleston, styled *Watson v. Bravera, Inc. et al.*, Case No. 2007-CP-10-5074, alleging breach of contract and breach of contract with fraudulent intent in regard to an unpaid loan he contends he made to Shea/Bravera. (the "South Carolina Lawsuit"). The Defendant filed a Notice of Removal seeking removal to the United States District Court for the District of South Carolina, where it is pending as Case No. 08-CV-81 (PMD).

WHEREAS, Daniel Island Partners, LLC filed a lawsuit against Bravera in the Magistrate's Court for the County of Berkeley, South Carolina, styled *Daniel Island Partners, LLC v. Bravera, Inc.*, Case No. 07K-0915, seeking payment of unpaid rent (the "Second South Carolina Lawsuit").

WHEREAS, SD2R Partners filed a lawsuit against Bravera in the Circuit Court of Fairfax County, Virginia, styled *SD2R Partners, LLC a/k/a SD2R, LLC v. Bravera, Inc.*, Civ. Action No. 2007 15640, alleging breach of a lease agreement (the "Virginia Lawsuit"). The New York Federal Lawsuit, the New York State Lawsuit, the South Carolina Lawsuit, the Second South Carolina Lawsuit, and the Virginia Lawsuit are collectively referred to as the "Lawsuits."

WHEREAS, the Parties deny any and all liability to each other in regard to the aforementioned Lawsuits.

WHEREAS, to avoid further costs and expenditures of resources, the Parties now desire to settle, compromise, and resolve all rights, claims, counterclaims, and demands of whatever nature which the Parties may have against one another as specified herein, including but not limited to those which are at issue in the Lawsuits.

NOW, THEREFORE, in consideration of the following mutual promises, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1. Return of the Shea Stock and the Shea Warrants. Within ten (10) business days of execution of this Agreement, Mr. Watson shall tender to Shea all certificates representing the Shea Stock and warrants to purchase shares of Shea Stock in the possession of any of the Watson Parties or to which any of the Watson Parties ever had any claim of ownership or interest, and Shea shall verify that all Shea Stock and warrants to purchase shares of Shea Stock have been returned by the Watson Parties.

2. Payment to Watson. Within fifteen (15) business days after the execution of this Agreement, Shea shall pay Mr. Watson the sum of One Hundred Seventy-Five Thousand Dollars and No Cents ($175,000.00) by wire transfer to a bank account designated in writing by Mr. Watson.

3. The Tax Liability Issue. Mr. Watson shall be personally responsible for resolving and settling the Tax Liability Issue to the extent set forth below. Shea shall cooperate with Mr. Watson in this endeavor, but Mr. Watson shall have final authority over settlement of the Tax Liability Issue. Mr. Watson shall be responsible for any and all costs associated with the settlement of the Tax Liability Issue, including but not limited to the hiring and/or retention of accountants.

Within fourteen (14) days of July 10, 2008, Shea shall deposit in an interest-bearing escrow account with the law firm of Williams Mullen the sum of Two Hundred Seventy-Five Thousand Dollars and No Cents ($275,000.00) (the "Escrowed Funds") as security for Mr. Watson's settlement of the Tax Liability Issue. The Escrowed Funds, together with any accrued interest, shall be paid to Mr. Watson upon Shea's receipt of written confirmation from the relevant taxing authorities that the Tax Liability Issue has been fully compromised and settled, and Shea/Bravera has been released from such liability. If there is any remaining tax liability to Shea/Bravera, the Escrowed Funds shall first be applied to such liability before any payment to Mr. Watson.

4. The Suite 250 Lease. The lease dated August 12, 2005 between SD2R and Bravera for the premises at 1801 Robert Fulton Drive, Suite 250, Reston, Virginia, 20191 (the

"Leased Premises") with a monthly rent of $6,000.00, which Shea assumed as part of the Merger, shall remain in full force and effect on a month-to-month basis until such time as Shea has fulfilled its obligations under the FEMA Contract and any extensions thereof. Upon completion of the FEMA Contract, Bravera shall vacate the premises, and the lease shall be null and void thereafter, with no further liability to SD2R.

5. Transfer of Personal Property. As soon as reasonably practical upon completion of its obligations under the FEMA Contract, Bravera will transfer to Mr. Watson the business equipment located at the Leased Premises; a certain BMW automobile; and a certain Ford Sport Utility Vehicle. Shea further shall make all reasonable efforts to obtain the consent of the Government Services Administration to transfer a certain GSA MOBUS Contract to either Mr. Watson or Intellectus.

6. Nullification of All Contracts and Non-Compete Clauses. The Parties agree that, with the exception of the Leased Premises addressed in paragraph 4 above, any and all contracts by and between any of the Shea Parties, on the one hand, and the Watson Parties, on the other hand, including but not limited to the Merger Agreement, the Employment Agreement, the Licensing Agreement, and the Lease for Suite 240 at 1801 Robert Fulton Drive, Reston, Virginia 20191, are declared null and void. This provision extends to any and all non-compete agreements between the Shea Parties and the Watson Parties, and, upon the completion of the FEMA Contract, to any non-compete clauses contained in the employment contracts of any individuals employed by Bravera in connection with the FEMA Contract.

7. Dismissal with Prejudice of the Lawsuits. The Parties agree that, within fifteen (15) business days of the execution of this Agreement, they shall cause to be entered Orders dismissing, with prejudice, all of the Lawsuits between the parties. Each Party shall bear its own costs and fees and waive and all rights of appeal in regard to the Lawsuits.

8. Denial of Liability. The Parties expressly deny any and all liability under the Lawsuits. Neither this Agreement nor any order of dismissal in the Lawsuits shall be construed to as admission of liability or wrongdoing by any Party. The Parties further agree and acknowledge that neither this Agreement, nor the terms thereof or negotiations relating thereto, shall be offered in evidence in any action or proceeding for any purpose whatsoever, except to enforce the terms hereof or in any proceeding in which the terms of this Agreement are applicable.

9. Release by the Shea Parties. With the exception of the Tax Liability Issue addressed in Paragraph 3 above and any claims Shea or Bravera may have against Elizabeth Anne Conley, for and in consideration of the covenants and promises set forth in this Agreement, the Shea Parties, on behalf of themselves and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants, hereby fully, finally and forever releases, remises, acquits and forever discharges the Watson Parties in all capacities and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors,

predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants from any and all claims, demands, suits, actions, causes of action, obligations, damages, punitive damages, penalties, costs, losses, interest, expenses and liabilities of any kind or nature whatsoever, whether legal, equitable or statutory, liquidated or unliquidated, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, which any or all of the Shea Parties ever had, now has or could have had from the beginning of the world to the date hereof, regardless of when such claim, demand, suit, action, cause of action, obligation, damage, punitive damages, penalty, cost, loss, interest, expense or liability accrues or ripens, including, without limitation, all claims under the Merger Agreement, the License Agreement and the Employment Agreement, and all claims or counterclaims that the Shea Parties asserted or could have asserted against any of the Watson Parties in the aforementioned Lawsuits.

10. Release by the Watson Parties. For and in consideration of the covenants and promises set forth in this Agreement, the Watson Parties, on behalf of themselves and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants, hereby fully, finally and forever releases, remises, acquits and forever discharges the Shea Parties in all capacities and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants from any and all claims, demands,

suits, actions, causes of action, obligations, damages, punitive damages, penalties, costs, losses, interest, expenses and liabilities of any kind or nature whatsoever, whether legal, equitable or statutory, liquidated or unliquidated, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, which any or all of the Watson Parties ever had, now has or could have had from the beginning of the world to the date hereof, regardless of when such claim, demand, suit, action, cause of action, obligation, damage, punitive damages, penalty, cost, loss, interest, expense or liability accrues or ripens, including, without limitation, all claims under the Merger Agreement, the License Agreement and the Employment Agreement, and all claims or counterclaims that the Watson Parties asserted or could have asserted against any of the Shea Parties in the aforementioned Lawsuits.

11.    No Assignment or Transfer of Claims.    The Parties each warrant and represent that they have not heretofore assigned or transferred to any Person or entity any released claim or any part or portion thereof and each shall defend, indemnify and hold harmless the other Parties from or against any claim (including the payment of attorneys' fees and costs actually incurred, whether or not litigation is commenced) based on or in connection with or arising out of any such assignment or transfer made, purported or claimed.

12. No Reliance on Statements by Others. The Parties each represent and acknowledge that, in executing this Agreement, they have not relied and do not rely upon any representation or statement made by any other Party, or by any of their agents, employees, representatives or attorneys, with regard to the subject matter, basis or effect of this Agreement, or otherwise, except as is specifically and expressly set forth in this Agreement.

The Parties represent and warrant that they have relied on the advice of their respective attorneys and that the terms of this Settlement Agreement have been completely read and explained to them by their attorneys, and that those terms are fully understood and accepted by them. The Parties hereto acknowledge that they and each of their counsel have had adequate opportunity to make whatever investigation or inquiry that may be necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution hereof.

13. Authority to Bind. Each person executing this Agreement on behalf of a Party represents and warrants that (i) he has the requisite power and authority to execute and deliver this Settlement Agreement and the related documents to which such Party is a signatory; (ii) the execution and delivery of this Settlement Agreement by such Party has been duly authorized by all requisite action(s) and creates valid and binding obligations of such Party, enforceable in accordance with its terms; (iii) neither the execution and delivery of this Settlement Agreement nor the consummation of the transactions contemplated hereby or thereby will violate any constitution, statute, regulation, rule, injunction, judgment, order, decree or other restriction of any governmental authority or conflict with, result in a breach of, or constitute a default under any contract, lease, license instrument or other arrangement to which such Party is bound; and (iv) he is authorized to execute this Settlement Agreement on behalf of its officers, directors,

beneficiaries, representatives, employees, agents, affiliates, subsidiaries, attorneys, insurers, successors, predecessors and assigns.

14.    Effectuation of the Agreement.  The Parties agree and covenant to cooperate fully and to take all additional actions that may be necessary or appropriate to give full force to the terms and intent of this Settlement Agreement and which are not inconsistent with its terms.

15.    Scope of Agreement.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto as well as their administrators, trustees, executors, beneficiaries, receivers, conservators, representatives, parents, subsidiaries, affiliates, successors and assigns. Notwithstanding anything to the contrary, the Parties agree that there are no third party beneficiaries of this Agreement except as expressly provided herein.

16.    Entire Agreement.    This Agreement contains all of the representations and warranties, express and implied, oral and written, between and among the Parties hereto, and the entire understanding and agreement between and among the Parties, with respect to the subject matter hereof. All prior and contemporaneous conversations, discussions, negotiations, proposed agreements and agreements, covenants, understandings, representations or warranties with respect to the subject matter hereof or of the Lawsuits are merged herein, waived, superseded and replaced in total by this Agreement. This Agreement is an integrated agreement and may not be altered, amended, modified or otherwise changed in any respect whatsoever except in a written instrument executed by all Parties (or their successors-in-interest) that expressly states that it is a modification or alteration of this Settlement Agreement.

This Agreement memorializes the parties' July 10, 2008 binding settlement, the material terms of which were read into the record by United States Magistrate Judge Gorenstein and the Parties in the New York Federal Lawsuit, the terms being accepted on the record by Francis E. Wilde on behalf of the Shea Parties and Christopher Watson on behalf of the Watson Parties, and by their respective attorneys. The representations and warranties contained in this Agreement shall survive the execution, delivery and consummation of this Agreement.

17.    Governing Law. This Agreement, and any claims and disputes arising out of or in connection with this Agreement or the transactions, conditions or performance contemplated hereby, shall be governed by and construed in accordance with the laws of the State of New York without regard to its principles of conflicts of laws. The Parties agree that any dispute arising out of this Agreement will be adjudicated in the United States District Court for the Southern District of New York.

18.    Severability.  If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or application, and to this end the provisions of this Agreement are declared to be severable.

19.    Sufficiency of Consideration.    The Parties acknowledge that the covenants contained in this Agreement can provide good and sufficient consideration for every promise, duty, release, obligation, agreement and right contained in this Settlement Agreement.

20.    Confidentiality.  This Agreement will be considered confidential by the Parties and their counsel.  The Parties and their counsel will use their best efforts not to disclose, disseminate and/or publicize to any person, corporation, or other entity the existence of this Agreement or its terms or the underlying disputes to which it relates.  The Parties may disclose information pursuant to this Agreement only:

    a.  based on the advice of legal counsel where necessary to report to appropriate taxing authorities;

    b.  to the extent necessary to enforce their rights under this Agreement;

    c.  for purposes of financial reporting, including SEC or other regulatory filings;

    d.  to the Parties' directors, officers and employees on a need-to-know basis;

    e.  where necessary in response to a direct order of a court of competent jurisdiction or subpoena issued under the authority thereof;

      f. pursuant to the request of a federal or state regulator or other regulatory body or government agency with oversight or regulatory authority relating to the business of either of the Parties; or

g. to the extent necessary to their attorneys or accountants (having first disclosed to such individuals the confidential nature of this information).

If any Party believes that it will disclose any information pursuant to sub-paragraph (e) above, it shall, if legally permitted, provide written notice prior to disclosure in accordance with the instructions in Paragraph 23 below.

21. Signatures in Counterparts. This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the full efficacy of a signed original. Photographic copies of such signed counterparts may be used in lieu of the originals for any permissible purpose.

22. Notices. Any notice, request, demand or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given if delivered or sent by facsimile transmission, upon proof of receipt, or if sent by registered or certified mail, upon the sooner of the date on which receipt is acknowledged or the expiration of three days after deposit in United States post office facilities properly addressed with postage prepaid. All such notices to a Party will be sent to the addresses set forth below or to such other address or Person as such Party may designate by notice to each other Party hereunder:

(a)     If to any Watson Party:


        Christopher Watson
        Intellectus LLC
        300 Bucksley Lane #305
        Daniel Island, SC 29492


        With a copy to:


        James Davies, Esq.
        Landman Corsi Ballaine & Ford P.C.
        120 Broadway, 27th Floor
        New York, NY 10271


(b)     If to any Shea Party:

        E. Joseph Vitetta, Jr.
        12301 Cicero Drive
        Alpharetta, GA 30022


        With a copy to:


        Stephen E. Baril, Esq.
        Williams Mullen
        1021 E. Cary Street
        P.O. Box 1320
        Richmond, VA 23218-1320

THIS SPACE IS INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, this Settlement Agreement has been duly executed by the Parties in counterparts, and each is an original as of the first date written above.

**SHEA DEVELOPMENT CORP.**

By:____________________________
Name:
Title:

**BRAVERA, INC.**

By:____________________________
Name:
Title:

**RIPTIDE WORLDWIDE, INC.**

By:____________________________
Name:
Title:

**RTWW BUSINESS SERVICES, INC.**

By:____________________________
Name:
Title:

**IP HOLDING OF NEVADA CORP.**

By:______________________________
Name:
Title:

**CHRISTOPHER WATSON**

________________________________

**INTELLECTUS, LLC**

By:________________________________
Name: Christopher Watson
Title: Managing Member

**INTELLECTUS BUSINESS SERVICES, LLC**

By:________________________________
Name: Christopher Watson
Title: Managing Member

**SD2R, LLC**

By:________________________________
Name: Christopher Watson
Title: Managing Member

**DANIEL ISLAND PARTNERS, LLC**

By:________________________________
Name: Christopher Watson
Title: Managing Member

# Exhibit G

**CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE**

This Confidential Settlement Agreement and Mutual Release (the "Agreement") is entered into this ___ day of July 2008, by and among Riptide Worldwide, Inc. (formerly Shea Development Corp.); RTWW Business Services, Inc. (formerly Bravera, Inc.); and IP Holding of Nevada Corp. (collectively, the "Shea Parties"), and Christopher Watson; Intellectus, LLC; SD2R Partners, LLC (a/k/a SD2R, LLC); Daniel Island Partners, LLC; and Intellectus Business Services, LLC (collectively, the "Watson Parties"). The Shea Parties and the Watson Parties are collectively referred to as the "Parties."

**RECITALS**

WHEREAS, Shea Development Corp. ("Shea") (n/k/a Riptide Worldwide, Inc.) and Bravera, Inc. (n/k/a RTWW Business Services, Inc.) ("Bravera") entered into an Agreement and Plan of Merger dated as of April 26, 2007 (the "Merger Agreement"). The Merger became effective July 16, 2007, with Bravera becoming a wholly-owned subsidiary of Shea.

WHEREAS, as contemplated by the Merger Agreement, Christopher Watson ("Mr. Watson") and Bravera entered into a Senior Management Employment Agreement dated July 15, 2007 (the "Employment Agreement"), whereby Mr. Watson accepted employment with Bravera.

WHEREAS, as contemplated by the Merger Agreement, IP Holding of Nevada Corp. ("IP Holding") and Intellectus, LLC ("Intellectus") entered into a Software License and Asset Purchase Agreement dated as of July 16, 2007 (the "Licensing Agreement"), whereby IP Holding acquired from Intellectus a worldwide license in regard to certain intellectual property assets described more fully in the Licensing Agreement. Intellectus also received warrants to purchase Shea stock.

WHEREAS, pursuant to the Merger Agreement, Mr. Watson received shares of Shea stock (the "Shea Stock"), and warrants to purchase shares of Shea stock.

WHEREAS, at the time of the Merger, Bravera was a party to a 2005 contract with the Federal Emergency Management Agency (the "FEMA Contract"). Shea assumed the FEMA Contract pursuant to the Merger. The FEMA Contract is scheduled to expire on September 30, 2008.

WHEREAS, at the time of the Merger, Bravera was the lessee of certain leased premises in Reston, Virginia, as described below; owned certain business equipment; and employed certain personnel for the purpose of servicing the FEMA Contract. Pursuant to the Merger, Shea assumed the leasehold, took legal title to the equipment, and employed the personnel.

WHEREAS, in mid-September 2007, a dispute arose between Shea/Bravera and Mr. Watson about certain pre-Merger representations. On September 29, 2007, Mr. Watson gave written notice of his voluntary termination of his employment under the Employment Agreement.

**Deleted:** sales projections

WHEREAS, the Merger Agreement stated that Bravera had filed and paid all taxes through the tax year ended December 31, 2006. In mid-November 2007, Shea/Bravera received a notice from the United States Internal Revenue Service of unpaid payroll withholding taxes for the tax year ended December 31, 2005 in the amount of $258,367.91, not including interest or penalties. In early December 2007, Shea/Bravera received a notice from the Commonwealth of Virginia of unpaid payroll withholding taxes for the period October 2005 through December 2005 in the amount of $9,300.20, including interest and penalties. The various notices of and liabilities for unpaid payroll withholding taxes shall be referred to herein collectively as the "Tax Liability Issue."

**Deleted:** . In May 2008, Shea/Bravera received a notice from the County of Fairfax, Virginia of Bravera's failure to notice the County of business personal property located in the County in 2006 and 2007

WHEREAS, Shea filed a lawsuit against, *inter alia*, Mr. Watson in the U.S. District Court for the Southern District of New York, styled *Shea Development Corp., et al. v. Watson, et al.*, Case No. CV-07-11201, alleging fraud, constructive fraud, breach of fiduciary duty, breach of the Employment Agreement, and breach of the Merger Agreement (the "New York Federal Lawsuit").

WHEREAS, Mr. Watson filed a lawsuit against, *inter alia*, Riptide Worldwide, Inc. (f/k/a/ Shea) in the Supreme Court of New York, New York County, styled *Watson, et al. v. Riptide Worldwide, Inc. (f/k/a Shea Development Corp.), et al.*, Case No. 600114/08, alleging breach of the Merger Agreement, breach of the Licensing Agreement, and breach of the Employment Agreement, as well as seeking declaratory and injunctive relief (the "New York State Lawsuit").

Deleted:

WHEREAS, Mr. Watson filed a lawsuit against Shea and Bravera in the Ninth Judicial Circuit, In the Court of Common Pleas, State of South Carolina, County of Charleston, styled *Watson v. Bravera, Inc. et al.*, Case No. 2007-CP-10-5074, alleging breach of contract and breach of contract with fraudulent intent in regard to an unpaid loan he contends he made to Shea/Bravera. (the "South Carolina Lawsuit"). The Defendant filed a Notice of Removal seeking removal to the United States District Court for the District of South Carolina, where it is pending as Case No. 08-CV-81 (PMD).

WHEREAS, Daniel Island Partners, LLC filed a lawsuit against Bravera in the Magistrate's Court for the County of Berkeley, South Carolina, styled *Daniel Island Partners, LLC v. Bravera, Inc.*, Case No. 07K-0915, seeking payment of unpaid rent (the "Second South Carolina Lawsuit").

WHEREAS, SD2R Partners filed a lawsuit against Bravera in the Circuit Court of Fairfax County, Virginia, styled *SD2R Partners, LLC a/k/a SD2R, LLC v. Bravera, Inc.*, Civ. Action No. 2007 15640, alleging breach of a lease agreement (the "Virginia Lawsuit"). The New York Federal Lawsuit, the New York State Lawsuit, the South Carolina Lawsuit, the Second South Carolina Lawsuit, and the Virginia Lawsuit are collectively referred to as the "Lawsuits."

Deleted: ¶

WHEREAS, the Parties deny any and all liability to each other in regard to the aforementioned Lawsuits.

WHEREAS, to avoid further costs and expenditures of resources, the Parties now desire to settle, compromise, and resolve all rights, claims, counterclaims, and demands of whatever nature which the Parties may have against one another as specified herein, including but not limited to those which are at issue in the Lawsuits.

NOW, THEREFORE, in consideration of the following mutual promises, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1. Return of the Shea Stock and the Shea Warrants. By execution of this agreement, Shea hereby accepts the December 18, 2007 tender of 400,000 (four hundred thousand) shares of Shea stock at $.25 (twenty-five cents) per share. Within ten (10) business days of execution of this Agreement, Mr. Watson shall tender to Shea all certificates representing the Shea Stock and warrants to purchase shares of Shea Stock in the possession of any of the Watson Parties or to which any of the Watson Parties ever had any claim of ownership or interest, and Shea shall verify that all Shea Stock and warrants to purchase shares of Shea Stock have been returned by the Watson Parties.

2. Payment to Watson. Within fifteen (15) business days after the execution of this Agreement, Shea shall pay Mr. Watson the sum of One Hundred Seventy-Five Thousand Dollars and No Cents ($175,000.00) by wire transfer to a bank account designated in writing by Mr. Watson.

3. The Tax Liability Issue. Mr. Watson shall be personally responsible for resolving and settling the Tax Liability Issue to the extent set forth below. Shea shall cooperate with Mr. Watson in this endeavor, but Mr. Watson shall have final authority over settlement of the Tax Liability Issue. Mr. Watson shall be responsible for any and all costs associated with the settlement of the Tax Liability Issue, including but not limited to the hiring and/or retention of accountants.

Within fourteen (14) days of July 10, 2008, Shea shall deposit in an interest-bearing escrow account with the law firm of Williams Mullen (the "Escrow Agent") the sum of Two Hundred Seventy-Five Thousand Dollars and No Cents ($275,000.00) (the "Escrowed Funds") as security for Mr. Watson's settlement of the Tax Liability Issue. The Escrowed Funds, together with any accrued interest, shall be paid to Mr. Watson upon delivery to the Escrow Agent of written confirmation from the relevant taxing authorities that the Tax Liability Issue has been fully compromised and settled, and Shea/Bravera has been released from such liability. If there is any remaining tax liability to Shea/Bravera arising from the Tax Liability Issue, the Escrowed Funds shall first be applied to such liability before any payment to Mr. Watson.

**Deleted:** Shea's receipt of

4. The Suite 250 Lease. The lease dated August 12, 2005 between SD2R and Bravera for the premises at 1801 Robert Fulton Drive, Suite 250, Reston, Virginia, 20191 (the "Leased Premises") with a monthly rent of $6,000.00, which Shea assumed as part of the Merger, shall remain in full force and effect on a month-to-month basis until such time as Shea has fulfilled its obligations under the FEMA Contract and any extensions thereof. Promptly, upon completion of the FEMA Contract, or within 30 (thirty) days after SD2R shall issue a written demand for the Premises, which ever is first, Bravera shall vacate the premises and Bravera shall have no posessory interest in the leased premises or any obligation to pay rent, other than rent as a hold-over tenant.

Deleted: U

Deleted: Bravera

Deleted: , and the lease shall be null and void thereafter, with no further liability to SD2R

Deleted: .

5. Transfer of Personal Property. Within five days of execution of this Agreement, Bravera will transfer to Mr. Watson the business equipment identified on Exhibit A hereto; a certain BMW automobile; and a certain Ford Sport Utility Vehicle. Shea further shall make all reasonable efforts to obtain the consent of the Government Services Administration to transfer a certain GSA MOBUS Contract to either Mr. Watson or Intellectus.

Deleted: As soon as reasonably practical upon completion of its obligations under the FEMA Contract

Deleted: located at the Leased Premises

6. Nullification of Contracts and Non-Compete Clauses. The Parties agree that, with the exception of the Leased Premises addressed in paragraph 4 above and Section 5.12(a) of Article 5 and Sections 7.2(b) and 7.4 and 7.5 or Article 7 of the Merger Agreement, any and all contracts by and between any of the Shea Parties, on the one hand, and the Watson Parties, on the other hand, including but not limited to the Merger Agreement, the Employment Agreement, the Licensing Agreement, and the Lease for Suite 240 at 1801 Robert Fulton Drive, Reston, Virginia 20191, are declared null and void. This provision extends to any and all non-compete

Deleted: All

agreements between the Shea Parties and the Watson Parties, and, upon the completion of the FEMA Contract, to any non-compete clauses contained in the employment contracts of any individuals employed by Bravera in connection with the FEMA Contract.

7. Dismissal with Prejudice of the Lawsuits. The Parties agree that, within fifteen (15) business days of the execution of this Agreement, they shall cause to be entered Orders dismissing, with prejudice, all of the Lawsuits between the parties. Each Party shall bear its own costs and fees and waive and all rights of appeal in regard to the Lawsuits.

8. Denial of Liability. The Parties expressly deny any and all liability under the Lawsuits. Neither this Agreement nor any order of dismissal in the Lawsuits shall be construed to as admission of liability or wrongdoing by any Party. The Parties further agree and acknowledge that neither this Agreement, nor the terms thereof or negotiations relating thereto, shall be offered in evidence in any action or proceeding for any purpose whatsoever, except to enforce the terms hereof or in any proceeding in which the terms of this Agreement are applicable.

9. Release by the Shea Parties. With the exception of the Tax Liability Issue addressed in Paragraph 3 above, for and in consideration of the covenants and promises set forth in this Agreement, the Shea Parties, on behalf of themselves and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants, hereby fully,

**Deleted:** and any claims Shea or Bravera may have against Elizabeth Anne Conley

finally and forever releases, remises, acquits and forever discharges the Watson Parties in all capacities and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants from any and all claims, demands, suits, actions, causes of action, obligations, damages, punitive damages, penalties, costs, losses, interest, expenses and liabilities of any kind or nature whatsoever, whether legal, equitable or statutory, liquidated or unliquidated, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, which any or all of the Shea Parties ever had, now has or could have had from the beginning of the world to the date hereof, regardless of when such claim, demand, suit, action, cause of action, obligation, damage, punitive damages, penalty, cost, loss, interest, expense or liability accrues or ripens, including, without limitation, all claims under the Merger Agreement, the License Agreement and the Employment Agreement, and all claims or counterclaims that the Shea Parties asserted or could have asserted against any of the Watson Parties in the aforementioned Lawsuits.

10. Release by the Watson Parties. With the exception of any claims that may accure hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement, for and in consideration of the covenants and promises set forth in this Agreement, the Watson Parties, on behalf of themselves and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants,

Deleted: F

hereby fully, finally and forever releases, remises, acquits and forever discharges the Shea Parties in all capacities and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants from any and all claims, demands, suits, actions, causes of action, obligations, damages, punitive damages, penalties, costs, losses, interest, expenses and liabilities of any kind or nature whatsoever, whether legal, equitable or statutory, liquidated or unliquidated, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, which any or all of the Watson Parties ever had, now has or could have had from the beginning of the world to the date hereof, regardless of when such claim, demand, suit, action, cause of action, obligation, damage, punitive damages, penalty, cost, loss, interest, expense or liability accrues or ripens, including, without limitation, all claims under the Merger Agreement, the License Agreement and the Employment Agreement, and all claims or counterclaims that the Watson Parties asserted or could have asserted against any of the Shea Parties in the aforementioned Lawsuits.

11. No Assignment or Transfer of Claims. The Parties each warrant and represent that they have not heretofore assigned or transferred to any Person or entity any released claim or any part or portion thereof and each shall defend, indemnify and hold harmless the other Parties from or against any claim (including the payment of attorneys' fees and costs actually incurred, whether or not litigation is commenced) based on or in connection with or arising out of any such assignment or transfer made, purported or claimed.

12. No Reliance on Statements by Others. The Parties each represent and acknowledge that, in executing this Agreement, they have not relied and do not rely upon any representation or statement made by any other Party, or by any of their agents, employees, representatives or attorneys, with regard to the subject matter, basis or effect of this Agreement, or otherwise, except as is specifically and expressly set forth in this Agreement.

The Parties represent and warrant that they have relied on the advice of their respective attorneys and that the terms of this Settlement Agreement have been completely read and explained to them by their attorneys, and that those terms are fully understood and accepted by them. The Parties hereto acknowledge that they and each of their counsel have had adequate opportunity to make whatever investigation or inquiry that may be necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution hereof.

13. Authority to Bind. Each person executing this Agreement on behalf of a Party represents and warrants that (i) he has the requisite power and authority to execute and deliver this Settlement Agreement and the related documents to which such Party is a signatory; (ii) the execution and delivery of this Settlement Agreement by such Party has been duly authorized by all requisite action(s) and creates valid and binding obligations of such Party, enforceable in accordance with its terms; (iii) neither the execution and delivery of this Settlement Agreement nor the consummation of the transactions contemplated hereby or thereby will violate any constitution, statute, regulation, rule, injunction, judgment, order, decree or other restriction of any governmental authority or conflict with, result in a breach of, or constitute a default under any contract, lease, license instrument or other arrangement to which such Party is bound; and (iv) he is authorized to execute this Settlement Agreement on behalf of its officers, directors,

beneficiaries, representatives, employees, agents, affiliates, subsidiaries, attorneys, insurers, successors, predecessors and assigns.

14. Effectuation of the Agreement. The Parties agree and covenant to cooperate fully and to take all additional actions that may be necessary or appropriate to give full force to the terms and intent of this Settlement Agreement and which are not inconsistent with its terms.

15. Scope of Agreement. This Agreement shall be binding upon and inure to the benefit of the Parties hereto as well as their administrators, trustees, executors, beneficiaries, receivers, conservators, representatives, parents, subsidiaries, affiliates, successors and assigns. Notwithstanding anything to the contrary, the Parties agree that there are no third party beneficiaries of this Agreement except as expressly provided herein.

16. Entire Agreement. This Agreement contains all of the representations and warranties, express and implied, oral and written, between and among the Parties hereto, and the entire understanding and agreement between and among the Parties, with respect to the subject matter hereof. All prior and contemporaneous conversations, discussions, negotiations, proposed agreements and agreements, covenants, understandings, representations or warranties with respect to the subject matter hereof or of the Lawsuits are merged herein, waived, superseded and replaced in total by this Agreement. This Agreement is an integrated agreement and may not be altered, amended, modified or otherwise changed in any respect whatsoever except in a written instrument executed by all Parties (or their successors-in-interest) that expressly states that it is a modification or alteration of this Settlement Agreement.

This Agreement memorializes the parties' July 10, 2008 binding settlement, the material terms of which were read into the record by United States Magistrate Judge Gorenstein and the Parties in the New York Federal Lawsuit, the terms being accepted on the record by Francis E. Wilde on behalf of the Shea Parties and Christopher Watson on behalf of the Watson Parties, and by their respective attorneys. The representations and warranties contained in this Agreement shall survive the execution, delivery and consummation of this Agreement.

17. Governing Law. This Agreement, and any claims and disputes arising out of or in connection with this Agreement or the transactions, conditions or performance contemplated hereby, shall be governed by and construed in accordance with the laws of the State of New York without regard to its principles of conflicts of laws. The Parties agree that any dispute arising out of this Agreement will be adjudicated in the United States District Court for the Southern District of New York.

18. Severability. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or application, and to this end the provisions of this Agreement are declared to be severable.

19. Sufficiency of Consideration. The Parties acknowledge that the covenants contained in this Agreement can provide good and sufficient consideration for every promise, duty, release, obligation, agreement and right contained in this Settlement Agreement.

20. Confidentiality. This Agreement will be considered confidential by the Parties and their counsel. The Parties and their counsel will use their best efforts not to disclose, disseminate and/or publicize to any person, corporation, or other entity the existence of this Agreement or its terms or the underlying disputes to which it relates. The Parties may disclose information pursuant to this Agreement only:

a. based on the advice of legal counsel where necessary to report to appropriate taxing authorities;

b. to the extent necessary to enforce their rights under this Agreement;

c. for purposes of financial reporting, including SEC or other regulatory filings;

d. to the Parties' directors, officers and employees on a need-to-know basis;

e. where necessary in response to a direct order of a court of competent jurisdiction or subpoena issued under the authority thereof;

    f. pursuant to the request of a federal or state regulator or other regulatory body or government agency with oversight or regulatory authority relating to the business of either of the Parties; or

g. to the extent necessary to their attorneys or accountants (having first disclosed to such individuals the confidential nature of this information).

If any Party believes that it will disclose any information pursuant to sub-paragraph (e) above, it shall, if legally permitted, provide written notice prior to disclosure in accordance with the instructions in Paragraph 23 below.

21. Signatures in Counterparts. This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the full efficacy of a signed original. Photographic copies of such signed counterparts may be used in lieu of the originals for any permissible purpose.

22. Notices. Any notice, request, demand or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given if delivered or sent by facsimile transmission, upon proof of receipt, or if sent by registered or certified mail, upon the sooner of the date on which receipt is acknowledged or the expiration of three days after deposit in United States post office facilities properly addressed with postage prepaid. All such notices to a Party will be sent to the addresses set forth below or to such other address or Person as such Party may designate by notice to each other Party hereunder:

(a) If to any Watson Party:

Christopher Watson
Intellectus LLC
300 Bucksley Lane #305
Daniel Island, SC 29492

With a copy to:

James Davies, Esq.
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, NY 10271

(b) If to any Shea Party:

E. Joseph Vitetta, Jr.
12301 Cicero Drive
Alpharetta, GA 30022

With a copy to:

Stephen E. Baril, Esq.
Williams Mullen
1021 E. Cary Street
P.O. Box 1320
Richmond, VA 23218-1320

THIS SPACE IS INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, this Settlement Agreement has been duly executed by the Parties in counterparts, and each is an original as of the first date written above.

**SHEA DEVELOPMENT CORP.**

By:______________________________
Name:
Title:

**BRAVERA, INC.**

By:______________________________
Name:
Title:

**RIPTIDE WORLDWIDE, INC.**

By:______________________________
Name:
Title:

**RTWW BUSINESS SERVICES, INC.**

By:______________________________
Name:
Title:

**IP HOLDING OF NEVADA CORP.**

By:______________________________
Name:
Title:

**CHRISTOPHER WATSON**

______________________________

**INTELLECTUS, LLC**

By:______________________________
Name: Christopher Watson
Title: Managing Member

**INTELLECTUS BUSINESS SERVICES, LLC**

By:_________________________________
Name: Christopher Watson
Title: Managing Member

**SD2R, LLC**

By:______________________________
Name: Christopher Watson
Title: Managing Member

**DANIEL ISLAND PARTNERS, LLC**

By:_________________________________
Name: Christopher Watson
Title: Managing Member

BRAVERA INVENTORY

| Make and Model | Serial number | System Info | Barcode |
|---|---|---|---|
| **Laptop** | | | |
| | | | |
| Dell Latitude D510 | 3DMTP81 | XP PRO SP2 - IGB RAM - 2.0GHz Intel | BC10054BC |
| Dell Latitude D610 | 129BL81 | XP PRO SP2 - 1GB RAM - 2.0GHz Intel | BC10013BC |
| Dell Latitude D510 | JDMTP81 | XP PRO SP2 - 1GB RAM - 2.0GHz Intel | BC10082BC |
| Dell Latitude D610 | ATA50200BB4 | XP PRO SP2 - 1GB RAM - 2.0GHz Intel | BC10069BC |
| Dell Latitude D610 | 729BL81 | XP P1GRO SP2 - 1GB RAM - 2.0GHz Intel | BC10029BC |
| Dell Latitude D610 | 6MUGH81 | XP PRO SP2 - 1GB RAM - 80gigHD | BC10068BC |
| Dell Latitude D510 | G70YY81 | XP PRO SP2 - 1GB RAM - 2.0GHz Intel | BC10083BC |
| Dell Latitude D610 | 760YY81 | XP PRO SP2 - 1GB RAM - 2.0GHz Intel | BC10102BC |
| | 4M5SN71 | XP PRO SP2 - 1GB RAM - 2.0GHz Intel | BC10091BC |
| | | | |
| Dell Latitude 810 | 90RVY71 | | BC10002BC |
| Dell Latitude 610 | G1MB571 | XP PRO SP2 - | BC10101BC |
| IBM ThinkPad G40 | KM 0469B 0406 | Windows 2003 - 750RAM - 2.7 GHz | BC10027BC |
| IBM ThinkPad T43 | L3-A7692 | XP PRO SP2 - 1GB RAM - 1.8GHz Intel | BC10016BC |
| Compaq Evo N620c | CNU32002DP | XP PRO SP2 - 512RAM - 1.6GHz | BC10030BC |
| | | | |
| **Workstation** | | | |
| | | | |
| Dell Optiplex 520 | 8XXZJ81 | XP Pro sp2 - 512 RAM - 2.8GHz Intel | BC10014BC |
| Dell Optiplex 620 | DV6N81 | Windows 2003 sp2 - 2GB Ram - 3.3GHz Intel | BC10042BC |
| Dell Optiplex 620 | 2W6NL81 | Windows 2003 sp2 - 2GB Ram - 3.3GHz Intel | BC10028BC |
| | | | |
| | | | |
| Dell Optiplex GX520 | FZNNS81 | XP PRO SP2 - 1GB RAM - XX GHz | BC10015BC |
| Dell Optiplex GX520 | HZNNS81 | XP PRO SP2 - 1GB RAM - XX GHz | BC10043BC |
| Dell Optiplex GX520 | JZNNS81 | XP PRO SP2 - 1GB RAM - XX GHz | BC10001BC |
| | | | |
| Compaq Presario SR1522x | MXF539035P | XP PRO SP2 - 1 GB RAM 2.9GHz Intel | BC10005BC |
| Compaq Presario SR1522x | MXF53700FR | XP PRO SP2 - 1 GB RAM 2.9GHz Intel | BC10045BC |
| Compaq Presario SR1522x | MXF53903SR | XP PRO SP2 - 1 GB RAM 2.9GHz Intel | BC10032BC |
| Compaq Presario SR1522x | MXF53700DV | XP PRO SP2 - 1 GB RAM 2.9GHz Intel | BC10046BC |
| | | | |
| Dell Optiplex GX520 | IXXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10031BC |
| Dell Optiplex GX520 | HWXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10017BC |
| Dell Optiplex GX520 | CWXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10003BC |
| Dell Optiplex GX520 | BWXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10044BC |
| Dell Optiplex GX520 | 6XXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10006BC |
| Dell Optiplex GX520 | 4XXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10004BC |
| Dell Optiplex GX520 | DWXZJ81 | XP PRO SP2 - 1 GB RAM 2.8GHz Intel | BC10018BC |

BRAVERA INVENTORY

| | | | |
|---|---|---|---|
| **Servers - Reston** | | | |
| | | | |
| Dell PowerEdge SC1425 Bravera2 | DJBYY71 | 10.10.10.10 | BC10023BC |
| Dell PowerEdge SC1425 Bravera3 | 1KBYY71 | 10.10.10.156 | BC10037BC |
| Dell PowerEdge SC1425 SECURE1 | CCRR81 | 10.10.10.137 | BC10051BC |
| Dell PowerEdge 850 Bravera4 | 9P0VZ81 | | BC10024BC |
| | | | |
| **Swithces/Routers/Hubs** | | | |
| Belkin 24 port switch | 47A35000286 | | BC10084BC |
| Netgear 24 port switch - JGS54 | 1392583L0049B | | BC10098BC |
| Cisco IAD 2400 | FHK0941F23U | | BC10057BC |
| Sonic Wall Pro200 | 00401015DB8E | | BC10071BC |
| Hawking 8 port switch | HCMCG58033100149 | | BC10085BC |
| | | | |
| DLINK 4 port switch | BNZB539093974 | | BC10099BC |
| Link SYS wireless router 4 port- WRT54GSv2 | CGN30E341489 | | BC10058BC |
| NetGear 24 port switch | S/N - not accessible | | BC10072BC |
| NetGear dual speed hub - 8 port - DS108 | DS18141DB695979 | | BC10086BC |
| Smart Ups 1000 | AS0142211933 | | BC10100BC |
| Smart Ups 1000 | AS0142112280 | | BC10059BC |
| | | | |
| NEC - Aspire | TA5100076B | | BC10073BC |
| **Verio Inventory - Herndon - Rack B23** | | | |
| | | | |
| Dell Power Connect 2708 - 8 port | | | BC10090BC |
| SonicWall Pro 2040 | 0006B11A154 | | BC10060BC |
| SonicWall Pro 2040 | 0006B11A17C | | BC10061BC |
| Dell Power Connect 2624 - 24 port | 4HF2R42 | | BC10062BC |
| Cisco 2600 Series | FTX0924546 | | BC10063BC |
| Dell PowerEdge 750 - Bravera1 | B0TQS71 | 128.121.23.10 | BC10064BC |
| Dell PowerEdge 750 - Mail | H0TQS71 | 128.121.23.11 | BC10065BC |
| Dell PowerEdge 750 - wpdev.bravera.com | 6H0HT61 | 128.121.23.12 | BC10066BC |
| Dell PowerEdge 750 - cni.bravera.com | 7H0HT61 | 128.121.23.13 | BC10067BC |
| Dell PowerEdge 750 - wfsrv6 | 4DLSX51 | 128.121.23.14 | BC10074BC |
| Dell PowerEdge 750 - wfsrv5 | 3DLSX51 | 128.121.23.15 | BC10075BC |
| TrippLite KVM switch - 8020-01b | 9351AZBO2001600257 | | BC10089BC |
| | | | |
| Dell PowerEdge - Demo Sales | DGJ7211 | 128.121.23.20 | BC10076BC |
| Dell PowerEdge - wfsrv2 | G05PV01 | 128.121.23. | BC10077BC |
| Dell PowerEdge - ViewStar | H05PV01 | 128.121.23.18 | BC10078BC |
| Dell PowerEdge - dcgc1.corp.bravera.com | 3TXLX11 | 128.121.23.19 | BC10079BC |
| Dell PowerEdge - wfsdemo | F5RGX11 | 128.121.23. | BC10080BC |

BRAVERA INVENTORY

| | | | |
|---|---|---|---|
| Dell PowerEdge - TestWeb | DYM1211 | 128.121.23.21 | BC10081BC |
| Dell PowerEdge - Dev2 | 5LKTP21 | 128.121.23.22 | BC10088BC |
| | | | |
| | | | |
| **Scanners - Reston** | | | |
| | | | |
| Cannon 9080C | CZ304492 | Scanning Station | BC10019BC |
| Cannon 9080C | CZ304471 | Scanning Station | BC10033BC |
| Cannon 9080C | CZ304470 | Scanning Station | BC10020BC |
| Cannon 9080C | CZ304552 | Scanning Station | BC10034BC |
| Cannon 9080C | CZ304551 | Scanning Station | BC10047BC |
| | | | |
| Kodax I40 | 4322-0998 | QC Station. | BC10048BC |
| Kodax I40 | 4322-1078 | QC Station | BC10007BC |
| Kodax I40 | 4322-1838 | QC Station | BC10021BC |
| Kodax I40 | 4322-2171 | QC Station | BC10035BC |
| | | | |
| **Printers - Reston** | | | |
| | | | |
| Cannon PC1060 (#240) | | Copier for FEMA project | BC10008BC |
| Samsung ML2200 (#240) | BADY508753J | Printer for Femaproject Managers | BC10009BC |
| | | | |
| Samsung SCX - 4100 | BAKY711711V | Local printer for #250 Conf. room. | BC10087BC |
| HP 1320tn (#250) | CNHC598022 | Network printer #250 | BC10052BC |
| Brother FAX/Scan/Print (#250) | U61092H5F954977 | Bravera FAX | BC10011BC |
| Xerox Phaser 1235 | 3892X003 | Out of order. | BC10039BC |
| HP Office Jet | SG045C30SP | Out of order. | BC10053BC |
| | | | |
| **Server Racks/Cabinet** | | | |
| | | | |
| Rack 1 | | Servers/Swtiches | BC10026BC |
| Rack 2 | | Swtiches | BC10040BC |
| | | | |
| Network Cabinet - Intended for #240 | | Will hold port/router/switch in #240 | BC10012BC |
| | | | |
| **Julia's Returned workstations/servers** | | | |
| | | | |
| HP SuperStore Opticle 220 | US9NJ00278 | | BC10041BC |
| Workstation - No brand name. | No available SN # | | BC10055BC |
| Workstation - No brand name. | 14486787 | | BC10056BC |
| | | | |
| Panisonic - 50 inch Plasma | YH5110324 | | |

# Exhibit H

**Cristi Luckow**

---

**From:** James Davies
**Sent:** Monday, July 21, 2008 6:20 PM
**To:** 'Baril, Stephen E.'; 'Dowd, Brendan'
**Cc:** 'Dillon, Edward'; Cristi Luckow
**Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08

Stephen,

We are surprised by your rejections of many of our revisions. Indeed, we believe the proposed draft substantially alters the agreement reached by the parties and accordingly feel we may be reaching an impasse. Mr. Watson was willing to forgo much of his claimed damages to enter into a speedy resolution beneficial to both parties. However, the terms as presently drafted, in our view, do not reflect the agreement made and present serious stumbling blocks to consummating the settlement.

Below, we highlight the most substantive areas of disagreement:

Paragraph1. Our proposed change in paragraph regarding Riptide's acceptance of the December 2007 tender reflects the agreement on the record that "[t]he tender of stocks and warrants that has been made by Mr. Watson will be accepted." Trans. at p. 4.

Paragraphs 4 & 5. With respect to the timing of the turnover of the lease and the equipment, we made clear prior to the conference, both orally and in writing, that time was of the essence to any compromise because the equipment transfer would become useless once Intellectus LLC began servicing FEMA and that its value was based upon allowing Mr. Watson to prepare for servicing the contract. The equipment has very little value, if any, to Mr. Watson once he begins servicing the FEMA contract. Therefore your proposal that the transfer only occur after Riptide ends its service of FEMA is unacceptable.

Paragraph 6 - There was never an understanding that the indemnification provisions of the contracts would become unenforceable in the event of future litigation by third-parties. Indeed, the sole mention of contractual language in the transcript is the release of non-competes for Mr. Watson and Bravera employees. Accordingly, your rejection of our proposed change is not acceptable.

I recommend a conference call tomorrow afternoon. If we are unable to reach an accord, we will need to contact the Court.

Sincerely,

James Davies

-----Original Message-----
**From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
**Sent:** Monday, July 21, 2008 5:14 PM
**To:** James Davies; Dowd, Brendan
**Cc:** Dillon, Edward; Baril, Stephen E.
**Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08

Jed,

Attached is Riptide's response to Watson's revisions from 7/18, together with an Exhibit A addressing the Shea Stock issue.

Riptide is still comparing the Bravera Inventory to its own inventory. The final inventory will be attached as Exhibit B.

Please let me know when you would like to discuss any final changes to the Settlement Agreement.

Steve

Stephen E. Baril, Esq.
Williams Mullen
1021 East Cary Street, 14th Floor
P.O. Box 1320
Richmond, VA 23218-1320
(804) 783-6423
(804) 783-6507 - fax
sbaril@williamsmullen.com

NOTICE: Information contained in this transmission to the named addressee is proprietary information and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.

---

**From:** James Davies [mailto:jdavies@lcbf.com]
**Sent:** Monday, July 21, 2008 12:06 PM
**To:** Dowd, Brendan; Baril, Stephen E.
**Subject:** Riptide/Watson

How are we going on the papers? My client is anxious to put this all behind him.

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540
NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

# Exhibit I

**Cristi Luckow**

---

**From:** James Davies
**Sent:** Wednesday, July 23, 2008 10:36 AM
**To:** 'Baril, Stephen E.'; Cristi Luckow; 'Dowd, Brendan'
**Cc:** 'Dillon, Edward'; Cristi Luckow
**Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08

Steve,

I spoke with my client. We will be writing to the Court today and requesting a conference as soon as possible as time is of the essence. As we have previously advised in writing, as each day passes the non-cash consideration (e.g. space and equipment) present less of a value to my client. As two weeks already have passed since the conference, the transfer of the leased space and equipment is already less attractive to my client. As previously discussed, at this moment, we believe the transition strategy we have proposed is beneficial to both our clients. However, once Intellectus leases other office space or purchases equipment, my client will not be amenable to accepting a discounted settlement and will hold Riptide/Bravera to the terms of the Reston office lease.

Thank you.

> -----Original Message-----
> **From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
> **Sent:** Tuesday, July 22, 2008 10:44 AM
> **To:** Cristi Luckow; James Davies; Dowd, Brendan
> **Cc:** Dillon, Edward
> **Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08
>
> We are confirmed at 3:30 pm.
>
> Dial-in # 866-397-5385
> Password 8047836423
>
> ---
>
> **From:** Cristi Luckow [mailto:cluckow@lcbf.com]
> **Sent:** Tuesday, July 22, 2008 10:01 AM
> **To:** Baril, Stephen E.; James Davies; Dowd, Brendan
> **Cc:** Dillon, Edward
> **Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08
>
> Jed and I will be available at 3:30 p.m. for a conference call. Please advise whether this works for all. Thanks.
>
> > -----Original Message-----
> > **From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
> > **Sent:** Tuesday, July 22, 2008 9:44 AM
> > **To:** James Davies; Dowd, Brendan
> > **Cc:** Dillon, Edward; Cristi Luckow; Baril, Stephen E.
> > **Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08
> >
> > Jed,
> >
> > I am sorry you and your client are discouraged by the progress we've made toward memorializing the parties' settlement agreement. I'm happy to discuss these issues with you later today. I should be available between 10:00-11:00 am and after 3:00 pm. Please let me know which time would suit

you.

Steve

---

**From:** James Davies [mailto:jdavies@lcbf.com]
**Sent:** Monday, July 21, 2008 6:20 PM
**To:** Baril, Stephen E.; Dowd, Brendan
**Cc:** Dillon, Edward; Cristi Luckow
**Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08

Stephen,

We are surprised by your rejections of many of our revisions. Indeed, we believe the proposed draft substantially alters the agreement reached by the parties and accordingly feel we may be reaching an impasse. Mr. Watson was willing to forgo much of his claimed damages to enter into a speedy resolution beneficial to both parties. However, the terms as presently drafted, in our view, do not reflect the agreement made and present serious stumbling blocks to consummating the settlement.

Below, we highlight the most substantive areas of disagreement:

Paragraph 1. Our proposed change in paragraph regarding Riptide's acceptance of the December 2007 tender reflects the agreement on the record that "[t]he tender of stocks and warrants that has been made by Mr. Watson will be accepted." Trans. at p. 4.

Paragraphs 4 & 5. With respect to the timing of the turnover of the lease and the equipment, we made clear prior to the conference, both orally and in writing, that time was of the essence to any compromise because the equipment transfer would become useless once Intellectus LLC began servicing FEMA and that its value was based upon allowing Mr. Watson to prepare for servicing the contract. The equipment has very little value, if any, to Mr. Watson once he begins servicing the FEMA contract. Therefore your proposal that the transfer only occur after Riptide ends its service of FEMA is unacceptable.

Paragraph 6 - There was never an understanding that the indemnification provisions of the contracts would become unenforceable in the event of future litigation by third-parties. Indeed, the sole mention of contractual language in the transcript is the release of non-competes for Mr. Watson and Bravera employees. Accordingly, your rejection of our proposed change is not acceptable.

I recommend a conference call tomorrow afternoon. If we are unable to reach an accord, we will need to contact the Court.

Sincerely,

James Davies

-----Original Message-----
**From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
**Sent:** Monday, July 21, 2008 5:14 PM
**To:** James Davies; Dowd, Brendan
**Cc:** Dillon, Edward; Baril, Stephen E.
**Subject:** RE: Riptide/Watson - Riptide's Response to Watson's Revisions 7/21/08

Jed,

Attached is Riptide's response to Watson's revisions from 7/18, together with an Exhibit A addressing the Shea Stock issue.

Riptide is still comparing the Bravera Inventory to its own inventory. The final inventory will be attached as Exhibit B.

Please let me know when you would like to discuss any final changes to the Settlement Agreement.

Steve


Stephen E. Baril, Esq.
Williams Mullen
1021 East Cary Street, 14th Floor
P.O. Box 1320
Richmond, VA 23218-1320
(804) 783-6423
(804) 783-6507 - fax
sbaril@williamsmullen.com

NOTICE: Information contained in this transmission to the named addressee is proprietary information and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.

---

**From:** James Davies [mailto:jdavies@lcbf.com]
**Sent:** Monday, July 21, 2008 12:06 PM
**To:** Dowd, Brendan; Baril, Stephen E.
**Subject:** Riptide/Watson

How are we going on the papers?   My client is anxious to put this all behind him.
Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

# Exhibit J

LANDMAN CORSI BALLAINE & FORD P.C.
A NEW YORK PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

One Gateway Center
Newark, NJ 07102
Tel: (973) 623-2700

120 BROADWAY
27TH FLOOR
NEW YORK, NY 10271-0079
TELEPHONE (212) 238-4800
FACSIMILE (212) 238-4848
www.lcbf.com

1617 JFK Boulevard
Philadelphia, PA 19103
Tel: (215) 561-8540

July 23, 2008

**Via Hand Delivery**
Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: Shea Development Corp et al. v. Watson et al.
Index No.: 07-CV-11201
Our File No: 913-1

Dear Judge Gorenstein:

We represent defendant Christopher Watson in the above referenced matter. The parties appeared at a settlement conference before Your Honor on July 10, 2008 at 2:30 p.m. and a settlement was reached and memorialized on the enclosed transcript. During drafting of the settlement agreement, a dispute has arisen regarding two material terms to the settlement which prevents the parties from consummating the agreement. Accordingly, we request a conference at the Court's earliest convenience. As the Court may recall, due to our client's business exigencies, time is of the essence if the settlement is to be consummated pursuant to the terms agreed to at the July 10, 2008 conference.

Thank you for your attention to this matter. Please feel free to contact the undersigned regarding any questions or concerns.

Respectfully submitted,

James Davies (JD 0599)

465630

**Via Facsimile**

cc: Michael E. Twomey (MT 7839)
Twomey, Hoppe & Gallanty, LLP
757 Third Avenue
New York, New York 10017
(212) 688-0400
(212) 688-1929 (fax)

Stephen E. Baril
Williams Mullen, PC
1021 East Cary Street, 17th Floor
Richmond, Virginia 23219
(804) 643-1991
(804) 783-6507 (fax)

Brendan J. Dowd
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
(212)326-2101
(212)326-2061 (fax)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SHEA DEVELOPMENT CORP, et al.,

Plaintiffs

-vs-

CHRISTOPHER WATSON, et al.,

Defendants

------------------------------x

DOCKET NO.: CV-07-11201 (DLC)
New York, New York
July 10, 2008

TRANSCRIPT OF CIVIL CAUSE FOR SETTLEMENT CONFERENCE

BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiffs: STEPHEN E. BARIL, ESQ.
Williams Mullen P.C.
1021 East Cary Street, 17th Floor
Richmond, VA 23219

BRENDAN J. DOWD, ESQ.
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

FRANCIS J. MOONEY, JR., ESQ.
Dunnington Bartholow & Miller LLP
1359 Broadway, 6th Floor
New York, NY 10018

Audio Operator: No Audio Operator

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcription Service

---

**KRISTIN M. RUSIN**
217 Pine Meadows Circle
Hickory NC 28601
kmrusin@earthlink.net

ADDITIONAL APPEARANCES

For the Defendants:

JAMES E. DAVIES, ESQ.
Landman Corsi Ballaine
& Ford P.C.
120 Broadway, 27th Floor
New York, NY 10271

(Recording on)

THE CLERK: -- versus Watson, docket zero seven civil one one two zero one.

Counsels, please state your name for the record and introduce your clients.

MR. BARIL: My name is Steve Baril. I represent the plaintiff.

With me is Brendan Dowd -- he's with the O'Melveny firm -- who is counsel of record for the plaintiff in the companion state court proceeding pending in the Supreme Court of New York.

Behind me, to my right, is Frank Wilde, who is the chairman and CEO of formerly Shea Development, now Riptide.

And standing directly behind me is Frank Mooney of the Dunnington firm, whose firm initiated the lawsuit back in December of 2007 and whose firm actually handled the merger and acquisition between these parties in 2007.

THE COURT: Okay.

MR. DAVIES: Yes, Your Honor. James Davis, from Landman Corsi Ballaine & Ford. I represent the defendant, Christopher Watson, who's standing next to me.

THE COURT: Okay.

Welcome, everyone. You can be seated. Let me tell you a little bit about our process. First --

(Audio gap)

THE COURT: -- so I'm asking the clerk to turn off the record.

(Recorder off/recorder on)

THE COURT: All right. We're back on the record. The parties have engaged in settlement negotiations, and we've reached a deal. I'm going to try saying the terms of that deal and will give -- after I do each term, I'll just check with the attorneys that I've correctly stated it. And after I'm finished, I'll ask the clients present whether they're agreeing to it.

The parties do expect to do some paperwork on this deal. However, they have reached an agreement as is going to be reflected during this conference. So even in the absence o the paperwork, this is an enforceable settlement. All right.

The tender of stocks and warrants that has been made by Mr. Watson will be accepted. He represents that these are all the stocks and warrants and that's going to be verified by the plaintiff.

Next is all pending litigation is to be dismissed with prejudice, and appropriate releases from all parties -- from parties to that litigation.

Next is the defendant, Mr. Watson, is going to be personally responsible for whatever tax liability is determined to exist with respect to the IRS and Virginia with respect to the particular tax problem that's been discussed.

As part of the process of determining that tax liability, Mr. Watson is going to be responsible for hiring any accountants that he needs in order to accomplish that. He will also have authority, final authority, with respect to any settlement of that tax liability with either the IRS or Virginia.

That tax liability is -- there's going to be some money held in escrow specifically for the purpose of paying that tax liability, but that money is going to be the property of Mr. Watson to be released to him for the purpose of the payment of that tax liability, and any remaining money will go to him personally.

The plaintiff will return to Mr. Watson -- will transfer to Mr. Watson the GSA MOBIS contract, a BMW, and certain business equipment that's been the subject of the settlement letters that every party appears to be familiar with.

The non-compete clauses that are in the contracts of any Bravera employees and of Mr. Watson will be released and deemed null and void from this day forward.

The plaintiff will have the option of terminating the Reston lease on thirty days' notice.

The escrow, by the way, will be put in an interest-bearing account that Mr. Watson will arrange and, of course, any interest earned on that will be his property. All right.

I'm going to ask the attorneys if there are any corrections -- oh, and the money. The amount of money in escrow is two hundred -- to be put in escrow that I mentioned is two hundred seventy-five thousand, and Mr. Watson is to be paid in cash the amount of one hundred seventy-five thousand.

And I don't think we specifically said it, but obviously, releases need to be executed by any parties to this litigation, general releases. And the payment should be made within thirty days of the execution, I would say, of any -- of the releases. Okay.

Does anyone want to add or change any terms that I've said?

MR. DAVIES: Just a clarification, Your Honor. The two hundred and seventy-five thousand dollars that is to be held in escrow for payment of any tax liability, the remainder of which is to be released to Mr. Watson or his holding company -- that is to be funded by the plaintiffs, is that correct?

THE COURT: That's correct.

MR. DAVIES: Thank you.

(Off the record discussion)

(Recorder off/recorder on)

THE COURT: -- some minor corrections and additional terms.

Mr. Davies?

MR. DAVIES: Yes. The parties have agreed that the

two hundred and seventy-five thousand dollars that is to be delivered in escrow will be available for delivery in escrow in fourteen days and will be so delivered.

With respect to the remaining one hundred and seventy-five thousand dollars in cash, that cash will be forwarded to my office as the attorney for Mr. Watson or pursuant to wiring instructions fifteen days after execution and completion of the final settlement agreement.

THE COURT: Something else from you, Mr. Baril, or your colleague?

MR. DOWD: This is Mr. Dowd. Yeah. With the -- Your Honor, with the GSA MOBIS contract, both parties understand that this is going to require the consent of the GSA. Therefore, what -- therefore, what Riptide will be doing is making its best efforts to novate the contract and obtain the GSA's consent to have this contract be in Mr. Watson's name or Intellectus's name.

MR. DAVIES: So stipulated.

THE COURT: Okay.

Any other terms? Mr. Davies?

MR. DAVIES: Nothing, Your Honor.

THE COURT: Mr. Baril?

MR. BARIL: No, sir.

THE COURT: Okay. Okay.

So, Mr. Baril, is this your understanding of the

agreement as we've stated it here on the record today?

MR. BARIL: It is, Your Honor.

THE COURT: Mr. Davies, is it your understanding?

MR. DAVIES: Yes, Your Honor.

THE COURT: Mr. Wilde, are you agreeing to this on behalf of Shea, Riptide, and any other related entities?

MR. WILDE: Yes, Your Honor.

THE COURT: Mr. Watson, are you agreeing to this on behalf of all -- of Intellectus, you yourself, and any other entities you control?

MR. WATSON: Yes, Your Honor.

THE COURT: Okay.

Thank you, everything.

MR. DAVIES: Thank you, Your Honor.

MR. BARIL: Thank you.

THE COURT: Oh, one other thing. This is going to be confidential, which means the parties are only to tell accountants, lawyers, immediate family members, or if they might be required to disclose anything about it by law or subpoena.

Anything else from anybody?

MR. BARIL: May we have a copy?

THE COURT: You can order it. I'll give you a form to do that.

MR. BARIL: Thank you.

THE COURT: All right.

Thank you, everyone.

MR. DAVIES: Thank you, Your Honor.

* * * * *

# Exhibit K

## Cristi Luckow

**From:** James Davies
**Sent:** Wednesday, July 30, 2008 6:51 PM
**To:** 'Baril, Stephen E.'
**Cc:** Cristi Luckow
**Subject:** Riptide

Yesterday, you indicated that you would be proposing today, dates for transfer of stock certificates, consideration, equipment, etc. with respect to the July 10, 2008 settlement.   We still have not received your proposal.   As we previously indicated we are interested in resolving these issues as soon as possible.    In addition, please provide the name, and contact information, for the appropriate person who at Riptide that our accountants will contact to start the ball rolling on the tax liability issues.


Thank you.

# Exhibit L

**Cristi Luckow**

---

**Subject:** FW: Riptide's Settlement Outline per Conference Call 7/29/08

-----Original Message-----
**From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
**Sent:** Thursday, July 31, 2008 2:28 PM
**To:** James Davies
**Cc:** Dowd, Brendan; Dillon, Edward
**Subject:** Riptide's Settlement Outline per Conference Call 7/29/08

<<1h_mr01_.XLS>> <<2414_001.pdf>>

Jed,

The following is my attempt to sum up the agreement reached by the parties during the conference call in your office on July 29th, as well as a timeline for carrying out the details of their Settlement:

1. The Parties intent to adhere to FEMA's 30-day transition process.

2. Mr. Watson will submit in writing any additional accommodations he would like to have with respect to the transition. Riptide will promptly respond in kind.

3. I gave you Riptide's reply to Bravera's Inventory of business equipment (Schedule B attached). We await Mr. Watson's response.

4. Assuming the parties reach agreement on Schedule B, and any other reasonable requests by Mr. Watson, Riptide plans to deliver to Mr. Watson as soon as practicable all business equipment in Bravera's possession, either in Reston or Florida, that Bravera is not currently using for the FEMA contract. Bravera will need a point of delivery.

5. I agreed to propose a timeline for carrying out the details of the parties' Settlement:

August 1 - Davies will provide Baril with contact information for Mr. Watson's accountants, so Riptide's controller can coordinate an orderly process for resolving the pending tax liability issue.

August 4 - Riptide will deposit $275K in escrow at WM.

August 5 - Mr. Watson will deliver to Baril all Shea stock and warrants set forth on the attached Schedule A.

August 6 - All Parties to the pending lawsuits will execute general releases.

August 7 - Counsel will file in all pending lawsuits Orders of Dismissal, with prejudice, and cause such orders to be entered.

August 7 - Counsel will confer on the status of transitioning the FEMA contract and associated business equipment and leasehold in Reston (the "FEMA Contract") to Mr. Watson.

TBA - Once the Parties agree on a written transition plan for the FEMA Contract, Riptide will wire the sum of $175K to Mr. Watson.

Stephen E. Baril, Esq.
Williams Mullen
1021 East Cary Street, 14th Floor
P.O. Box 1320
Richmond, VA 23218-1320
(804) 783-6423
(804) 783-6507 - fax
sbaril@williamsmullen.com

**NOTICE**: Information contained in this transmission to the named addressee is proprietary information and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.

# Schedule B

## BRAVERA INVENTORY

| Make and Model | Serial Number | Barcode | | Used for FEMA | In Possession | Not In Possession |
|---|---|---|---|---|---|---|
| **Laptop** | | | | | | |
| Dell Latitude D510 | 3DMTP81 | BC10054BC | | Yes | Yes | |
| Dell Latitude D610 | 129BL81 | BC10013BC | | Yes | Yes | |
| Dell Latitude D510 | JDMTP81 | BC10082BC | | | | No |
| Dell Latitude D610 | ATA50200BB4 | BC10069BC | | | | No |
| Dell Latitude D610 | 729BL81 | BC10029BC | | | | No |
| Dell Latitude D610 | 6MUGH81 | BC10068BC | | | | No |
| Dell Latitude D510 | G70YY81 | BC10083BC | | | | No |
| Dell Latitude D610 | 760YY81 | BC10102BC | | | | No |
| Dell Latitude D510 | 4M5SN71 | BC10091BC | | | | No |
| Dell Latitude 810 | 90RVY71 | BC10002BC | | Yes | Yes | |
| Dell Latitude 610 | C1MBGS71 | BC10101BC | | Yes | Yes | |
| IBM ThinkPad G40 | KM 0469B 0406 | BC10027BC | | No | Yes | |
| IBM ThinkPad T43 | L3A7692 | BC10016BC | | | | No |
| Compaq Evo N620c | CNU32002DP | BC10030BC | | No | Yes | |
| | | | | | | |
| **Workstation** | | | | | | |
| Dell Optiplex 520 | 8XXZJ81 | BC10014BC | | No | Yes | |
| Dell Optiplex 620 | DV6N81 | BC10042BC | | No | Yes | |
| Dell Optiplex 620 | 2W6NL81 | BC10028BC | | No | Yes | |
| | | | | | | |
| Dell Optiplex GX520 | FZNNS81 | BC10015BC | | Yes | Yes | |
| Dell Optiplex GX520 | HZNNS81 | BC10043BC | | Yes | Yes | |
| Dell Optiplex GX520 | JZNNS81 | BC10001BC | | | | |
| | | | | | | |
| Compaq Presario SR1522x | MXF53903SP | BC10005BC | | Yes | Yes | |
| Compaq Presario SR1522x | MXF53700FR | BC10045BC | | Yes | Yes | |
| Compaq Presario SR1522x | MXF53903SR | BC10032BC | | Yes | Yes | |
| Compaq Presario SR1522x | MXF53700DV | BC10046BC | | Yes | Yes | |
| | | | | | | |
| Dell Optiplex GX520 | 1XXZJ81 | BC10031BC | | Yes | Yes | |
| Dell Optiplex GX520 | HWXZJ81 | BC10017BC | | Yes | Yes | |
| Dell Optiplex GX520 | CWXZJ81 | BC10003BC | | Yes | Yes | |
| Dell Optiplex GX520 | BWXZJ81 | BC10044BC | | Yes | Yes | |
| Dell Optiplex GX520 | 6XXZJ81 | BC10006BC | | Yes | Yes | |
| Dell Optiplex GX520 | 4XXZJ81 | BC10004BC | | Yes | Yes | |
| Dell Optiplex GX520 | DWXZJ81 | BC10018BC | | Yes | Yes | |
| | | | | | | |
| **Servers - Reston** | | | | | | |
| Dell PowerEdge SC1425 Bravera2 | DJBYY71 | BC10023BC | | Yes | Yes | |
| Dell PowerEdge SC1425 Bravera3 | 1KBYY71 | BC10037BC | | No | Yes | |
| Dell PowerEdge SC1425 SECURE1 | CCRR81 | BC10051BC | | Yes | Yes | |
| Dell PowerEdge 850 Bravera4 | 9POVZ81 | BC10024BC | | No | Yes | |
| | | | | | | |
| **Switches/Routers/Hubs** | | | | | | |
| Belkin 24 port Switch | 47A35000286 | BC10084BC | | Yes | Yes | |
| Netgear 24 port Switch - JGS54 | 1392583L0049B | BC10098BC | | Yes | Yes | |
| Cisco IAD 2400 | FHK0941F23U | BC10057BC | | Yes | Yes | |
| Sonic Wall Pro200 | 00401015DB8E | BC10071BC | | | | No |
| Hawking 8 port Switch | HCMCG58033100149 | BC10085BC | | | | No |
| | | | | | | |
| DLINK 4 port Switch | BNZB539093974 | BC10099BC | | | | No |
| LinkSys Wireless Router 4 port - WRT54GCV2 | CGN30E341489 | BC10058BC | | Yes | Yes | |
| NetGear 24 port Switch | S/N - not accessible | BC10072BC | | Yes | Yes | |
| NetGear Dual Speed ub - 8 port - DS108 | DS18141DB695979 | BC10086BC | | | | No |
| Smart UPS 1000 | AS0142211933 | BC10100BC | | Yes | Yes | |
| Smart UPS 1000 | AS0142112280 | BC10059BC | | Yes | Yes | |
| NEC Aspire | TA5100076B | BC10073BC | | Yes | Yes | |
| | | | | | | |
| **Verio Inventory - Herndon - Rack B23** | | | | | | |
| Dell Power Connect 2708 - 8 port | | BC10090BC | | No | No (FL) | |
| SonicWall Pro 2040 | 0006B11A154 | BC10060BC | | No | No (FL) | |
| SonicWall Pro 2040 | 0006B11A17C | BC10061BC | | No | No (FL) | |
| Dell Power Connect 2624 - 24 port | 4HF2R42 | BC10062BC | | No | No (FL) | |
| Cisco 2600 Series | FTX0924546 | BC10063BC | | No | No (FL) | |
| Dell PowerEdge 750 - Bravera1 | B0TQS71 | BC10064BC | | No | No (FL) | |
| Dell PowerEdge 750 - Mail | H0TQS71 | BC10065BC | | No | No (FL) | |
| Dell PowerEdge 750 - wpdev.bravera.com | 6H0HT61 | BC10066BC | | No | No (FL) | |

## Schedule B

### BRAVERA INVENTORY

| Make and Model | Serial Number | Barcode | | Used for FEMA | In Possession | Not In Possession |
|---|---|---|---|---|---|---|
| Dell PowerEdge 750 - cni.bravera.com | 7H0HT61 | BC10067BC | | No | No (FL) | |
| Dell PowerEdge 750 - wfsrv6 | 4DLSX51 | BC10074BC | | No | No (FL) | |
| Dell PowerEdge 750 - wfsrv5 | 3DLSX51 | BC10075BC | | No | No (FL) | |
| TrippLite KVM Switch - 8020-01b | 9351AZBO2001600257 | BC10089BC | | Yes | Yes | |
| Dell PowerEdge - Demo Sales | DGJ7211 | BC10076BC | | Yes | Yes | |
| Dell PowerEdge - wfsrv2 | G05PV01 | BC10077BC | | No | No (FL) | |
| Dell PowerEdge - ViewStar | H05PV01 | BC10078BC | | No | No (FL) | |
| Dell PowerEdge - dcgc1.corp.bravera.com | 3TXLX11 | BC10079BC | | Yes | Yes | |
| Dell PowerEdge - wfsdemo | F5RGX11 | BC10080BC | | No | No (FL) | |
| Dell PowerEdge - TestWeb | DYM1211 | BC10081BC | | No | No (FL) | |
| Dell PowerEdge - Dev2 | 5LKTP21 | BC10088BC | | No | No (FL) | |
| | | | | | | |
| **Scanners - Reston** | | | | | | |
| Cannon 9080C | CZ304492 | BC10019BC | | Yes | Yes | |
| Cannon 9080C | CZ304471 | BC10033BC | | Yes | Yes | |
| Cannon 9080C | CZ304470 | BC10020BC | | Yes | Yes | |
| Cannon 9080C | CZ304552 | BC10034BC | | Yes | Yes | |
| Cannon 9080C | CZ304551 | BC10047BC | | Yes | Yes | |
| | | | | | | |
| Kodax 140 | 4322-0998 | BC10048BC | | Yes | Yes | |
| Kodax 140 | 4322-1078 | BC10007BC | | Yes | Yes | |
| Kodax 140 | 4322-1838 | BC10021BC | | Yes | Yes | |
| Kodax 140 | 4322-2171 | BC10035BC | | Yes | Yes | |
| | | | | | | |
| **Printers - Reston** | | | | | | |
| Cannon PC1060 (#240) | ZTX15530 | BC10008BC | | Yes | Yes | |
| Samsung ML2200 (#240) | BADY508753J | BC10009BC | | No | Yes (Not Working) | |
| Samsung SCX-4100 | BAKY711711V | BC10087BC | | | | No |
| HP 132tn (#250) | CNHC598022 | BC10052BC | | Yes | Yes | |
| Brother FAX/Scan/Printer (#250) | U61092H5F954977 | BC10011BC | | Yes | Yes | |
| Xerox Phaser 1235 | 3892X003 | BC10039BC | | No | No | |
| HP Office Jet | SG045C30SP | BC10053BC | | | | No |
| | | | | | | |
| **Server Racks/Cabinet** | | | | | | |
| Rack 1 | | BC10026BC | | Yes | Yes | |
| Rack 2 | | BC10040BC | | Yes | Yes | |
| Network Cabinet - Intended for #240 | | BC10012BC | | No | No (FL) | |
| | | | | | | |
| **Julia's Returned Workstations/Servers** | | | | | | |
| HP Superstore Opticle 220 | US9NJ00278 | BC10041BC | | No | No (FL) | |
| Workstation - No Brand Name | No available SN# | BC10055BC | | | | No |
| Workstation - No Brand Name | 14486787 | BC10056BC | | | | No |
| Panasonic - 50 inch Plasma | YH5110324 | | | No | Yes | |

**Schedule A**

**Stock and Warrant Issuance to Christopher Watson and ALL Parties Related**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|
| Common | Chris Watson | 7/18/07 | 357 | Merger Agreement | 3,300,000 |
| Warrant | Christopher Watson | June 14, 2007 | NA | Exhibit D Equity Earn-Out Warrant | 5,000,000 shares at a price of $1.00 |
| Warrant | Christopher Watson | June 15, 2007 | NA | Exhibit B Year One Earn-Out Warrant | 1,312,500 shares at a price of $1.00 |
| Warrant | Christopher Watson | June 15, 2007 | NA | Exhibit C Year Two Earn-Out Warrant | 1,625,00 shares at a price of $1.00 |
| Warrant | Intellectus, LLC | June 16, 2007 | NA | Exhibit E of the IP Agreement | 450,000 shares at a price of $1.00 |

# Exhibit M

## Cristi Luckow

**From:** Cristi Luckow

**Sent:** Friday, August 01, 2008 6:24 PM

**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'

**Cc:** James Davies

**Subject:** Riptide

Steve,

We are in receipt of your July 31, 2008 email regarding the the July 10 settlement. These discussions should not be deemed to abrogate, supplement or supercede the agreement on the record.

With respect to the Tax Liability Issue, Riptide should contact the following:

**Daniel J. Wahlberg, CPA**
**Hertzbach & Company, P.A.**
800 Red Brook Boulevard, Suite 300
Owings Mills, MD 21117
phone: (410) 363-3200 x 2066

direct: (443) 471-2066

fax: (410) 356-0058

The $275,000 needs to placed in escrow with WM immediately and held for the benefit of Intellectus Holdings LLC.

Our client is interested and intends on working with and adhering to the FEMA transition process. To that end, our client requests that the equipment listed on Schedule B located in Florida be transferred to the Reston office next week and that next week Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel for planning and discussions during the transition period. All of the other equipment should remain in Reston. If there is limited space, our client will transfer equipment not being used to service FEMA to a storage location. Further, please identify an individual to whom we may contact with respect to transition of the GSA MOBUS contract.

In addition, our client will prepare and submit a written transition plan, including transfer of the leasehold to Intellectus Holdings LLC, on Monday August 4, 2008 for Riptide's review. Once the plan is agreed upon the remaining steps outlined in your memo are acceptable provided that the additional $175,000 in consideration be transferred simultaneously with the releases. We will issue a letter tendering 2,900,000 shares along with the original certificate in the amount of 3,300,000 shares.

We have proposed language for the general release(s) which will be forwarded on Monday, August 4, 2008. Please call with any questions.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848

cluckow@lcbf.com

# Exhibit N

## Cristi Luckow

**Subject:** FW: Riptide's Reply to Watson's Response re: Execution of Parties' Settlement

2749_001.pdf (31 KB)

2414_001.pdf (38 KB)

z36603!.DOC (94 KB)

-----Original Message-----
From: Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
Sent: Monday, August 04, 2008 4:33 PM
To: Cristi Luckow; James Davies
Cc: Dowd, Brendan; Dillon, Edward; Barbie, Karoline M.; Baril, Stephen E.
Subject: Riptide's Reply to Watson's Response re: Execution of Parties' Settlement

Jed & Cristi,

Thank you for your email on Friday.

1. We agree that the parties have a binding and enforceable Settlement. We are merely working on the execution of their Settlement.

2. Sheri Pantermuehl will be in touch with Mr. Wahlberg shortly to discuss the tax liability issue.

3. I have been out most of the day and will be in court in DC tomorrow and Wednesday. I have a call into Riptide about wiring the $275K into WM's trust acct. I will confirm a date as soon as possible.

4. Today Riptide is looking into the logistics of shipping the equipment in Florida back to Reston. Since Watson is working on a written transition plan, and since Riptide has a meeting this week with FEMA, I suggested in my last email that we discuss a transition plan on 8/7 (attached). I still think that would be appropriate.

5. Once the parties have agreed to a transition plan, Riptide has no objection to a simultaneous closing. Counsel will exchange executed general releases (attached) for the original certificate of Shea stock (3.3M) and a letter from Mr. Watson and Intellectus, LLC. releasing and relinquishing all right, title and interest in the four (4) warrants for the purchase of Shea stock. I noticed one discrepancy here. Riptide's Schedule A (attached) states that Mr. Watson and Intellectus were issued four (4) warrants to purchase 8,375,500 shares of Shea stock, not the 2.9M mentioned in your email. That discrepancy needs to be rectified. Further, counsel will exchange copies of the papers in advance and represent that they are holding the original papers in escrow, and will FedEx the original papers to each other simultaneously once both sides have confirmed that everything is in order. Riptide will simultaneously wire the $175K to Mr. Watson.

6. The final piece will be the entry of an Order of Dismissals, with prejudice, in all pending lawsuits. They will be endorsed by counsel and forwarded to the respective courts immediately upon the completion of item # 5 above.

From: Cristi Luckow [mailto:cluckow@lcbf.com]
Sent: Friday, August 01, 2008 6:24 PM
To: Baril, Stephen E.; BDowd@OMM.com
Cc: James Davies
Subject: Riptide

Steve,
We are in receipt of your July 31, 2008 email regarding the the July 10 settlement. These discussions should not be deemed to abrogate, supplement or supercede the agreement on the record.
With respect to the Tax Liability Issue, Riptide should contact the following:
Daniel J. Wahlberg, CPA
Hertzbach & Company, P.A.
800 Red Brook Boulevard, Suite 300
Owings Mills, MD 21117
phone: (410) 363-3200 x 2066
direct: (443) 471-2066
fax: (410) 356-0058
The $275,000 needs to placed in escrow with WM immediately and held for the benefit of Intellectus Holdings LLC.
Our client is interested and intends on working with and adhering to the FEMA transition process. To that end, our client requests that the equipment listed on Schedule B located in Florida be transferred to the Reston office next week and that next week Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel for planning and discussions during the transition period. All of the other equipment should remain in Reston. If there is limited space, our client will transfer equipment not being used to service FEMA to a storage location. Further, please identify an individual to whom we may contact with respect to transition of the GSA MOBUS contract.
In addition, our client will prepare and submit a written transition plan, including transfer of the leasehold to Intellectus Holdings LLC, on Monday August 4, 2008 for Riptide's review. Once the plan is agreed upon the remaining steps outlined in your memo are acceptable provided that the additional $175,000 in consideration be transferred simultaneously with the releases. We will issue a letter tendering 2,900,000 shares along with the original certificate in the amount of 3,300,000 shares.
We have proposed language for the general release(s) which will be forwarded on Monday, August 4, 2008. Please call with any questions.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax:  (212) 238-4848
cluckow@lcbf.com

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540
NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

## Baril, Stephen E.

**From:** Baril, Stephen E.
**Sent:** Thursday, July 31, 2008 2:28 PM
**To:** 'James Davies'
**Cc:** 'Dowd, Brendan'; Dillon, Edward
**Subject:** Riptide's Settlement Outline per Conference Call 7/29/08

**Attachments:** 1h_mr01_.XLS; 2414_001.pdf

1h_mr01_.XLS (21 KB)

2414_001.pdf (38 KB)

Jed,

The following is my attempt to sum up the agreement reached by the parties during the conference call in your office on July 29th, as well as a timeline for carrying out the details of their Settlement:

1. The Parties intent to adhere to FEMA's 30-day transition process.

2. Mr. Watson will submit in writing any additional accommodations he would like to have with respect to the transition. Riptide will promptly respond in kind.

3. I gave you Riptide's reply to Bravera's Inventory of business equipment (Schedule B attached). We await Mr. Watson's response.

4. Assuming the parties reach agreement on Schedule B, and any other reasonable requests by Mr. Watson, Riptide plans to deliver to Mr. Watson as soon as practicable all business equipment in Bravera's possession, either in Reston or Florida, that Bravera is not currently using for the FEMA contract. Bravera will need a point of delivery.

5. I agreed to propose a timeline for carrying out the details of the parties' Settlement:

August 1 - Davies will provide Baril with contact information for Mr. Watson's accountants, so Riptide's controller can coordinate an orderly process for resolving the pending tax liability issue.

August 4 - Riptide will deposit $275K in escrow at WM.

August 5 - Mr. Watson will deliver to Baril all Shea stock and warrants set forth on the attached Schedule A.

August 6 - All Parties to the pending lawsuits will execute general releases.

August 7 - Counsel will file in all pending lawsuits Orders of Dismissal, with prejudice, and cause such orders to be entered.

August 7 - Counsel will confer on the status of transitioning the FEMA contract and associated business equipment and leasehold in Reston (the "FEMA Contract") to Mr. Watson.

TBA - Once the Parties agree on a written transition plan for the FEMA Contract, Riptide will wire the sum of $175K to Mr. Watson.

Stephen E. Baril, Esq.

**Schedule A**

**Stock and Warrant Issuance to Christopher Watson and ALL Parties Related**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|
| Common | Chris Watson | 7/18/07 | 357 | Merger Agreement | 3,300,000 |
| Warrant | Christopher Watson | June 14, 2007 | NA | Exhibit D Equity Earn-Out Warrant | 5,000,000 shares at a price of $1.00 |
| Warrant | Christopher Watson | June 15, 2007 | NA | Exhibit B Year One Earn-Out Warrant | 1,312,500 shares at a price of $1.00 |
| Warrant | Christopher Watson | June 15, 2007 | NA | Exhibit C Year Two Earn-Out Warrant | 1,625,00 shares at a price of $1.00 |
| Warrant | Intellectus, LLC | June 16, 2007 | NA | Exhibit E of the IP Agreement | 450,000 shares at a price of $1.00 |

**CONFIDENTIAL SETTLEMENT AND GENERAL RELEASES**

This Confidential Settlement and General Releases is entered into this ___ day of August 2008, by and among Riptide Worldwide, Inc. (formerly Shea Development Corp.); RTWW Business Services, Inc. (formerly Bravera, Inc.); and IP Holding of Nevada Corp. (collectively, the "Shea Parties"), and Christopher Watson; Intellectus, LLC; SD2R Partners, LLC (a/k/a SD2R, LLC); Daniel Island Partners, LLC; and Intellectus Business Services, LLC (collectively, the "Watson Parties"). The Shea Parties and the Watson Parties are collectively referred to as the "Parties."

**RECITALS**

WHEREAS, Shea Development Corp. ("Shea") (n/k/a Riptide Worldwide, Inc.) and Bravera, Inc. (n/k/a RTWW Business Services, Inc.) ("Bravera") entered into an Agreement and Plan of Merger dated as of April 26, 2007 (the "Merger Agreement"). The Merger became effective July 16, 2007, with Bravera becoming a wholly-owned subsidiary of Shea;

WHEREAS, as contemplated by the Merger Agreement, Christopher Watson ("Mr. Watson") and Bravera entered into a Senior Management Employment Agreement dated July 15, 2007 (the "Employment Agreement"), whereby Mr. Watson accepted employment with Bravera;

WHEREAS, as contemplated by the Merger Agreement, IP Holding of Nevada Corp. ("IP Holding") and Intellectus, LLC ("Intellectus") entered into a Software License and Asset Purchase Agreement dated as of July 16, 2007 (the "Licensing Agreement"), whereby IP Holding acquired from Intellectus a worldwide license in regard to certain intellectual property assets described more fully in the Licensing Agreement. Intellectus also received warrants to purchase Shea stock;

WHEREAS, pursuant to the Merger Agreement, Mr. Watson received shares of Shea stock (the "Shea Stock"), and warrants to purchase shares of Shea stock;

WHEREAS, at the time of the Merger, Bravera was a party to a 2005 contract with the Federal Emergency Management Agency (the "FEMA Contract"). Shea assumed the FEMA Contract pursuant to the Merger. The FEMA Contract is scheduled to expire on September 30, 2008;

WHEREAS, at the time of the Merger, Bravera was the lessee of certain leased premises in Reston, Virginia, as described below; owned certain business equipment; and employed certain personnel for the purpose of servicing the FEMA Contract. Pursuant to the Merger, Shea assumed the leasehold, took legal title to the equipment, and employed the personnel;

WHEREAS, in mid-September 2007, a dispute arose between Shea/Bravera and Mr. Watson about certain pre-Merger representations. On September 29, 2007, Mr. Watson gave written notice of his voluntary termination of his employment under the Employment Agreement;

WHEREAS, the Merger Agreement stated that Bravera had filed and paid all taxes through the tax year ended December 31, 2006. In mid-November 2007, Shea/Bravera received a notice from the United States Internal Revenue Service of unpaid payroll withholding taxes for the tax year ended December 31, 2005 in the amount of $258,367.91, not including interest or penalties. In early December 2007, Shea/Bravera received a notice from the Commonwealth of Virginia of unpaid payroll withholding taxes for the period October 2005 through December 2005 in the amount of $9,300.20, including interest and penalties. The various notices of and liabilities for unpaid payroll withholding taxes shall be referred to herein collectively as the "Tax Liability Issue";

WHEREAS, Shea filed a lawsuit against, *inter alia*, Mr. Watson in the U.S. District Court for the Southern District of New York, styled *Shea Development Corp., et al. v. Watson, et al.*, Case No. CV-07-11201, alleging fraud, constructive fraud, breach of fiduciary duty, breach of the Employment Agreement, and breach of the Merger Agreement (the "New York Federal Lawsuit");

WHEREAS, Mr. Watson filed a lawsuit against, *inter alia*, Riptide Worldwide, Inc. (f/k/a/ Shea) in the Supreme Court of New York, New York County, styled *Watson, et al. v. Riptide Worldwide, Inc. (f/k/a Shea Development Corp.), et al.*, Case No. 600114/08, alleging breach of the Merger Agreement, breach of the Licensing Agreement, and breach of the Employment Agreement, as well as seeking declaratory and injunctive relief (the "New York State Lawsuit");

WHEREAS, Mr. Watson filed a lawsuit against Shea and Bravera in the Ninth Judicial Circuit, In the Court of Common Pleas, State of South Carolina, County of Charleston, styled *Watson v. Bravera, Inc. et al.*, Case No. 2007-CP-10-5074, alleging breach of contract and breach of contract with fraudulent intent in regard to an unpaid loan he contends he made to Shea/Bravera. (the "South Carolina Lawsuit"). The Defendant filed a Notice of Removal seeking removal to the United States District Court for the District of South Carolina, where it is pending as Case No. 08-CV-81 (PMD);

WHEREAS, Daniel Island Partners, LLC filed a lawsuit against Bravera in the Magistrate's Court for the County of Berkeley, South Carolina, styled *Daniel Island Partners, LLC v. Bravera, Inc.*, Case No. 07K-0915, seeking payment of unpaid rent (the "Second South Carolina Lawsuit");

WHEREAS, SD2R Partners filed a lawsuit against Bravera in the Circuit Court of Fairfax County, Virginia, styled *SD2R Partners, LLC a/k/a SD2R, LLC v. Bravera, Inc.*, Civ. Action No. 2007 15640, alleging breach of a lease agreement (the "Virginia Lawsuit"). The New York Federal Lawsuit, the New York State Lawsuit, the South Carolina Lawsuit, the Second South Carolina Lawsuit, and the Virginia Lawsuit are collectively referred to as the "Lawsuits";

WHEREAS, on July 10, 2008, the Parties, in person and by counsel, appeared before the Honorable Gabriel W. Gorenstein, U.S. Magistrate Judge for the U.S. District Court for the Southern District of New York, for the purpose of mediating a global settlement of all Lawsuits and related disputes;

WHEREAS, on July 10, 2008, the Parties entered into a binding and enforceable settlement in open Court as reflected by a certain transcript, a copy of which is attached hereto as Exhibit A (the "Settlement");

WHEREAS, thereafter the Parties disagreed over the memorilization of their Settlement in a written settlement agreement; and

WHEREAS, on July 29, 2008, the Parties again appeared before Judge Gorenstein in an attempt to resolve their disagreement but were unable to do so, which in no way affects the binding and enforceable nature of their Settlement.

NOW, THEREFORE, in consideration of the mutual promises and good and valuable consideration contained in the Settlement, the Parties agree to the following general releases and terms of confidentiality:

1.    Release by the Shea Parties.  With the exception of the Tax Liability Issue addressed in the Settlement, for and in consideration of the covenants and promises set forth in

the Settlement, the Shea Parties, on behalf of themselves and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants, hereby fully, finally and forever releases, remises, acquits and forever discharges the Watson Parties in all capacities and each of their current and/or former employees, agents, officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and accountants from any and all claims, demands, suits, actions, causes of action, obligations, damages, punitive damages, penalties, costs, losses, interest, expenses and liabilities of any kind or nature whatsoever, whether legal, equitable or statutory, liquidated or unliquidated, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, which any or all of the Shea Parties ever had, now has or could have had from the beginning of the world to the date hereof, regardless of when such claim, demand, suit, action, cause of action, obligation, damage, punitive damages, penalty, cost, loss, interest, expense or liability accrues or ripens, including, without limitation, all claims under the Merger Agreement, the License Agreement and the Employment Agreement, and all claims or counterclaims that the Shea Parties asserted or could have asserted against any of the Watson Parties in the aforementioned Lawsuits.

2. Release by the Watson Parties. For and in consideration of the covenants and promises set forth in this Settlement, the Watson Parties, on behalf of themselves and each of their current and/or former employees, agents, officers, directors, representatives, principals,

parents, affiliates, subsidiaries, shareholders, members, partners, successors, predecessors,

executors, assigns, trustees, beneficiaries, administrators, insurers, attorneys, auditors and

accountants, hereby fully, finally and forever releases, remises, acquits and forever discharges

the Shea Parties in all capacities and each of their current and/or former employees, agents,

officers, directors, representatives, principals, parents, affiliates, subsidiaries, shareholders,

members, partners, successors, predecessors, executors, assigns, trustees, beneficiaries,

administrators, insurers, attorneys, auditors and accountants from any and all claims, demands,

suits, actions, causes of action, obligations, damages, punitive damages, penalties, costs, losses,

interest, expenses and liabilities of any kind or nature whatsoever, whether legal, equitable or

statutory, liquidated or unliquidated, known or unknown, suspected or unsuspected, reasonably

discoverable or not, present, fixed or contingent, which any or all of the Watson Parties ever had,

now has or could have had from the beginning of the world to the date hereof, regardless of

when such claim, demand, suit, action, cause of action, obligation, damage, punitive damages,

penalty, cost, loss, interest, expense or liability accrues or ripens, including, without limitation,

all claims under the Merger Agreement, the License Agreement and the Employment

Agreement, and all claims or counterclaims that the Watson Parties asserted or could have

asserted against any of the Shea Parties in the aforementioned Lawsuits.


      3.      Confidentiality. This Settlement will be considered confidential by the Parties

and their counsel. The Parties and their counsel will use their best efforts not to disclose,

disseminate and/or publicize to any person, corporation, or other entity the existence of this

Settlement or its terms or the underlying disputes to which it relates. The Parties may disclose

information pursuant to this Settlement only:

a. based on the advice of legal counsel where necessary to report to appropriate taxing authorities;

b. to the extent necessary to enforce their rights under this Settlement;

c. for purposes of financial reporting, including SEC or other regulatory filings;

d. to the Parties' directors, officers and employees on a need-to-know basis;

e. where necessary in response to a direct order of a court of competent jurisdiction or subpoena issued under the authority thereof;

f. pursuant to the request of a federal or state regulator or other regulatory body or government agency with oversight or regulatory authority relating to the business of either of the Parties; or

g. to the extent necessary to their attorneys or accountants (having first disclosed to such individuals the confidential nature of this information).

If any Party believes that it will disclose any information pursuant to sub-paragraph (e) above, it shall, if legally permitted, provide written notice prior to disclosure in accordance with the instructions in Paragraph 23 below.

**IN WITNESS WHEREOF**, this Settlement has been duly executed by the Parties in counterparts, and each is an original as of the first date written above.

**RIPTIDE WORLDWIDE, INC.**
**(formerly Shea Development Corp.)**

By:______________________________
Name:
Title:

**RTWW BUSINESS SERVICES, INC.**
**(formerly Bravera, Inc.)**

By:______________________________
Name:
Title:

**IP HOLDING OF NEVADA CORP.**

By:______________________________
Name:
Title:

**CHRISTOPHER WATSON**

______________________________

**INTELLECTUS, LLC**

By:______________________________
Name: Christopher Watson
Title: Managing Member

**INTELLECTUS BUSINESS SERVICES, LLC**

By:_________________________________
Name: Christopher Watson
Title: Managing Member

**SD2R, LLC**

By:______________________________
Name: Christopher Watson
Title: Managing Member

**DANIEL ISLAND PARTNERS, LLC**

By:_________________________________
Name: Christopher Watson
Title: Managing Member

# Exhibit O

**Cristi Luckow**

---

**From:** James Davies
**Sent:** Tuesday, August 05, 2008 4:29 PM
**To:** 'Baril, Stephen E.'; Cristi Luckow
**Cc:** 'Dowd, Brendan'; 'Dillon, Edward'; 'Barbie, Karoline M.'
**Subject:** RE: Riptide's Reply to Watson's Response re: Execution of Parties' Settlement

Steve:

We are most disturbed by your response and the attachments we received yesterday. We have made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement. Your proposed release language only regurgitates Riptide's position made before, and rejected by, the Court on July 29, 2008. Given the discussion before the Court, we question the basis of your repeated inclusion of terms that were never agreed to on July 10, 2008.

Further, there was no discrepancy in our August 1, 2008 correspondence regarding our client's tender of shares. The settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. What remains to be tendered by our client and accepted by Riptide under the agreement is 2.9 million shares. Obviously, counsel will provide the original certificate of stock in the amount of 3.3. million shares.

In addition, we still have not received confirmation that the $275,000 which was, under the agreement, to be placed in escrow by July 24, 2008 has in fact been placed into escrow.

Lastly, we have received no response regarding our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel for planning and discussions during the transition period. Nor, to our understanding, has Riptide made any efforts with respect to the transition of the GSA MOBUS contract.

Notwithstanding, Riptide's utter failure's under the agreement, we remain committed to completing the settlement as anticipated amicably. To this end, we have attached Mr. Watson's transition plan for the FEMA contract as you requested. However, if Riptide continues to blatantly disregard the July 10, 2008 settlement agreement, we will move by Order to Show Cause to enforce the agreement and seek sanctions, including costs and attorneys fees, based upon Riptide's recurrent, time consuming, and resource wasting efforts to renegotiate the terms of the July 10 agreement.

-----Original Message-----
**From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
**Sent:** Monday, August 04, 2008 4:33 PM
**To:** Cristi Luckow; James Davies
**Cc:** Dowd, Brendan; Dillon, Edward; Barbie, Karoline M.; Baril, Stephen E.
**Subject:** Riptide's Reply to Watson's Response re: Execution of Parties' Settlement

Jed & Cristi,

Thank you for your email on Friday.

1. We agree that the parties have a binding and enforceable Settlement. We are merely working on the execution of their Settlement.

2. Sheri Pantermuehl will be in touch with Mr. Wahlberg shortly to discuss the tax liability issue.

3. I have been out most of the day and will be in court in DC tomorrow and Wednesday. I have a call into Riptide about wiring the $275K into WM's trust acct. I will confirm a date as soon as possible.

4. Today Riptide is looking into the logistics of shipping the equipment in Florida back to Reston. Since Watson is working on a written transition plan, and since Riptide has a meeting this week with FEMA, I suggested in my last email that we discuss a transition plan on 8/7 (attached). I still think that would be appropriate.

5. Once the parties have agreed to a transition plan, Riptide has no objection to a simultaneous closing. Counsel will exchange executed general releases (attached) for the original certificate of Shea stock (3.3M) and a letter from Mr. Watson and Intellectus, LLC. releasing and relinquishing all right, title and interest in the four (4) warrants for the purchase of Shea stock. I noticed one discrepancy here. Riptide's Schedule A (attached) states that Mr. Watson and Intellectus were issued four (4) warrants to purchase 8,375,500 shares of Shea stock, not the 2.9M mentioned in your email. That discrepancy needs to be rectified. Further, counsel will exchange copies of the papers in advance and represent that they are holding the original papers in escrow, and will FedEx the original papers to each other simultaneously once both sides have confirmed that everything is in order. Riptide will simultaneously wire the $175K to Mr. Watson.

6. The final piece will be the entry of an Order of Dismissals, with prejudice, in all pending lawsuits. They will be endorsed by counsel and forwarded to the respective courts immediately upon the completion of item # 5 above.

---

**From:** Cristi Luckow [mailto:cluckow@lcbf.com]
**Sent:** Friday, August 01, 2008 6:24 PM
**To:** Baril, Stephen E.; BDowd@OMM.com
**Cc:** James Davies
**Subject:** Riptide

Steve,

We are in receipt of your July 31, 2008 email regarding the the July 10 settlement. These discussions should not be deemed to abrogate, supplement or supercede the agreement on the record.

With respect to the Tax Liability Issue, Riptide should contact the following:

**Daniel J. Wahlberg, CPA**
**Hertzbach & Company, P.A.**
800 Red Brook Boulevard, Suite 300
Owings Mills, MD 21117
phone: (410) 363-3200 x 2066

direct: (443) 471-2066

fax: (410) 356-0058

The $275,000 needs to placed in escrow with WM immediately and held for the benefit of Intellectus Holdings LLC.

Our client is interested and intends on working with and adhering to the FEMA transition process. To that end, our client requests that the equipment listed on Schedule B located in Florida be transferred to the Reston office next week and that next week Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel for planning and discussions during the transition period. All of the other equipment should remain in Reston. If there is limited space, our client will transfer equipment not being used to service FEMA to a storage location. Further, please identify an individual to whom we may contact with respect to transition of the GSA MOBUS contract.

In addition, our client will prepare and submit a written transition plan, including transfer of the leasehold to Intellectus Holdings LLC, on Monday August 4, 2008 for Riptide's review. Once the plan is agreed upon the remaining steps outlined in your memo are acceptable provided that the additional $175,000 in consideration be transferred simultaneously with the releases. We will issue a letter tendering 2,900,000 shares along with the original certificate in the amount of 3,300,000 shares.

We have proposed language for the general release(s) which will be forwarded on Monday, August 4, 2008. Please call with any questions.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

# Exhibit P

**Cristi Luckow**

**From:** Baril, Stephen E. [sbaril@williamsmullen.com]
**Sent:** Wednesday, August 06, 2008 5:38 PM
**To:** James Davies; Cristi Luckow
**Cc:** Dowd, Brendan; Dillon, Edward; Barbie, Karoline M.
**Subject:** RE: Riptide's Reply to Watson's Response re: Execution of Parties' Settlement -- Riptide's 8/6 Response

Jed,

Thank you for your email from yesterday afternoon. I just returned from two days in DC and NOVA and am trying to catch up before the end of the day. I will attempt to respond to your email in the order of the issues you raised:

1. General Release. I used the language from the draft settlement agreement. You didn't object to those provisions before. I presume you object now. Please suggest alternative language and we will consider it.

2. Shea Stock and Warrants. I suspect we might be talking past each other, but let me try to clarify a few pertinent facts. Mr. Watson never "tendered" 400,000 shares of stock to Riptide. There was no stock attached to or enclosed with his 12/18/07 demand letter. Further, there could be no tender of 400,000 shares. The lone certificate is for 3.3M shares. Moreover, the operative sentence in the Settlement, which you consistently ignore, reads: "He [Watson] represents that these [400,000 shares] are <u>all</u> the stocks and warrants and that's going to be verified by the plaintiff." Page 4 (emphasis added). Well, 400,000 shares, as represented by Mr. Watson, does not constitute <u>all</u> the Shea stock and warrants. The correct number of shares and warrants are set forth in Riptide's Schedule A. It may be a moot point because you stated in your email that Mr. Watson will return the certificate for 3.3M shares. Accepting that, then the only remaining requirement is for Mr. Watson and Intellectus to provide a letter releasing and relinquishing all right, title and interest in the four (4) warrants issued to Mr. Watson and Intellectus (see Schedule A), per the terms of the parties' Settlement.

3. Escrow. I understand the $275K will be wired into WM's escrow account tomorrow. I will attempt to verify that.

4. FEMA Transition. I suggested that we talk on 8/7 (tomorrow) about the transition of the FEMA contract after Riptide's meeting with FEMA and receipt of Mr. Watson's request for any reasonable accommodations from Riptide. Such a discussion is clearly necessary because I do not understand the attachment to your email and do not know how to respond without some clarification.

5. GSA MOBUS. Riptide is working on this item.

Please let me know if I have omitted anything.

Stephen E. Baril, Esq.
Williams Mullen
1021 East Cary Street, 14th Floor
P.O. Box 1320
Richmond, VA 23218-1320
(804) 783-6423
(804) 783-6507 - fax
sbaril@williamsmullen.com

---

**From:** James Davies [mailto:jdavies@lcbf.com]
**Sent:** Tuesday, August 05, 2008 4:29 PM
**To:** Baril, Stephen E.; Cristi Luckow
**Cc:** Dowd, Brendan; Dillon, Edward; Barbie, Karoline M.

**Subject:** RE: Riptide's Reply to Watson's Response re: Execution of Parties' Settlement

Steve:

We are most disturbed by your response and the attachments we received yesterday.   We have made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.  Your proposed release language only regurgitates Riptide's position made before, and rejected by, the Court on July 29, 2008.   Given the discussion before the Court, we question the basis of your repeated inclusion of terms that were never agreed to on July 10, 2008.

Further, there was no discrepancy in our August 1, 2008 correspondence regarding our client's tender of shares.   The settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007.   What remains to be tendered by our client and accepted by Riptide under the agreement is 2.9 million shares.   Obviously, counsel will provide the original certificate of stock in the amount of 3.3. million shares.

In addition, we still have not received confirmation that the $275,000 which was, under the agreement, to be placed in escrow by July 24, 2008 has in fact been placed into escrow.

Lastly,  we have received no response regarding our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel for planning and discussions during the transition period.  Nor, to our understanding, has Riptide made any efforts with respect to the transition of the GSA MOBUS contract.

Notwithstanding, Riptide's utter failure's under the agreement, we remain committed to completing the settlement as anticipated amicably.  To this end, we have attached Mr. Watson's transition plan for the FEMA contract as you requested.   However, if Riptide continues to blatantly disregard the July 10, 2008 settlement agreement, we will move by Order to Show Cause to enforce the agreement and seek sanctions, including costs and attorneys fees, based upon Riptide's recurrent, time consuming, and resource wasting efforts to renegotiate the terms of the July 10 agreement.

-----Original Message-----
**From:** Baril, Stephen E. [mailto:sbaril@williamsmullen.com]
**Sent:** Monday, August 04, 2008 4:33 PM
**To:** Cristi Luckow; James Davies
**Cc:** Dowd, Brendan; Dillon, Edward; Barbie, Karoline M.; Baril, Stephen E.
**Subject:** Riptide's Reply to Watson's Response re: Execution of Parties' Settlement

Jed & Cristi,

Thank you for your email on Friday.

1. We agree that the parties have a binding and enforceable Settlement. We are merely working on the execution of their Settlement.

2. Sheri Pantermuehl will be in touch with Mr. Wahlberg shortly to discuss the tax liability issue.

3. I have been out most of the day and will be in court in DC tomorrow and Wednesday. I have a call into Riptide about wiring the $275K into WM's trust acct. I will confirm a date as soon as possible.

4. Today Riptide is looking into the logistics of shipping the equipment in Florida back to Reston. Since Watson is working on a written transition plan, and since Riptide has a meeting this week with FEMA, I suggested in my last email that we discuss a transition plan on 8/7 (attached). I still think that would be appropriate.

5. Once the parties have agreed to a transition plan, Riptide has no objection to a simultaneous closing. Counsel will exchange executed general releases (attached) for the original certificate of Shea stock (3.3M) and a letter from Mr. Watson and Intellectus, LLC. releasing and relinquishing all right, title and interest in the four (4) warrants for the purchase of Shea stock. I noticed one discrepancy here. Riptide's Schedule A (attached) states that Mr. Watson and Intellectus were issued four (4) warrants to purchase 8,375,500 shares of Shea stock, not the 2.9M mentioned in your email. That discrepancy needs to be rectified. Further, counsel will exchange copies of the papers in advance and represent that they are holding the original papers in escrow, and will FedEx the original papers to each other simultaneously once both sides have confirmed that everything is in order. Riptide will simultaneously wire the $175K to Mr. Watson.

6. The final piece will be the entry of an Order of Dismissals, with prejudice, in all pending lawsuits. They will be endorsed by counsel and forwarded to the respective courts immediately upon the completion of item # 5 above.

---

**From:** Cristi Luckow [mailto:cluckow@lcbf.com]
**Sent:** Friday, August 01, 2008 6:24 PM
**To:** Baril, Stephen E.; BDowd@OMM.com
**Cc:** James Davies
**Subject:** Riptide

Steve,

We are in receipt of your July 31, 2008 email regarding the the July 10 settlement. These discussions should not be deemed to abrogate, supplement or supercede the agreement on the record.

With respect to the Tax Liability Issue, Riptide should contact the following:

**Daniel J. Wahlberg, CPA**
**Hertzbach & Company, P.A.**
800 Red Brook Boulevard, Suite 300
Owings Mills, MD 21117
phone: (410) 363-3200 x 2066

direct: (443) 471-2066

fax: (410) 356-0058

The $275,000 needs to placed in escrow with WM immediately and held for the benefit of Intellectus Holdings LLC.

Our client is interested and intends on working with and adhering to the FEMA transition process. To that end, our client requests that the equipment listed on Schedule B located in Florida be transferred to the Reston office next week and that next week Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel for planning and discussions during the transition period.

All of the other equipment should remain in Reston. If there is limited space, our client will transfer equipment not being used to service FEMA to a storage location. Further, please identify an individual to whom we may contact with respect to transition of the GSA MOBUS contract.

In addition, our client will prepare and submit a written transition plan, including transfer of the leasehold to Intellectus Holdings LLC, on Monday August 4, 2008 for Riptide's review. Once the plan is agreed upon the remaining steps outlined in your memo are acceptable provided that the additional $175,000 in consideration be transferred simultaneously with the releases. We will issue a letter tendering 2,900,000 shares along with the original certificate in the amount of 3,300,000 shares.

We have proposed language for the general release(s) which will be forwarded on Monday, August 4, 2008. Please call with any questions.


Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

# Exhibit Q

## Cristi Luckow

**From:** Cristi Luckow
**Sent:** Thursday, August 07, 2008 4:11 PM
**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'
**Cc:** James Davies
**Subject:** RIPTIDE

Steve,

The following is a response to your email of August 6, 2008.

Escrow- Has the $275K that was due on July 24th been placed in WM's escrow account? Please confirm immediately.

General Release- We continue to be disturbed by your responses. Your claim that we failed to raise an objection to this language previously is patently false. We clearly asserted an objection to this language from the draft settlement agreement. See page 8 of our redlined revisions to your proposed agreement- in which we added "With the exception of any claims that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement...." We have consistently made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.

Shea Stock & Warrants- As you well know, the settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. If, instead, you now seek a tender of 3.3 million shares at this time, that is acceptable to us. According to the last trade, RTWW.OB is trading at $.10 (ten cents) per share. Accordingly, the new tender, which Riptide must accept pursuant to the agreement, would be valued at $330,000.00.

Please advise what steps have been taken with respect to the transfer of the GSA MOBUS contract. We are amenable to having a conference call to discuss FEMA related issues and Mr. Watson's transition plan. You, however, still have not provided any response to our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

**Cristi Luckow**

**From:** Cristi Luckow
**Sent:** Thursday, August 07, 2008 4:11 PM
**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'
**Cc:** James Davies
**Subject:** RIPTIDE

Steve,

The following is a response to your email of August 6, 2008.

Escrow- Has the $275K that was due on July 24th been placed in WM's escrow account? Please confirm immediately.

General Release- We continue to be disturbed by your responses. Your claim that we failed to raise an objection to this language previously is patently false. We clearly asserted an objection to this language from the draft settlement agreement. See page 8 of our redlined revisions to your proposed agreement- in which we added "With the exception of any claims that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement...." We have consistently made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.

Shea Stock & Warrants- As you well know, the settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. If, instead, you now seek a tender of 3.3 million shares at this time, that is acceptable to us. According to the last trade, RTWW.OB is trading at $.10 (ten cents) per share. Accordingly, the new tender, which Riptide must accept pursuant to the agreement, would be valued at $330,000.00.

Please advise what steps have been taken with respect to the transfer of the GSA MOBUS contract. We are amenable to having a conference call to discuss FEMA related issues and Mr. Watson's transition plan. You, however, still have not provided any response to our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

**Cristi Luckow**

---

**From:** Cristi Luckow
**Sent:** Thursday, August 07, 2008 4:11 PM
**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'
**Cc:** James Davies
**Subject:** RIPTIDE

Steve,

The following is a response to your email of August 6, 2008.

Escrow- Has the $275K that was due on July 24th been placed in WM's escrow account? Please confirm immediately.

General Release- We continue to be disturbed by your responses. Your claim that we failed to raise an objection to this language previously is patently false. We clearly asserted an objection to this language from the draft settlement agreement. See page 8 of our redlined revisions to your proposed agreement- in which we added "With the exception of any claims that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement...." We have consistently made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.

Shea Stock & Warrants- As you well know, the settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. If, instead, you now seek a tender of 3.3 million shares at this time, that is acceptable to us. According to the last trade, RTWW.OB is trading at $.10 (ten cents) per share. Accordingly, the new tender, which Riptide must accept pursuant to the agreement, would be valued at $330,000.00.

Please advise what steps have been taken with respect to the transfer of the GSA MOBUS contract. We are amenable to having a conference call to discuss FEMA related issues and Mr. Watson's transition plan. You, however, still have not provided any response to our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

**Cristi Luckow**

**From:** Cristi Luckow
**Sent:** Thursday, August 07, 2008 4:11 PM
**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'
**Cc:** James Davies
**Subject:** RIPTIDE

Steve,

The following is a response to your email of August 6, 2008.

Escrow- Has the $275K that was due on July 24th been placed in WM's escrow account? Please confirm immediately.

General Release- We continue to be disturbed by your responses. Your claim that we failed to raise an objection to this language previously is patently false. We clearly asserted an objection to this language from the draft settlement agreement. See page 8 of our redlined revisions to your proposed agreement- in which we added "With the exception of any claims that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement...." We have consistently made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.

Shea Stock & Warrants- As you well know, the settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. If, instead, you now seek a tender of 3.3 million shares at this time, that is acceptable to us. According to the last trade, RTWW.OB is trading at $.10 (ten cents) per share. Accordingly, the new tender, which Riptide must accept pursuant to the agreement, would be valued at $330,000.00.

Please advise what steps have been taken with respect to the transfer of the GSA MOBUS contract. We are amenable to having a conference call to discuss FEMA related issues and Mr. Watson's transition plan. You, however, still have not provided any response to our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

**Cristi Luckow**

**From:** Cristi Luckow
**Sent:** Thursday, August 07, 2008 4:11 PM
**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'
**Cc:** James Davies
**Subject:** RIPTIDE

Steve,

The following is a response to your email of August 6, 2008.

Escrow- Has the $275K that was due on July 24th been placed in WM's escrow account? Please confirm immediately.

General Release- We continue to be disturbed by your responses. Your claim that we failed to raise an objection to this language previously is patently false. We clearly asserted an objection to this language from the draft settlement agreement. See page 8 of our redlined revisions to your proposed agreement- in which we added "With the exception of any claims that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement...." We have consistently made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.

Shea Stock & Warrants- As you well know, the settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. If, instead, you now seek a tender of 3.3 million shares at this time, that is acceptable to us. According to the last trade, RTWW.OB is trading at $.10 (ten cents) per share. Accordingly, the new tender, which Riptide must accept pursuant to the agreement, would be valued at $330,000.00.

Please advise what steps have been taken with respect to the transfer of the GSA MOBUS contract. We are amenable to having a conference call to discuss FEMA related issues and Mr. Watson's transition plan. You, however, still have not provided any response to our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

**Cristi Luckow**

---

**From:** Cristi Luckow
**Sent:** Thursday, August 07, 2008 4:11 PM
**To:** 'sbaril@williamsmullen.com'; 'BDowd@OMM.com'
**Cc:** James Davies
**Subject:** RIPTIDE

Steve,

The following is a response to your email of August 6, 2008.

Escrow- Has the $275K that was due on July 24th been placed in WM's escrow account? Please confirm immediately.

General Release- We continue to be disturbed by your responses. Your claim that we failed to raise an objection to this language previously is patently false. We clearly asserted an objection to this language from the draft settlement agreement. See page 8 of our redlined revisions to your proposed agreement- in which we added "With the exception of any claims that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made under Article 5, Section 5.12(a) of the Merger Agreement...." We have consistently made clear that in any documentation regarding the settlement, the documents must unambiguously state that the settlement does not affect any claims that may arise in the future under the relevant agreements other than, as set forth in the July 10, 2008 transcript, a claim based upon the non-competition provisions of the employment agreement.

Shea Stock & Warrants- As you well know, the settlement entered into on July 10th explicitly stated that Riptide would accept the tender of shares previously made by Mr. Watson - to wit: a tender of 400,000 shares made in December 2007. If, instead, you now seek a tender of 3.3 million shares at this time, that is acceptable to us. According to the last trade, RTWW.OB is trading at $.10 (ten cents) per share. Accordingly, the new tender, which Riptide must accept pursuant to the agreement, would be valued at $330,000.00.

Please advise what steps have been taken with respect to the transfer of the GSA MOBUS contract. We are amenable to having a conference call to discuss FEMA related issues and Mr. Watson's transition plan. You, however, still have not provided any response to our request that Intellectus be provided a cubicle in the Reston office and reasonable, non-disruptive access to personnel.

Cristi L. Luckow
Landman Corsi Ballaine & Ford
120 Broadway, 27th floor
New York, New York 10271
(212) 238-4806
fax: (212) 238-4848
cluckow@lcbf.com

# Exhibit R

LANDMAN CORSI BALLAINE & FORD P.C.
A NEW YORK PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

JAMES E. DAVIES
MEMBER
TEL: (212) 238-4859
EMAIL: jdavies@lcbf.com

120 BROADWAY
27TH FLOOR
NEW YORK, NY 10271-0079
TELEPHONE (212) 238-4800
FACSIMILE (212) 238-4848
www.lcbf.com

One Gateway Center
Newark, NJ 07102
Tel: (973) 623-2700

1617 JFK Boulevard
Philadelphia, PA 19103
Tel: (215) 561-8540

August 12, 2008

**Via E-Mail**
Stephen E. Baril
Williams Mullen, PC
1021 East Cary Street, 17th Floor
Richmond, Virginia 23219

Brendan J. Dowd
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036

Re: Shea Development Corp et al. v. Watson et al.
Index No.: 07-CV-11201
Our File No: 913-1

Dear Steve and Brendan:

We write in yet another attempt to cooperatively complete the July 10, 2008 settlement, without the need for further Court intervention. To this end, and given that your proposed dates have now long since passed, the following is a list of items which we believe can be resolved expeditiously and about which there can be no debate.

1. **Transfer of the physical possession of the non-FEMA equipment**

A. Resolution of BMW: Attached hereto is a document transferring the title to the BMW from Riptide World Wide Inc. ("Riptide") to Christopher Watson. Please have your client execute and return before Friday, August 15, 2008. If you would prefer alternative language, please supply the suggested language as soon as possible.

B. Florida Equipment: As agreed, Mr. Watson will be at 200 E Palm Valley Dr Suite 2000, Oviedo, Florida on Wednesday, August 13th at 11a.m. to retrieve his property stored at Riptide's Florida's offices.

2. **Transferring the MOBUS schedule:**

We propose a kickoff meeting between the working parties on Wednesday, August 13th at 9am to discuss and begin to initiate the transition of the MOBUS contract. The call-in information for this discussion is (641) 715 3200 with a PIN of "463123#"

3. **Resolving the payroll tax issue:**

We propose a working meeting between Riptide's financial staff and Mr. Watson's accountants on Thursday, August 14th at 10am Eastern time to discuss and begin to resolve the payroll tax issue. The call-in information for this discussion is (641) 715 3200 with a PIN of "463123#". In preparation for this meeting, Mr. Watson's accountants need the power of attorney (provided by e-mail on July 11, 2008) authorizing them to discuss the matters with the tax authorities executed and returned. Please have the previously provided powers of attorney executed and returned prior to this meeting

4. **$275,000 escrow payment:**

This escrow payment is long overdue. Please provide confirmation that Riptide has placed $275,000 in escrow with your firm. If the funds have not been placed in escrow, please provide a proposed timeline for the placement of the funds.

5. **Riptide's payment of $175,000 as directed by Mr. Watson:**

This payment has been delayed far longer than contemplated by the settlement. If your client is intending to abide by the spirit and the intent of the binding settlement, we suggest that the payment be made immediately to Landman Corsi Ballaine & Ford PC, as attorneys for Christopher Watson.

6. **FEMA Transition Planning:**

We have previously provided a transition plan for the FEMA services. This is an important contract that is responsible for inbound Federal disaster claims management for the United States. We urge your client to address this responsibility quickly as the time in which to

complete the transaction continues to shrink. We propose scheduling a working meeting between both parties technical and management staff involved in the FEMA contract work on Thursday, August 14th at 9am to discuss and plan the transition. The call-in information for this discussion is (641) 715 3200 with a PIN of "463123#"

7. **Tender of Shares, return of warrants:**

As required and agreed by the settlement Mr. Watson, has tendered his shares, the certificate which holds the 400,000 shares tendered in December of 2007 and required to be accepted under this agreement will be returned this week under separate cover to your office directed to your attention. In this same letter, Mr. Watson will make a second tender of the remaining 2,900,000 shares of the 3,300,000 shares listed on the same certificate under Article 7 of the Merger Agreement. While we believe the tender of December 2007 is valid and effective under Article 7.5 of the Merger Agreement, to remove any doubt, we will tender the remaining 2,900,000 shares pursuant to Article 7 of the Merger Agreement between our respective clients as provided for and required by the binding settlement agreement between the parties. In addition, those warrants held by Mr. Watson or a Watson controlled entity will be returned in the letter containing the tenders and the share certificate.

We appreciate your consideration to a speedy resolution of these binding aspects of the settlement agreement. If the times contemplated for the meetings outlined above are not convenient to the necessary Riptide employees, please propose alternative meeting times for this week and my client and his staff will do their best to accommodate your time proposal(s).

Lastly, we are prepared to participate in the execution of mutual releases releasing the claims in the various actions upon receipt of appropriate language and your client's adherence to the above settlement requirements. At this juncture, your client has avoided all of its obligations under the July 10, 2008 settlement agreement and has cost Mr. Watson an appreciable amount of additional time and money pursuing resolution of these matters. Please respond to this letter as soon as possible to avoid further motion practice.

Sincerely,

James Davies

xx

# Exhibit S

## Cristi Luckow

---

**From:** Baril, Stephen E. [sbaril@williamsmullen.com]
**Sent:** Wednesday, August 13, 2008 7:03 PM
**To:** James Davies; Dowd, Brendan
**Cc:** Cristi Luckow; Baril, Stephen E.; Dillon, Edward; Barbie, Karoline M.
**Subject:** RE: Watson v. Shea

Jed,

Thank you for your letter of August 11th and your email today. I had planned to respond to your letter tomorrow. I will attempt to give you a partial response to your email and will look into the matter further tomorrow.

My first question is where does the July 10th Settlement obligate Shea/Riptide to return a source code from excess equipment in storage in Florida? As you will recall, Riptide located some of the equipment in Florida upon receipt of Mr. Watson's list some time after the mediation on July 10th. It is my understanding that the equipment had been wiped clean in response to a threat of suit for breach of the IP agreement by Mr. Watson's former attorney, Jay West. I will try to locate a copy of his letter and make sure I have my facts straight.

My next question is why doesn't Mr. Watson have a back-up copy of the source code? After all, it is his intellectual property. Did he not make a back-up copy before closing or vacating the premises?

Since Riptide is not and has not been using the source code in connection with the FEMA contract, I fail to see the urgency of your email insofar as it relates to the parties' settlement. Nonetheless, I am hopeful we can sort this out after I am able to talk to my client tomorrow.

Again, I fully intend to respond to your August 11th letter and remain optimistic that everything can be resolved satisfactorily if cool heads prevail.

Best regards,

Steve

Stephen E. Baril, Esq.
Williams Mullen
1021 East Cary Street, 14th Floor
P.O. Box 1320
Richmond, VA 23218-1320
(804) 783-6423
(804) 783-6507 - fax
sbaril@williamsmullen.com

NOTICE: Information contained in this transmission to the named addressee is proprietary information and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.

---

**From:** James Davies [mailto:jdavies@lcbf.com]
**Sent:** Wednesday, August 13, 2008 3:57 PM
**To:** Dowd, Brendan; Baril, Stephen E.
**Cc:** Cristi Luckow

**Subject:** Watson v. Shea

Dear Steve & Brendan:

I have spoken to client and he is inspecting the equipment that he picked up this morning in Florida.    Upon inspection, he observed that key development servers are missing and that drives have been removed from other servers.  Specifically, these drives contained the development software and source code owned by Intellectus and licensed to Bravera/Riptide.  Pursuant to the agreement reached in Court, Riptide was to deliver the source code for the Intellectus intellectual property and return all of derivatives of that Intellectual property.
This shocking conduct is a clear breach of the July 10, 2008 settlement agreement and constitutes sanctionable conduct by your client.

We demand and expect Riptide to deliver of all source codes and other Intellectus intellectual property in your client's possession no later than 5 pm tomorrow afternoon at our offices located at 120 Broadway, 27th Floor, New York, NY.

Landman Corsi Ballaine & Ford P.C. N.Y. 212 238-4800 N.J. 973 623-2700 P.A. 215 561-8540 NOTE: This message, and any attached files, may contain privileged or confidential information. It is intended for use only by the addressee(s). Any disclosure, copying or distribution of, or reliance upon, this message by anyone else is strictly prohibited. If you received this message in error, please notify the sender by reply e-mail message or by telephone to one of the numbers above.

# Exhibit T



WILLIAMS MULLEN

Direct Dial: 804.783.6423
sbaril@williamsmullen.com

August 14, 2008

James E. Davies, Esq.
Landman, Corsi, Ballaine & Ford, P.C.
120 Broadway, 27th Floor
New York, NY 10271-0079

Re: Shea Development Corp., *et al.* v. Christopher Watson, *et al.*
Case No.: 1:07-CV-11201 (DLC) (GWG)

Dear Jed:

Thank you for your letter of August 12th and your continuing efforts to resolve the details pertaining to the parties' execution of their July 10th Settlement. I will respond to the items in your letter in the order of importance to Riptide.

1. Return of All Shea Stock and Warrants. Since the mediation on July 10th, Mr. Watson has argued that he made a partial tender of 400,000 shares of Shea stock, which is factually untrue (no stock was "tendered"), and which would have been a physical impossibility (there is only one certificate for 3.3M shares). He has further attempted to tie the return of the Shea stock and warrants to a demand for future indemnification, which was never discussed or agreed to at mediation. Judge Gorenstein confirmed this point at the second mediation on July 29th. Mr. Watson also has attempted to inject a price per share factor, which also was never discussed and is not reflected in the July 10th Settlement.

The parties' agreement is simple and straight forward. Mr. Watson is obligated to return all shares of Shea stock and all warrants to purchase Shea stock. There are no strings attached. Mr. Watson has yet to indicate his willingness to perform this simple term of the parties' settlement, but instead has groused about Riptide's alleged lack of performance of certain terms that are important to him. In order to facilitate the prompt resolution of this issue, I have drafted the attached letter for Mr. Watson's execution that will satisfy his obligation under this term of the July 10th Settlement. Until Mr. Watson performs this term, there really is no point in discussing the other issues.

*A Professional Corporation*

NORTH CAROLINA • VIRGINIA • WASHINGTON, D.C. • LONDON

Two James Center 1021 East Cary Street (23219) P.O. Box 1320 Richmond, VA 23218-1320 Tel: 804.643.1991 Fax: 804.783.6507
www.williamsmullen.com



WILLIAMS MULLEN

2. General Release. The July 10th Settlement makes clear that Riptide is entitled to a general release. On July 31st, I sent you a proposed General Release. You objected, and on August 6th, I invited you to send me alternative language. I have yet to receive anything except continuing complaints. Here again, Riptide cannot complete the terms of settlement until, at a minimum, we have agreed-upon language for a general release that has been executed by Mr. Watson.

3. Tax Liability Issue. Last week, Sheri Pantermuehl called Mr. Watson's CPA, Dan Wahlberg. They discussed the situation and Mr. Wahlberg said that he needed to search for certain documents and would be back in touch with Ms. Pantermuehl. She followed up with Mr. Wahlberg, but she has not heard from him since early this week. (See attached emails.) Ms. Pantermuehl also informed Mr. Wahlberg that the IRS has set a Collection Due Process Hearing for August 27th. (See attached letter.)

With respect to your request for a written power of attorney authorizing Mr. Watson to deal directly with the IRS and the Commonwealth of Virginia, Riptide would prefer for Ms. Pantermuehl to be involved in all communications with the taxing authorities. We believe her direct involvement is in the best interest of all concerned.

4. $275,000 Escrow. Riptide has not yet deposited these funds in escrow for three (3) reasons. First, Riptide has been working on a number of business transactions which will provide funding for this settlement. Riptide anticipates funding coming through next week. I will keep you posted on this issue. Next, it would appear that funding the escrow is not material at this point, since the IRS tax liability issue will not be resolved before the hearing on August 27th. Of course, that still leaves the tax liability issue with the Commonwealth of Virginia. As the parties' agreed, no funds will be released to Mr. Watson until all tax liability issues have been resolved and Riptide has received a full and complete release. Finally, there is the issue of Mr. Watson's non-performance with respect to the stocks and warrants and general releases, as discussed above.

5. FEMA Transition and Business Equipment. On August 4th, I suggested a conference call on August 7th to discuss a transition plan. I reiterated that suggestion by email on August 6th. At that time, Riptide had met with FEMA, and we had received a copy of Mr. Watson's written request for certain accommodations. I specifically stated that a conference call was necessary because we did not fully understand Mr. Watson's requests. We still need a conference call. I have no objection to Mr. Watson's participation. If he would like, I can



WILLIAMS MULLEN

arrange to have a representative from Riptide on the call. I am available on Friday until mid-afternoon as well as next Monday.

With respect to the excess business equipment shipped to Orlando, Florida for storage, I refer to you the letters from Mr. Watson's former attorneys dated November 29, 2007, January 3, 2008, and January 22, 2008. Mr. Watson's lawyers alleged that Riptide and/or IP Holding had breached the Software License and Asset Purchase Agreement, and therefore terminated the agreement effective February 3, 2008. While Riptide disagreed with Mr. Watson's position, it ceased and desist using the software, including the source code, which was wiped clean from the business equipment in Riptide's possession so as to avoid any future use. Riptide is now confused as to why Mr. Watson is looking to Riptide for a copy of his software and source code, which he owns and licensed to IP Holdings. I suggest we add this issue to the topics for discussion during our conference call.

6. GSA MOBUS. Per the July 10th Settlement, Riptide has contacted GSA about novating and allowing Mr. Watson to perform the MOBUS contract. Riptide is working on this term of the settlement.

7. $175,000 Payment. The payment of this amount to Mr. Watson has been delayed due to Mr. Watson's failure to deliver, or even commit to deliver, all Shea stock and warrants, together with a general release. On August 4th, I suggested a simultaneous closing to resolve any impasse caused by the parties' distrust of each other. Mr. Watson has not responded to this suggestion, but instead has focused on Riptide's alleged non-performance at the exclusion of his own non-performance. He also has not offered a plan for the parties to perform in a mutual fashion. Hence, we need to resolve this impasse driven by the parties' distrust.

8. Dismissal, with Prejudice. Once both parties have performed their respective obligations under the July 10th Settlement, orders of dismissal, with prejudice, must be entered in all pending litigation. There does not appear to be any disagreement over this.

9. Confidentiality. I suggested a confidentiality provision be included in the exchange of general releases. You have not responded to this suggestion, so I do know whether you concur or object. It is a material term of the July 10th Settlement, and I assume this will not be a sticking point.



WILLIAMS MULLEN

While the parties have gotten bogged down in the performance of terms of the July 10th Settlement, they agree that they have a binding and enforceable settlement, as confirmed by the transcript and our meeting with Judge Gorenstein on July 29th. I sincerely hope that you and I can lead our respective clients through these performance issues and bring the pending litigation to closure. To this end, I strongly urge an end to the letter writing campaign and instead a conference call to review each issue to see what we can do to accomplish the parties' settlement in an orderly fashion.

With best wishes, I remain

Sincerely yours,

Stephen E. Baril

SEB/adh
cc: Brendan J. Dowd, Esq.

1643587v1



James E. Davies, Esq.
August 14, 2008
Page 5

bcc: Francis E. Wilde (via email)
E. Joseph Vitetta, Jr. (via email)
Francis J. Mooney, Esq. (via email)

August____, 2008

Francis E. Wilde, CEO
Riptide Worldwide, Inc.
200 East Palm Valley Drive, Suite 2000
Oviedo, FL 32765-9401

RE: Shea Development Corporation.

Dear Mr. Wilde:

I, Christopher Watson, do hereby deliver to you Certificate No. 357, issued July 18, 2007, for 3,300,000 shares of common stock of Shea Development Corporation ("Shea") n/k/a Riptide Worldwide, Inc.

On behalf of myself and Intellectus, LLC, of which I am the managing member, Christopher Watson and Intellectus, LLC do hereby release and relinquish all right, title and interest in Shea stock and warrants for the right to purchase Shea stock as set forth in Schedule A attached hereto.

Sincerely,

______________________________
Christopher Watson

INTELLECTUS, LLC

By:___________________________
Managing Member

**Schedule A**

**Stock and Warrant Issuance to Christopher Watson and ALL Parties Related**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|
| Common | Chris Watson | 7/18/07 | 357 | Merger Agreement | 3,300,000 |
| Warrant | Christopher Watson | June 14, 2007 | NA | Exhibit D Equity Earn-Out Warrant | 5,000,000 shares at a price of $1.00 |
| Warrant | Christopher Watson | June 15, 2007 | NA | Exhibit B Year One Earn-Out Warrant | 1,312,500 shares at a price of $1.00 |
| Warrant | Christopher Watson | June 15, 2007 | NA | Exhibit C Year Two Earn-Out Warrant | 1,625,00 shares at a price of $1.00 |
| Warrant | Intellectus, LLC | June 16, 2007 | NA | Exhibit E of the IP Agreement | 450,000 shares at a price of $1.00 |

**Baril, Stephen E.**

**Subject:** FW: Bravera - Emails with Dan Wahlberg

----- Original Message -----
From: Dan Wahlberg [mailto:DJW@Hertzbach.com]
To: sheri.pantermuehl@riptidesoftware.com
Sent: Mon, 11 Aug 2008 11:45:43 -0400
Subject: RE: Bravera

Sheri,

I was out of the office on Friday, I will try to give you a call today.

Thanks
Dan

-----Original Message-----
From: Sheri Pantermuehl [mailto:sheri.pantermuehl@riptidesoftware.com]
Sent: Friday, August 08, 2008 12:38 PM
To: Dan Wahlberg
Subject: Bravera

Dan, have not heard from you in a couple of days. Just checking on status.

Sheri

---

CIRCULAR 230 DISCLOSURE NOTICE

In accordance with Internal Revenue Service rules, we are now required to advise you that, any federal tax advice provided in this communication, including attachments and enclosures, is not intended or written by the author to be used, and cannot be used by the recipient, for the purpose of avoiding tax-related penalties which may be imposed on the recipient by the Internal Revenue Service.

CONFIDENTIALITY NOTICE

The material accompanying this electronic transmission contains confidential information which is the property of the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this electronic information is strictly prohibited. If you have received this electronic mail in error, please immediately notify us by telephone to arrange for the return of the material to us.

If any part of this message is not clear, please call 410-363-3200

Bravera, Inc

Internal Revenue Service
IRS Wash. Appeals Field Office
1099 14th Street, N.W.
4100 West Tower
Washington, DC 20005

Department of the Treasury

**Person to Contact:**
Mark Hunt
Employee ID Number: 52-07238
Tel: 202-435-5756
Fax: 202-435-5750
**Refer Reply to:**
AP:FE:AP:WA:MEH
**In Re:**
BRAVERA INC
**Social Security or Employer Identification Number:**
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
**Tax Period(s) Ended:**
12/2005

Date: July 22, 2008

DUNNINGTON, BARTHOLOW & MILLER LLP
ATTORNEYS AT LAW
NEW YORK, N.Y. 10022
Attn: Joseph Michaels IV

**Appeals Received Your Request for a Collection Due Process Hearing**

Joseph Michaels IV:

Appeals received your request for a Collection Due Process (CDP) Hearing. I have scheduled a telephone conference call for you on August 27, 2008 at 10am. This call will be your primary opportunity to discuss with me the reasons you disagree with the collection action and/or to discuss alternatives to the collection action.

I will call you at 212-682-8811, the number you indicated on your CDP request.

Please call me at the number indicated above by August 15, 2008 to confirm the teleconference.

Your CDP hearing request regarding proposed levy action on the following tax period was timely: Form 941, for tax period December 31, 2005. During your hearing, and until any appeals become final for these tax periods, the legal collection period is suspended and no levy action may be taken.

During the hearing, I must consider:

- Whether the IRS met all the requirements of any applicable law or administrative procedure
- Any nonfrivolous issues you wish to discuss. These can include:

  1. Collection alternatives to levy such as full payment of the liability, installment agreement, offer in compromise or temporary suspension of collection action if the action imposes a hardship condition. Although they may not be considered an "alternative" to a notice of lien filing, these collection options may also be discussed at a lien hearing.

2. Challenges to the appropriateness of collection action. If this is a lien hearing, you may ask us to determine if the notice of lien filing was appropriate and if you qualify for a lien withdrawal or other lien options, such as subordination.

- We may also consider whether you owe the amount due, but **only if** you have not otherwise had an opportunity to dispute it with Appeals or did not receive a statutory notice of deficiency.

- We will balance the IRS' need for efficient tax collection and your legitimate concern that the collection action be no more intrusive than necessary.

You are entitled to have your conference with an Appeals employee who has had no **prior involvement** with the tax periods at issue (other than a prior CDP hearing), either in Appeals or in the Compliance division. I do not recall any prohibited previous involvement with these tax periods, however, if you believe I have, please notify me immediately. If I have been involved but you would still like me to conduct your hearing, you may waive this right.

Regarding the liability you are raising:

**I am in receipt of your letter dated February 5, 2008 in which you assert that Shea Development Corp. or a subsidiary thereof should not be held accountable for the December 31, 2005 employment tax liability because of the alleged fraudulent acts of Bravera Inc's former President, former sole Director and former sole Shareholder, Christopher R. Watson. You make the following requests:**

**1) Immediate hold on the account - the account is placed in abeyance while it is under Appeals jurisdiction. Penalties and interest continue to accrue.**

**2) Abate the assessment, interest, and penalties - as you are no doubt aware, penalty abatement relief is made on a case by case basis governed by reasonable cause. Reasonable cause is determined in accordance with the ordinary and prudent business person standard. Tax assessments on the other hand generally are only abated if they are incorrect or erroneous. Based on the latter there appear to be no grounds, equitable or otherwise, for the abatement of either tax or penalty.**

**3) IRS pursuit of Mr. Watson in accordance with Section 6672 or the Internal Revenue Service Code - IRS Appeals has no control over the initial "trust fund" tax assessment determination. This is an IRS Compliance Unit function.**

**4) Provide such other relief to the Company permissible by law - collection alternatives may be available based on the Taxpayer's income, expenses and assets.**

For me to consider alternative collection methods such as an installment agreement or

offer in compromise, you must provide any items listed below. In addition, you must have filed all federal tax returns required to be filed.

- A completed Collection Information Statement (Form 433-A for Individuals and/or Form 433-B for businesses.)

Please send me the items **requested** above by August 15, 2008. I cannot consider collection alternatives at your conference **without this information**

At the conclusion of the hearing, we will issue a **determination letter** as required by law **for the tax periods for which your CDP hearing request was received timely.** If you do not agree with our determination you may appeal the case to the appropriate court. We will provide information about the appropriate court in your determination letter.

If you do not participate in the conference or respond to this letter, the determination and/or decision letter that we issue will be based on your CDP request, any information you previously provided to this office about the applicable tax periods, and the Service's administrative file and records.

Please contact me with any questions or concerns you have regarding this letter or the CDP procedures. My telephone number is listed above.

Sincerely,

Mark Hunt
Settlement Officer

cc: Bravera Inc

DUNNINGTON, BARTHOLOW & MILLER LLP
ATTORNEYS AT LAW
477 MADISON AVENUE
NEW YORK, N. Y. 10022

TELEPHONE: (212) 682-8811
FACSIMILE: (212) 661-7769
DBM@DUNNINGTON.COM
WWW.DUNNINGTON.COM
(646) 865-7741

MARVIN M. BROWN
RAYMOND J. DOWD
JOHN T. DUNLAP
GEORGE W. GOWEN
MICHAEL J. KOPCSAK
STEVEN E. LEWIS
ROBERT T. LINCOLN
ALBERT L. LINGELBACH
THOMAS V. MARINO
JOSEPH MICHAELS IV
C. FREDERICK ROGGE, III
JOHN W. SHROYER
CAROL A. SIGMOND
LOUIS E. TEITEL

FREDERICK W. LONDON
FRANCIS J. MOONEY, JR.
JOHN I. FORRY
OF COUNSEL

February 5, 2008

<u>EXPRESS MAIL</u>

Internal Revenue Service
P.O. Box 16296
Philadelphia, PA 19114-0296

Re: <u>Bravera, Inc. – EIN: 20-3010278</u>

Dear Sir or Madam:

We are legal counsel for Shea Development Corp. (whose name has recently been changed to Riptide Worldwide, Inc.) For purposes of this discussion, I will continue to refer to the companies as Bravera, Inc. and Shea Development Corp., respectively. On or about July 16, 2007, a wholly-owned subsidiary of Shea Development Corp. acquired Bravera, Inc. via a reverse triangular merger. Due to a difficult transition between the companies, the new management of Bravera, Inc. only just received a copy of your "Notice of Intent to Levy" dated November 5, 2007 which was forwarded to Bravera, Inc. (the "Company") in care of its <u>former</u> President, former sole Director and former sole Shareholder, Christopher R. Watson, at his Jacksonville, Florida address. Mr. Watson resigned as an employee and officer of Bravera, Inc. on September 29, 2007. Mr. Watson never forwarded the November 5, 2007, "Notice of Intent to Levy."

We are enclosing herewith a "Power of Attorney and Declaration of Representative," on Form 2848, signed by the current Chief Financial Officer of Bravera, Inc., authorizing the undersigned and other Members of this Firm to represent Bravera, Inc. with regard to this "Notice of Intent to Levy."

The Merger Agreement executed by the parties to effectuate the acquisition of Bravera, Inc. by a wholly-owned subsidiary of Shea Development Corp. contains <u>warranties and representations</u> from Bravera, Inc.'s then President, sole Director, and sole shareholder, Christopher R. Watson, and/or the Company to the effect that <u>there were no</u>

"undisclosed liabilities" for, amongst other things, Federal, State or local income tax, employment tax and/or other tax liabilities with respect to Bravera, Inc. for the period prior to the July 16, 2007 merger date and that (i) the Company timely filed and paid all taxes due through December 31, 2006, (ii) the Company or its agents collected or withheld all amounts required to be collected or withheld on account of taxes, and "remitted the same to the appropriate governmental authority in the manner and in the time required . . . ," and (iii) Christopher R. Watson had no knowledge of any actions by any taxing authority in connection with assessing a material amount of additional taxes, nor was he aware of any tax liability of the Company. A copy of Sections 2.8, 2.10 and other appropriate portions of said Merger Agreement are annexed hereto.

In December, 2007, Shea Development Corp. and Bravera, Inc. commenced suit against Mr. Watson in the United States District Court for the Southern District of New York. The lawsuit contains multiple causes of action grounded in fraud, breach of contract, together with other causes of action seeking a judgment for the extensive damages done to Bravera, Inc.

Had Shea Development Corp. known prior to the execution of this Merger Agreement, or prior to the closing under the merger Agreement, of these tax liabilities for the quarter ended December 31, 2005, it would have sought to remit, or at a minimum, reserve for these liabilities from funds or other consideration due Mr. Watson under the Merger Agreement. As noted above, Mr. Watson represented that there were no outstanding tax liabilities as of the July 16, 2007 that had not been timely remitted or reserved for.

On the basis of your "Notice of Intent to Levy," it is now apparent to Bravera, Inc. and Shea Development Corp. that Mr. Watson failed to remit, or reserve for, the employment and withholding taxes which are the subject of your "Notice of Intent to Levy." Since Shea Development Corp. was unaware of these liabilities and not in control of Bravera, Inc. at the time these liabilities were incurred, and because Bravera, Inc. is in no financial position to satisfy the substantial liability arising from your assessment, we respectfully request on behalf of the Company that you (i) place an immediate "hold" on the levy and collection of the $258,367.91 balance set forth in your Notice and all interest and penalties thereon against the Company, (ii) abate the assessment, interest and penalties in full on equitable grounds and for reasonable cause, (iii) pursue Christopher R. Watson pursuant to the provisions of Section 6672 of the Internal Revenue Service for the amount of said assessment, interest and penalties on the basis that Mr. Watson was the person "required to . . . truthfully account for and pay over" said withholding taxes and

who "willfully" failed to "truthfully account for and pay over such tax," and (iv) provide such other relief to the Company permissible by law. Mr. Watson should be held liable for a penalty equal to the total amount of the tax not accounted for or paid over by him to the IRS during his ownership and stewardship of the Company as President, sole Director and sole Shareholder..

Thank you for your kind attention to this request. We would appreciate the opportunity to confer with you further on these issues if you have any questions with regard to our requests and to submit additional documentation and information, if needed, in support of our requests for relief.

We would appreciate it if you would acknowledge receipt of this letter and the enclosed "Power of Attorney and Declaration of Representative" by stamping the enclosed copy of this letter with your "Received" stamp and returning it to us in the stamped envelope provided.

Sincerely yours,

DUNNINGTON, BARTHOLOW & MILLER LLP

By: ______________________
Joseph Michaels IV
A Partner

JM/mcf
Enclosures

cc: RTWW Business Services,. Inc. (f/k/a Bravera, Inc.)

WEST & COSTELLO, LLC
409 Washington Avenue, Suite 1010
Baltimore, Maryland 21204

John H. West III
Thomas C. Costello
James H. West

Telephone: 410-296-4655
Facsimile: 410-296-6654

November 29, 2007

VIA E-MAIL AND FEDERAL EXPRESS

Mr. Francis E. Wilde
Chairman & CEO
IP Holding of Nevada Corp.
3452 Lake Lynda Drive, #350
Orlando, Florida 32817

Re: Intellectus, LLC

Dear Mr. Wilde:

This firm represents Intellectus, LLC ("Intellectus") and Christopher Watson ("Watson"). As you will recall, Watson is the sole member of Intellectus.

I am writing to you in connection with the Software License and Asset Purchase Agreement ("Software Agreement") dated July 16, 2007 by and between Intellectus and IP Holding of Nevada Corp. ("IP Holding"). Pursuant to Article IV, Section 5(B) of the Software Agreement, IP Holding expressly assumed "all liability and responsibility, including product liability and warranty obligations, whether express or implied, with respect to any product in inventory at the time of Closing or in the Software which was shipped, sold in place or manufactured or for services rendered by [IP Holding] or any successor in interest after Closing." This letter constitutes notice to IP Holding that it has materially breached its obligations under the Software Agreement by failing to provide support for numerous customers to whom it has sold licensed software and product support services since Closing.

In addition, under Article IV, Section 15 of the Agreement, IP Holding agreed that "[a]ll consideration set forth on Exhibit C shall be deemed earned, accelerated and due and payable sixty (60) days after the termination of the employment of Christopher Watson by Bravera, Inc. (or its successor), a Florida corporation and subsidiary of Shea, for any reason other than for 'Cause' as defined in that certain Senior Management Employment Agreement between Bravera, Inc. and Christopher Watson dated as of July 15, 2007." As you are aware, Watson's employment with Bravera terminated, effective on or about October 30, 2007. Watson's employment by Bravera did not terminate for "Cause," as that term is defined in the Senior Management Employment Agreement ("Employment Agreement").

Mr. Francis E. Wilde
November 29, 2007
Page 2

Accordingly, under Article IV, Section 15 of the Software Agreement, "[a]ll consideration set forth on Exhibit C shall be deemed earned, accelerated and due and payable" by IP Holding to Intellectus on or before December 29, 2007. The consideration due under Exhibit C to the Software Agreement includes: $750,000 (1st Closing Date Anniversary Payment), $375,000 (2nd Closing Date Anniversary Payment), $375,000 (3rd Closing Date Anniversary Payment), $500,000 (Q3 2007 Earn-Out Payment), $500,000 (Q4 2007 Earn-Out Payment), $500,000 (Year 1 Earn-Out Payment), $375,000 (Year 2 Earn-Out Payment), and $375,000 (Year 3 Earn-Out Payment) – a total of $3,750,000.

In the Form 10-QSB filed for the quarter ended September 30, 2007, Shea Development Corp. ("Shea"), the parent corporation of IP Holding, indicated that "all potential future payments and the vesting on restricted shares and warrants to [Watson] were cancelled" as a result of his resignation from Bravera. Based on this representation, Intellectus hereby provides notice that IP Holding has anticipatorily breached its obligation to make the significant payments that are required under Article IV, Section 15 of the Software Agreement.

In the event that IP Holding fails to cure the breaches set forth herein within thirty (30) days by (a) providing the support required for customers that have purchased licensed software and related services and (b) providing assurances that the payments required by the Software Agreement, based on the termination of the employment of Watson by Bravera, will be remitted on or before December 29, 2007, Intellectus will terminate the Software Agreement pursuant to Article II, Section 5 of the Agreement.

This letter is not, nor is it intended to be, a waiver of any prior notices of default with respect to the Software Agreement, the Employment Agreement, or the Agreement and Plan of Merger dated April 26, 2007, which defaults remain uncured as of the date of this notice, or to waive any other sums or charges due under said agreements. Intellectus and Watson fully reserve their rights to pursue all available remedies with respect to such existing defaults or other sums due.

Please contact me with any questions that you may have.

Very truly yours,

James H. West

JHW/r

cc: Robert T. Lincoln, Esquire (via e-mail and Federal Express)

**WEST & COSTELLO, LLC**
409 Washington Avenue, Suite 1010
Baltimore, Maryland 21204

John H. West III
Thomas C. Costello
James H. West

Telephone: 410-296-4655
Facsimile: 410-296-6654

January 3, 2008

**VIA E-MAIL AND FEDERAL EXPRESS**

Mr. Francis E. Wilde
Chairman & CEO
IP Holding of Nevada Corp.
3452 Lake Lynda Drive, #350
Orlando, Florida 32817

Re: Intellectus, LLC

Dear Mr. Wilde:

This firm represents Intellectus, LLC ("Intellectus") and Christopher Watson ("Watson").

I refer you to my letter dated November 29, 2007 relating to the Software License and Asset Purchase Agreement ("Software Agreement") dated July 16, 2007 by and between Intellectus and IP Holding of Nevada Corp. ("IP Holding"). IP Holding has not responded in any way to my November 29 letter and has failed to cure its breaches of the Software Agreement set forth in that letter. Accordingly, pursuant to Article II, Section 5 of the Software Agreement, the License granted by Intellectus to IP Holding shall terminate on February 3, 2008.

This letter is not, nor is it intended to be, a waiver of any prior notices of default with respect to the Software Agreement, the Employment Agreement, or the Agreement and Plan of Merger dated April 26, 2007, which defaults remain uncured as of the date of this notice, or to waive any other sums or charges due under said agreements. Intellectus and Watson fully reserve their rights to pursue all available remedies with respect to such existing defaults or other sums due.

Please contact me with any questions that you may have.

Very truly yours,

James H. West

JHW/r
cc: Robert T. Lincoln, Esquire (via e-mail and Federal Express)

Moony KJM

GOODWIN | PROCTER

Jeffrey A. Simes
212.813.8879
jsimes@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
599 Lexington Avenue
New York, NY 10022
212.813.8800

January 22, 2008

**By Federal Express**

Thomas V. Marino, Esq.
Dunnington Barthoiow & Miller LLP
477 Madison Avenue
New York, NY 10022

Mr. Frank Wilde
IP Holding of Nevada Corp.
1351 Dividend Drive, Suite G
Marietta, GA 30067

Mr. Frank Wilde
Mr. Phil Loeffel
Riptide Worldwide, Inc.
200 East Palm Valley Drive, 2nd Floor
Oviedo, FL 32765

Re: **Software License and Asset Purchase Agreement dated July 16, 2007 by and between Intellectus, LLC and IP Holding of Nevada Corp. (the "Software License Agreement")**

Dear Sirs:

I am counsel for Intellectus, LLC ("Intellectus"), the Owner under the above-referenced Software License Agreement. All terms used in this letter will have the same definitions as set forth in the Software License Agreement unless otherwise specified herein.

It has come to our attention that certain affiliates of IP Holding of Nevada Corp. ("IP Holding")—including at least Bravera, Inc. ("Bravera")—have informed customers that they will continue to have rights in the Intellectual Property Assets that were licensed under the Software License Agreement. We further understand that Bravera and/or its affiliates have informed customers that Bravera can perform new installations with its customers using the Intellectual Property Assets.

As you know, by letter dated November 29, 2007, counsel for Intellectus informed IP Holding that the sum of $3,750,000 was due and owing to Intellectus under the plain requirements of Article IV, § 15 of the Software License Agreement. Specifically, IP Holding was obligated to

GOODWIN | PROCTER

January 22, 2008
Page 2

make a series of payments within sixty days of the termination of Mr. Watson's employment with Bravera, which occurred on October 29, 2007. IP Holding failed to pay any portion of the owed sum within the required time frame. IP Holding is thus in material breach of the Software License Agreement. If IP Holding does not cure its default within thirty days of when its payment obligation was due—*i.e.*, January 27, 2008—the License Agreement will be terminated.

Under the plain terms of Section 5 of the Software License Agreement, upon termination, IP Holding will no longer have any rights with respect to the Intellectual Property Assets and cannot inform its customers to the contrary. Upon termination, IP Holdings and its affiliates must immediately and completely discontinue any and all use of the Intellectual Property Assets. This includes all of the software licensed under the Software License Agreement as well as all rights to the Bravera trademarks, logos, and domain names, among other things.

In addition, upon termination, all right, title and interest in any Derivative Works of IP Holding or any of its affiliates become the property of Intellectus, LLC. If it is not IP Holding's intention to pay what it owes in full, please make arrangements to transfer those assets promptly.

Please be advised that Intellectus will demand strict compliance with the terms of the Software License Agreement, and, in particular, the requirement that IP Holding and its affiliates cease and desist from any use or activity in connection with the Intellectual Property Assets after termination. Please confirm, immediately and in writing either (i) that IP Holding will pay $3,750,000 on or by January 27, 2008; or (ii) that neither IP Holdings nor its affiliates intend to make any use of the Intellectual Property Assets or make available any products or services that require the use of the Intellectual Property Assets following the termination of the License Agreement.

If you are unable or unwilling to provide assurances that you will respect Intellectus's intellectual property rights in this manner, we are authorized to take all necessary actions to enjoin any infringement of Intellectus's rights and we will seek such other remedies at equity or law as may be appropriate. In addition, if IP Holdings and its affiliates do not immediately desist from making false statements to customers and in the public filings of IP Holding's affiliates concerning the continuing availability or pricing of Intellectus's intellectual property, we will hold IP Holdings and its affiliates fully responsible for any resulting damages and will take any further actions as may be necessary to avoid irreparable harm to Intellectus, its goodwill and reputation, and its intellectual property rights.

As you are well aware, the parties' affiliates and principals are engaged, and in all likelihood will remain engaged for some time, in several litigations with each other. Our preference would be to narrow those disputes and address the issues under the Software License Agreement outside of the courts, particularly given the clear language of the Software License Agreement that compels the conclusion set forth above. Make no mistake, however, that we will aggressively protect

Fax sent by : 12126617769 DUNNINGTON,BARTHLOW 08-14-08 10:31a Pg: 4/4

GOODWIN | PROCTER

January 22, 2008
Page 3

Intellectus's rights and will ensure that IP Holdings and its affiliates are held fully accountable for all breaches.

Sincerely,

Jeffrey A. Simes

3

LIBNY/4672732.1

PAGE 4/4 * RCVD AT 8/14/2008 10:33:31 AM [Eastern Daylight Time] * SVR:WMCD-FAX/5 * DNIS:5 * CSID:12126617769 * DURATION (mm-ss):01-48

**AFFIDAVIT OF SERVICE BY MAIL**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

**RYAN NEW**, being duly sworn, deposes and says, that deponent is not a party to the action, is over 18 years of age and resides at NEW YORK, NEW YORK.

That on the 18th day of August, 2008, deponent served the within **ORDER TO SHOW CAUSE** upon:

Williams Mullen
Two James Center
1021 East Cary Street
Richmond, VA 23219

attorneys in this action, at the addresses designated by said attorneys for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States post office department within the State of New York.

Ryan New

Sworn to before me this
18th day of August, 2008

Notary

MELISSA SHARI KATZ
Notary Public, State of New York
No. 02KA6147335
Qualified in Kings County
Commission Expires May 30, 2010