UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SHEA DEVELOPMENT CORP., BRAVERA, INC.,
and IP HOLDING OF NEVADA CORP.,

                Plaintiffs,

v.                                  **07 Civ. 11201 (DLC) (GWG)**

CHRISTOPHER WATSON and ELIZABETH ANNE
CONLEY,

                Defendants.

-----------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION TO
ENFORCE SETTLEMENT AGREEMENT AND FOR SANCTIONS AND IN
OPPOSITION TO DEFENDANTS' MOTION TO ENFORCE SETTLEMENT
AGREEMENT AND FOR SANCTIONS**

Michael E. Twomey
Twomey, Hoppe & Gallanty, LLP
757 Third Avenue
New York, NY 10017
212.688.0400
212.688.1929 (FAX)

Stephen E. Baril
WILLIAMS MULLEN
P. O. Box 1320
Richmond, VA  23218-1320
804.783.6459
804.783.6507 (FAX)

*Counsel for Plaintiffs*

August 29, 2008

## TABLE OF CONTENTS

                                                                                    **Page**

TABLE OF AUTHORITIES .................................................................................... i

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

    A.    Mediation on July 10, 2008 ................................................................... 1
    B.    Return of All Shea Stocks and Warrants ............................................... 6
    C.    Full and Complete Releases................................................................... 12
    D.    Tax Liability Issue ................................................................................. 13
    E.    Transfer of Business Equipment............................................................ 15
    F.    Reston, VA Office and FEMA Transition Plan ..................................... 18
    G.    GSA MOBUS Contract........................................................................... 19
    H.    BMW......................................................................................................... 20
    I.    $175,000 Cash Payment to Watson ...................................................... 20

ARGUMENT ....................................................................................................... 20

  I.  ENFORCEMENT OF SETTLEMENT ............................................................ 20

    *A.*    *All Stocks and Warrants Issued to Watson Must be Returned Without Any Strings*
         *Attached.*................................................................................................... 21
    *B.*    *The Settlement Requires the Parties to Execute General Releases.* ............ 23
    *C.*    *The Tax Liability Issue Remains Unresolved.*................................................ 24
    *D.*    *The Transfer of the Business Equipment. the Reston Office and FEMA Contract.* ...... 25
    *E.*    *The GSA MOBUS Contract and BMW.* ...................................................... 27
    *F.*    *$175,000 Payment to Watson.* ...................................................................... 27

  II.  SHEA IS ENTITLED TO SANCTIONS FOR ENFORCING THE SETTLEMENT ....... 28

CONCLUSION...................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*CMI II, LLC v. Interactive Brand Development, Inc.,*
    13 Misc. 1214A, 824 N.Y.S.2d 753 (Sup. Ct. NY Co. 2006) ................................................. 28

*Collins v. Harrison-Bode,*
    03 F.3d 429 (2nd Cir. 2002) ..................................................................................................... 23

*Greenfield v. Philles Records, Inc.,*
    8 N.Y.2d 562, 750 N.Y.S.2d 565 (2002) ........................................................................... 23, 25

*Medinol Ltd. v. Guidant Corp.,*
    500 F.Supp.2d 345 (S.D.N.Y. 2007) ..................................................................... 23, 25, 26, 29

*Nemaizer v. Baker,*
    793 F.2d 58 (2nd Cir. 1986) (quoting *Heiser v. Woodruff*, 327 U.S. 726 (1946) ...................... 27

*Ruskay v. Waddell,*
    552 F.2d 392 (2nd Cir. 1977) ..................................................................................................... 27

*Torres v. Costich,*
    35 F. Supp. 232 (W.D.N.Y. 1996) (citing *Hall v. Cole*, 412 U.S. 1 (1973) ............................ 31

## PRELIMINARY STATEMENT

Plaintiffs Shea Development Corp., et al. (referred to collectively as "Shea"), by counsel, submit the following Memorandum of Law in support of their cross-motion to enforce Shea's understanding of the settlement agreed to by the parties during mediation on July 10, 2008, and further in support of Shea's cross-motion for an award of attorney's fees and costs incurred in connection with enforcement of the settlement. Shea further submits this memorandum in opposition to defendants' (referred to collectively as "Watson") motions to enforce the settlement and for sanctions.

In short, the parties' Settlement broke down when Shea discovered that Watson would not return all Shea stock and warrants, together with a general release, without any strings attached. The "strings" Watson insists upon relate to duties of indemnification under the parties' Merger Agreement. The Settlement, however, is completely silent on "indemnification." Accordingly, the Court's assistance is needed to resolve the impasse.

For the reasons sets forth herein, Shea respectfully submits that it is entitled to the entry of an order enforcing its interpretation of the parties' settlement agreement, denying Watson's motions, and awarding Shea its attorney's fees and costs incurred herein.

## STATEMENT OF FACTS

**A.      Mediation on July 10, 2008**

The general facts and circumstances relating to (i) the merger of Watson's former company, Bravera, into Shea, (ii) the dispute that quickly arose between the parties, and (iii) the subsequent litigation that ensued are not in dispute and are summarized in the Recitals of both parties' draft Confidential Settlement Agreement and Mutual Release. (See Watson Ex. F at pp.

1-4 (Shea's draft); Watson Ex. G at pp. 1-4 (Watson's revisions).)[1]  Succinctly stated, Shea and

Bravera entered into a Merger Agreement in April 2007, which closed on July 16, 2007.  (See

Watson Ex. A.)  Pursuant to the Merger Agreement, the parties entered into a related

Employment Agreement with Watson (See Watson Ex. B) and a related Licensing Agreement

(See Watson Exhibit C).  (See Watson Ex. F at 1.)  Pursuant to the Merger Agreement, Watson

and a company he controlled received certain shares of Shea stock and warrants to purchase

shares of Shea stock in the future.  (See Watson Ex. A at 3-6; Watson Ex. C at 14.)

     At the time of the Merger, Shea assumed Bravera's performance of a contract with

FEMA; the contract is scheduled to expire on September 30, 2008 (the "FEMA Contract").  (See

id. at 2.)  In order to service the FEMA Contract, Shea assumed Bravera's leased premises in

Reston, Virginia and took legal title to certain business equipment, and employed certain Bravera

personnel.  (Id.)

     In September 2007, a dispute arose between the parties resulting in the termination of

Watson's Employment Agreement.  (See Watson Ex. F at 2.)  For example, Watson represented

in the Merger Agreement that Bravera's taxes had been paid through the tax year ending

December 31, 2006.  (See Watson Ex. A at 14; Watson Ex. F at 2.)  After the Merger, Shea

discovered that Bravera owed unpaid withholding taxes to the IRS and the Commonwealth of

Virginia for 2005 and 2006 totaling approximately $275,000 (the "Tax Liability Issue").  (Id. at

2-3.)

     Thereafter, Shea filed this action against Watson alleging fraud, constructive fraud,

breach of fiduciary duty, breach of the Employment Agreement and breach of the Merger

---

[1] Shea incorporates the exhibits identified in the Declaration of James Davies filed on August 15, 2008 in support of Watson's motions, and Shea will refer to them herein as "Watson Ex. __."

Agreement.  (Id. at 3.)  There are four (4) other related actions pending between the parties in

New York, South Carolina and Virginia.  (Id. at 3-4.)

Pursuant to an Order Scheduling Settlement Conference entered on April 15, 2008, the

parties appeared before the Honorable Gabriel W. Gorenstein, U.S. Magistrate Judge, on July 10,

2008 for the purpose of mediating a global settlement of this action and related actions between

the parties.  Frank E. Wilde appeared, in person and by counsel, on behalf of Shea.[2]  Christopher

Watson appeared, in person and by counsel, on behalf of himself and the other defendants.  (See

Watson Ex. D at 1-3.)

At the conclusion of the mediation, Judge Gorenstein stated on the record that the parties

had "reached an agreement . . . an enforceable settlement," and dictated the terms of the

agreement on the record.  (See Watson Ex. D at 4.)  Because the transcript is the only written

memorialization of the parties' settlement agreement, the terms are quoted below verbatim:

> THE COURT:  All right.  We're back on the record.  The
> parties have engaged in settlement negotiations, and we've reached
> a deal.  I'm going to try saying the terms of that deal and will give
> – after I do each term, I'll just check with the attorneys that I've
> correctly stated it.  And after I'm finished, I'll ask the clients
> present whether they're agreeing to it.
>
> The parties do expect to do some paperwork on this deal.
> However, they have reached an agreement as is going to be
> reflected during this conference. So even in the absence o[f] the
> paperwork, this is an enforceable settlement.  All right.
>
> The tender of stocks and warrants that has been made by
> Mr. Watson will be accepted.  He represents that these are all the
> stocks and warrants and that's going to be verified by the plaintiff.
>
> Next is all pending litigation is to be dismissed with
> prejudice, and appropriate releases from all parties – from parties
> to that litigation.

---

[2] Mr. Wilde is the CEO of Riptide Worldwide, Inc., formerly known as Shea Development Corp., the plaintiff in this action.

Next is the defendant, Mr. Watson, is going to be personally responsible for whatever tax liability is determined to exist with respect to the IRS and Virginia with respect to the particular tax problem that's been discussed.

As part of the process of determining that tax liability, Mr. Watson is going to be responsible for hiring any accountants that he needs in order to accomplish that. He will also have authority, final authority, with respect to any settlement of that tax liability with either the IRS or Virginia.

That tax liability is – there's going to be some money held in escrow specifically for the purpose of paying that tax liability, but that money is going to be the property of Mr. Watson to be released to him for the purpose of the payment of that tax liability, and any remaining money will go to him personally.

The plaintiff will return to Mr. Watson – will transfer to Mr. Watson the GSA MOBIS [sic] contract, a BMW, and certain business equipment that's been the subject of the settlement letters that every party appears to be familiar with.

The non-compete clauses that are in the contracts of any Bravera employees and of Mr. Watson will be released and deemed null and void from this day forward.

The plaintiff will have the option of terminating the Reston lease on thirty days' notice.

The escrow, by the way, will be put in an interest-bearing account that Mr. Watson will arrange and, of course, any interest earned on that will be his property. All right.

I'm going to ask the attorneys if there are any corrections – oh, and the money. The amount of money in escrow is two hundred – to be put in escrow that I mentioned is two hundred seventy-five thousand, and Mr. Watson is to be paid in cash the amount of one hundred seventy-five thousand.

And I don't think we specifically said it, but obviously, releases need to be executed by any parties to this litigation, general releases. And the payment should be made within thirty days of the execution, I would say, of any – of the releases. Okay.

Does anyone want to add or change any terms that I've said?

4

MR. DAVIES:  Just a clarification, Your Honor.  The two hundred and seventy-five thousand dollars that is to be held in escrow for payment of any tax liability, the remainder of which is to be released to Mr. Watson or his holding company – that is to be funded by the plaintiffs, is that correct?

THE COURT:  That's correct.

MR. DAVIES:  Thank you.

\* \* \*

THE COURT: – —— some minor corrections and additional terms.  Mr. Davies?

MR. DAVIES:  Yes.  The parties have agreed that the two hundred and seventy-five thousand dollars that is to be delivered in escrow will be available for delivery in escrow in fourteen days and will be so delivered.

With respect to the remaining one hundred and seventy-five thousand dollars in cash, that cash will be forwarded to my office as the attorney for Mr. Watson or pursuant to wiring instructions fifteen days after execution and completion of the final settlement agreement.

THE COURT:  Something else from you, Mr. Baril, or your colleague?

MR. DOWD:  This is Mr. Dowd.  Yeah.  With the – Your Honor, with the GSA MOBIS contract, both parties understand that this is going to require the consent of the GSA.  Therefore, what– – therefore, what Riptide will be doing is making its best efforts to novate the contract and obtain the GSA's consent to have this contract be in Mr. Watson's name or Intellectus's name.

MR. DAVIES:  So stipulated.

THE COURT:  Okay.  Any other terms?  Mr. Davies?

MR. DAVIES:  Nothing, Your Honor.

THE COURT:  Mr. Baril?

MR. BARIL:  No, sir.

COURT: Okay. Okay.

(Id. at 4-7.) Judge Gorenstein then asked counsel and the parties to confirm their understanding of, and agreement to, the terms of the settlement, which they did on the record. (Id. at 7-8.) The terms of the parties' settlement, as reflected by the July 10, 2008 transcript, shall be referred to herein as the parties' "Settlement."

**B.**     **Return of All Shea Stocks and Warrants**

The first term of the Settlement, and the one paramount to Shea, is the return of all Shea stock and warrants transferred to Watson and one of his companies pursuant to the Merger Agreement. This term essentially effected Shea's desire to "unwind" the Merger as far as reasonably practicable. (See Declaration of Francis E. Wilde dated August 29, 2008, ¶¶ 2-4 ("Decl. Wilde").) The term reads as follows: "The tender of stocks and warrants that has been made by Mr. Watson will be accepted. He represents that these are all of the stocks and warrants and that's going to be verified by the plaintiff." (Watson Ex. D at 4 (emphasis added).)

Three things are clear about this term of the Settlement. First, the parties agreed that Watson would return all Shea stocks and warrants. Second, Watson represented that he had previously tendered all stocks and warrants. Third, the parties agreed that Shea would verify Watson's representation that his previous tender constituted all stocks and warrants. (See Decl. Wilde, ¶ 4.)

In keeping with the parties' intent to enter into a settlement agreement (see Watson Ex. D at 4), counsel for Shea drafted a settlement agreement and mutual release. The agreement contained the following provision for return of all Shea stock and warrants:

> 1.     Return of the Shea Stock and the Shea Warrants.
> Within ten (10) business days of the execution of this Agreement,
> Mr. Watson shall tender to Shea all certificates representing the

>Shea Stock and warrants to purchase shares of Shea Stock in the
>possession of the Watson Parties or to which any of the Watson
>Parties ever had any claim of ownership or interest, and Shea shall
>verify that all Shea Stock and Warrants to purchase shares of Shea
>Stock have been returned by the Watson Parties.

(See Watson Ex. F at 4.)

Counsel for Watson countered by proposing the following sentence at the beginning of
the above quoted provision: "By execution of this agreement, Shea hereby accepts the
December 18, 2007 tender of 400,000 (four hundred thousand) shares of Shea stock at $.25
(twenty-five cent) per share." (Watson Ex. G at 4 (emphasis added).)[3] The parties' settlement
does not mention a tender on December 18, 2007, or a tender of 400,000 shares, or a stock price
of 25¢ per share. That information could only be derived by resorting to parol evidence, i.e.,
Watson's demand letter/settlement offer of December 18, 2007. (See Shea Ex. 1.)[4] What is
clear from the Settlement, however, is that Shea is entitled to verify Watson's representation that
400,000 shares constitutes all Shea stock and warrants transferred to Watson. As it turns out,
Watson actually received 3,300,000 shares of Shea stock and four (4) warrants to purchase an
additional 8,375,500 shares. (See Shea Ex. 2 (Schedule A identifying all stocks and warrants
transferred to Watson, together with all backup documents); Shea Ex. 3 (Stock Certificate issued
to Watson); Decl. Wilde, ¶ 6.) Hence, 400,000 shares does not constitute all Shea stock and
warrants issued to Watson.

In a good faith effort to resolve this discrepancy, Shea incorporated Schedule A into the
draft settlement agreement for the purpose of identifying the total number of shares of Shea stock
and warrants, and forwarded the revised settlement agreement to Watson by email dated July 21,

---

[3] Watson's transmittal email, dated July 18, 2008, is attached as Shea Ex. 11.
[4] Shea incorporates the exhibits identified in the Declaration of Stephen E. Baril, Esq. filed on or about September 2, 2008 in support of Shea's motions, and Shea will refer to them herein as "Shea Ex. ___."

7

2008. (See Watson Ex. H.) (Because Watson Ex. H omitted Schedule A, a copy is attached as Shea Ex. 2.)

Surprisingly, on July 21, 2008, Watson sent Shea an email claiming that the parties had reached an "impasse." (See Watson Ex. H.) In the same email, Watson argued, for the first time, that Shea had agreed in the Settlement to indemnify Watson from all future third-party suits under Article 5 of the Merger Agreement. (Id.) Counsel for Shea scheduled a conference call on July 22 to resolve the apparent misunderstanding. (See id.) During the conference call, counsel for Watson made clear that Watson was insisting on future indemnification as a condition for return of all Shea stock and warrants. Counsel for Shea pointed out that this "new" term was not discussed during mediation and would have been a "deal breaker" had Watson raised it. (See Decl. Wilde, ¶ 7.) Counsel for Shea sent a follow-up email clarifying its willingness to perform its terms of the Settlement, but expressing concern that Watson had repudiated his end of the bargain by refusing "to deliver all shares and warrants of Shea stock, together with what Judge Gorenstein called a 'general release [],' and dismissal of all pending litigation, with prejudice. The holdup is on your client's end." (See Shea Ex. 4 (email exchange between counsel on July 28, 2008).)

To break the impasse, Watson scheduled a second conference with Judge Gorenstein. (See Watson Ex. J.) On July 29, 2008, Mr. Wilde and his counsel appeared in person before Judge Gorenstein. Watson did not attend, but was represented by counsel. There is no record of this conference. Watson's counsel argued that Shea had agreed to indemnify Watson, in accordance with Article 5 of the Merger Agreement, as a condition for return of all Shea stock and warrants. He further argued that Watson had been relieved of his indemnification duties

under Article 7 of the Merger Agreement by virtue of his partial tender of 400,000 shares of Shea stock on December 18, 2007.  (See Shea Ex. 1.)

After reading the Settlement (Watson Ex. D), Judge Gorenstein first concluded that the parties had entered into a binding and enforceable settlement agreement.  (See Decl. Wilde, ¶ 9.) Next, he concluded that the Settlement does not include a term obligating Shea to indemnify Watson in the future, or releasing Watson from any indemnification duties.  (Id.)  The Settlement, he said, is silent on this point.  Judge Gorenstein then encouraged Mr. Wilde and his counsel to participate in a telephone conference call with Watson and his counsel to attempt to resolve any remaining issues.  (See id., ¶ 9.)

During the conference call, the parties discussed areas of agreement and a timeline for consummating their Settlement.  (Id.)  Counsel for Shea agreed to draft a summary.  On July 31, Shea sent Watson a summary of the areas of agreement, along with a proposed timeline for "closing" the deal.  (See Watson Ex. L.)  On August 1, Watson began to dissemble once again about returning all Shea stock and warrants without any strings attached.  (See Watson Ex. M.) Shea sought clarification on August 4.  (See Watson Ex. N, ¶ 5.)  By August 5, Watson had backtracked to his original position that Shea must accept a partial "tender" of 400,000 shares of Shea stock, pursuant to Watson's letter of December 18, 2007, and agree to indemnify Watson as a pre-condition for return of the remaining 2.9M shares.  (See Watson Ex. O, second paragraph.) Watson never mentioned the warrants.  (See id.)

Once again, Shea tried to dissuade Watson from his interpretation of the Settlement in an email dated August 6, 2008.  (See Watson Ex. P, ¶ 2.)  First, the pertinent term of the Settlement, Shea explained, states that Shea will accept a "tender of stocks and warrants," which Watson "represents are all the stock and warrants and that's going to be verified by the plaintiff."  (See

9

Watson Ex. D at ¶ 4 (emphasis added).)  Watson's so-called "tender" of 400,000 shares on

December 18, 2007 did not constitute all Shea stock and warrants that Watson had received

pursuant to the Merger Agreement.  The correct figures are 3.3M shares and four (4) warrants for

8,375,500 shares.  (See Shea Ex. 2 and 3; Decl. Wilde, ¶ 6.)  Up to that point, Watson had failed

to acknowledge his promise to return the warrants.  (See, e.g., Watson Ex. N, ¶ 5.)

Second, Shea clarified that Watson did not actually "tender" any shares of Shea stock

with his letter of December 18, 2007.[5]  There were no shares of stock attached to or enclosed

with Watson's letter.  (See Shea Ex.1 at 3; Decl. Wilde, ¶ 5.)  Instead, Watson's letter demanded

indemnification by Shea under Article 5 of the Merger Agreement, and offered to settle

Watson's claim for indemnification under Article 7 of the Merger Agreement in exchange for an

offer of 400,000 shares of the Shea stock at 25¢ per share.  (Id. at 2-3.)  Watson's letter was

clearly marked, "For Settlement Purposes Only."  (See id. at 1.)  Shea never accepted Watson's

settlement offer.

Third, Shea pointed out that Watson could not have made a partial tender of 400,000

shares of Shea stock because Watson had received only one certificate for a total of 3,300,000

shares.  (See Shea Ex. 3.)  The certificate for 3.3 M shares has been in Watson's possession and

has never been "tendered" to Shea.  In sum, Shea attempted to persuade Watson to simply return

all shares of Shea stock and warrants, pursuant to the parties' Settlement, in exchange for Shea's

performance of its mutual promises to Watson.  (See Watson Ex. P, ¶ 2.)

The effort was unavailing.  On August 7, Watson persisted with his scheme of

conditioning the return of the Shea stock and warrants on Shea's acceptance of a stated price per

share.  (See Watson Ex. Q, fourth paragraph.)  By letter dated August 12, 2008, Watson stated

---

[5] Black's Law Dictionary defines a "tender" as follows:  "The actual proffer of money, as distinguished from the mere proposal or proposition to offer it.  (Citations omitted.)  Hence mere written proposal to pay money, without offer of cash, is not 'tender.'"  (Citations omitted.)

that he would not return the stock certificate and the warrants unless Shea accepted the partial

tender of 400,000 per the terms of his December 18, 2007 letter, thereby saddling Shea with

ongoing indemnification duties and liabilities under the Merger Agreement. (See Watson Ex. R,

¶ 7.) Suffice it to say, Watson's scheme does not square with the text of the parties' Settlement.

(Compare Watson Ex. R, ¶ 7 with Watson Ex. D, ¶ 4.)

In a final attempt to overcome this obstacle, Shea wrote Watson on August 14 to sum up

its position:

> 1.    Return of All Shea Stock and Warrants.  Since the
> mediation on July 10th, Mr. Watson has argued that he made a
> partial tender of 400,000 shares of Shea stock, which is factually
> untrue (no stock was "tendered"), and which would have been a
> physical impossibility (there is only one certificate for 3.3M
> shares).  He has further attempted to tie the return of the Shea stock
> and warrants to a demand for future indemnification, which was
> never discussed or agreed to at mediation.  Judge Gorenstein
> confirmed this point at the second mediation on July 29th.  Mr.
> Watson also has attempted to inject a price per share factor, which
> also was never discussed and is not reflected in the July 10th
> Settlement.
>
>     The parties' agreement is simple and straight forward.  Mr.
> Watson is obligated to return all shares of Shea stock and all
> warrants to purchase Shea stock.  There are no strings attached.
> Mr. Watson has yet to indicate his willingness to perform this
> simple term of the parties' settlement, but instead has groused
> about Riptide's alleged lack of performance of certain terms that
> are important to him.  In order to facilitate the prompt resolution of
> this issue, I have drafted the attached letter for Mr. Watson's
> execution that will satisfy his obligation under this term of the July
> 10th Settlement.  Until Mr. Watson performs this term, there really
> is no point in discussing the other issues.

(See Watson Ex. T, ¶ 1.)  (A copy of Shea's proposed letter for return of the stock and warrants

is an attachment to Watson Ex. T.)

On August 15, Watson elected to file his motions to enforce his interpretation of the

Settlement and for sanctions.

**C.    Full and Complete Releases**

The next term in the Settlement, and the second most important to Shea, is the agreement

to exchange full and complete releases of all claims arising out of the parties' agreements and the

pending litigation. The Settlement states: "Next is all pending litigation is to be dismissed with

prejudice, and appropriate releases from all parties – from parties to that litigation." (Watson Ex.

D at 4.) Later in the transcript, Judge Gorenstein said, "And I don't think we specifically said it,

but obviously, releases need to be executed by any parties to this litigation, general releases."

(Id. at 6.)

Shea's initial draft settlement agreement contained standard mutual release provisions.

(See Watson Ex. F at 7-9.) Watson countered by proposing the following language at the

beginning of Watson's release: "With the exception of any claims that may accrue hereafter

under the Suite 250 Lease, or any future claims that may be made under Article 5, Section

5.12(a) of the Merger Agreement . . . ." (Watson Ex. G at 8 (emphasis added).)[6] Shea could not

agree to Watson's proposed exception for indemnification claims arising under Article 5 of the

Merger Agreement. Simply stated, that term was not part of the Settlement.

During the conference call between counsel on July 22, Watson insisted on a "carve out"

from his release of all future claims of indemnification against Shea. (See Declaration of

Stephen E. Baril, Esq. dated August 29, 2008, ¶ 15.) Shea understood that Watson's so-called

"carve out" was part and parcel of his scheme to get Shea to accept a partial tender of 400,000

shares of Shea stock as a condition for returning the remaining shares and warrants. (Id.) In

short, as Shea understood it, Watson wanted to be released from any obligation to indemnify

Shea under Article 7 of the Merger Agreement, but he wanted Shea to be required to fully

---

[6] Shea did not object to an exception for claims arising under the lease in Reston, Virginia (Suite 250) where Shea is currently servicing the FEMA Contract, which does not expire until September 30, 2008.

indemnify him from any claims in the future under Article 5. (Id.) Shea would not agree to this "new" term because it is not reflected in the parties' Settlement. (See Watson Ex. T, ¶ 2 (Shea's letter to Watson, 8/14/08).)

**D.    Tax Liability Issue**

As stated above, Shea inherited approximately $275,000 of tax liability on account of Bravera's unpaid payroll taxes for 2005 and 2006. (See page 2 supra.) As part of the Settlement, Watson agreed to be personally responsible for the tax liability and resolving the issue at his own expense. (See Watson Ex. D at 4-5.) Shea incorporated this term into the draft settlement agreement. (See Watson Ex. F at 5.) Watson had no material objection to the term as stated. (See Watson Ex. G at 5.) The day after mediation, July 11, Watson proposed that Shea execute certain powers of attorney to enable his CPA to investigate the tax liability issue. (See Watson Ex. E.) Watson now claims that Shea's failure to sign the power of attorney forms "is significantly hindering Mr. Watson's ability to resolve the tax liability issue." (See Watson Memo at 7.)

First, signing a power of attorney is not a term of the parties' Settlement. (See Watson Ex. D at 4-7.) This was another "new" term raised by Watson after the fact. More importantly, Watson cites no facts, and Shea is aware of none, to support Watson's assertion that Shea has hindered his ability to resolve the tax liability issue. (See Watson Memo at 7.)

Here are the facts. During the telephone conference among the parties and counsel on July 29, the parties agreed that Watson would provide Shea with contact information for his CPA. (See Watson Ex. L, ¶ 5.) Shea agreed to have its controller (Sheri Pantermuehl) contact the CPA and coordinate an orderly process for resolving the tax liability issue. (Id.) On August 1, Watson provided the contact information for his CPA. (See Watson Ex. M.) Ms. Pantermuehl

contacted the CPA on or about August 1, 2007. (See Declaration of Sheri Pantermuehl dated

August 29, 2008, ¶¶ 1-2 ("Decl. Pantermuehl").) Ms. Pantermuehl advised the CPA that the IRS

had scheduled a hearing on August 27, 2008, and she provided the CPA with a copy of the letter

from the IRS. (See id. at ¶ 3; Shea Ex. 5.) Ms. Pantermuehl followed up with the CPA on

August 8. (See Decl. Pantermuehl, ¶ 4; Shea Ex. 6.) On August 18, Watson forwarded Ms.

Pantermuehl a copy of his email exchange with his CPA, who stated he was researching the

matter with an outside vendor. (See Decl. Pantermuehl, ¶ 5; Shea Ex. 7.) Thereafter, Shea

learned that the CPA had provided certain information to the IRS and the Commonwealth of

Virginia. (See Decl. Pantermuehl, ¶ 6.) At the conclusion of the hearing with the IRS on August

27, the IRS agreed to review the information provided and consider the parties' request for an

abatement of the tax liability. (See id., ¶ 7.) The IRS gave no indication when a decision will be

forthcoming. (See id.) No meeting or hearing has been held with the Commonwealth of

Virginia, and Shea does not know when that matter will be resolved. (See id., ¶ 8.)

The second part of the parties' agreement related to Shea's agreement to escrow

$275,000 as security for payment of the tax liability. (See Watson Ex. F at 5.) Assuming

Watson could resolve the issue favorably, and secure releases for Shea, Shea would release the

balance of the escrowed funds to Watson. (See id.) The parties further agreed that the funds

would be deposited in escrow within fourteen (14) days of the Settlement, or on July 24. (See

Watson Ex. D at 7.)

By July 22, however, Watson declared that the parties had reached an "impasse" and he

was going to schedule a conference with Judge Gorenstein. (See Watson Ex. H.) Shea advised

Watson on July 28 that Shea is ready, willing and able to fund the escrow, but is reluctant to do

so because "Mr. Watson [had] repudiated his end of the bargain two (2) days before the funds

were due, i.e., his refusal to deliver all shares and warrants of Shea stock, together with what Judge Gorenstein called a 'general release [],' and dismissal of all pending litigation, with prejudice. The holdup is on your client's end." (See Shea Ex. 4.)  Shea assured Watson, however, that Shea would perform its financial terms of the Settlement, if Watson would commit to a timetable for performing his end of the bargain, i.e., returning all stocks and warrants and giving Shea a full and complete release of all claims arising under the parties' agreements and the pending litigation.  (See Decl. Wilde, ¶ 14.)

Following the second conference with Judge Gorenstein on July 29, Shea sent Watson a timeline to "close" the Settlement.  (See Watson Ex. L.)  The problem, from Shea's perspective, was that Watson immediately dissembled and backtracked on his agreement to return all the stock and warrants without any strings attached, along with a general release.  (See Decl. Wilde, ¶ 10; Watson Exs. M, O, Q and S, ¶ 7.)

In summary, to date the tax liability issue has not been resolved, and it has yet to be determined if or when Watson might be entitled to receive any of the $275,000 to be escrowed by Shea.  (See Decl. Pantermuehl, ¶¶ 7-8.)  Per the Settlement, the funds are dedicated first for the payment of Shea's tax liability to the IRS and the Commonwealth of Virginia.  (See Watson Ex. D at 5, 6.)

**E.     Transfer of Business Equipment**

The parties' Settlement states: "The plaintiff will return to Mr. Watson – will transfer to Mr. Watson . . . the certain business equipment that's been the subject of the settlement letters that every party appears to be familiar with." (Watson Ex. D at 5.)  That is the full extent of this term of the Settlement.  The Settlement does not identify the specific business equipment in question.  It does not identify the specific letters in which the equipment was discussed.  It does

not state where the equipment is located, or its condition, or where it is to be delivered. Most importantly, it does not state when the equipment is to be transferred to Watson. (Id.) In this instance, the Court must look to parol evidence to determine these particulars about the "business equipment." Fortunately, the parties appear to agree, and they should stipulate, that the "business equipment" in question relates to the equipment used to service the FEMA Contract in Reston, Virginia. The Recitals of both parties' draft settlement agreements characterize the "business equipment" in connection with servicing the FEMA Contract. (See Watson Ex. F at 2 (Shea's draft); Watson Ex. G at 2 (Watson's revisions).)

The record makes clear, however, that the parties had not previously worked out the details for transferring the "business equipment" in question. For example, on July 18, Watson provided Shea with a copy of his Bravera Inventory identifying the business equipment he wanted returned. The inventory was attached to his revised settlement agreement. (See Watson Ex. G (attachment).) Shea responded by informing Watson that it would compare its inventory to Watson's inventory. (See Watson Ex. H (7/21/08 email).) During the conference call with Watson on July 29, Shea gave Watson's counsel a copy of Shea's inventory of the business equipment. (See Watson Ex. L (Schedule B).) Schedule B identifies (i) the equipment in use in Reston, Virginia in connection with the FEMA Contract, (ii) the equipment sitting idle in Reston, (iii) the equipment in storage in Florida, and (iv) equipment that Shea never took possession of at the time of the Merger. (Id.)

Watson responded by requesting the return of the equipment in storage in Florida. (See Watson Ex. M.) Shea agreed to look in to the logistics of shipping the equipment back to Reston, Virginia. (See Watson Ex. N, ¶ 4.) By letter dated August 12, Watson advised that he would pick up the equipment in Florida on August 13. (See Watson Ex. R, ¶ 1.B.) A copy of

Watson's receipt for the equipment is attached. (See Shea Ex. 8.) Later on August 13, Watson

claimed that certain servers and drives were missing from some of the equipment. (See Watson

Ex. S.) Watson makes the same claim in his motion (Watson's Memo at 3-4), but Watson has

not provided the Court or Shea with a list of the equipment in question. In any event, Shea

believes it returned the used business equipment to Watson in the same condition that Shea

received it at the time of the Merger. (See Decl. Wilde, ¶ 12.)

Watson also claims that Shea failed to return certain development software and a source

code owned by Watson's company, Intellectus. (See Watson Ex. S; Watson Memo at 4.) During

the initial mediation, however, Mr. Wilde informed Watson that the software and source code

were wiped clean from all business equipment when Watson's former attorneys threatened suit

against Shea for allegedly violating the parties' Licensing Agreement. (See Decl. Wilde, ¶ 11.)

Shea's counsel reiterated this point on August 13 (see Watson Ex. S), and on August 14 provided

Watson's new counsel with copies of the pertinent demand letters from Watson's former

counsel. (See Watson Ex. T, ¶ 5 (letters attached).)

Watson now argues that the business equipment in the Reston, Virginia office must be

returned immediately. (See Watson Memo at 5.) He also argues that "time is of the essence."

(See, e.g., id. at 4.) First, the parties' Settlement does not state a specific time for delivery of any

of the "business equipment." It also does not state, "time is of the essence." (See Watson Ex. D

at 5.) Watson has injected this new term after the fact. Indeed, Watson's argument conflicts

with the fact that Shea is using, and will continue to use, the business equipment until the FEMA

Contract expires on September 30, 2008. (See Decl. Wilde, ¶ 13.) At that time, Shea had fully

intended to transfer the business equipment to Watson for his use in serving the FEMA Contract

thereafter. (See id.; Watson Ex. F, ¶ 5.) Such an orderly transfer is consistent with the intent of

the parties when they reached their Settlement, and it is consistent with FEMA's Award

Announcement & Transition Planning notification dated August 26, 2008. (See Decl. Wilde,

¶ 13; Shea Ex. 9.)

**F.      Reston, VA Office and FEMA Transition Plan**

The parties' Settlement simply states: "The Plaintiff [Shea] will have the option of

terminating the Reston lease on thirty days' notice." (Watson Ex. D at 5.) The "Reston lease"

refers to the leased premises in Reston, Virginia where Shea is currently servicing the FEMA

Contract. (See Watson Ex. F at 2; Watson Ex. G at 2.)

In keeping with the parties' Settlement, Shea drafted a settlement agreement that would

permit the Reston lease to run month-to-month and would terminate "[u]pon completion of the

FEMA Contract." (Watson Ex. F, ¶ 4.) Watson insisted that the contract terminate upon

completion of the FEMA Contract, "or within 30 (thirty) days after [Watson] shall issue a written

demand for the Premises, which ever is first . . . ." (See Watson Ex. G, ¶ 4.) Watson's position

is inconsistent with the Settlement. The Settlement gives Shea the right to terminate the lease on

30-days notice, not Watson. Watson's position is also inconsistent with the intent of the parties

that Shea would complete the FEMA Contract and then transfer the premises, the business

equipment, and the personnel to Watson. (See Decl. Wilde, ¶ 13.)

The Settlement does not mention a FEMA transition plan. (See Watson Ex. D at 4-7.)

During the second conference with Judge Gorenstein on July 29, Watson maintained that he

wanted a "shared arrangement" with respect to the lease premises, business equipment and

personnel. Watson has raised this issue again in his motion. (See Watson Memo at 10.) No

such term appears in the Settlement. (Id.) Nonetheless, Shea agreed to consider any reasonable

accommodations that Watson might request with respect to transitioning the FEMA Contract.

(See Watson Ex. L, ¶ 2.)  On August 5, Watson sent Shea a transition plan.  (See Watson Ex. O (last paragraph).)  (Because Watson Ex. O omitted the plan, a copy is attached as Shea Ex. 10.) Shea suggested a conference call on August 7 to discuss Watson's proposed plan.  (See Watson Ex. P, ¶ 4.)  Watson never took Shea up on its offer.  Accordingly, the parties have simply agreed, post-settlement, to adhere to the transition plan dictated by FEMA.  (See Watson Ex. L, ¶ 1; Watson Ex. M (fourth paragraph).)

**G.    GSA MOBUS Contract**

The parties' Settlement provides that "[t]he plaintiff will return to Mr. Watson – will transfer to Mr. Watson the GSA MOBIS [sic] Contract . . . ."  (Watson Ex. D at 5.)  Later in the transcript, counsel for Shea clarified the term as follows:

> MR. DOWD:  This is Mr. Dowd.  Yeah.  With the – Your
> Honor, with the GSA MOBIS [sic] contract, both parties
> understand that this is going to require the consent of the GSA.
> Therefore, what – therefore, what Riptide [Shea] will be doing is
> making its best efforts to novate the contract and obtain the GSA's
> consent to have this contract be in Mr. Watson's name or
> Intellectus's name.
>
> MR. DAVIES:  So stipulated.
>
> THE COURT:  Okay.

(Id. at 7.)

Shea advised Watson that Shea had contacted the GSA about novating the MOBUS contract and allowing Watson to perform it.  (See, e.g., Watson Ex. T, ¶ 6.)  The problem is that Watson has refused to uphold his end of the bargain on terms material to Shea, such as the return of stock and warrants and giving Shea a full and complete release.

**H.     BMW**

The parties' Settlement clearly states that Shea will deliver to Watson a certain BMW. (See Watson Ex. D at 5.) The Settlement does not state a date for delivery. Here again, the problem is that Watson has refused to uphold his end of the bargain on terms material to Shea, such as the return of stock and warrants and giving Shea a full and complete release.

**I.     $175,000 Cash Payment to Watson**

The parties agreed that Shea would pay Watson the sum of $175,000 "fifteen days after execution and completion of the final settlement agreement." (See Watson Ex. D at 5-7.) A "final settlement agreement," as contemplated by the parties, has never been completed. In addition, Watson has failed to perform a single term of the parties' Settlement. As the terms of the settlement are mutual, Watson cannot reasonably expect Shea to wire $175,000.00 cash to his attorney when he has failed and refused to return all Shea stocks and warrants, without any strings attached, along with a general release in accordance with the terms of the Settlement.

## ARGUMENT

**I.     ENFORCEMENT OF SETTLEMENT**

The Settlement placed on the record by the Judge Gorenstein on July 10, 2008 is a binding settlement that should be enforced in accordance with its stated terms. *See Medinol Ltd. v. Guidant Corp.*, 500 F.Supp.2d 345, 353 (S.D.N.Y. 2007) ("A settlement stated on the record is 'one of the strongest and most binding agreements in the field of law' and is thus entitled to substantial deference."). The terms of the Settlement must be "construed according to general principles of contract law." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2nd Cir. 2002).

Consistent with those principles, the unambiguous provisions of the Settlement must be interpreted and enforced without resort to extrinsic evidence. *See generally Greenfield v. Philles*

20

*Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms"). Accordingly, the Court should not resort to parole evidence to interpret or re-write the parties' Settlement. Only if a term is incomplete or ambiguous may the Court look to extrinsic evidence.

### A.    *All Stocks and Warrants Issued to Watson Must be Returned Without Any Strings Attached.*

The plain language of the Settlement requires Watson to return all Shea stock and warrants to Shea: "The tender of stocks and warrants that has been made by Watson will be accepted. He represents that these are all of the stocks and warrants and that's going to be verified by the plaintiff." (See Watson Ex. D at 4 (emphasis added)). The parties agreed that Watson would return all stocks and warrants. Watson represented that he had tendered all stocks and warrants, and the parties agreed that Shea would be entitled to verify that Watson had, in fact, tendered all stocks and warrants.

In the immediate aftermath of the Settlement, Watson proposed the following language to Shea's draft settlement agreement: "By execution of this agreement, Shea hereby accepts the December 18, 2007 tender of 400,000 (four hundred thousand) shares of Shea stock at $.25 (twenty-five cent) per share." (Watson Ex. G at 4 (emphasis added)). Nowhere does the Settlement mention a December 18, 2007 tender, a partial tender of 400,000 shares, or a price of $.25 per share.[7] These "new" terms come from Watson's December 18, 2007 demand letter, which is not part of the Settlement. (See Shea Ex. 1.) Thereafter, Shea verified that Watson had

---

[7] Moreover, the idea that a partial tender occurred is ridiculous. No shares of stock were enclosed with the December 18, 2007 letter (see Shea Ex. 1 at 3), and Mr. Watson could not physically tender 400,000 shares, because he has only one certificate for a total of 3.3 million shares of Shea stock. (See Shea Ex. 3.)

received 3,300,000 shares of Shea stock and four (4) warrants to purchase 8,375,500 shares. (See Shea Exs. 2, 3.)

Shea subsequently attempted to resolve the issue only to discover Watson had adopted a scheme to force Shea to accept a partial tender of 400,000 shares to extinguish Watson's indemnification duties under the Merger Agreement. (See pages 7-11, supra.) His larger scheme, Shea learned, was to force Shea to indemnify him from all future third-party claims. (Id.)

When counsel and Mr. Wilde appeared before Judge Gorenstein on July 29, 2008 to resolve this dispute, Judge Gorenstein concluded that the Settlement does not specifically address indemnification duties; it is silent on indemnification. (See Decl. Wilde, ¶ 8.) Shea thought that ended the dispute. (See id., ¶¶ 9-10.) Watson has persisted, however, in attempting to re-write the parties' Settlement. (Id.)

Watson never raised the issue of indemnification at mediation. (See id., ¶ 7.) The Settlement is silent on the issue, and the record's silence is fatal to Watson's scheme. *See Greenfield*, 98 N.Y.2d at 570, 750 N.Y.S.2d at 570 (stating that a settlement's silence on certain issues does not "create an ambiguity that opens the door to the admissibility of extrinsic evidence to determine the intent of the parties[.]"). Watson cannot now wedge this new term into the Settlement.

Watson's scheme is similar to what occurred in *Medinol, supra*. In that case, the Court rejected an attempt to read a field of use restriction into a settlement that had been placed on the record:

> The long and short of it is that the settlement placed on the record
> by the parties on the evening of the settlement contained no field of
> use restriction. The license Medinol gave Abbott to the '381
> patent family included a geographic limitation and was specified to

22

> include "related patents, continuations and reexaminations," but
> was unrestricted as to its use. "This case demonstrates the validity
> of an old legal truism: God may know but the record must show."

*Medinol*, 500 F.Supp.2d at 354. As a result, the Court concluded that the "parties stated on the

record both the terms of the settlement and their unqualified agreement to it[,]" and the Court

found no basis for an evidentiary hearing or extrinsic evidence. (Id., at 353-54.) Watson's

scheme must fail for the same reasons. The unambiguous language of the Settlement should be

enforced regardless of Watson's change of heart. Indeed, "[a] settling party – no matter how

acute its buyer's remorse – may not assert ambiguity to undo the settlement when the record

contains an agreement that is clear on its face." *Medinol* at 353. Watson, having agreed to

return all stocks and warrants, without any strings attached, should be compelled to perform the

parties' Settlement.

**B.     *The Settlement Requires the Parties to Execute General Releases.***

The Settlement requires that "all pending litigation is to be dismissed with prejudice, and

appropriate releases from all parties – from parties to that litigation." (See Watson Ex. D at 4.)

Judge Gorenstein clarified that the parties contemplated "general releases": "And I don't think

we specifically said it, but obviously, releases need to be executed by any parties to this

litigation, general releases." (See id. at 6.)

Within days after the Settlement, Watson insisted on a "carve out" for Shea's duty to

indemnify Watson under Article 5 of the Merger Agreement: "With the exception of any claims

that may accrue hereafter under the Suite 250 Lease, or any future claims that may be made

under Article 5, Section 5.12(a) of the Merger Agreement[.]" (Watson Ex. G at 8 (emphasis

added).) Shea rejected the proposed "carve out" because it is not part of the Settlement.

The Settlement contemplates "general" releases, not limited releases. When a release is described as "general," it includes "any claim which might arise in the future out of the 'matters and transactions' recited in the pleadings." *Ruskay v. Waddell*, 552 F.2d 392, 395 n.5 (2nd Cir. 1977). Accordingly, the plain language of the Settlement requires the parties to execute general releases that extend to past, present, and future claims arising out of the litigation, including any indemnification claims.

Moreover, a "general" release, when coupled with a dismissal with prejudice of all pending litigation between the parties, has a "preclusive effect of '*res judicata* not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit.'" *Nemaizer v. Baker*, 793 F.2d 58, 61 (2nd Cir. 1986) (quoting *Heiser v. Woodruff*, 327 U.S. 726, 735 (1946)). The parties' clear and unambiguous agreement to exchange "general" releases with dismissals with prejudice reinforces Shea's understanding that Shea is entitled to a full and complete release without any "carve out" whatsoever.

### C.     *The Tax Liability Issue Remains Unresolved.*

There is no dispute that the Settlement requires Watson to take personal responsibility for resolving the Tax Liability Issue at his own expense. (See Watson Ex. D at 4-5.) Watson now complains that Shea's failure to execute certain power of attorney forms "hindered" his ability to resolve this issue. (See Watson Memo at 7.) There is no factual basis in the record for Watson's assertion.

In fact, Shea's Controller contacted Watson's CPA immediately upon receipt of his contact information. (See Decl. Pantermuehl, ¶ 2.) She coordinated the hearing with the IRS on August 27, 2008. (See id., ¶ 3.) The parties are now awaiting a decision from the IRS on the parties' request for an abatement of tax liability. (See id., ¶ 7.) No hearing has been scheduled

24

with the Commonwealth of Virginia. (See id., ¶ 8.) Hence, it is yet to be determined whether Watson is entitled to any amount of the $275,000 that Shea agreed to escrow to satisfy the tax liability issue. Stated differently, Watson has suffered no harm or damages at this point.[8]

Just as importantly, Watson should be barred from complaining about Shea's reluctance to deposit the $275,000 in escrow when Watson has made clear that he will not return all Shea stock and warrants, or give Shea a general release, unless he gets his way on his "new" terms regarding indemnification. It is axiomatic that a party must do equity in order to seek equity. Likewise, a party seeking to enforce a contract must show that he has performed, or is at least willing to perform. *See generally CMI II, LLC v. Interactive Brand Development, Inc.*, 13 Misc. 1214A, 824 N.Y.S.2d 753 (Sup. Ct. NY Co. 2006) (a party seeking to recover for breach of contract must establish "performance of the contract by the injured party").

Here, the record is clear that Shea was ready, willing and able to fund the escrow until it discovered Watson's "gotcha" scheme. Under the circumstances, Shea cannot be faulted for delaying its performance.

### D.    *The Transfer of the Business Equipment, the Reston Office and FEMA Contract.*

The Settlement states that "[t]he plaintiff will return to Mr. Watson – will transfer to Mr. Watson . . . the certain business equipment that's been the subject of the settlement letters that every party appears to be familiar with." (Watson Ex. D at 5.) Nowhere does the Settlement provide the pertinent terms of the transfer, such as the identification of the specific equipment at issue, the location of the equipment, the condition of equipment, the site to which the equipment is to be delivered, or, importantly, the timing of delivery. Since this provision of the Settlement

---

[8] For a breach to be material, "it must 'go to the root of the agreement between the parties[]'" and defeat the very purpose of the contract. *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 1997 U.S. App. LEXIS 19795, *14 (2d Cir. 1997) (quoting *Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).

is incomplete, the Court can only derive the parties' intent on these critical issues by resorting to extrinsic evidence. *See Medinol*, 500 F. Supp. 2d at 350 (a court is allowed to consider extrinsic evidence to derive the parties' intent if a contract is "incomplete, or its language ambiguous").

The parties' exchanges of an initial draft settlement make clear that the business equipment at issue relates to the performance of the FEMA Contract in Reston, Virginia. (See Watson Ex. F at 2 (Shea's draft settlement); Watson Ex. G at 2 (Watson's revisions to Shea's draft settlement).) The parties subsequently exchanged inventories (see Watson Exs. G and L) and Watson personally retrieved certain equipment located in Florida (see Watson Ex. R, ¶ 1.B).

Watson now contends, without providing any supporting evidence, that certain servers and drives were missing from the equipment in storage in Florida. (See Watson Ex. S.) To Shea's knowledge, however, the equipment was returned in the same condition in which it was received. (See Decl. Wilde, ¶ 12.) Moreover, during the initial mediation, Shea informed Watson that Shea had wiped clean the source code and software from all business equipment in response to demand letters from Watson's former attorneys. (See Decl. Wilde, ¶ 11; Watson Ex. T, ¶ 5 (letters attached).)

The next issue relates to the business equipment in use in Reston, Virginia to service the FEMA Contract, which expires on September 30, 2008. Watson now demands immediate return of that equipment. Based on the relevant extrinsic evidence, both Shea and Watson understood and intended that the transfer of the business equipment in use on the FEMA Contract would occur at the completion of that contract. (See Decl. Wilde, ¶ 13.)

The same holds true for the leased premises in Reston, Virginia. The Settlement states that "the plaintiffs [Shea] will have the option of terminating the Reston lease on thirty day's notice." (Watson Ex. D at 5.) The "Reston lease" refers to leased office space in Reston,

Virginia in use to service the FEMA Contract. (See Watson Ex. F at 2; Watson Ex. G at 2.) Watson now asserts that he has the right to terminate the lease on 30-days notice. Watson's position is inconsistent with the plain language of the Settlement, which gives Shea, not Watson, the option of terminating the Reston lease upon 30-days notice. (See Watson Ex. D at 5.)

Finally, Shea has indicated that it would transition the FEMA Contract in accordance with FEMA's transition plan. Shea fully intends to honor that commitment.

### E.    *The GSA MOBUS Contract and BMW.*

The Settlement requires that "Plaintiff will return to Mr. Watson – will transfer to Mr. Watson the GSA MOBIS [sic] Contract[.]" (Watson Ex. D at 5.) The Settlement later states that parties "understand that this is going to require the consent of GSA[]" and that Shea will make its "best efforts to novate the contract and obtain the GSA's consent to have this contract be in Mr. Watson's name or Intellectus' name." (Id. at 7.) Shea has contacted the GSA about novating the GSA MOBUS contract allowing Watson to perform it. (See Watson Ex. T, ¶ 6.)

The Settlement also requires Shea to transfer a certain BMW to Watson. (See Watson Ex. D, at 5.) Shea is prepared to transfer title to the BMW.

The problem with Shea's cooperation on the GSA MOBUS contract and the transfer of the BMW to Watson is here Watson's refusal to perform material terms of the Settlement, such as returning all stock and warrants and providing a general release without any strings attached. Until Watson commits to performing his obligations, Shea is justified in holding its ground on the terms important to Watson. (See Decl. Wilde, ¶ 14.)

### F.    *$175,000 Payment to Watson.*

The Settlement also states that Shea will pay Watson $175,000 "fifteen days after execution and completion of the final settlement agreement." (See Watson Ex. D at 5-7.) The

27

"final settlement agreement" contemplated by the Settlement has never been completed. Here again, Watson has failed to live up to his obligations under the Settlement. As a result, Shea cannot be required to wire $175,000 to Watson's counsel until Watson is willing to live up to his end of the bargain.

## II.    SHEA IS ENTITLED TO SANCTIONS FOR ENFORCING THE SETTLEMENT

Watson's accusations notwithstanding, it is Watson who has acted in bad faith and unnecessarily prolonged the completion of the Settlement placed on the record by Judge Gorenstein. As a result, Watson should bear responsibility for Shea's attorney's fees and costs incurred in enforcing the Settlement. Sanctions for enforcing settlement agreements may be awarded "in such circumstances under the court's inherent power to award attorney's fees to a successful litigant when the opposing party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Torres v. Costich*, 935 F. Supp. 232, 236 (W.D.N.Y. 1996) (citing *Hall v. Cole*, 412 U.S. 1, 5 (1973)).

In the present case, Watson attempted to pull a bait-and-switch in the immediate aftermath of the July 10, 2008 Settlement. Rather than tender all stocks and warrants unconditionally, and grant Shea a general release as required by the plain language of the Settlement, Watson contrived a "gotcha" argument around an alleged partial tender of 400,000 shares in December 2007, together with a "carve out" from his release, which would impose certain indemnification duties on Shea. Watson simply ignored the Settlement and attempted to renegotiate material terms, all the while driving up Shea's legal fees on a matter that was settled on July 10, 2008.

Despite Watson's scheming, Shea has repeatedly made good-faith efforts to resolve the issue and move the parties forward with the Settlement. Shea's efforts are recited at length in the

Statement of Facts above and will not be repeated here. One example will make the point. After the second conference with Judge Gorenstein, and as a result of the subsequent conference call with Watson and his counsel, Shea took the lead on preparing a summary of areas of agreement and a timeline for "closing" the Settlement. (See Watson Ex. L.) As it turns out, Watson had no intention of consummating the Settlement unless Shea acquiesced to his demands for indemnification. Shea made one last-ditch effort to resolve the dispute on August 14. (See Watson Ex. T.) Watson instead elected to file his Motion to Enforce the Settlement, despite his own failure to perform. Accordingly, Watson should be required to pay Shea's attorney's fees for his bad faith in dragging out the Settlement until he could get his way.

## CONCLUSION

For the reasons stated herein, Shea respectfully moves the Court to enforce Shea's understanding of the parties' Settlement, to award Shea sanctions against Watson, including attorney's fees and costs incurred herein, and to deny Watson's motion to enforce the Settlement and for sanctions.

Dated: New York, New York
      August 29, 2008

WILLIAMS MULLEN

By: _____
    Stephen E. Baril (SEB – 2728)
P.O. Box 1320
Richmond, Virginia 23218-1320
804.783.6459
804.783.6507 (FAX)
    - and –
Twomey, Hoppe & Gallanty LLP
757 Third Avenue, 7th Floor
New York, New York 10017
212.688.0400
212.688.1929 (FAX)
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this **29th** day of August, 2008, a true and correct copy of the

foregoing was sent by electronic mail and by Federal Express to:

James E. Davies
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, NY 10271-0079
jdavies@lcbf.com

1649329v1